**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------------------x
                                         :
In re                                    :    Chapter 11
                                         :
UNITED ROAD TOWING, INC. et al.,         :    Case No. 17-10249 (____)
                                         :
                Debtors.¹                :    Joint Administration Requested
                                         :
                                         :
-----------------------------------------------------------------x
```

**DECLARATION OF MICHAEL J. MAHAR IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

Michael J. Mahar declares, pursuant to 28 U.S.C. § 1746, under penalty of

perjury, that the following is true and correct:

1.      I am the Chief Financial Officer of United Road Towing, Inc., a Delaware

limited liability company ("URT"), one of the above-captioned debtors and debtors in possession

(collectively, the "Debtors").  Prior to my roles at URT, I served as an executive of two other

companies, developing significant experience in restructurings and operational turnarounds.  I

am also a Certified Public Accountant.  I have served in various roles at URT since the creation

of the company in 2005 and at the predecessor company, United Road Services, Inc.  In these

---

¹    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: United Road Towing, Inc. (6962); URT Holdings, Inc. (8341); City Towing, Inc. (2118); URS West, Inc. (3518); Bill & Wags, Inc. (3518); Export Enterprises of Massachusetts, Inc. (5689); Pat's Towing, Inc. (6964); Keystone Towing, Inc. (6356); Ross Baker Towing, Inc. (9742); URT Texas, Inc. (3716); Mart Caudle Corporation (1912); Signature Towing, Inc. (3054); WHW Transport, Inc. (3055); URS Southeast, Inc. (7289); URS Northeast, Inc. (7290); URS Southwest, Inc. (7284); Fast Towing, Inc. (5898); E&R Towing and Garage, Inc. (8500); Sunrise Towing, Inc. (7160); Ken Lehman Enterprises, Inc. (1970); United Road Towing of South Florida, Inc. (9186); Rapid Recovery, Inc. (1659); United Road Towing Services, Inc. (2206); Arri Brothers, Inc. (7962); Rancho Del Oro Companies, Inc. (3924); CSCBD, Inc. (2448); URS Leasing, Inc. (9072); UR VMS LLC (4904); UR Vehicle Management Solutions, Inc. (0402).  The Debtors' mailing address is c/o United Road Towing, Inc., 9550 Bormet Drive., Suite 301, Mokena, Illinois 60448.

and my current capacity, I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records.

2.      On the date hereof (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have sought an order directing that their cases be jointly administered for procedural purposes only by this Court.  No trustee, examiner or official committee has been appointed in these cases.

3.      As discussed below, the Debtors' primary objective in commencing these chapter 11 cases is to pursue a prompt sale of their assets in order to maximize value for stakeholders, preserving jobs, minimizing supply disruptions for the Debtors' customers and ensuring an uninterrupted supply chain for the Debtors' vendors.

4.      To minimize the effects of filing for bankruptcy protection on the Debtors' business and employees, and to maximize the possibility these cases are successful, the Debtors have requested various types of "**first day**" relief (collectively, the "First Day Pleadings").[2] Each First Day Pleading seeks relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession in the chapter 11 cases.

5.      I am generally familiar with the contents of each First Day Pleading (including the exhibits thereto) and believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, as well as to avoid immediate and irreparable harm to the Debtors' estates.

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the applicable First Day Pleading.

01:21513022.5

The approval of the First Day Pleadings would assist the Debtors in maximizing the value of their estates and best serves the interests of the Debtors' estates and creditors.

6.    Accordingly, I submit this declaration (the "Declaration") in support of the Debtors' chapter 11 petitions and the relief requested in the First Day Pleadings.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management (without further review of same), my review of relevant documents or information supplied to me by other members of the Debtors' management or professionals (without further review of same), or my opinion based upon my experience, discussions with the Debtors' advisors, and knowledge of the Debtors' operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtors.  I am of sound mind and, if called to testify, I would attest to the facts described herein.

7.    This Declaration is divided into two main sections. Part I contains a discussion of the nature of the Debtors' corporate structure, business operations, prepetition capital structure, and the circumstances leading to the commencement of the chapter 11 cases. Part II contains a brief discussion of the First Day Pleadings filed by the Debtors.

## I.    THE DEBTORS' BUSINESS, CAPITAL STRUCTURE AND CIRCUMSTANCES LEADING TO THE FILING

### A.    The Debtors' Corporate Structure

8.    The Debtors are comprised of twenty nine (29) separate privately-held entities.  URT Holdings, Inc. is the corporate parent of URT, a Delaware corporation which, in turn is the parent (or indirect parent/ "grandparent") of the remaining Debtors as is set forth in the attached **Exhibit A**.

01:21513022.5

B.       **The Debtors' Business**

9.       The Debtors, headquartered in Mokena, Illinois, are a leader in towing, recovery, impound, and vehicle management solutions in both the private and public sector. Through a portfolio of local and regional brands operating across 10 different regions in eight different states, the Debtors dispatch approximately 500,000 tows, manage over 200,000 impounds and sell over 38,000 vehicles annually across the United States.

10.      Formed in 2005, after United Road Services, Inc. divested its towing division, the Debtors experienced rapid growth, opening multiple new operations and making additional acquisitions.  Prior to the 2008 economic crisis, the Debtors, with their mix of commercial and municipal customers, had not been adversely impacted by the general economy, as its services are a necessity for its customers.

11.       However, the economic downturn in 2008 began to impact not just the Debtors' consumers and businesses, but also strained municipal budgets.  Strained municipal budgets lead to budget shrinkage, in turn decreasing the volume of tow service and vehicles available for storage and auction.  The overall decrease in towing volume in all of the Debtors' markets forced the Debtors to divest of their presence in five markets.

12.      In 2014, the Debtors reduced its debt and underwent a change of equity control in a reorganization lead by their second-lien lender, Medley Capital Corporation ("Medley") with the support through a credit facility offered by the Debtors' first-lien lender, Wells Fargo Bank, N.A. ("Wells Fargo").

13.      The Debtors' Leased Facilities.  The Debtors own no real property.  The Debtors' various offices, impound lots, and dispatch locations include the separate facilities, each of which is leased by the Debtors, a described in the attached **Exhibit B**.

14.    <u>The Debtors' Financial Status</u>.  The Debtors' have enjoyed a generally positive financial status for the last two years, with $88.1 million in gross revenue and a $2.8 million EBITDA for 2015 and an estimated $87.6 million in gross revenue and $5.6 million EBITDA in 2016.  Therefore, reasons other than the financial performance of the company lead the Debtors to seek bankruptcy protection, as described further below.

## C.    **Prepetition Capital Structure**

15.    <u>First Lien Debt</u>. The Debtors' first lien secured indebtedness is a $32.250 million senior credit facility pursuant to that certain Credit Agreement dated as of August 21, 2014 (as the same may have been amended, restated, supplemented or modified, and together with any security documents or agreements ancillary thereto, the "<u>First Lien Credit Agreement</u>"), among URT, as borrower and Wells Fargo, as administrative agent and lender (collectively, the "<u>First Lien Lender</u>").  URT Holdings, Inc. and each subsidiary of URT (other than UR Vehicle Management Solutions, Inc.) has guaranteed all of the indebtedness under the First Lien Credit Agreement.  An approximately $4.9 million letter of credit issued  under the First Lien Credit Facility is subject to the  Medley Participation Agreement (as defined in the First Lien Credit Agreement), whereby Medley has agreed to purchase the loans that fund any draw on account of such specified letter of credit.  As of the Petition Date, approximately $13.8 million in revolving loans are outstanding under the First Lien Credit Agreement and approximately $6.1 million in face amount of letters of credit have been issued and remain undrawn.

16.    <u>Second Lien Debt</u>.  The Debtors' secured indebtedness also includes a $17 million second-lien credit facility pursuant to that certain Second Lien Credit Agreement dated as of August 21, 2014 (as the same may have been amended, restated, supplemented or modified, and together with any security documents or agreements ancillary thereto, the "<u>Second Lien Credit Agreement</u>" and with the First Lien Credit Agreement, the "<u>Credit Agreements</u>"), among

URT and Medley as administrative agent and lender (the "Second Lien Lender" and with the First Lien Lender, the "Prepetition Lenders"). URT Holdings, Inc. and each subsidiary of URT (other than UR Vehicle Management Solutions, Inc.) has guaranteed all of the indebtedness under the Second Lien Credit Agreement. As of the Petition Date, approximately $19.365 million in obligations are outstanding under the Second Lien Credit Agreement.

17. Each Debtor (other than UR Vehicle Management Solutions, Inc.) pledged substantially all of their assets to the Prepetition Lenders as security for the obligations under the Credit Agreements.

**D.    Circumstances Leading to the Filing**

18. A number of factors have contributed to the Debtors' determination that chapter 11 filings were necessary:

a. While the Debtors have remained capable of operating an entity with continued growth, they have been limited by a lack of capital for marketing and equipment purchases.

b. There has been a decrease in the price of scrap metal which has adversely impacted the sale prices of unclaimed vehicles in their impound (particularly in Chicago, the Debtors' largest market) and led to a corresponding decrease in the Debtors' net earnings and cash flow.

c. In December 2014, URT commenced suit against certain former executives and the company they formed in a non-compete suit, to which such defendants asserted a cross-complaint (the "Non-Compete Suit"). As a result of significant motion practice and other issues, the Non-Compete Suit generated over $1.2 million of legal expenses prior to trial, and reached a subsequent settlement to be paid by the defendants over thirty months in an

01:21513022.5

amount less than the legal costs incurred.  Thus, though URT resolved the Non-Compete Suit, URT expended significant costs, which such debt continues to be carried by URT today.

        d.      In May 2010, certain of the Debtors were named as defendants in a class action lawsuit in the Nevada District Court in Clark County (the "Class Action Suit"). Following trial, in July 2015, the court found URT liable to the plaintiffs in the amount of $5 million.  To date, no judgment has been entered in the Class Action Suit, and the parties continue to engage in various post-trial motion practice.  A hearing in the Class Action Suit was held on February 2, 2017, and based on the outcome of that hearing, a judgment likely would have been entered the week of February 6, 2017. The Debtors spent many months following the trial attempting to negotiate a resolution with counsel for the plaintiffs.  Ultimately, however, the parties were unable to come to agreement on the settlement of the Class Action Suit.  Although the Debtors generate positive EBITDA, they do not have sufficient free cash flow or access to capital to satisfy a $5 million judgment in the Class Action Suit should judgment ultimately be entered.  If the class action plaintiffs obtain a judgment and begin enforcing remedies against the Debtors' assets, that would cause a severe deterioration in the value of the Debtors' assets. Accordingly, while the issues identified above concerning the general challenges facing the Debtors businesses contributed to the need to file for relief under chapter 11, the primary driver of the need to commence these bankruptcy cases is the unfavorable result in the Class Action Suit and the impending threat of collection action by the plaintiffs.

        19.      In sum, though I believe the efforts to improve the Debtors' operations and finances have been worthwhile and will continue to positively impact the Debtors and their business, they were not enough to avoid the commencement of these bankruptcy cases.

01:21513022.5

20.     Sale Process.  Unable to resolve the Class Action Suit, the Debtors began exploring strategic alternatives to restructuring, including the potential sale of the Debtors' business as a going-concern.  The Debtors engaged SSG Capital Advisors, LLC ("SSG") as investment banker in efforts to explore strategic alternatives and to assist the Debtors with negotiations with interested parties, preparing for and initiating marketing efforts as well as facilitating due diligence by various parties.

21.     The Debtors executed 43 non-disclosure agreements with parties identified by SSG and maintained a dataroom which the Debtors populated with a wide range of information about the Debtors that could be accessed by those parties, and they additionally provided other information (including a confidential information memorandum) to them.  In the two weeks prior to the Petition Date, the Debtors received nine written indications of interest in purchasing the Debtors' assets.[3]  The Debtors are continuing to work with these parties as they continue their due diligence, and the Debtors' management team is actively participating in the sales process, including having provided management presentation to several parties in the days leading up to the commencement of these cases.

22.     As part of their negotiations with Wells Fargo over the terms and conditions of the DIP Facility (as defined below), the Debtors agreed to several milestones related to this sales process.  These include: (a) the Debtors entry into one or more definitive agreements with a "stalking horse" purchaser by February 22, 2017; (b) setting March 22, 2017 as the outside date for establishing a "bid deadline" by which parties will be required to submit bids for the Debtors' assets; and (c) holding an auction for the Debtors' assets (if applicable) by no later than March 27, 2017, with a Court-approval hearing being held no later than March 30,

---

[3]     Ultimately one prospective purchaser withdrew their indication of interest, leaving the net number of interested parties at eight.

2017.  The Debtors will be seeking the Court's approval of a sale and auction process shortly after the Petition Date, which will incorporate these and other milestones contemplated by the DIP Facility.

23.     <u>DIP Loan Negotiations</u>.  The Debtors' concern in the market place and damage being done to the Debtors' business due to the impact of the Class Action Suit dictated that a chapter 11 filing and section 363 sale was the best course of action to maximize value for all stakeholders.

24.     When it became apparent that a chapter 11 filing was possible, the Debtors, with the aid of Getzler Henrich & Associates LLC, SSG, and their proposed bankruptcy counsel, Winston & Strawn LLP, began the process of identifying potential providers of post-petition financing.  The Debtors received term sheets from each of the Prepetition Lenders and negotiated with both to improve the terms ultimately determining to accept the arrangement with Wells Fargo.  The Debtors also communicated with a third potential DIP lender who did not provide a term sheet but did express that it would require terms valued at approximately $1 million less favorable to the Debtors than proposed by Wells Fargo.  Based on the likelihood of a similar position from other third party lenders and the current status of the Debtors' leverage, I do not believe other third party lenders would provide terms better than those provided by Wells Fargo, and therefore, did not solicit further DIP lending proposals.

25.     After the Debtors determined to proceeds with the DIP Facility proposed by the DIP Lenders, the Debtors, with the assistance of their Delaware bankruptcy counsel, Young Conaway Stargatt & Taylor, LLP, engaged in further negotiation over the documentation of the DIP Financing Agreements, as well as the economic terms, including the fees associated with the DIP Facility (which were further reduced during these negotiations), the proposed

budget under which the Debtors would conduct the Chapter 11 Cases, and the approximately $2.5 million in "new money" availability (which is being provided over the amount that could be borrowed pursuant to the borrowing base established under the First Lien Credit Agreement) that the Debtors will obtain under the DIP Facility.

26.    As a result of the foregoing developments, the Debtors have filed (a) their bankruptcy petitions and (b) the First Day Pleadings relating to relief needed in connection with these bankruptcy filings.

27.    The Debtors intend to maintain their operations, to the extent possible, on a "business as usual" basis during the pendency of these chapter 11 cases while they seek to sell their assets in a manner which maximizes value for their stakeholders. The Debtors believe the filing of their bankruptcy petitions, the relief the Debtors request in their First Day Pleadings and the availability of post-petition financing will aid the Debtors' operations and assuage the fears of their vendors and customers regarding the Debtors' ongoing operations.

## II.    FIRST DAY MOTIONS AND OTHER PLEADINGS[4]

28.    To minimize the adverse effects of the commencement of their chapter 11 cases on their business and employees, the Debtors have requested various types of relief in their First Day Pleadings, all of which are being filed concurrently with this Declaration. I believe that the relief requested in each of the First Day Pleadings is necessary, appropriate, and is in the best interest of the Debtors' estates, creditors and other parties in interest.

29.    I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto), and the facts set forth in the First Day Pleadings are true and correct to the best of my knowledge.  If I were called upon to testify, I could and would, based

---

[4]    Unless otherwise defined herein, capitalized terms used in describing each First Day Pleading shall have the meaning ascribed to in the applicable First Day Pleading.

on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings. That testimony would establish that the failure to receive the relief requested by the First Day Pleadings would have a deleterious effect on the Debtors' operations and value.

## Administrative Motions

### Debtors' Motion for an Order Authorizing Joint Administration of Their Chapter 11 Cases Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1

30.    Many of the motions, applications, hearings and orders that will arise in these chapter 11 cases will jointly affect all of the Debtors.  For this reason, I believe that the interests of the Debtors, their creditors and other parties in interest would be best served by the joint administration of these chapter 11 cases for procedural purposes only, under the case number assigned to URT.  I believe that joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, I believe that the relief requested by this motion will also simplify supervision of the administrative aspects of these cases by the United States Trustee (the "U.S. Trustee"). For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

### Application of Debtors for Order Authorizing Appointment of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date

31.    The Debtors request entry of an order appointing Rust Consulting/Omni Bankruptcy ("Rust/Omni") as the Claims and Noticing Agent for the Debtors and their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases. It is my understanding that the Debtors' selection of Rust/Omni to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents*

01:21513022.5

*under 28 U. S. C. § 156(c)*, in that the Debtors, with the assistance of their advisors, have

obtained and reviewed engagement proposals from at least two other court-approved claims and

noticing agents to ensure selection through a competitive process.  Moreover, I submit, based on

all engagement proposals obtained and reviewed, that Rust/Omni's rates are competitive and

reasonable given Rust/Omni's quality of services and expertise.

32.     Although the Debtors have not yet filed their schedules of assets and

liabilities, they anticipate that there will be well in excess of 1,000 entities to be noticed.  In view

of the number of anticipated claimants and the complexity of the Debtors' businesses, the

Debtors submit that the appointment of a claims and noticing agent is required by Local Rule

2002-1(f) and is otherwise in the best interests of both the Debtors' estates and their creditors.

### Operations Motions

**Debtors' Motion for an Order (I) Approving Cash Management System; (II) Authorizing Use of Prepetition Bank Accounts and Business Forms; and (III) Waiving the Requirements of  11 U.S.C. § 345(b) on an Interim Basis (the "Cash Management Motion")**

33.     Pursuant to the Cash Management Motion, the Debtors' seek the Court's

approval, *inter alia*, to maintain their Treasury System.  The Treasury System constitutes an

essential business practice and is substantially similar to systems currently utilized by

comparable corporate enterprises.  The bank accounts (collectively, the "Bank Accounts")

through which the Treasury System is operated are part of a company-wide accounting and cash

concentration and disbursement system used by the Debtors.

34.     The Debtors maintain the majority of their Bank Accounts with Wells

Fargo, including:

- "Collection Accounts."  The Debtors have 11 Collection Accounts.  These accounts are associated with specific locations and are used to collect payments by cash or check and receive deposits of credit and debit card transactions for each location. These are depository accounts only.

01:21513022.5

- "Main Depository Account."  All of the funds in the Collection Accounts are swept into this account on a daily basis.  This is a depository account only and, historically, has been swept by Wells Fargo on a daily-basis to reduce outstanding obligations owed to Wells Fargo on account of the pre-petition first lien revolving credit facility (the "Prepetition ABL Credit Agreement").  The Debtors' proposed debtor-in-possession financing facility (the "DIP Facility") and related adequate protection package provides that the funds in the Main Depository Account will continue to be swept and paid to reduce the obligations under the Prepetition ABL Credit Agreement under a "creeping roll-up" until such amounts are satisfied in full and, then, will be swept to pay-down amounts outstanding under the DIP Facility.

- "Master Operating Account."  This account is the Debtors' master operating account into which most of the Debtors' cash is concentrated.  It is used to fund all of the Debtors' expenses through three disbursement accounts (collectively, the "Disbursement Accounts").  Historically, the Master Operating Account has been funded by revolving loans made under the Prepetition ABL Credit Agreement, and the Debtors anticipate that after the Petition Date the proceeds of the DIP Facility will be funded into the Master Operating Account.

- "A/P Disbursement Account."  This account is a zero balance account (ZBA) linked to the Master Operating Account.  [All electronic payments issued from the Debtors' accounts payable system are drawn on this account, other than Advance Charges (as defined below).]

- "Manual Checks Disbursement Account."  This account is a ZBA linked to the Master Operating Account.  [All manual checks issued from the Debtors' accounts payable system are drawn on this account, other than Advance Charges (as defined below).]

- "Advance Payment Disbursement Account."  This account is a ZBA linked to the Master Operating Account.  It is used to pay charges that the Debtors have agreed to advance for certain of their customers, mainly insurance salvage companies, associated with relocating cars between third-party operated facilities (collectively, the "Advance Payments").  For example, the Debtors may be asked to transport a vehicle from an initial tow storage yard to the customer's storage yard, and the Debtors may be required to make an advance cash payment on behalf of their customer as condition to release of the vehicle from the first body shop.

- "San Antonio Account."  This account is a stand-alone account held by United Road Towing, Inc. for its San Antonio operations.  It is not electronically linked to any other Bank Account, and the funds in the San Antonio Account are collected from impound operations and disbursed (i) weekly to the city of San Antonio for its share of the impound charges collected, and (ii) weekly to the Main Depository Account for the Debtors' share of such charges.

01:21513022.5

35.     Additionally, the Debtors maintain four local accounts one with Wells Fargo, two with Fifth Third Bank, and one with Bank of America (collectively, the "Banks"). These accounts are used by the Debtors for petty cash reimbursement and to get the cash needed for Advance Payments in locations without a Wells Fargo presence.  To obtain cash for Advance Payments, the Debtors write checks drawn on the Advance Payment Disbursement Account and deposit the checks in the Local Advance Payment Accounts.  In the aggregate, the Local Accounts do not exceed $100,000 in deposits at any time.

36.     Finally, the Debtors use Clearent Intelligence Processing ("Clearent") and ClearPay Financial Solutions for their credit/debit card processing.  Through Clearent, payments made to the Debtors via credit or debit card are deposited into the Collection Accounts.  Charges that are settled one day are deposited into the Collection Accounts the following business day. The Debtors are charged once per month from the Master Operating Account for credit/debit card processing fees (collectively, the "Credit Card Processing Fees"), which amounts have averaged $40,000 per month and are typically debited on the fourth business day of each month. Given the timing of the filing of these cases, I believe it is possible that the amount owed for the month of January is not debited prior to the Petition Date, and the Debtors will owe amounts for credit card transactions occurring in the month of February prior to the commencement of these cases.

37.     The Debtors also conduct certain Intercompany Transactions regularly, netting said transactions and posting the balance on a monthly basis.  The Intercompany Transactions reduce the administrative costs incurred by the Debtors.  If the Intercompany Transactions were to be discontinued, the Treasury System and related administrative controls would be disrupted.

38.     I submit that cause exists for allowing the Debtors to maintain their cash within the Treasury System without meeting the bond requirements of Bankruptcy Code section 345(b), including the authorization of the Debtors to pay prepetition credit card processing fees, and permit continued use of intercompany transactions between the Debtors.

**Debtors' Motion for an Order, Pursuant to Bankruptcy Code Sections 105(a), 363(b), 503(b), 507(a)(4), and 507(a)(8), and Bankruptcy Rules 6003 and 6004, (A) Authorizing the Debtors to (I) Pay Certain Employee Compensation and Benefits and (II) Maintain and Continue Such Benefits and Other Employee-Related Programs and  (B) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Employee Wages and Benefits Motion")**

39.     As of the Petition Date, the Debtors employed approximately 725 employees and independent contractors (collectively, the "Employees") based in the Debtors' facilities across the country.  Of those Employees, approximately 93 are salaried (including certain additional compensation including commissions, paid time off and the like), approximately 345 are paid hourly, 232 are paid commissions (primarily drivers), and 55 are employed as independent contractors paid on a commission basis.

40.     The Debtors depend on their employees to oversee virtually every aspect of their businesses.  The Debtors' ability to operate their business depends on the continued loyalty and morale of their Employees and Independent Contractors, as well as their specialty training and skills.  As a specialty business that includes transportation, any delay in the processing of regular wage or benefits payments to the Employees and Independent Contractors would cause the Debtors and their business irreparable harm.  Put simply, a significant unplanned loss of Employees and Independent Contractors would substantially diminish the Debtors' value as a going concern.

41.     By the Employee Wages and Benefits Motion, the Debtors seek entry of (i) an order (a) authorizing, but not directing, the Debtors, in their sole discretion and in the

exercise of their business judgment, as deemed necessary to continue to operate and preserve value, to pay certain prepetition wage, staffing and independent contractor obligations, payroll taxes and deductions, certain fringe benefits, certain expense reimbursements, employee health and welfare benefits, and the 401(k) Plan (collectively, the "Employee Obligations"), as well as all costs incident to the foregoing, and to continue to honor their practices, programs and policies for their employees as those practices, programs and policies were in effect as of the Petition Date and as such practice, programs and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' business; and (b) directing all financial institutions to receive, honor, process, and pay any and all checks and wire transfers drawn on the Debtors' accounts in satisfaction of the Employee Obligations, and (ii) entry of a supplemental order authorizing, but not directing, the Debtors to remit certain cash compensation-related payments to non-insider employees (including and independent contractors) to the extent such payments are in excess of the $12,850 priority cap established by section 507(a)(4) of the Bankruptcy.

42.     The Wage Obligations consist of prepetition amount due to employees, including wages, salaries, overtime, paid time-off, commissions, and independent contractor obligations.  With respect to payroll taxes and deductions, the Debtors are required by law to withhold from an employee's wages amount related to federal, state and local income taxes, and social security and Medicare taxes and to remit the same to the appropriate taxing authority.  The Debtors are also required to make certain payments from their own funds on account of social security and Medicare taxes and to pay the relevant taxing authorities.  Additionally, the Debtors arrange for the withdrawal of amounts for garnishments and other pre-tax and after-tax deductions.

01:21513022.5

43.     The Debtors provide employees with standard fringe benefits, including without limitation, vacation pay, holiday pay, bereavement leave pay, and jury duty pay.  The Debtors' reimburse employees for various expenses in the discharge of their duties, including expense for traveling, gas, lodging, and meals both directly and through the use of a Corporate Card Program.  The Debtors' employees are also provided with a standard range of health, dental, disability and other health and welfare benefits.

44.     As of the Petition Date, the Debtors estimate that the Prepetition Employee Obligations do not exceed $12,850 with respect to any single employee or independent contractor.  Accordingly, the Debtors request entry of an order, authorizing, but not directing, the Debtors to pay Prepetition Employee obligations in an aggregate amount not to exceed $12,850 per employee.  To the extent necessary, the Debtors also request entry of a supplemental order authorizing, but not directing, the Debtors to remit certain cash compensation-related payments to non-insider employees (including and independent contractors) as and to the extent such payments ultimately are determined to exceed the aforementioned $12,850 priority cap.

45.     The success of these Cases depends on the retention and cooperation of the Debtors' employees.  Any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the employees' morale, dedication, confidence, and cooperation and would adversely impact the Debtors' relationship with their employees. At this early stage, the Debtors simply cannot risk the substantial damage and potential value destruction to their businesses that would inevitably follow as a result of any trained and knowledgeable employee seeking employment elsewhere.  Consequently, it is critical that the Debtors be authorized to

01:21513022.5

satisfy their Employee Obligations and continue their ordinary course employee benefits obligations in effect as of the Petition Date.

46.    Moreover, if the checks issued and fund transfers requested in payment of the Employee Obligations are dishonored, or if such Employee Obligations are not timely paid during the post-petition period, the Debtors' employees could suffer extreme personal hardship, including, in some instances, being unable to pay their daily living expenses. It would also be inequitable to require the Debtors' employees to bear personally the cost of any business expenses they incurred prepetition, for the benefit of the Debtors, with the understanding that they would be reimbursed.

47.    Accordingly, I believe that payment of all prepetition Employee Obligations in accordance with the Debtors' prepetition business practices will enable the Debtors to retain qualified employees and independent contractors and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**Motion of Debtors for Order Authorizing (I) Payment of Prepetition Obligations Incurred in the Ordinary Court of Business in Connection with Liability, Property, and Other Insurance Programs, Including Payment of Policy Premiums and (II) Continuation of Insurance Premium Financing Programs (the "Insurance Motion")**

48.    In the ordinary course of their businesses, the Debtors maintain numerous insurance policies that provide coverage for, among other things, property, casualty, directors and officers liability, workers compensation and other insurance programs (collectively, the "Insurance Programs"), as summarized in the motion. The Insurance Programs are essential to the preservation of the Debtors' businesses, properties, and assets, and in many cases coverage is required by various laws and contracts that govern the Debtors' business conduct. Furthermore, I am informed that the Guidelines of the Office of the U.S. Trustee for the District of Delaware, which were promulgated in 1996, require debtors to maintain insurance coverage throughout

these chapter 11 cases.  The Insurance Programs include coverage from third-party insurance carriers (the "Insurance Policies") for the Debtors' Insurance Programs.  Pursuant to the Insurance Motion, the Debtors seek authority to maintain their Insurance Programs post-petition.

49.    I submit that absent the relief requested in the motion, the Debtors would be required to obtain replacement insurance on an expedited basis and at significant cost to the estates.

50.    Further, failing to maintain current insurance and related benefits would have a negative effect on the morale of the Debtors' employees at a time when the support of such employees is most critical.  Without the support of their workforce, the Debtors' operations would be severely impaired.  On the other hand, continuation of these programs will facilitate the Debtors' reorganization efforts by creating a morale boosting sense of "**business as usual.**"

51.    Any prepetition amounts that the Debtors may pay in respect of the Insurance Obligations are extremely small in light of the size of the Debtors' estates and benefits to be derived therefrom.  Thus, I submit that the continuation of the Insurance Policies and the payment of all prepetition and Post-Petition Insurance Obligations arising thereunder are essential to preserve the Debtors' assets and protect against unknowable losses.

52.    Furthermore, it is essential that the relief requested in the motion be granted expeditiously considering the necessity of keeping appropriate insurance coverage in place and the potential adverse consequences to the Debtors.

53.    To summarize, if the Debtors cannot continue those programs and ensure that any Insurance Obligations in respect of those programs will be paid in the ordinary course of business, the Debtors could face severe consequences for failure to comply with applicable state laws and risk a loss of value in their business operations, including, among other things,

01:21513022.5

-19-

potentially significant litigation exposure and increased costs for alternative arrangements for workers' compensation coverage. For the foregoing reasons, I believe it is vital that the relief requested in the Insurance Motion be granted.

**Debtors' Motion For Interim and Final Orders, Pursuant to Section 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate <u>Assurance of Payment (the "Utilities Motion")</u>**

54.     In the ordinary course of business and in connection with the management of their properties and operation of their businesses, the Debtors obtain electricity, gas, trash collection, water, telephone services and/or other similar services (collectively, the "<u>Utility Services</u>") from a number of utility companies (collectively, the "<u>Utility Providers</u>"). The Debtors estimate that in 2016, they paid approximately $1.3 million to the Utility Providers for Utility Services rendered before the Petition Date.

55.     The Debtors' access to uninterrupted Utility Services is essential to their ongoing operations and to their reorganization efforts. Should a Utility Provider refuse or discontinue Utility Services, even for a brief period, the Debtors' business operations could be severely disrupted. If such disruption occurred, the impact on the Debtors' business operations and revenue would be extremely harmful and would jeopardize the Debtors' reorganization efforts. It is therefore critical that the Utility Services continue uninterrupted.

56.     To ensure uninterrupted Utility Services, pursuant to the Utilities Motion, the Debtors are seeking approval to provide to each Utility Provider security equal to the Debtors' estimate of two weeks' worth of utility fees by depositing such sums in a segregated account plus the Debtors' demonstrated ability to pay for future utility services in the ordinary course of business (together, the "<u>Proposed Adequate Assurance</u>"), as set forth in greater detail in the Utilities Motion.

01:21513022.5

57.     Notwithstanding my belief that the Proposed Adequate Assurance will provide the Utility Providers with adequate assurance of future payment in these chapter 11 cases, the Debtors have proposed the Procedures as a reasonable procedure for the Utility Providers to request additional adequate assurance under any unique facts and circumstances that may exist. I believe that separate negotiations with each of the Utility Providers with respect to adequate assurance would be time-consuming and unnecessarily divert the Debtors' personnel from other critical tasks related to the operation of their business and the restructuring.  This is especially true during the first days of these chapter 11 cases.  If the Debtors fail to reach early agreement with each Utility Provider, they would have to file motions seeking expedited determinations as to adequate assurance or risk service termination.

**Debtors' Motion for an Order Pursuant to Sections 105(a), 363(b), 507(a)(8), and 541 of the Bankruptcy Code Authorizing (I) Payment of Certain Prepetition Taxes and (II) Financial Institutions to Honor and Process  Cash Related Checks and Transfers (the "<u>Taxes Motion</u>")**

58.     Pursuant to the Taxes Motion, the Debtors are requesting authority to pay certain prepetition property and use taxes, and other personal liability and/or trust fund taxes for licenses, permits, and other similar charges and assessments owed to various taxing, licensing, and other governmental authorities, as they arise after the Petition Date.

59.     In the ordinary course of business, the Debtors incur and/or collect certain taxes and fees and remit same to the applicable authorities.  Continuing this practice is vital to the Debtors' operations.  Failing to do so could cause the applicable authorities to file liens or seek to lift the automatic stay or take severe action against the Debtors' directors and officers for unpaid taxes, which would take those persons' attention away from working on the Debtors' restructuring.

01:21513022.5

60.      I have been informed that, as of the Petition Date, the Debtors' estimate of prepetition liabilities owing to the various taxing authorities will not exceed approximately $500,000 exclusive of any Taxes that may have been paid prior to the Petition Date but had not cleared as of the Petition Date.  I believe it is likely that the failure to satisfy prepetition taxes will have a detrimental effect on the Debtors' operations and these chapter 11 cases, as I have been informed that the failure to pay these amounts could lead to taxing authorities auditing the Debtors and, in certain cases, personal liability for the Debtors' insiders.

61.      Thus, to prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**Motion of Debtors for Entry of Interim and Final Orders Authorizing (i) The Debtors to Continue and Renew Surety Bond Program and (ii) Financial Institutions to Honor and Process Related Checks and Transfers (the "Surety Motion")**

62.      The Debtors seek entry of interim and final orders authorizing (a) the Debtors to maintain, continue and renew, in their sole discretion, their Surety Bond Program on an uninterrupted basis and in accordance with the same practices and procedures, including, but not limited to, the maintenance of existing collateral, as were in effect before the Petition Date and (b) financial institutions to receive, process, honor and pay related checks or wire transfers. This authority would include permitting, but not requiring, the Debtors (a) to pay all amounts arising under the Surety Bond Program due and payable after the Petition Date and (b) to renew or obtain new surety bonds as needed, including, but not limited to, as may be required by law or judicial authority, without further notice or order of the Court.

63.      In the ordinary course of their businesses, the Debtors are required, pursuant to state and federal law, to provide surety bonds to third parties to secure the Debtors'

payment or performance of certain other obligations, including obligations owed to state or federal agencies, contractual obligations, and obligations required by law. Failure to provide, maintain and timely replace these surety bonds would jeopardize the Debtors' ability to continue its transportation and towing operations.

64. I believe that the relief requested in the Surety Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that relief requested in the Surety Motion should be granted.

**Debtors' Motion for Entry of Interim and Final Orders Authorizing The Debtors to Pay Prepetition Claims of Certain Critical Vendors (the "Critical Vendors Motion")**

65. The Debtors have long standing relationships with many of their primary vendors, certain of whom are the sole or one of only a few municipality-approved vendors to work under the Debtors many municipal contracts. I anticipate that certain vendors will be reluctant to do business with the Debtors absent prompt payment in full of their pre-petition claims. Certain of these vendors (the "Critical Vendors"), particularly those who supply the Debtors with fuel, lubricant, oil, tires, party, repairs, dispatching services, referrals to towing opportunities, and backstop towing services are vital to the Debtors' ongoing operations and the success of these cases. In determining which vendors are Critical Vendors, the Debtors considered, among others, the following criteria:

- whether a particular vendor is a sole source supplier or service provider, including whether the Debtors' selection of a vendor is limited to those approved by municipalities serving as the Debtors' customers;

- whether the services provided by the vendor are so vital, or the vendors' operations are so commingled with the Debtors' business, that even the briefest disruption would cause significant harm to the Debtors' operations;

01:21513022.5

- whether the Debtors would be unable to obtain comparable products or services from alternative sources on a cost-effective basis within a reasonable timeframe;

- whether the Debtors inventory levels or service coverage is sufficient to meet customer demands while an alternative vendor is located;

- whether a vendor meeting the foregoing criteria is able or likely to refuse providing essential products or services to the Debtors if their prepetition balances are not paid; and

- whether the business relationship between the Debtors and the supplier is governed by a contract and the relative relationship between the amount owed to the vendor and the costs the Debtors would incur if the vendor ceased performance due to non-payment and the Debtors had to take an enforcement action against the vendor.

66.    Accordingly, in the Critical Vendor Motion, the Debtors request authorization to pay the pre-petition fixed, liquidated, and undisputed claims of Critical Vendors (the "Critical Vendor Claims"), because payment of such claims is necessary to achieve their chapter 11 objectives and preserve value for their various constituencies.

67.    The Debtors also seek authority to continue making payments under its advance programs with certain of the Debtors' customers.  In addition to towing services, the Debtors supply certain of their largest customers with services intended to assist in the sale of impounded cars on the auction market.  Specifically, the Debtors retrieve vehicles stored at third-party locations (impound lots or body shops), advancing Debtor funds ("Advanced Payments") to ensure the release of such vehicles to the Debtors, and transport of same to the customer's insurance auto auctions for sale (the "Advanced Payment Program").  It is upon delivery of such vehicles to auction that the customer reimburses the Advanced Payments made by the Debtors. Thus, under the Advanced Payment Program, all such Debtor-advanced payments are ultimately reimbursed in full.

68.    The Debtors make Advanced Payments under the Advance Payment Program every day, and making such Advanced Payments are made in the ordinary course of the Debtors' business.  This service is provided to certain of the Debtors' largest customers, and

disruption of such services could certainly lead to the souring or even loss of certain customer relationships essential to the Debtors' continuing operations as a going concern.

69.     The Debtors will attempt to condition the payment of individual Critical Vendor Claims on the agreement of the Critical Vendor to continue supplying goods and/or services to the Debtors on the same trade terms that, or better trade terms than, such Critical Vendors offered the Debtors immediately prior to the Petition Date or, if more favorable, within the 120 day period prior to the Petition Date, or pursuant to such other trade practices and programs that are favorable to the Debtors.  In the Critical Vendor Motion, the Debtors seek to reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim or to make payment without obtaining trade terms where the Debtors determine that such payment is necessary to avoid immediate and irreparable harm and in the best interest of their estates.

70.     To prevent immediate and irreparable harm to the Debtors' business, I believe that the relief requested in the Critical Vendors Motion—including payment of Critical Vendor Claims and authorization to continue making Advanced Payments under the Advanced Payment Program—is in the best interests of the Debtors' estates, their creditors and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be approved.

**Motion For Interim and Final Orders Authorizing the Debtors to Obtain Senior Secured Superpriority Post-Petition Financing and Utilize Cash Collateral (the "DIP Motion")**

71.     By the DIP Motion, the Debtors seek entry of interim and final orders: (i) authorizing the Debtors to obtain the DIP Financing on a senior secured superpriority basis; (ii) authorizing use of cash collateral ("Cash Collateral"); (iii) granting priming liens, priority liens,

and superpriority claims to the DIP Lenders (as defined in the motion); (iv) granting adequate protection; and (v) granting related relief.

72.     Specifically, the Debtors have negotiated the DIP Facility to be provided by Wells Fargo that will provide the Debtors with an additional $2.5 million in availability.  The DIP Facility is structured as a revolving credit facility and is being provided on substantially the same economic terms as the First Lien Credit Agreement, including a similar interest rate and borrowing base but with an incremental $2.5 million of post-petition availability above what would otherwise be permitted under the borrowing base established under the First Lien Credit Agreement (subject to certain reserves customary for financings of this type, including with respect to obligations outstanding under the First Lien Credit Agreement).

73.     Additionally, the Debtors have been able to negotiate with the DIP Lenders on an Approved Budget, and corresponding availability, that will allow the Debtors the liquidity necessary to meet their post-petition obligation and to preserve and maintain the value of their business as they pursue a section 363 sale process.  The financing under the DIP Facility, and use of Cash Collateral, will be essential to preserving and maximizing the value of the Debtors' estates. Finally, and as discussed above, the DIP Facility resulted from negotiations with both of the Debtors' existing secured lenders, as well as outreach to third-party financing sources, and represents what the Debtors believe is the best available financing in these Chapter 11 cases.  For these reasons, the Debtors' management believes that the DIP Facility will benefit all parties in interest and should be approved; failing to obtain postpetition financing would impair (if not absolutely prevent) the Debtors' efforts to maximize value.

74.     The DIP Financing Agreements and Interim DIP Order (collectively, the "DIP Documents") are the result of extensive negotiations with Wells Fargo, conducted in good

faith and at arm's length.  The Debtors and their advisors believe that the proposed DIP Facility is the only viable option available to the Debtors, and the Debtors have therefore negotiated to obtain the DIP Facility on the best and most realistic terms available.  The circumstances of these Chapter 11 Cases necessitate financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Facility offered by Wells Fargo reflects the sound exercise of the Debtors' business judgment.

75.     The Debtors have been and are unable to obtain sufficient and otherwise viable financing without granting priming liens pursuant to section 364(d) of the Bankruptcy Code.   Specifically, none of the alternative proposals they received that contemplated postpetition financing on an unsecured or non-consensual priming basis or on a priority junior to that of the Prepetition Lenders would have provided the Debtors with sufficient liquidity to fund these chapter 11 cases.   Accordingly, the Debtors propose to obtain the DIP Facility by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2), (3), and (d) of the Bankruptcy Code.

76.     The Debtors also require the use of Cash Collateral to ensure that they have the liquidity necessary to fund their ordinary course business operations and the administration of these chapter 11 cases while effectuating the sale of substantially all of their assets.  Without the ability to use Cash Collateral, the Debtors' liquidity needs would not be satisfied, jeopardizing the Debtors' ability to conduct an efficient and effective sale process in accordance with the timeline set forth in the DIP Documents.  Thus, the use of Cash Collateral is imperative to the success of these chapter 11 cases.

77.     Approval of the DIP Facility and the use of Cash Collateral will provide immediate access to capital that is needed to, among other things, pay employees and vendors

while minimizing disruptions to day-to-day businesses, thereby preserving and maximizing the value of the Debtors' estates.  Absent the DIP Facility, the Debtors' operations would come to a halt, resulting in irreparable harm to their businesses and their going-concern value.

78.    Finally, each of the Prepetition Agents, Prepetition Secured Lenders, DIP Agent and DIP Lenders have all engaged in arms'-length and good faith negotiations with the Debtors regarding the terms of the DIP Facility and Interim Order.

79.    Accordingly, for these reasons, I believe that the relief requested in the DIP Motion is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

*[remainder of page intentionally left blank]*

01:21513022.5

81.     I declare under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated:  February 6, 2017                    */s/ Michael J. Mahar*_____
Wilmington, Delaware                      Name: Michael J. Mahar
                                          Title:   Chief Financial Officer

01:21513022.5

# EXHIBIT A
## Corporate Organizational Chart



**EXHIBIT B: Debtors' Leases**

| Lease Name/Lessor | Address | Debtor/Lessee | Lease Guarantor(s) (if any) | Description of Location and Debtors' Use |
|---|---|---|---|---|
| Laraway Center LLC | 9550 Bormet Drive Suite 301 Mokena, IL 60448 | United Road Services, Inc d/b/a United Road Transportation Services | | Debtors' headquarters and includes corporate offices. |
| L. Williamand Muriel Goldojarb 1988 Revocable Trust | 3328 Losee Road Las Vegas, NV 89030 | United Road Towing, Inc. d/b/a Quality Towing & SST Towing of Las Vegas | | Property includes impound lots, offices, dispatch |
| Garvin W. Robertson & Rita L. Robertson | 1516 S. Bon View Avenue Ontario, CA 91761 | United Road Towing, Inc | | Property includes impound lots, offices, dispatch |
| 50 Mystic Avenue, LLC | 50 Mystic Ave. Medford, MA  02155 | Export Enterprises of Massachusetts, Inc | | Property includes impound lots, offices, dispatch |
| City of San Antonio | 3625 Growdon Road San Antonio, TX 78227 | United Road Towing, Inc | | Property includes impound lots, offices, dispatch |
| Metropolitan Government of Nashville | 1201 Freightliner Drive Nashville, TN 37210 | UR Vehicle Management Solutions Inc. | | Property includes impound lots, offices, dispatch. |
| State of Texas acting through the Texas Department of Transportation | 3500 NW Loop 410 San Antonio, TX  78229 | Untied Road Vehicle Management Solutions | | Property includes offices and dispatch. |
| 4100 Cheyenne, LLC | 4100 E. Cheyenne Las Vegas, NV 89115 | City Towing Inc. d/b/a Quality Towing | | Property includes impound lots, offices, dispatch |
| Ammon Properties, LLC | 2024 Losee Road North Las Vegas, NV 89030 | City Towing, Inc. | | Property includes impound lots, offices, dispatch |
| Victoria Lynne O'Connor-Boden | 415 E. Commercial Street Pomona, CA 91767 | United Road Towing, Inc. | | Property includes impound lots, offices, dispatch |
| Paul Beagle and Adelle Beagle | 945 W. Brockton Avenue Redlands, CA 92374 | URS West, Inc | | Property includes impound lots, offices, dispatch |
| The Berry Trust | 404 E. Monterey Pomona, CA  91767 | United Road Towing, Inc. | | Property includes impound lots, offices, dispatch |
| 142 Mystic, Inc | 142-148 Mystic Ave. Medford, MA  02155 | Pat's Towing, Inc | United Road Towing , Inc | Property includes impound lots, offices, dispatch |
| Broadway Investments, Inc | 503 A Medford St. Somerville, MA  02143 | United Road Towing, Inc dba Pat's Towing Inc. | | Property includes impound lots, offices, dispatch. |
| Building Number Sixteen, | 7817 Woodley Ave. | United Road Towing, Inc. | | Property includes impound |

1

| Lease Name/Lessor | Address | Debtor/Lessee | Lease Guarantor(s) (if any) | Description of Location and Debtors' Use |
|---|---|---|---|---|
| LLC and Industrial Number Sixteen, LLC | Van Nuys, CA  91406 | | | lots, offices, dispatch |
| Parcel D, LLC and Industrial Parcel D, LLC | 7877 Woodley Ave. Van Nuys, CA  91406 | United Road Towing, Inc. | | Property includes impound lots, offices, dispatch |
| Building Number Twenty-Six, LLC | 16345-B  Raymer Van Nuys, CA  91406 | United Road Towing, Inc. | | Property includes impound lots, offices, dispatch |
| Building Number Twenty-Six, LLC | 16139 Stagg Street Van Nuys, CA  91406 | United Road Towing, Inc. | | Property includes impound lots, offices, dispatch |
| Gregory R and Lisa K Baker Trs of the Baker Trust | 8750 Vanalden Ave. Northridge, CA  91324 | United Road Towing LLC | | Property includes impound lots, offices, dispatch |
| Gregory R and Lisa K Baker Trs of the Baker Trust | 12025 Branford St. Sun Valley, CA  91352 | United Road Towing LLC | | Property includes impound lots, offices, dispatch |
| Tuch Metals | 8756 Vanalden Ave. Northridge, CA  91324 | Ross Baker Towing Inc. | | Property includes impound lots, offices, dispatch |
| Joseph S. Perry and Cynthia L. Perry | 32170 N. Castaic Castaic, CA | Ross Baker Towing Inc. | | Property includes impound lots, offices, dispatch |
| AKAC Properties, LLC | 11239 Goodnight Lane Dallas, TX  75229 | Mart-Caudle Corporation | | Property includes impound lots, offices, dispatch |
| LBJ Concourse Office Partner, LP | 6310 LBJ Freeway Dallas, TX  75229 | Signature Towing, Inc | | Property includes impound lots, offices, dispatch |
| AKAC Properties, LLC | 11240 Goodnight Lane Dallas, TX  75229 | Mart-Caudle Corporation | | Property includes impound lots, offices, dispatch |
| AKAC Properties, LLC | 11229 Goodnight Lane Dallas, TX  75229 | Mart-Caudle Corporation | | Property includes impound lots, offices, dispatch. |
| Municipal Investor Group, LP | 1204 Municipal Drive Plano, TX  75074 | Signature Towing Inc. | | Property includes impound lots, offices, dispatch |
| John and Sharon Lewis | 903 J Place Plano, TX  75074 | Signature Towing, Inc. | | Property includes impound lots, offices, dispatch |
| SWG Properties, LLC | 2557 S. Riverside Drive Fort Worth, TX  76104 | WHW Transport, Inc | | Property includes impound lots, offices, dispatch |
| The Corcoran Family Trust | 16325 S. Crawford Markham, IL  60428 | E&R Towing Garage, Inc | | Property includes impound lots, offices, dispatch. |
| The Corcoran Family Trust | 16401 S. Crawford Markham, IL  60428 | E&R Towing Garage, Inc | | Property includes impound lots, offices, dispatch. |
| Cynthia J. Maiorano | 129 – 131 N. Halsted Chicago Heights, IL  60411 | E&R Towing Garage, Inc | | Property includes impound lots, offices, dispatch |

| Lease Name/Lessor | Address | Debtor/Lessee | Lease Guarantor(s) (if any) | Description of Location and Debtors' Use |
|---|---|---|---|---|
| The Corcoran Family Trust | 16327 S. Crawford Markham, IL  60428 | E&R Towing Garage, Inc | | Property includes impound lots, offices, dispatch |
| Lucky Star Properties LLC | 16350 S. Crawford Markham, IL  60428 | E&R Towing, Inc | | Property includes impound lots, offices, dispatch |
| Daniel P. Lagone and Cynthia A. Lagone | 350 W. 194 Street Glenwood, IL 60425 | United Road Towing, Inc. Dba X-Pert Towing | | Property includes impound lots, offices, dispatch. |
| Challenge Investment Group, LLC | 340A Industrial Dr. Aurora, IL  60505 | E&R Towing, Inc | | Property includes impound lots, offices, dispatch. |
| Brian Boomsma and Pete Lindemulder | 10823 S. Langley Chicago, IL | E&R Towing Garage | | Property includes impound lots, offices, dispatch. |
| Jared Gruett and Pete Olson | 4360 N. Lyndale Ave. Minneapolis, MN  55412 | United Road Towing Inc | | Property includes impound lots, offices, dispatch. |
| Jared Gruett | 14 East Acker St. St. Paul, MN 55117 | United Road Towing Inc | | Property includes impound lots, offices, dispatch. |
| Pete Olson and Deborah Olson | 240 W. Sycamore St. Paul, MN  55117 | United Road Towing Inc | | Property includes impound lots, offices, dispatch |
| Mobile Facilities of IL, Inc | 10301 S. Doty Road Chicago, IL  60617 | United Road Towing, Inc. | | Storage Units |
| Mobile Facilities of IL, Inc | 701 N. Sacramento Chicago, IL  60612 | United Road Towing, Inc. | | Storage Units |
| Mark Chapparone and Deborah Chapparone | 6050 Avenida Encinas Carlsbad, CA 92011 | CSCBD | | Property includes impound lots, offices, dispatch |
| Reynland Properties, Inc | 196 Bosstick Blvd San Marcos, CA 92069 | Rancho Del Oro Companies, Inc | | Property includes impound lots, offices, dispatch |
| Donald L. & Charlotte O. Wilson Family Trust | 1167 Palm and 501 Front Street El Cajon, CA 92020 | United Road Towing,  Inc. | | Property includes impound lots, offices, dispatch |

3