## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------

|  |  |
|---|---|
| **In re** | Chapter 11 |
| **UNITED ROAD TOWING, INC.** *et al.*, | Case No. 17-10249 (____) |
| **Debtors.**[1] | Joint Administration Requested |

---------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (A) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE & WAG PROTECTION TO PREPETITION SECURED LENDERS, AND (V) MODIFYING THE AUTOMATIC STAY, (B) SCHEDULING A FINAL HEARING, AND (C) GRANTING RELATED RELIEF**

United Road Towing, Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "***Debtors***") hereby file this motion (the "***DIP Motion***") requesting entry of an interim order, substantially in the form attached hereto as <u>Exhibit A</u> (the "***Interim Order***"), and a Final Order (as defined below and together with the Interim Order, the "***DIP Orders***"):

01:21510553.61

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: United Road Towing, Inc. (6962); URT Holdings, Inc. (8341); City Towing, Inc. (2118); URS West, Inc. (3518); Bill & Wag's Towing (3518); Export Enterprises of Massachusetts, Inc. (5689); Pat's Towing, Inc. (6964); Keystone Towing, Inc. (6356); Ross Baker Towing, Inc. (9742); URT Texas, Inc. (3716); Mart Caudle Corporation (1912); Signature Towing, Inc. (3054); WHW Transport, Inc. (3055); URS Southeast, Inc. (7289); URS Northeast, Inc. (7290); URS Southwest, Inc. (7284); Fast Towing, Inc. (5898); E&R Towing and Garage, Inc. (8500); Sunrise Towing, Inc. (7160); Ken Lehman Enterprises, Inc. (1970); United Road Towing of South Florida, Inc. (9186); Rapid Recovery Incorporated (1659); United Road Towing Services, Inc. (2206); Arri Brothers, Inc. (7962); Rancho Del Oro Companies, Inc. (3924); CSCBD, Inc. (2448); URS Leasing, Inc. (9072); UR VMS LLC (4904); UR Vehicle Management Solutions, Inc. (0402). The Debtors' mailing address is c/o United Road Towing, Inc., 9550 Bormet Drive., Suite 301, Mokena, Illinois 60448.

**(I)    Approving the DIP Financing**

(A)    Authorizing the Debtors to obtain up to $35,250,000 in post-petition financing (the "***DIP Facility***"), including up to $12,500,000 on an interim basis pending entry of the Final Order, pursuant to (and in accordance with the terms of) that certain *Senior Secured, Superpriority Debtor-in-Possession Credit Agreement* (as may be amended, modified, or supplemented and in effect from time-to-time, the "***DIP Credit Agreement***"), substantially in the form attached to the Interim Order as Exhibit 2, by and among the Debtors, as borrowers and/or guarantors, Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "***DIP Agent***"), and each Revolving Lender party thereto (individually a "***DIP Lender***"; and collectively the "***DIP Lenders***"), to be used for the purposes enumerated in the Interim Order in accordance with and as limited by the Approved Budget[2] (subject to permitted variances)

(B)    Authorizing the Debtors to enter into the DIP Financing Agreements;

(C)    Approval of the Interim Roll-Up and Final Roll-Up;

(D)    Granting the DIP Liens to the DIP Agent for the benefit of the DIP Lenders.

**(II)    Interim Use of Cash Collateral** – During the Interim Period, authorizing the Debtors' use of "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code ("***Cash Collateral***")) in which the Prepetition ABL Agent and the Prepetition Term Agent (each as defined below) have an interest;

**(III)    Adequate Protection** – Granting certain adequate protection, including, among other things, Adequate Protection Liens and Adequate Protection Superpriority Claims and certain other adequate protection as described in the Interim Order, to (A) Wells Fargo Bank, National Association, as administrative agent and as collateral agent (the "***Prepetition ABL Agent***") under that certain Credit Agreement, dated August 21, 2014 (as amended and in effect, the "***Prepetition ABL Credit Agreement***"), by and among the Debtors that comprised the "Loan Parties" thereunder, the Prepetition ABL Agent, and each Revolving Lender party thereto (the "***Prepetition ABL Lenders***"), and (B) Medley Capital Corporation, as term loan agent (the "***Prepetition Term Agent***" and, together with the Prepetition ABL Agent, the "***Prepetition Agents***") under that certain Credit Agreement dated as of August 21, 2014 (as amended and in effect, the "***Prepetition Term Credit***

01:21510553.62

---

[2]    Capitalized terms used but not defined herein shall have the meaning given to them in the DIP Credit Agreement (as defined below) or the Interim Order, as applicable.

*Agreement*"), by and among the Debtors that comprised the "Borrowers" and "Guarantors" thereunder, the Prepetition Term Agent, and the lenders party thereto (the "***Prepetition Term Lenders***" and, together with the Prepetition ABL Lenders, the "***Prepetition Secured Lenders***")), in each case limited to the extent of any Diminution In Value of the Prepetition Agents' respective interests in the Prepetition Collateral having the priority set forth in the Interim Order, as adequate protection for (i) the granting of the DIP Liens to the DIP Agent, (ii) the use of Cash Collateral, (iii) subordination to the Carve Out, and (iv) for the imposition of the automatic stay;

**(IV)**    **Modifying the Automatic Stay –** Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and the Interim Order;

**(V)**    **Waiving Any Applicable Stay –** Waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

**(VI)**    **Final Hearing –** Scheduling a final hearing (the "***Final Hearing***") to consider entry of an order (the "***Final Order***") granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

**(VII)**   **Granting Related Relief**

In support of this DIP Motion, the Debtors rely on the *Declaration of Michael J.  Mahar in Support of Chapter 11 Petitions and First Day Pleadings* (the "***First Day Declaration***"),[3] which was filed with the Court concurrently herewith, and respectfully represent as follows:

### <u>Jurisdiction and Venue</u>

1.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to

01:21510553.63

---

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

28 U.S.C. § 157(b), and the Debtors consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***") to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 506, 507 and 552 of the Bankruptcy Code, Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Local Rules 2002-1, 4001-2, and 9013-1(m).

<u>**Background**</u>

4.      On the date hereof (the "***Petition Date***"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Court***").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (collectively, the "***Chapter 11 Cases***") and no committees have been appointed or designated.

5.      The Debtors have requested that these Chapter 11 Cases be consolidated for procedural purposes only and jointly administered pursuant to Bankruptcy Rule 1015(b).

6.      The Debtors, headquartered in Mokena, Illinois, are the leader in towing, recovery, impound, and vehicle management solutions in both the private and public sector.  Through a portfolio of local and regional brands operating across 10 different regions in

eight different states, the Debtors dispatch approximately 500,000 tows, manage over 200,000 impounds and sell over 38,000 vehicles annually across the United States.

7.      Further information regarding the Debtors' business, capital structure, and the circumstances leading to these Chapter 11 Cases is set forth in the First Day Declaration, which is incorporated herein by reference

## I.      The Debtors' Prepetition Secured Indebtedness

8.      <u>First Lien Debt</u>.  The Debtors' first lien secured indebtedness consists of the $32.250 million Prepetition ABL Credit Agreement by and among each Debtor (other than UR Vehicle Management Solutions, Inc.)[4] as a "Loan Party" thereunder, the Prepetition ABL Agent and the lenders party thereto.  The obligations under the Prepetition ABL Credit Agreement are secured by a first lien on substantially all of the Debtors' assets.  An approximately $4.9 million letter of credit issued under the Prepetition ABL Credit Agreement is subject to the Medley Participation Agreement (as defined in the Prepetition ABL Credit Agreement), whereby Medley Capital Corporation, who, as discussed below, is the Prepetition Term Agent and lender under the Prepetition Term Credit Agreement and a significant equity holder of the Debtors, has agreed to purchase the loans that fund any draw on account of such specified letter of credit.  As of the Petition Date, approximately $13.8 million in revolving loans are outstanding under the Prepetition ABL Credit Agreement and approximately $6.1 million in face amount of letters of credit have been issued and remain undrawn.

01:21510553.65

---

[4]      Debtor UR Vehicle Management Solutions, Inc. is not a Borrower or Guarantor under the Prepetition ABL Credit Agreement or Prepetition Term Credit Agreement.

9.      <u>Second Lien Debt</u>.    The Debtors' secured indebtedness also includes the Prepetition Term Credit Agreement, which is a $17 million second-lien credit facility by and among the Debtors that comprised the "Borrowers" and "Guarantors" thereunder, the Prepetition Term Agent, and the lenders party thereto.   The obligations under the Prepetition Term Credit Agreement are secured by the same assets as the Prepetition ABL Credit Agreement.   As of the Petition Date, approximately $19.365 million in obligations are outstanding under the Prepetition Term Credit Agreement.

10.      <u>Intercreditor Agreement</u>.    The Prepetition Agents are parties to that certain Intercreditor Agreement, dated as of August 21, 2014, between and among Wells Fargo Bank, National Association, as "First Lien Agent" and Medley Capital Corporation, as "Second Lien Agent" (the "***Prepetition Intercreditor Agreement***").   The Prepetition Intercreditor Agreements sets forth and governs, certain rights and obligations as between the Prepetition Agents with respect to the Prepetition ABL Credit Agreement and Prepetition Term Credit Agreement, and it includes provisions with respect to the terms and conditions upon which the Prepetition Term Agent, on behalf of itself and the Prepetition Term Lenders, will be deemed to consent to debtor-in-possession financing, use of cash collateral and proposed adequate protection to be obtained or provided by the Debtors that are parties to the prepetition credit agreements in a chapter 11 proceeding.

## II.      <u>The Debtors' Efforts to Obtain DIP Financing</u>

11.      When it became apparent that a chapter 11 filing was possible, the Debtors, with the aid of their financial advisor, Getzler Henrich & Associates LLC, investment banker, SSG Advisors, LLC, and their proposed general bankruptcy counsel, Winston & Strawn LLP, began the process of identifying potential providers of post-petition financing.   The Debtors received term sheets from each of the Prepetition ABL Lenders and Prepetition Term Lenders and

negotiated with both to improve the terms initially proposed.  The Debtors also communicated with a third potential DIP lender who did not provide a term sheet but did express that it would require terms valued at approximately $1 million less favorable to the Debtors than proposed by the Prepetition ABL Lenders.  Based on the likelihood of a similar position from other third party lenders, the current status of the Debtors' leverage and the fact that the Debtors would be able (after giving effect to the Prepetition Intercreditor Agreement) to obtain consensual priming of the Prepetition Liens, which the Debtors believed would be a condition to any DIP financing proposal, the Debtors determined that no other third party lenders would provide terms better than those provided by the Prepetition ABL Lenders, and therefore, did not solicit further DIP lending proposals.

12.    After the Debtors determined to proceeds with the DIP Facility proposed by the DIP Lenders, the Debtors, with the assistance of their Delaware bankruptcy counsel, Young Conaway Stargatt & Taylor, LLP, engaged in further negotiation over the documentation of the DIP Financing Agreements, as well as the economic terms, including the fees associated with the DIP Facility (which were further reduced during these negotiations), the proposed budget under which the Debtors would conduct the Chapter 11 Cases, and the approximately $2.5 million in "new money" availability (over the borrowing base in effect under the Prepetition ABL Credit Agreement) that the Debtors will obtain under the DIP Facility.  The Prepetition Term Agent and Prepetition Term Lenders have advised the Debtors that they do not object to entry of the Interim DIP Order, but they have reserved their rights with respect to entry of the Final Order, subject to the terms of the Prepetition Intercreditor Agreement.

## III.    **The DIP Facility**

13.    A summary of the DIP Facility and certain material terms set forth in the DIP

Credit Agreement and the Interim Order is set forth below:[5]

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| **Borrower:** | United Road Towing, Inc. <br> *See* DIP Credit Agreement pmbl. |
| **Guarantors:** | All other Debtors <br> *See* DIP Credit Agreement pmbl (definition of "Parent"), § 5.11 sched. 1.1 (definition of Guarantors),. |
| **DIP Agent:** | Wells Fargo Bank, National Association <br> *See* Interim Order pmbl.; DIP Credit Agreement pmbl. (definition of Administrative Agent). |
| **DIP Lenders:** | Wells Fargo Bank, National Association <br> *See* Interim Order pmbl. (definition of DIP Lender); DIP Credit Agreement pmbl., sched. 1.1 (definition of Lender). |
| **DIP Facilities:** | A $35.25 million senior secured, superpriority debtor-in-possession revolving credit loan facility, subject only to (i) the Carve Out, and (ii) the Permitted Prior Liens. <br> *See* Interim Order ¶ 9; DIP Credit Agreement § 2.1. |
| **DIP Budget:** | The DIP Budget means the financial projections for the Loan Parties covering the thirteen-week period commencing on the Petition Date on a weekly basis, which projections shall include, at a minimum, cash receipts, operating disbursements, payroll disbursements, a reasonably detailed professional fee budget, non-operating disbursements (including, for the avoidance of doubt, professional fees) and inventory for the period covered thereby, substantially in the form of the initial budget annexed to the DIP Credit Agreement as Schedule 1.2 and any subsequent projections furnished pursuant to Section 5.2 of the DIP Credit Agreement, in each case, in form and substance reasonably satisfactory to the Agent.  The Agent acknowledges and agrees that the budget attached to the DIP Credit Agreement as Schedule 1.2 and in effect as of the date of the DIP Credit Agreement is in form and substance satisfactory to the Agent. <br> The DIP Budget in its short form is also attached to the Interim Order as Exhibit 1. <br> *See* DIP Credit Agreement sched.  1.1 (definition of Approved Budget); |

01:21510553.68

---

[5]    This summary is provided in accordance with Bankruptcy Rule 4001 and Local Rule 4001-2 and is qualified in its entirety by reference to the provisions of the DIP Credit Agreement and the Interim Order.  To the extent there exists any inconsistency between this summary and the provisions of the DIP Credit Agreement, the Interim Order, or the Final Order, the provisions of the DIP Credit Agreement, the Interim Order, and the Final Order, as applicable, shall control.

| | |
|---|---|
| | Interim Order ¶ M. |
| **Uses of Proceeds:** | In accordance with and as may be limited by the Approved Budget (subject to any permitted variances thereunder), the advances under the DIP Facility may be used solely as follows: |
| | (a) to pay fees, costs, and expenses as provided in the respective DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement, the other DIP Financing Agreements, and this Interim Order; |
| | (b) for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper and lawful corporate purposes of the Debtors not otherwise prohibited by the terms of the Interim Order or under the DIP Credit Agreement and/or the other DIP Financing Agreements; |
| | (c) for making payments in respect of Adequate Protection and other payments as provided in this Interim Order; |
| | (d) to fund the Prepetition ABL Indemnity Account (as provided in paragraph 16 below); |
| | (e) upon entry of a Final Order, for the payment of the Final Roll-Up; and |
| | (f) to fund the Carve Out Account (as defined below). *See* Interim Order ¶ 4; DIP Credit Agreement § 5.20. |
| **Use of Cash Collateral; Entities with an Interest in Cash Collateral:** | Pursuant to the terms and conditions of the Interim Order, the respective DIP Financing Agreements, and in accordance with and as may be limited by the Approved Budget (subject to permitted variances), the Debtors are authorized to use Cash Collateral and to use the advances under the DIP Facility during the Interim Period and terminating upon notice being provided by the DIP Agent to the Debtors that a DIP Order Event of Default (as defined in the Interim Order) has occurred and is continuing in the manner set forth in Paragraphs 36 and 38 of the Interim Order. |
| | The Prepetition ABL Agent and the Prepetition Term Agent have an interest in the Cash Collateral. |
| | *See* Interim Order ¶¶ 15. |
| **Interest Rate:** | All Obligations (except Letter of Credit Fee): A per annum rate equal to LIBOR Rate + 2.5%. |
| | Letter of Credit Fee: 2.50% *per annum* times the face amount of all issued and undrawn Letters of Credit, plus the fees described below. *See* DIP Credit Agreement § 2.6. |
| **Default Rate:** | All Obligations (except Letter of Credit Fee): A per annum rate equal to 2.00% in excess of the *per annum* rate otherwise applicable to such Obligations |
| | Letter of Credit Fee: 2.00% *per annum* in excess of the Letter of Credit |

| | |
|---|---|
| | Fee otherwise applicable hereunder. |
| | *See* DIP Credit Agreement § 1.01 (definition of Default Rate). |
| **Fees:** | <u>Agent Fees:</u> Borrower shall pay to Agent, for the account of Agent, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter, which are a one-time closing fee of $100,000 and a monthly collateral monitoring fee of $2,500. |
| | <u>Unused Line Fee:</u> Borrower shall pay to Agent, for the ratable account of the Revolving Lenders, an unused line fee (the "Unused Line Fee") in an amount equal to 0.375% per annum times the result of (i) the aggregate amount of the Maximum Revolver Amount, less (ii) the Average Revolver Usage during the immediately preceding month (or portion thereof), which Unused Line Fee shall be due and payable, in arrears, on the first day of each month from and after the Closing Date up to the first day of the month prior to the date on which the Obligations are paid in full and on the date on which the Obligations are paid in full. |
| | <u>Field Examination and Other Fees:</u> Borrower shall pay to Agent field examination, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows: a fee not to exceed $1,000 per day, per examiner, plus reasonable and documented out-of-pocket expenses (including travel, meals, and lodging) incurred by Agent for each field examination of Borrower performed by personnel employed by Agent or by personnel employed by one or more third party appraisal companies engaged by Agent to perform field examinations of the Loan Parties, to establish electronic collateral reporting systems, or to appraise the Collateral, or any portion thereof, or to assess the Loan Parties' business valuation; provided, that so long as no Event of Default shall have occurred and be continuing, Borrower shall not be obligated to reimburse Agent for more than two (2) such field examinations and two (2) such appraisals of the Collateral during any fiscal year. |
| | <u>Letter of Credit Fees:</u> (i) a fronting fee which shall be charged by Issuing Bank upon the issuance of each Letter of Credit in an aggregate amount equal to 0.250% per annum of the face amount thereof, plus (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all reasonable and documented out-of-pocket expenses incurred by, Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations). |
| | *See* DIP Credit Agreement §§ 2.10, 2.11(k). |
| **Conditions to Borrowing:** | The obligation of the Lender Group (or any member thereof) to make any Revolving Loans hereunder (or, except as expressly set forth herein, to extend any other credit hereunder) at any time shall be subject to the satisfaction (or waiver in accordance with Section 14.1) of the following conditions precedent: (a) the representations and warranties of the Loan Parties contained in the DIP Credit Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the |

text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date); and (b) no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof. (c)Each request for a Revolving Loan shall be made in accordance with the Approved Budget.(d) No Overadvance shall result from such credit extension. (e) There shall not have been any order granted by the Bankruptcy Court sustaining (i) any motion, complaint, objection or other pleading filed by any party, any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations, or (ii) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Agent or the Lenders hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the DIP Orders). (f) There shall not have been any order granted by the Bankruptcy Court sustaining any motion, complaint, objection or other pleading filed by any party, challenging, in either case, the validity, priority, perfection, or enforceability of the Existing Loan Documents, the Existing Liabilities, or any Existing Lien granted pursuant to the Existing Loan Documents, and no Existing Lien granted pursuant to the Existing Loan Documents shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases, including, without limitation, the Committee.

*See* DIP Credit Agreement § 3.2.

| | |
|---|---|
| **DIP Collateral:** | Under the DIP Credit Agreement "Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by the Loan Parties in or upon which a Lien is granted by such Person in favor of Agent or the Lenders under any of the Loan Documents. *See* DIP Credit Agreement sched. 1.1 (definition of Collateral); *See* Interim Order ¶¶ 8 |
| **Liens and Priorities of DIP Obligations:** | The DIP Agent is granted the DIP Liens (which Liens are subject to the Permitted Prior Liens and the Carve Out) for the ratable benefit of the DIP Lenders, which DIP Liens constitute priming, first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security interests and Liens senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates, that are senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates, and except as otherwise expressly provided in this Interim Order and the Prepetition Intercreditor Agreement, upon and to all of the following (but excluding the |

"Excluded Assets") (collectively, the "***DIP Collateral***"):

(a) the Collateral, as defined in the DIP Financing Agreements, including: All: (a) Accounts, (b) Books, (c) Chattel Paper (d) Commercial Tort Claims, (e) Deposit Accounts, (f) Equipment, (g) Farm Products, (h) Fixtures, (i) General Intangibles, (j) Inventory, (k) Investment Property, (l) Intellectual Property, (m) Negotiable Collateral, (n) Pledged Interests (including all of such Debtor's Operating Agreements and Pledged Partnership Agreements), (o) Securities Accounts, (p) Supporting Obligations, (q) all of such Debtor's money, Cash Equivalents, or other assets of such Debtor that now or hereafter come into the possession, custody, or control of the Prepetition ABL Agent (or its agent or designee) or any other Prepetition ABL Lender, (r) all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable Collateral, Pledged Interests, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds").  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Debtor or the Prepetition ABL Agent from time to time with respect to any of the Investment Property, and (s) any of the foregoing, whether now owned or now due, or in which any Debtor has an interest, or hereafter acquired, arising, or to become due, or in which any Debtor obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing.

(b) Subject to entry of the Final Order, the Bankruptcy Recoveries (as defined below), but only (A) with respect to Bankruptcy Recoveries arising under section 549 of the Bankruptcy Code, the full amount of any such recovery, and (B)

| | |
|---|---|
| | with respect to Bankruptcy Recoveries arising under all other sections of chapter 5 of the Bankruptcy Code, the amounts necessary to reimburse the DIP Lenders, as the case may be, for the amount of the Carve Out, if any, used to finance the pursuit of such recovery (the foregoing Bankruptcy Recoveries in (A) and (B) being referred to collectively as the "***Specified Bankruptcy Recoveries***"); provided, however, for the avoidance of doubt, the DIP Superpriority Claims (as defined below) and the Adequate Protection Superpriority Claims (as defined below) of the Prepetition Agents and the Prepetition Secured Lenders as provided in Paragraph 16 of the Interim Order shall be payable out of all Bankruptcy Recoveries, among other things.<br><br>"***Bankruptcy Recoveries***" shall mean any recoveries of the Debtors, by settlement or otherwise, in respect of claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under chapter 5 of the Bankruptcy Code.<br>(c) The Lease Proceeds, but not the Leases themselves, whether or not so perfected prior to the Petition Date.<br>(d) Any cash held in any escrow or other account of the Debtors in respect of accrued and/or accruing employee benefit obligations as provided for in the Approved Budget.<br>The DIP Liens to be created and granted to the DIP Agent, as provided herein, are: (a)created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (b) other than as set forth in (c) below, first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and (c) subject to the Prepetition Intercreditor Agreement, subject only to (i) the Carve Out, and (ii) the Permitted Prior Liens.<br>*See* Interim Order ¶¶ 8, 9. |
| **Carve-Out:** | "Carve out"  means (a) (i) statutory fees and interest payable to the Office of the U.S.  Trustee (pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717, respectively), as determined by agreement of the U.S. Trustee or by final order of this Court, and (ii) 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court; (b) all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals retained by the Debtors or a Committee, if any (collectively, the "***Case Professionals***"), through the date of service by the DIP Agent of a Carve Out Trigger Notice (as defined below), up to and as limited by the aggregate Approved Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to all |

carryforwards and carrybacks from prior or subsequent favorable budget variances),[6] less the amount of prepetition retainers received by such Case Professionals and not previously applied to fees and expenses; and(c) all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice in an aggregate amount not to exceed $75,000 (the "*Carve Out Cap*"), less the amount of prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above.  The Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice.

For the avoidance of doubt, fees, disbursements, costs and expenses incurred by Case Professionals cannot be paid to Case Professionals unless and until allowed by the Court.  For the further avoidance of doubt, the Approved Budget includes fees payable to the Case Professionals on a "cash basis," but for purposes of the Carve Out, the amounts identified in a the Approved Budget for each Case Professional shall be equally allocated across the applicable Approved Budget period and treated on an "accrual basis," except that, where the terms of a Case Professional's engagement agreement with the Debtors (or applicable order approving such engagement) provide for a fixed payment to be made for a designated period of time or for any success or transaction fee, the amounts included in the Approved Budget shall be allocated on an accrual basis consistent with such payment terms.

For purposes of the foregoing, "*Carve Out Trigger Notice*" shall mean a written notice delivered by the DIP Agent to the Debtors and their counsel, counsel to the Prepetition Term Lenders, the U.S.  Trustee, and lead counsel to any Committee, which notice may be delivered at any time by the DIP Agent following the occurrence and continuance of any DIP Order Event of Default and shall specify that it is a "Carve Out Trigger Notice", which notice may be delivered at any time following the occurrence and continuance of a Cash Collateral Termination Event.

For the avoidance of doubt, the Carve Out shall be senior to the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, Liens or claims securing the DIP Obligations and/or the Prepetition Secured Debt granted or recognized as valid.

Further, the Carve Out shall exclude, and neither advances under the DIP

01:21510553.614

---

[6] Accordingly, to the extent that a particular Case Professional is over budget during any measurement period, it shall be entitled to offset such budget overage with any amounts such Case Professional is under budget in prior or subsequent periods prior to the delivery of a Carve Out Trigger Notice.

<table>
<tr>
<td></td>
<td>Facility nor proceeds of the Prepetition Collateral and the DIP Collateral shall be used to pay, any fees and expenses incurred in connection with the assertion or joinder in any Challenge Proceeding or any other claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the DIP Liens in the DIP Collateral, (iii) the Prepetition Secured Debt, (iv) the Prepetition Liens in the Prepetition Collateral, and/or (v) the Adequate Protection Liens; or (B) preventing, hindering, or delaying, whether directly or indirectly, the DIP Agent's, the DIP Lenders', the Prepetition Agents', or the Prepetition Secured Lenders' assertion or enforcement of their Liens and security interests, or their efforts to realize upon any DIP Collateral, Prepetition Collateral, the Adequate Protection Liens, or the Prepetition ABL Indemnity Account; provided, however, that such exclusion does not encompass any investigative work conducted by Case Professionals retained by a Committee with regard to the Prepetition Liens and Prepetition Debt only, but only up to $50,000.00 of the Carve Out may be used for such investigative work.<br><br>*See* Interim Order ¶¶ 26-28.</td>
</tr>
<tr>
<td>**Adequate Protection to Prepetition Secured Parties:**</td>
<td>**Adequate Protection Liens**.  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, and solely to the extent of the Diminution In Value of the respective interests of the Prepetition Agents and the Prepetition Secured Lenders in the Prepetition Collateral (including Cash Collateral): (i) the Prepetition ABL Agent (for the benefit of the Prepetition ABL Lenders) shall have, subject to the terms and conditions set forth below, valid, perfected, and enforceable additional and replacement security interests and Liens in the Prepetition Collateral and the DIP Collateral (the "***ABL Adequate Protection Liens***") which shall be (1) junior only to the Carve Out, the DIP Liens securing the DIP Obligations, and Permitted Prior Liens, and (2) in all instances, subject to the Prepetition Intercreditor Agreement; and (ii) the Prepetition Term Agent (for the benefit of the Prepetition Term Lenders) shall have, subject to the terms and conditions set forth below, valid, perfected, and enforceable additional and replacement security interests and Liens in the Prepetition Collateral and the DIP Collateral (the "***Term Adequate Protection Liens***"; and together with the ABL Adequate Protection Liens, the "***Adequate Protection Liens***") which shall be (1) junior only to the Carve Out, the DIP Liens securing the DIP Obligations, the ABL Adequate Protection Liens, the Prepetition ABL Liens, and Permitted Prior Liens, and (2) in all instances, subject to the Prepetition Intercreditor Agreement.<br>**Adequate Protection Superiority Claim**.  Solely to the extent of any Diminution In Value of the interests of the Prepetition Agents and the Prepetition Secured Lenders in the Prepetition Collateral, (i) the Prepetition ABL Agent (for the benefit of the Prepetition ABL Lenders) shall have an allowed superpriority administrative expense claim (the "***ABL Adequate Protection Superiority Claim***"), which shall have</td>
</tr>
</table>

priority (except with respect to (1) the Carve Out and (2) the DIP Superpriority Claim) in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; and (ii) the Prepetition Term Agent (for the benefit of the Prepetition Term Lenders) shall have an allowed superpriority administrative expense claim (the "**Term Adequate Protection Superpriority Claim**"; and together with the ABL Adequate Protection Superpriority Claim, the "**Adequate Protection Superpriority Claims**"), in each case which shall have priority (except with respect to (1) the Carve Out, and (3) the DIP Superpriority Claim, and the ABL Adequate Protection Superpriority Claim) in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment.

Other than the DIP Liens, the DIP Superpriority Claims, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claims.

**Adequate Protection Payments**.  Until the repayment in full of the obligations under the Prepetition ABL Credit Agreement (including pursuant to the Final Roll-Up), on the last business day of each month, the Prepetition ABL Agent shall receive, for the ratable benefit of the Prepetition ABL Lenders, payment of all accrued and unpaid interest at the default rate set forth in the Prepetition ABL Credit Agreement Subject to the provisions of Paragraph 50 of the Interim Order, the Prepetition ABL Agent and the Prepetition ABL Lenders shall be reimbursed, on a current basis, for all reasonable and documented out-of-pocket costs and expenses of the financial advisors and outside attorneys engaged by such parties, solely to the extent permitted under the Prepetition ABL Credit Agreement.

**Adequate Protection With Respect to Sales.**  The comprehensive sale process to be implemented under section 363 of the Bankruptcy Code as

| | |
|---|---|
| | contemplated by the Sale Motion (as defined in the DIP Credit Agreement), including the timeline and milestones contained therein, shall not be materially modified without the prior written consent of the Prepetition ABL Agent and the DIP Agent, failing which there shall occur an Event of Default under the DIP Credit Agreement and this Interim Order.<br><br>Upon the disposition of Prepetition Collateral as contemplated in the Sale Motion (collectively, the "*Sale*"), any such Prepetition Collateral shall be sold free and clear of the DIP Liens, Prepetition Liens, and the Adequate Protection Liens; provided, however, that such DIP Liens, Prepetition Liens, and Adequate Protection Liens, respectively, shall attach to the proceeds of any such Sale to the same extent, validity and priority as such Liens attached to the DIP Collateral and Prepetition Collateral, respectively, which proceeds shall be promptly paid at closing on the Sale (including if such Sale constitutes a DIP Maturity Event):<br><br>first, to fund the Carve Out Account (subject to the Carve Out Cap) in accordance with Paragraph 31 of the Interim Order;<br><br>second, to the DIP Agent for application to the Prepetition ABL Debt or the DIP Obligations in accordance with the terms of the DIP Credit Agreement, and after payment in full of the DIP Obligations in the event the Final Roll-Up has not occurred to the Prepetition ABL Agent to be applied to the Prepetition ABL Debt in accordance with the Prepetition ABL Credit Agreement;<br><br>third, subject to entry of the Final Order, to the Prepetition Term Agent to reimburse all reasonable and documented out-of-pocket costs and expenses of outside attorneys engaged by the Prepetition Term Agent and the Prepetition Term Lenders, solely to the extent permitted under the Prepetition Term Credit Agreement and so long as the Prepetition Term Agent and the Prepetition Term Lenders have submitted invoices in accordance with and otherwise complied with the review procedures set forth in Paragraph 50 of the Interim Order ; and<br><br>fourth, to the Debtors (provided, that either (x) subject to the Final Order or (y) absent an agreement among the Prepetition Term Agent, the Debtors and any Committee in furtherance of Paragraphs 32-33 of the Interim Order, any remaining proceeds of the Prepetition Collateral and/or DIP Collateral shall be deposited in a segregated account pending further order of the Court, and shall remain subject to the Prepetition Liens and Adequate Protection Liens of the Prepetition Term Agent and Prepetition Term Lenders to the same extent, validity and priority as such Liens attached to the Prepetition Collateral).<br><br>*See* Interim Order ¶16 |
| **Financial, Reporting, and Other Covenants:** | Article V of the DIP Credit Agreement contains covenants customary and appropriate for DIP financings of this type, including, but not limited to, (i) provision of and compliance with the DIP Budget, (ii) reporting of financial information, (iii) operation and maintenance of properties, and (iv) maintenance of insurance on properties.<br><br>*See* DIP Credit Agreement art.  V |
| **Case Milestones:** | The DIP Credit Agreement contains the following sale and case-related milestones: |

(i) Within five (5) days after the Petition Date, the Borrower shall file motion (the "Sale Motion") requesting, among other things, approval of a comprehensive sale process ("Sale Process") under Section 363 of the Bankruptcy Code to sell all of the Loan Parties' businesses and assets ("363 Sale"), which Sale Motion shall include a motion seeking authority to establish bidding procedures for the proposed Sale Process on terms reasonably acceptable to the Agent.  The Sale Motion, as well as the order approving the related bid procedures ("Bidding Procedures Order") shall be reasonably acceptable to the Agent.

(ii) No later than five (5) days after the Petition Date, the Borrower shall forward so-called "bid packages" to any potential bidders to whom bid packages had not already been delivered prior to the Petition Date, including, without limitation, to potential bidders identified by the Agent, provided such potential bidders have entered into confidentiality agreements reasonably acceptable to the Borrower, with the deadline for submitting binding bids with respect to the sale of the Borrower's assets on or before March 29, 2017;

(iii) No later than February 22, 2017, the Loan Parties shall have entered into a definitive agreement with a "stalking horse" purchaser(s) providing for the sale and purchase of all or substantially all of the Loan Parties' assets and/or businesses, with the designation of stalking horse purchaser, and the terms and provisions of any such definitive agreement being subject to the reasonable satisfaction of Agent and Lenders;

(iv) One or more binding bids for some or all of the assets of the Loan Parties upon terms and conditions acceptable to the Agent in its reasonable discretion shall have been received by no later than March 22, 2017.  Without limiting the discretion of the Agent in determining the acceptability of such a bid or bids, in no event shall any bid which contains a financing contingency be reasonably acceptable;

(v) Upon receipt thereof, the Loan Parties shall deliver to the Agent copies of all formal proposals, letters of interest, letters of intent, bids, agreements and any final proposed definitive documentation for any sale of any or all its assets or any other investment pursuant to which additional capital is to be received by the Loan Parties;

(vi) On or before March 27, 2017, an auction among all qualified bidders shall be conducted with the highest and best bid or combination of bids being selected, in consultation with the Agent;

(vii) No later than March 30, 2017, the Bankruptcy Court shall have conducted a sale hearing with respect to such sale;

(viii) The Borrower shall have obtained an order of the Bankruptcy Court approving the Sale Motion on or before April 3, 2017;

(ix) The Borrowers shall consummate the 363 Sale on or before the first Business Day that is at least fifteen (15) days after entry of the order approving the 363 Sale; and

(x) On or before the date that is sixty (60) days following the Petition Date, the Loan Parties shall have filed a motion under Section 365 of the Bankruptcy Code requesting extension of the date on which the Loan

| | |
|---|---|
| | Parties must assume or reject leases to 210 days after the entry of the order for relief, with an order so extending that deadline to be have been entered by the Bankruptcy Court within ninety (90) days after the Petition Date.  The Loan Parties may not, without the prior written consent of the Agent, assume, assume and assign, or reject leases.<br><br>In addition, the DIP Credit Agreement contains the following DIP Facility-related milestones:<br><br>(i) obtain entry of the Interim Borrowing Order on or before the date that is three (3) Business Days following the Petition Date;<br><br>(ii) obtain entry of the Final Borrowing Order on or before the date that is thirty (30) days after the entry of the Interim Borrowing Order.<br><br>The failure to meet these milestones is deemed an event of default.  *See* DIP Credit Agreement § 5.26, 8.17. |
| **DIP Maturity Date:** | A "DIP Maturity Event" means the earliest of: (a) April 28, 2017;(b) the closing of a Sale of all or substantially all of the working capital assets of the Debtors pursuant to the provisions of section 363 of the Bankruptcy Code; or (c) the effective date of any chapter 11 plan of reorganization/liquidation for the Debtors.  *See* DIP Credit Agreement sched.  1.1 (definition of Maturity Date); Interim Order ¶30 |
| **Events of Default:** | The DIP Credit Agreement contains customary events of default for commercial lending documents, including, without limitation, customary events of default related to: non-payment of obligations; breaches of warranties; non-performance of covenants and obligations; incurrence of judgments; certain actions under ERISA; Change of Control, impairment of security; liquidation, dissolution or cessation of business; proceedings against Administrative Agent, any Secured Parties, or certain other parties; sales of assets; and Material Adverse Effects, as well as events of defaults relating the Chapter 11 Cases, including, without limitation, and failure to achieve Case Milestones.  *See* DIP Credit Art.  VIII. |
| **Exercise of Remedies** | Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the DIP Orders, if any Event of Default occurs and is continuing, the Agent may (and at the request of, or with the consent of, the Required Lenders, shall) take any or all of the following actions, at the same time or different times, in each case without further order of or application to the Bankruptcy Court:<br><br>(a) (i) declare the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations (other than the Bank Product Obligations), whether evidenced by the DIP Credit Agreement or by any of the other Loan Documents to be immediately due and payable, whereupon the same shall become and be immediately due and payable and Borrower shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by Borrower, and (ii) direct Borrower to provide (and |

Borrower agrees that upon receipt of such notice it will provide) Letter of Credit Collateralization to Agent with respect to any issued and outstanding Letters of Credit;

(b) declare the Commitments terminated, whereupon the Commitments shall immediately be terminated together with (i) any obligation of any Revolving Lender to make Revolving Loans, and (ii) the obligation of Issuing Bank to issue Letters of Credit;

(c) exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents, under applicable law, or in equity;

(d) Subject to the DIP Orders, in case any one or more of the covenants and/or agreements set forth in the DIP Credit Agreement or any other Loan Document shall have been breached by any Loan Party, then the Agent may proceed to protect and enforce the Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in the DIP Credit Agreement or such other Loan Document. Without limitation of the foregoing, the Borrower agrees that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof. The Agent shall be indemnified by the Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms of the DIP Credit Agreement.

*See* DIP Credit Agreement § 9.1.

Per the Interim Order, any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified so that after the occurrence of any DIP Order Event of Default, upon five (5) days prior written notice (a "***Remedies Notice***") of such occurrence (the "***Remedies Notice Period***"), in each case given to each of (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel to each of the Prepetition Agents, (iv) lead counsel for any Committee, and (v) the U.S. Trustee, the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the DIP Financing Agreements.

Upon the service of a Remedies Notice after the occurrence of a DIP Order Event of Default:

(a) the Debtors shall continue to deliver and cause the delivery of the proceeds of the Prepetition Collateral to the Prepetition ABL Agent and the DIP Collateral to the DIP Agent as provided in this Interim Order and in the DIP Financing Agreements;

(b) the Prepetition ABL Agent and the DIP Agent shall continue to apply

such proceeds in accordance with the provisions of this Interim Order and the DIP Financing Agreements and the Prepetition ABL Financing Agreements, as applicable;

(c) the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the Prepetition ABL Debt, the DIP Obligations, and the Carve Out; provided, that the Debtors shall be permitted to use Cash Collateral to pay their employees ordinary wages accrued up to and including the date of service of the Remedies Notice; and

(d) any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended, and any loan or advance made thereafter shall be made by the DIP Lenders in their sole and exclusive discretion.

Following the giving of a Remedies Notice by the DIP Agent, the Debtors and any Committee appointed in the Chapter 11 Cases shall be entitled to an emergency hearing before this Court, with any such hearing to be held on not less than three (3) days' notice to lead counsel for any Committee, the Prepetition ABL Agent, the DIP Agent, the DIP Lenders, the Prepetition Term Agent and the Prepetition Term Lenders. If (x) the Debtors or any such Committee do not contest the occurrence of a DIP Order Event of Default and/or the right of the DIP Agent and the DIP Lenders to exercise their remedies, or (y) the Debtors or any such Committee do timely contest the occurrence of a DIP Order Event of Default and/or the right of the DIP Agent and the DIP Lenders to exercise their remedies, and unless this Court, after notice and hearing prior to the expiry of the Remedies Notice Period stays the enforcement thereof, the automatic stay, solely as to the DIP Agent and the DIP Lenders, shall automatically terminate at the end of the Remedies Notice Period.

Subject to the provisions of Paragraphs 37-39 above, upon the occurrence of a DIP Order Event of Default, the DIP Agent and the DIP Lenders are authorized to exercise their remedies and proceed under or pursuant to the DIP Financing Agreements; except that, (A) with respect to any of the Debtors' leasehold locations, the DIP Agent's and the DIP Lenders' rights shall be limited to such rights (i) as may be ordered by this Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Agent; or (iii) which the DIP Agent and the DIP Lenders have under applicable non-bankruptcy law, and (B) prior to exercising any such remedies, the DIP Agent shall fund the Carve Out Account as set forth in Paragraph 31 of the Interim Order (provided that such Carve Out Account shall be subject to the control of the DIP Agent).

*See* Interim Order ¶ 37-40

| | |
|---|---|
| **Indemnification:** | Pursuant to Section 10.3 of the DIP Credit Agreement: |

"Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery (provided that Borrower shall not be liable for costs and expenses (including attorney's fees) of any Lender (other than Wells Fargo) incurred in advising, structuring, drafting, reviewing, administering or syndicating the Loan Documents), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Loan Parties' compliance with the terms of the Loan Documents (provided, that the indemnification in this Section 10.3 shall not extend to (i) disputes solely between or among the Lenders that do not involve any acts or omissions of any Loan Party, or (ii) disputes solely between or among the Lenders and their respective Affiliates that do not involve any acts or omissions of any Loan Party; it being understood and agreed that the indemnification in this Section 10.3 shall extend to Agent (but not the Lenders) relative to disputes between or among Agent on the one hand, and one or more Lenders, or one or more of their Affiliates, on the other hand, or (iii) any Taxes or any costs attributable to Taxes, which shall be governed by Section 16), (b) with respect to any actual or prospective investigation, litigation, or proceeding related to this Agreement, any other Loan Document, the making of any Loans or issuance of any Letters of Credit hereunder, or the use of the proceeds of the Loans or the Letters of Credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by Borrower or any of its Subsidiaries or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any such assets or properties of Borrower or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, Borrower shall have no obligation to any Indemnified Person under this Section 10.3 to the extent that such Indemnified Liabilities (A) may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of such Indemnified Person, (B) may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from a material breach by such Indemnified Person of its obligations hereunder or under any other Loan Document or (C) result from or arise

| | |
|---|---|
| | out of a dispute solely among Indemnified Persons that does not involve any acts or omissions of any Loan Party; provided, that notwithstanding the foregoing, in no event shall Borrower's indemnification obligations under this Section 10.3 include any Indemnified Liabilities in respect of legal fees, disbursements and expenses in excess of the reasonable and documented out-of-pocket fees, disbursements and expenses of one outside legal counsel for all Indemnified Persons and, to the extent necessary, one local counsel in each relevant jurisdiction and one regulatory counsel (if reasonably required) for all Indemnified Persons (but excluding the allocated costs of in-house or internal counsel to any Indemnified Person), and, in the case of an actual or perceived conflict of interest where such Indemnified Person affected by such conflict informs Borrower of such conflict and thereafter retains its own counsel, another firm of counsel for such affected Indemnified Persons.  This provision shall survive the termination of this Agreement and the repayment in full of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrower with respect thereto.  SUBJECT TO THE SECOND SENTENCE OF THIS <u>SECTION 10.3</u>, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON." <br><br>*See* DIP Credit Agreement § 10.3 |
| **Debtors' Stipulations and Challenge Period:** | Paragraph F of the Interim Order has certain Debtors' Stipulations regarding the extent, validity, enforceability and perfection of the Prepetition Liens and obligations under the Prepetition ABL Credit Agreement and Prepetition Term Credit Agreement, as well as the absence of any claims against the Prepetition Agents or any Prepetition Secured Lenders and their respective shareholders, affiliates, partners, members, officers, directors, employees, financial advisors, attorneys, agents and other representatives, with respect to the Prepetition Financing Documents or the Prepetition Liens, or any claim of the Prepetition Secured Lenders whether arising at law or at equity, including, without limitation, any recharacterization, subordination (whether equitable or otherwise), avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code or any theory of "lender liability" under applicable state law or otherwise.  The Debtors further stipulate that the Prepetition Agents have a continuing security interest in and Lien on all or substantially all of the Debtors' Cash Collateral. <br><br> The Debtors' Stipulations made in Paragraph F of the Interim Order are subject to the rights of parties to assert a Challenge, as detailed in paragraphs 23-25 of the Interim Order, provided that any Committee or any other party-in-interest with requisite standing that has been sought |

|  | and granted by this Court must commence a Challenge Proceeding asserting such objection or challenge by the later of (x) for any Committee, sixty (60) days following the appointment of the first official Committee or (y) for any party-in-interest other than an official Committee, seventy-five (75) days following entry of this Interim Order (collectively, (x) and (y) shall be referred to as the "*Challenge Period*", and the date that is the next calendar day after the termination of the Challenge Period, in the event that no Challenge Proceeding has been timely commenced during the Challenge Period, shall be referred to as the "*Challenge Period Termination Date*"; provided, that the Challenge Period shall be tolled for a period not to exceed thirty (30) days upon the filing of a motion by an interested party seeking standing to commence a Challenge in accordance with the terms of this Interim Order).<br><br>In the event a third party, including any Committee, files a motion seeking standing to commence a Challenge in accordance with the terms of this Interim Order, any such motion shall, at a minimum, include a copy of any proposed objection or adversary complaint containing a detailed description of the claims and causes of action such party proposes to pursue.  The Challenge Period Termination Date may occur as to some, but not all, of the Prepetition Agents or Prepetition Secured Lenders, if a Challenge Proceeding is brought against one or more but not all of the Prepetition Agents and Prepetition Secured Lenders.  For the avoidance of doubt, in the event any of the Chapter 11 Cases is converted to a case under Chapter 7 or if a Chapter 11 trustee is appointed prior to expiration of the Challenge Period, then the Challenge Period shall not expire until sixty (60) days after the trustee's appointment in the affected chapter 11 case only.  In the event that the Committee or any other party in interest with requisite standing has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the applicable trustee shall be entitled (but not required) to assume the prosecution of any pending Challenge Proceeding.  In either event, until the later of the expiration of the Challenge Period without commencement of a Challenge Proceeding or the entry of a final, non-appealable order or judgment on account of any Challenge Proceeding commenced within the Challenge Period, no such trustee shall be bound by the Debtors' Stipulations in this Order. *See* Interim Order ¶¶ F(1)-(7), 23. |
|---|---|
| **Sections 506(c) and 552(b) Waivers:** | Upon entry of the Final Order the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent, the DIP Lenders, the Prepetition Collateral, and the DIP Collateral.<br><br>Upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall |

| | apply to the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral.<br><br>*See* Interim Order ¶¶ 44, 54 |
|---|---|
| **Lien on Avoidance Action Proceeds:** | As discussed above, the DIP Collateral to which the DIP Liens and Adequate Protection Liens attached include only the Specified Bankruptcy Recoveries and not all Bankruptcy Recoveries; provided, however, for the avoidance of doubt, the DIP Superpriority Claims and the Adequate Protection Superpriority Claims of the Prepetition Agents and the Prepetition Secured Lenders as provided in Paragraph 16 of the Interim Order shall be payable out of all Bankruptcy Recoveries, among other things.   .<br>*See* DIP Credit Agreement ¶¶ 8, 16. |

### Local Rule 4001-2 Disclosures

14.     The Debtors believe that the following financing terms are required to be highlighted pursuant to Local Rule 4001-2 and, as discussed herein, are necessary and justified in the context of, and the circumstances relating to, the Chapter 11 Cases.

- **Waiver of Section 506(c) Surcharge**.   Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. Although the DIP Loan Documents provide for a waiver of rights under section 506(c) with respect to the Prepetition Secured Lenders, the proposed waiver of the estates' rights will be effective only upon entry of the Final Order.  See Interim Order ¶ 44.

- **Liens on Avoidance Actions**.   Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions.  Upon entry of the Final Order, the DIP Collateral, to which the DIP Liens and Adequate Protection Liens have recourse, shall include the Specified Bankruptcy Recoveries, which include causes of action under section 549 of the Bankruptcy Code but will have limited recourse to the other causes of action under chapter 5 of the Bankruptcy Code; *provided* that the DIP Superpriority Claims and the Adequate Protection Superpriority Claims shall be payable from, among other things, proceeds of all chapter 5 causes of action.  *See* Interim Order ¶¶ 8, 16.

- **Roll-up of Prepetition ABL Obligations.**   Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use postpetition loans from a party to repay its own prepetition debt.  The Interim Roll-Up provides that during the Interim Period, all cash, collections, and proceeds of the Prepetition Collateral and DIP Collateral, and/or proceeds realized in connection with the Sale Motion (as defined below), shall be immediately paid to the Prepetition ABL Agent for application in reduction of the Revolving Loans outstanding under the Prepetition

ABL Credit Agreement in accordance with the Prepetition ABL Financing Documents, and upon payment in full thereof, to the DIP Agent for application in reduction of the Revolving Loans outstanding under the DIP Credit Agreement. Under the Final Roll-Up, solely upon entry of the Final Order, the Debtors shall use the proceeds of the next advance under the DIP Credit Agreement to satisfy all Prepetition ABL Debt (excluding any amounts in respect of Specified Letters of Credit) in full in accordance with the terms of the Prepetition ABL Credit Agreement. The Final Roll-Up and deemed issuance of letters of credit under the DIP Credit Agreement as provided for in Paragraph 2 of the Interim Order and Section 2.11 of the DIP Credit Agreement will be without prejudice to the rights of any third party, including, without limitation, any Committee, to seek an appropriate remedy from the Court upon a successful Challenge. *See* Interim Order ¶¶ 5,6.

- **Treatment of Professionals.** Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the creditors' committee from professionals retained by the Debtors. The Approved Budget includes line items for the Debtors' professionals and Committee's professionals. The Carve Out permits payments to professionals in accordance with the Approved Budget, provided that upon delivery of a Carve Out Trigger Notice, professional fees are subject to the Carve-Out Cap of $75,000, which is available on an unallocated basis to the Case Professionals (but in all cases, subject to the Approved Budget). *See* Interim Order ¶¶ 26-28.

- **Priming Liens.** Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder. The DIP Liens will prime the existing liens of the Prepetition Secured Parties. *See* Interim Order ¶ 8(b). As discussed below, the Prepetition Agents have consented to the DIP Liens priming the Prepetition Liens.

- **Equities of the Case.** Local Rule 4001-2(a)(1)(H) requires disclosure of provisions that seek to affect the Court's power to consider the equities of the case under Section 552(b)(1) of the Bankruptcy Code. The Interim Order provides that, upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral. *See* Interim Order ¶ 54.

15. The provisions of the DIP Financing Agreements and DIP Orders as to which disclosure was required pursuant to Local Rule 4001-2 are all justified under the circumstances of the Chapter 11 Cases because the DIP Lenders would not agree to the DIP Facility and the

Prepetition Agents would not consent to the use of Cash Collateral and priming of their liens by the DIP Facility without the inclusion of such terms.  As demonstrated herein, the funds provided under the DIP Facility are needed to allow the Debtors to operate in chapter 11, and the DIP Facility present the best financing available to the Debtors at this stage.  The DIP Facility provides the Debtors with the incremental funding needed to conduct preserve and maintain their business as a going concern so that they can conduct sale process and maximize the value of their assets for the benefit of their creditors.

## Basis for Relief Requested

16.    As set forth above and in the First Day Declaration, the Debtors believe that the DIP Facility is the best financing available under the circumstances and will enable the Debtors adequate liquidity to conduct the Chapter 11 Cases through the completion of their section 363 sale process.  For the reasons stated herein, the Debtors submit that they have satisfied the requirements to obtain postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.  The Prepetition Agents (after giving effect to the Intercreditor Agreement) have consented to the use of Cash Collateral and to the priming of their liens by the DIP Liens in accordance with the terms of the DIP Facility and Interim Order and are adequately protected against any diminution in value of the Prepetition Collateral.

17.    Section 364 of the Bankruptcy Code distinguishes among (i) obtaining unsecured credit in the ordinary course of business, (ii) obtaining unsecured credit out of the ordinary course of business, and (iii) obtaining credit with specialized priority or with security.[7]  If a debtor-in-possession cannot obtain sufficient postpetition credit on an unsecured basis, section

01:21510553.627

---

[7]    11 U.S.C. §§ 364(a)–(d).

364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is (i) entitled to superpriority, administrative-expense status or (ii) is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or both.[8]   Furthermore, section 364(d) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain postpetition credit secured by a senior or equal lien on encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected.[9]

18.    As further discussed herein, the DIP Facility is secured by substantially all of the assets of the Debtors' estates through superpriority claims, security interests, and secured liens pursuant to section 364 of the Bankruptcy Code.   The circumstances of the Chapter 11 Cases necessitate postpetition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Facility reflect the sound exercise of the Debtors' business judgment.

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Under Section 364(c) of the Bankruptcy Code.**

19.    Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.[10]   Courts have articulated

01:21510553.628

---

[8]    11 U.S.C. §364(c).

[9]    11 U.S.C. § 364(d).

[10]    *See In re LA Dodgers* LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion for authorization to enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990) (stating that debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the

Bankruptcy Code.  Specifically, courts look to whether:

> i.  The debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> ii.  The credit transaction is necessary to preserve the assets of the estate; and
>
> iii.  The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.[11]

20.    The Debtors propose to obtain the financing set forth in the DIP Credit

Agreement by providing, among other things, superpriority claims, security interests, and liens

pursuant to sections 364(c)(1)–(3) and 364(d) of the Bankruptcy Code.  For the reasons set forth

below, the Debtors submit that entry into the DIP Facility satisfies the three-part test to obtain

such financing.

### A.    The Debtors Could Not Obtain Unsecured Financing.

21.    To show that the credit required is not obtainable on an unsecured basis, a debtor

need only demonstrate "by a good faith effort that credit was not available without" the

protections of sections 364(c) of the Bankruptcy Code.[12]  Thus, "[t]he statute imposes no duty to

seek credit from every possible lender before concluding that such credit is unavailable."[13]

Moreover, in circumstances where only a few lenders likely can or will extend the necessary

credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct

01:21510553.629

---

[11]  *See In re L.A. Dodgers*, 457 B.R. at 312; *see also In re Ames Dep't Stores*, 115 B.R. at 37–39.

[12]  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).

[13]  *Id.*, *see also In re Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).

such an exhaustive search for financing."[14]  As set forth above and in the First Day Declaration, unsecured postpetition financing was simply not available to the Debtors.  This is unsurprising given, among other things, the level of secured debt the Debtors already have and the difficulties facing the Debtors' business and financial condition, particular in light of the pending Class Action.  Accordingly, the Debtors have satisfied the requirement of sections 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

### B. Entry Into the DIP Facility Is Necessary to Preserve Assets of the Estates and Is In the Best Interests of Creditors.

22.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.[15]  Courts grant a debtor considerable deference in acting in accordance with its sound business judgment.[16]  Further, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."[17]

01:21510553.630

---

[14]   *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Snowshoe*, 789 F.2d at 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

[15]   *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y.  Mar. 5, 2009) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

[16]   *See, e.g., Barbara K. Enters.*, 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest").

[17]   *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

23.    The Debtors' decision to enter into the DIP Facility is an exercise of their sound judgment that warrants approval by the Court.  The Debtors are at a point where they do not have adequate liquidity to fund their go-forward operations.  The Debtors' management, board, and professionals have reviewed their restructuring alternatives in detail over the past several months and have explored, and solicited, alternative sources of capital and financing as part of this process.  The ultimate conclusion was that the Debtors should pursue a sale process and that a section 363 sale process would result in maximum value for the Debtors' assets and, by extension, their stakeholders.  Therefore, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility.  This included negotiating with the two most likely sources of DIP financing – their existing secured creditors – as well as soliciting interest from third-parties.  The DIP Facility represents the best terms available at the conclusion of that process and under the circumstances of the Chapter 11 Cases.  The DIP Facility will provide immediate access to capital, on terms that, collectively, are the best and most favorable terms available to the Debtors.

24.    Without access to the DIP Facility, the Debtors would experience a liquidity shortfall and would be deprived of the capital necessary to operate their businesses.  The DIP Facility will provide the funding necessary to allow the Debtors to, among other things, maintain their businesses in the ordinary course and successfully implement their sale process.  The Debtors' management has prepared the Approved Budget, which the DIP Lenders have agreed to, and the Debtors believe that expenditures of funds pursuant to the Approved Budget (after taking into account the Permitted Variances) will permit the Debtors to continue operations on a post-petition basis and meet their postpetition ordinary course obligations while they conduce the section 363 sale process.  The DIP Facility also will enhance the Debtors' ability to minimize

disruption to their businesses and instill confidence in their various creditor constituencies, including customers, vendors and employees.  In short, with the DIP Facility, the Debtors will be in a position to continue operations while conducting their section 363 sale process, thereby preserving and maximizing the value of their assets for the benefit of all creditors.

      **C.**      **The Terms of the DIP Facility Are Fair and Reasonable Under the Circumstances.**

25.    In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.[18]  Judged from that perspective, the terms of the DIP Facility are fair and reasonable.

26.    First and foremost, the Debtors believe that the DIP Facility, along with the coupled consent to use Cash Collateral, provides them with sufficient liquidity to continue their operations in the near term while they seek to pursue a value-maximizing sale transaction.  Second, the financial terms of the DIP Facility are consistent with market terms for such financing under the current economic environment and the Debtors' recent and projected financial performance.  Indeed, the economic terms of the DIP Facility are substantially the same as those under which the Debtors were borrowing under the Prepetition ABL Credit Agreement, with the exception that the DIP Facility provides incremental liquidity above the Debtors' borrowing base that would otherwise have been unavailable prepetition.  After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Facility are

01:21510553.632

---

[18]    *See In re Farmland*, 294 B.R. at 886–89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364–65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

reasonable and appropriate under the circumstances, as well as the best option the Debtors' believe is available and feasible

27.    Likewise, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in the Chapter 11 Cases.  Instead, the DIP Facility subject the security interests and administrative expense claims granted to the DIP Lenders to the Carve-Out for certain administrative and professional fees.  Carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate is adequately assisted by counsel and other professionals.[19]

28.    For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Facility are fair and reasonable in the circumstances of the Chapter 11 Cases.

### D.    The Roll-Up is Necessary and Appropriate.

29.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.[20]  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.[21]  The business judgment rule shields a debtor's management from judicial second-guessing.[22]

01:21510553.633

---

[19]    *See In re Ames*, 115 B.R. at 38.

[20]    *See* 11 U.S.C. § 363(b).

[21]    *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).

[22]    *See In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

30.    The Debtors submit that the satisfaction of the Prepetition ABL Debt pursuant to the Interim Roll-Up and Final Roll-Up as provided for under the DIP Facility is appropriate in these cases.  The roll-up of the Prepetition ABL Debt is part of the overall package presented to the Debtors by the DIP Lenders, a package that the Debtors believe is fair and reasonable under the circumstances, as well as the only option that the Debtors believe is available and feasible, based on the Debtors' and their advisors' efforts to seek alternative financing.  The Debtors do not believe that the DIP Lenders would have agreed to the DIP Facility absent the satisfaction of the Prepetition ABL Debt provided for under the DIP Facility.

31.    Further, the DIP Lenders are the same as the Prepetition ABL Lenders, and the Prepetition ABL Debt currently holds a first-lien position on the Prepetition Collateral.  As a result, the Debtors submit that the replacement of pre-petition first lien with post-petition first lien debt should have minimal impact on the Debtors creditors and the Prepetition Term Lenders, the party who represents the Debtors' largest creditor, are deemed to consent to the terms of the DIP Facility, which include the roll-up through the Prepetition Intercreditor Agreement.  The Prepetition Term Agent and Prepetition Term Lenders have advised the Debtors that they do not object to entry of the Interim DIP Order, although they have reserved their rights with respect to entry of the Final Order, subject to the terms of the Prepetition Intercreditor Agreement.  Finally, the Debtors submit that any prejudice to the estates and creditors that may arise by the roll-up of the Prepetition ABL Debt is mitigated by the fact that the roll-up is subject to the "challenge" rights set forth in the DIP Orders.

## II.    A Priming Lien Should Be Approved under Section 364(d) of the Bankruptcy Code.

32.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code alone, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."[23] Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that a court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A)    the trustee is unable to obtain credit otherwise; and

(B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.[24]

33.    To justify a priming lien, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code and demonstrate adequate protection[25]    The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.[26]  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization

01:21510553.635

---

[23]    11 U.S.C. § 364(d).

[24]    *Id.*

[25]    *See In re Snowshoe Co.*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

[26]    *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

process."[27]   However, consent by a secured creditor to priming obviates the need to show adequate protection.[28]

34.    As demonstrated above, the Debtors believe that the DIP Facility, which provide for DIP Liens that prime the Prepetition Liens, is best and only feasible source of postpetition financing under the circumstances of the Chapter 11 Cases.  Additionally, the Prepetition ABL Lenders (who are the DIP Lenders) and the Prepetition Term Lenders have consented to the priming of their liens.  Further, subject to the terms and conditions set forth in the Interim Order, in accordance with section 364(d)(1)(B) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the DIP Facility and Interim Order also provides adequate protection to the Prepetition ABL Lenders and the Prepetition Term Lenders for the priming of the Prepetition Liens.

35.    The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.[29]  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."[30]  However, the proposed adequate protection need only provide a prepetition secured creditor "with the same level of protection it would have had if there had not

01:21510553.636

---

[27]   *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

[28]   *See Anchor Savs. Bank FSB v*, 99 B.R. at 122 ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

[29]   *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

[30]   *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

been post-petition superpriority financing."[31]    Moreover, the form of a secured creditor's

adequate protection package is firmly within the province of a debtor's business judgment.[32]

36.    The Prepetition ABL Lenders and the Prepetition Term Lenders are adequately

protected against any diminution in value of the Prepetition Collateral by the protections set forth

in the Interim Order, including the Adequate Protection Liens, the Adequate Protection Claims,

and the additional funding provided by the DIP Lenders to maintain the Debtors' operations and

preserve their going-concern value.[33]    The postpetition financing provided by the DIP Lenders

not only protects against diminution in value—which would likely result from the Debtors'

inability to continue to finance their operations—but also enhances the Debtors' ability to derive

value (and the Prepetition ABL Lenders' and the Prepetition Term Lenders' ability to realize

value) from the Prepetition Collateral by enabling the Debtors to continue as a going-concern

while they implement the section 363 sale process and seek to obtain maximum value for their

assets through consummation of a sale.    The alternative to a section 363 sale, a liquidation,

01:21510553.637

---

[31]    *Resolution Trust Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994) (citations and internal quotation marks omitted)).

[32]    *See, e.g.*, *Crocker Nat'l Bank* v. *Am. Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.)*, 734 F.2d 426, 435 (9th Cir. 1984) ("Consistent with the policies behind sections 361 and 362, the debtor should be permitted maximum flexibility in structuring a proposal for adequate protection."); *In re True Temper Sports, Inc.*, Case No. 09-13446 (PJW), 2010 WL 5093163, at *8 (Bankr. D. Del. Oct. 9, 2010); *In re Atrium Corp.*, Case No. 10-10150 (BLS), 2010 WL 2822131, at *6 (Bankr. D. Del. Mar. 17, 2010).

[33]    *See, e.g.*, *First Sec. Bank & Trust Co. v. Vander Vegt*, 511 B.R. 567, 583–84 (N.D. Iowa 2014) (finding that secured party was adequately protected because value of collateral was likely to increase was not clearly erroneous); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 632 (Bankr. S.D.N.Y. 1992) ("[The creditor] will be adequately protected because the infusion of approximately $600,000.00 in improvements from the borrowed proceeds will enhance the value of the property secured by [the creditor's] mortgage by at least the amount of the borrowed proceeds."); *In re Ledgemere Land Corp.*, 125 B.R. 58, 65 (Bankr. D. Mass. 1991) (holding that bank was adequately protected when value of collateral would be enhanced); *Bank of New England v. BWL, Inc.*, 121 B.R. 413, 418 (D. Me. 1990) (upholding bankruptcy court's determination that increase in the value of collateral was such that secured party was adequately protected); *accord* 3-361 Collier on Bankruptcy P 361.03 ("In some cases, this requirement may be satisfied if the court finds . . . that the proposed use will result in an enhancement of value.").

would likely lead to substantially reduced recoveries.  In contrast, absent such authority, the Debtors' ability to continue operations will be significantly impaired and the value of their assets and the Prepetition Collateral could be destroyed to the detriment of the Prepetition ABL Lenders and the Prepetition Term Lenders and other creditors.  Further, the use of any proceeds of the DIP Facility and other cash shall be solely in accordance with the Approved Budget, which provides further assurance that the DIP Facility will not only maintain the value of the Prepetition Collateral, but will augment the collateral base and strengthen the value of the Debtors' business.

37.    Accordingly, the Debtors respectfully submit that the Prepetition Secured Parties have consented to the priming liens and are adequately protected against any diminution in the value of the Prepetition Collateral.

**III.    The Debtors Should Be Authorized to Use Cash Collateral.**

38.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.[34]

Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set

01:21510553.638

---

[34]   11 U.S.C. § 363(c)(1).

forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or debtor-in-possession may

not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)    each entity that has an interest in such collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.[35]

39.     During the ordinary course of operations, the Debtors generate cash from the use

of the Prepetition Collateral and DIP Collateral.  As of the Petition Date, the Debtors held only a

*de minimis* amount of unrestricted cash, if any.  The Debtors need the DIP Facility and the use of

Cash Collateral as contemplated thereby is a condition of the DIP Facility.  As a result, it is

imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of the

Interim DIP Order.  Accordingly, to avoid immediate and irreparable harm to the Debtors'

business operations and their estates that would arise if they could not obtain the DIP Facility,

the Debtors have an immediate need for authority to use Cash Collateral.

40.     The Debtors submit that, under the circumstances here, their request to use Cash

Collateral should be approved.  The parties with the material interest in the Cash Collateral—

namely the Prepetition ABL Lenders and the Prepetition Term Lenders—have consented to the

use of Cash Collateral under the Interim DIP Order provided that the relief requested herein is

granted.  Accordingly, the proposed adequate protection is fair, reasonable, and sufficient to

justify the requirements of sections 363(c)(2) and (3) of the Bankruptcy Code.

01:21510553.639

---

[35]   11 U.S.C. § 363(c)(2).

**IV.**     **Interim Approval Should Be Granted.**

41.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.[36]  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the borrowers' estates.[37]

42.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the DIP Facility as provided therein.  Critically, the Debtors have payroll funding obligations that must be met on February 7, 2016, and they require authorization to use Cash Collateral and/or proceeds of the DIP Facility to fund the payroll disbursements set forth in the Approved Budget for such date.  As set forth herein, this relief requested in the Interim Order will provide the Debtors with sufficient liquidity to operate their businesses in a manner that will permit them to preserve and maximize value, and successfully consummate a section 363 sale.  Under these circumstances and in light of the risk of immediate and irreparable harm and prejudice to their estates and all parties in interest, the Debtors submit that interim relief is warranted.

01:21510553.640

---

[36]     *See* FED. R. BANKR. P. 4001(b)(2), (c)(2).

[37]     *See id.*; *see also* Local Rule 4001-2(b).

## Final Hearing

43.     The Debtors further respectfully request that this Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon:  (A) the Office of the United States Trustee ("**U.S.  Trustee**"); (B) counsel to the DIP Agent, the DIP Lenders, and the Prepetition ABL Agent; (C) holders of the 30 largest unsecured claims on a consolidated basis against the Debtors; (D) counsel for the Prepetition Term Agent and Prepetition Term Lenders; (E) the Internal Revenue Service; (F) all appropriate state taxing authorities; (G) all landlords, owners, and/or operators of premises at which any of the Debtors' material assets are located; and (H) any other party that files a request for notices with the Court as of the date of such service (collectively, the "**Notice Parties**").  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

## Notice

44.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney General for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel to the Debtors' first and second lien lenders; (vi) the Debtors' cash management banks; (vii) all other secured creditors of record; and (viii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Interim Order granting the relief requested herein, (ii) schedule a Final Hearing, (iii) enter the Final Order following a Final Hearing, and (iv) grant such other relief as is just and proper.

Dated:    February 6, 2017
          Wilmington, Delaware

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

/s/     *Ryan M. Bartley*
M. Blake Cleary (No. 3614)
Ryan M. Bartley (No. 4985)
Andrew L. Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

WINSTON & STRAWN LLP
Daniel J. McGuire
(*pro hac vice* admission pending)
Grace D. D'Arcy
(*pro hac vice* admission pending)
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700

Carrie V. Hardman
(*pro hac vice* admission pending)
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

*Proposed Counsel for Debtors and
Debtors in Possession*

# **EXHIBIT A**

**Interim Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------   :
                                                            :
In re                                                       :   Chapter 11
                                                            :
UNITED ROAD TOWING, INC. et al.,                            :   Case No. 17-10249 (____)
                                                            :
            Debtors.¹                                       :   Jointly Administered
                                                            :
---------------------------------------------------------   :   Docket Ref. No. ___
```

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507
AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS
AND DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING,
(II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS
AND SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED LENDERS, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***")[2] of United Road Towing, Inc., on behalf of itself and its affiliated

debtors and debtors-in-possession in the above-captioned cases (collectively, the "***Debtors***"), pursuant to

sections 105, 361, 362, 363, 364, and 507 of Title 11, United States Code, 11 U.S.C. §§ 101 *et seq*. (the

"***Bankruptcy Code***"), and in accordance with Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 4001-2 of the Local Rules of Bankruptcy

Practice and Procedure (the "***Local Rules***") of the United States Bankruptcy Court for the District of

Delaware (this "***Court***"), in these chapter 11 cases (the "***Chapter 11 Cases***"), for entry of an interim order

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
United Road Towing, Inc. (6962); URT Holdings, Inc. (8341); City Towing, Inc. (2118); URS West, Inc. (3518);
Bill & Wag's Towing (3518); Export Enterprises of Massachusetts, Inc. (5689); Pat's Towing, Inc. (6964);
Keystone Towing, Inc. (6356); Ross Baker Towing, Inc. (9742); URT Texas, Inc. (3716); Mart Caudle
Corporation (1912); Signature Towing, Inc. (3054); WHW Transport, Inc. (3055); URS Southeast, Inc. (7289);
URS Northeast, Inc. (7290); URS Southwest, Inc. (7284); Fast Towing, Inc. (5898); E&R Towing and Garage,
Inc. (8500); Sunrise Towing, Inc. (7160); Ken Lehman Enterprises, Inc. (1970); United Road Towing of South
Florida, Inc. (9186); Rapid Recovery Incorporated (1659); United Road Towing Services, Inc. (2206); Arri
Brothers, Inc. (7962); Rancho Del Oro Companies, Inc. (3924); CSCBD, Inc. (2448); URS Leasing, Inc. (9072);
UR VMS LLC (4904); UR Vehicle Management Solutions, Inc. (0402).  The Debtors' mailing address is c/o
United Road Towing, Inc., 9550 Bormet Drive., Suite 301, Mokena, Illinois 60448.

[2]   Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms
in the DIP Credit Agreement (defined below).

(this "***Interim Order***"), granting the following relief on an interim basis until the date that a Final Order (as defined below) has been entered (the "***Interim Period***"):

**(I)**   **Interim DIP Financing**

(A)   Authorizing the Debtors to obtain up to $35,250,000 in post-petition financing (the "***DIP Facility***") pursuant to (and in accordance with the terms of) that certain *Senior Secured, Superpriority Debtor-in-Possession Credit Agreement* (as may be amended, modified, or supplemented and in effect from time-to-time, the "***DIP Credit Agreement***"), substantially in the form attached hereto as ***Exhibit "2"***, by and among the Debtors, as borrowers and/or guarantors, Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "***DIP Agent***"), and each Revolving Lender party thereto (individually a "***DIP Lender***"; and collectively the "***DIP Lenders***"), which may be used for the following purposes in accordance with and as limited by the Approved Budget (as defined below) (subject to permitted variances) and subject to Paragraph 50 hereof (where applicable):

(i)   to pay fees, costs, and expenses as provided in the DIP Financing Agreements (as defined below), including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Agreements (as defined below);

(ii)   for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper and lawful corporate purposes of the Debtors not otherwise prohibited by the terms hereof and/or the DIP Financing Agreements;

(iii)   treating all undrawn and unexpired Letters of Credit issued under the Prepetition ABL Credit Agreement (as defined below), other than any Specified Letter of Credit (as defined in the Prepetition ABL Credit Agreement), as Letters of Credit under the DIP Credit Agreement for all purposes;

(iv)   for making adequate protection payments and other payments as provided in this Interim Order (and upon its entry, the Final Order);

(v)   to fund the Prepetition Indemnity Account (as defined below) for the benefit of the Prepetition ABL Agent and the Prepetition ABL Lenders (each as defined below);

(vi)   for payment of the outstanding prepetition Revolving Loans constituting Prepetition ABL Debt (each as defined below) in the manner set forth in Paragraph 5 hereof (the "***Interim Roll-Up***");

(vii)   other than as may be applicable to any Specified Letter of Credit, upon entry of a Final Order, for the payment in full of all outstanding prepetition

amounts under the Prepetition ABL Credit Agreement in the manner set forth in Paragraph 6 hereof (the "***Final Roll-Up***"); and

 (viii) upon either (x) a DIP Maturity Event, so long as all Prepetition ABL Debt and all DIP Obligations have been paid in full in cash, or (y) after the occurrence of a DIP Order Event of Default (as defined below) as provided in Paragraph 31 below, to fund the Carve Out Account (as defined below).

(B) Authorizing the Debtors to enter into the DIP Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Agent and/or the DIP Lenders, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("***UCC***") financing statements, and all other related agreements, documents, notes, certificates, and instruments to be executed, delivered, and/or ratified by the Debtors in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, the "***DIP Financing Agreements***");

(C) Approval of the Interim Roll-Up;

(D) Granting the DIP Agent for the benefit of the DIP Lenders the following Liens (as defined in section 101(37) of the Bankruptcy Code) (the "***DIP Liens***") and claims:

 (i) first priority priming, valid, perfected, and enforceable Liens, subject only to the Carve Out (as defined below) and the Permitted Prior Liens (as defined below), as provided in and as contemplated by this Interim Order and the DIP Financing Agreements;

 (ii) a first-priority senior lien on the Debtors' unencumbered assets, but excluding leasehold interests of the Debtors ("***Leases***") and actions arising under chapter 5 of the Bankruptcy Code; provided, however, (A) upon entry of the Interim Order, the DIP Liens shall include, first-priority senior liens on the proceeds of Leases (the "***Lease Proceeds***"), and (B) subject to entry of a Final Order, the DIP Liens shall include, first-priority senior liens on Specified Bankruptcy Recoveries (defined below); and

 (iii) allowed superpriority administrative claim status in respect of all obligations under the DIP Financing Agreements (collectively, the "***DIP Obligations***"), subject to the Carve Out as provided herein.

**(II)** **Interim Use of Cash Collateral** – During the Interim Period, authorizing the Debtors' use of "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code ("***Cash Collateral***")) in which the Prepetition ABL Agent and the Prepetition Term Agent (each as defined below) have an interest;

**(III)** **Adequate Protection** – Granting certain adequate protection, including, among other things, Adequate Protection Liens and Adequate Protection Superpriority Claims (each as defined below) and certain other adequate protection as described in this Interim Order, to (A) Wells Fargo Bank, National Association, as administrative agent and as collateral agent (the "***Prepetition ABL Agent***") under that certain Credit Agreement, dated August

21, 2014 (as amended and in effect, the "***Prepetition ABL Credit Agreement***"), by and among the Debtors that comprised the "Loan Parties" thereunder, the Prepetition ABL Agent, and each Revolving Lender party thereto (the "***Prepetition ABL Lenders***"), and (B) Medley Capital Corporation, as term loan agent (the "***Prepetition Term Agent***" and, together with the Prepetition ABL Agent, the "***Prepetition Agents***") under that certain Credit Agreement dated as of August 21, 2014 (as amended and in effect, the "***Prepetition Term Credit Agreement***"), by and among the Debtors that comprised the "Borrowers" and "Guarantors" thereunder, the Prepetition Term Agent, and the lenders party thereto (the "***Prepetition Term Lenders***" and, together with the Prepetition ABL Lenders, the "***Prepetition Secured Lenders***"), in each case limited to the extent of any Diminution In Value (as defined below) of the Prepetition Agents' respective interests in the Prepetition Collateral (as defined below), having the priority set forth in this Interim Order, as adequate protection for (i) the granting of the DIP Liens to the DIP Agent, (ii) the use of Cash Collateral, (iii) subordination to the Carve Out, and (iv) for the imposition of the automatic stay;

(IV)    **Modifying the Automatic Stay** – Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Interim Order;

(V)    **Waiving Any Applicable Stay** – Waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order; and

(VI)    **Final Hearing** – Scheduling a final hearing (the "***Final Hearing***") to consider entry of an order (the "***Final Order***") granting the relief requested in the DIP Motion on a final basis and approving the form of notice with respect to the Final Hearing.

and upon the *Declaration of Michael Mahar in Support of First Day Pleadings* (the "***First Day Declaration***") filed contemporaneously with the Motion; and this Court having reviewed the Motion and held a hearing with respect to the Motion (the "***Interim Hearing***"); and upon the Motion, the First Day Declaration, and the record of the Interim Hearing and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

I.    <u>**Procedural Findings of Fact**</u>

A.    **Petition Date.**  On February 6, 2017 (the "***Petition Date***"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue

to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

**B.    Jurisdiction and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

**C.    Statutory Predicates**.  The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014 and the applicable Local Rules.

**D.    Committee Formation.**  No official committee (a "***Committee***") of unsecured creditors, equity interest holders, or other parties-in-interest has been appointed in the Chapter 11 Cases.

**E.    Notice.**  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014, and the Local Rules.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors to certain parties-in-interest, including: (i) the Office of the United States Trustee ("***U.S. Trustee***"); (ii) those creditors holding the 30 largest unsecured claims against the Debtors' estates, on a consolidated basis; (iii) counsel to the Prepetition ABL Agent and the DIP Agent; (iv) counsel to the Prepetition Term Agent; and (v) all other secured creditors of record. Notice has been given in accordance with Local Rule 9013-1(m), and no other or further notice need be given.

## II.    Debtors' Acknowledgements and Agreements

**F.**    Without prejudice to the rights of parties-in-interest as set forth in Paragraphs 23-25 below, each of the Debtors admits, stipulates, acknowledges, and agrees that (collectively, Paragraphs F(1) through F(7) hereof shall be referred to herein as the "***Debtors' Stipulations***"):

(1)    Prepetition ABL Financing Documents.    Prior to the commencement of the Chapter 11 Cases, the Loan Parties (as defined in the Prepetition ABL Credit Agreement) were parties to (A) the Prepetition ABL Credit Agreement, (B) that certain Guaranty and Security Agreement dated August 14, 2014 (as amended, restated, modified and supplemented from time to

time and in effect), and (C) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition ABL Agent or Prepetition ABL Lenders, including, without limitation, that certain Intercreditor Agreement , dated as of August 21, 2014, between and among Wells Fargo Bank, National Association, as "First Lien Agent" and Medley Capital Corporation, as "Second Lien Agent" (the "*Prepetition Intercreditor Agreement*"), control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively, the "*Prepetition ABL Financing Documents*").

(2)     Prepetition Term Financing Documents.   Prior to the commencement of the Chapter 11 Cases, the Loan Parties (as defined in the Prepetition Term Credit Agreement) were parties to (A) the Prepetition Term Credit Agreement, (B) that certain Guaranty and Security Agreement dated August 21, 2014 (as amended, restated, modified and supplemented from time to time and in effect), and (C) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Prepetition Term Agent or the Prepetition Term Lenders, including, without limitation, the Prepetition Intercreditor Agreement, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively, the "*Prepetition Term Financing Documents*" and, together with the Prepetition ABL Financing Documents, the "*Prepetition Financing Documents*").

(3)     Prepetition ABL Debt Amount.   As of the Petition Date, the Loan Parties (as defined in the Prepetition ABL Credit Agreement) were liable to the Prepetition ABL Lenders under the Prepetition ABL Financing Documents, on account of "Revolving Loans" in the approximate principal amount of $13.84, million, plus letters of credit in the approximate stated amount of not less than $6.08 million, plus interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other obligations, including, without limitation, on account of cash management, credit card, depository, investment, leasing, hedging and other banking or financial services secured by the Prepetition ABL Financing Documents (collectively the "*Prepetition ABL Debt*").

(4)     Prepetition Term Loan Debt Amount.   As of the Petition Date, the Loan Parties (as defined in the Prepetition Term Credit Agreement) were liable to the Prepetition Term Lenders in the total aggregate principal amount of $17 million, plus interest accrued and accruing, costs, expenses, and fees (including attorneys' fees and legal expenses).   All obligations of the Loan Parties (as defined in the Prepetition Term Credit Agreement) arising under the Prepetition Term Credit Agreement or any other Prepetition Term Financing Document, including all principal, accrued or hereafter accruing interest, fees, and costs, payable under the Prepetition Term Credit Agreement shall hereinafter be referred to as the "*Prepetition Term Loan Debt*" and, together with the Prepetition ABL Debt, the "*Prepetition Secured Debt*."

(5)     Prepetition Collateral.   To secure the Prepetition Secured Debt, each of the  Loan Parties (as defined in the respective Prepetition ABL Credit Agreement and Prepetition Term Credit Agreement) granted continuing security interests and Liens (collectively, the "*Prepetition Liens*") to the Prepetition Agents and the Prepetition Secured Lenders upon substantially all of its property, including the following, all as defined in the Prepetition Financing Documents (collectively, the "*Prepetition Collateral*"), including, without limitation:

All: (a) Accounts, (b) Books, (c) Chattel Paper (d) Commercial Tort Claims, (e) Deposit Accounts, (f) Equipment, (g) Farm Products, (h) Fixtures, (i) General Intangibles, (j) Inventory, (k) Investment Property, (l) Intellectual Property, (m) Negotiable Collateral, (n) Pledged Interests (including all of such Debtor's Operating Agreements and Pledged Partnership Agreements), (o) Securities Accounts, (p) Supporting Obligations, (q) all of such Debtor's money, Cash Equivalents, or other assets of such Debtor that now or hereafter come into the possession, custody, or control of the Prepetition ABL Agent (or its agent or designee) or any other Prepetition ABL Lender, (r) all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable Collateral, Pledged Interests, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds").  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Debtor or the Prepetition ABL Agent from time to time with respect to any of the Investment Property, and (s) any of the foregoing, whether now owned or now due, or in which any Debtor has an interest, or hereafter acquired, arising, or to become due, or in which any Debtor obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing.

(6)    <u>Prepetition Liens</u>.  The Prepetition Liens of the Prepetition Agents and the Prepetition Secured Lenders have priority over all other Liens except (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens (collectively, the "***Permitted Prior Liens***").

(a)    As of the Petition Date, (i) the Prepetition Liens are valid, binding, enforceable, and perfected first priority Liens, subject only to any Permitted Prior Liens, and are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) (a) the Prepetition Secured Debt constitutes legal, valid, and binding obligations of the Loan Parties (as defined in the respective Prepetition ABL Credit Agreement and Prepetition Term Credit Agreement), enforceable in accordance with the terms of the Prepetition Financing Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy

Code), (b) no offsets, defenses, or counterclaims to any of the Prepetition Secured Debt exists, and (c) no portion of the Prepetition Secured Debt is subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (iii) the Debtors have no valid claims (as such term is defined in section 101(5) of the Bankruptcy Code) or causes of action against the Prepetition Agents or any Prepetition Secured Lender with respect to the Prepetition Financing Documents or otherwise, whether arising at law or at equity, including, without limitation, any recharacterization, subordination, disallowance, avoidance or other claims arising under or pursuant to sections 105, 510, 541 or 542 through 553, inclusive, of the Bankruptcy Code, and (iv) the Prepetition Secured Debt constitutes allowed claims.

(b)     On the date that this Interim Order is entered, each of the Debtors has waived, discharged, and released the Prepetition Agents and the Prepetition Secured Lenders, together with their respective successors, assigns, subsidiaries, parents, affiliates, agents, attorneys, officers, directors, and employees (collectively, the "**_Released Parties_**"), of any right the Debtors may have (i) to challenge or object to any of the Prepetition Secured Debt, (ii) to challenge or object to the Prepetition Liens or any other security for the Prepetition Secured Debt, and (iii) to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the Prepetition Financing Documents, or otherwise.

(c)     None of the Debtors possesses and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description against any of the Released Parties, including anything which would in any way affect the validity, enforceability, priority, and non-avoidability of any of the Prepetition Financing Documents or the Prepetition Liens, or any claim of the Prepetition Secured Lenders pursuant to the Prepetition Financing Documents, or otherwise.

(7)     _Cash Collateral_.  The Prepetition Agents have a continuing security interest in and Lien on all or substantially all of the Loan Parties' (as defined in the respective Prepetition ABL Credit Agreement and Prepetition Term Credit Agreement) Cash Collateral, including all amounts on deposit in the Loan Parties' (as defined in the respective Prepetition ABL Credit Agreement and Prepetition Term Credit Agreement) banking, checking, or other deposit accounts and all proceeds of the Prepetition Collateral, to secure the Prepetition Secured Debt.

## III.   Findings Regarding the Post-Petition Financing.

**G.     Need for Post-Petition Financing**.  An immediate need exists for the Debtors to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of their estates for the benefit of their stakeholders.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates and their stakeholders.

**H.        No Credit Available on More Favorable Terms**.    As discussed in the First Day Declaration, the Debtors have been unable to obtain any of the following:

(1)        unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,

(2)        credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,

(3)        credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, or

(4)        credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien,

in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Interim Order.  The Debtors are unable to obtain credit from the DIP Lenders without granting to the DIP Agent, for the benefit of the DIP Lenders, the DIP Protections (as defined below).

**I.        Prior Liens**.    Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Liens or Prepetition Liens (subject to Paragraphs 23-25 below) are valid, senior, perfected, or unavoidable.    Moreover, except as provided in Paragraphs 23-25 below, nothing shall prejudice the following:

(1)        the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Lenders, the Prepetition Agents, Prepetition Secured Lenders, and any Committee to challenge the validity, priority, perfection, and extent of any such Permitted Prior Liens, or

(2)        the rights of any Committee or any other party-in-interest (other than the Debtors) with requisite standing to challenge the validity, priority, perfection, and extent of the Prepetition ABL Debt, Prepetition Term Debt, and/or the Prepetition Liens as set forth in this Interim Order.

**J.        Adequate Protection for Prepetition Secured Lenders.**  As a result of the granting of the DIP Liens, the incurrence of the DIP Obligations, subordination to the Carve Out, the use of Cash Collateral authorized herein, and the imposition of the automatic stay, the Prepetition Agents and Prepetition Secured Lenders are entitled to receive adequate protection pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, in each case limited to the extent of any Diminution In Value of their interests in the Prepetition Collateral (including Cash Collateral) during these Chapter 11 Cases. As adequate protection,

the Prepetition Secured Lenders will receive the Adequate Protection (as defined below) described in Paragraph 16 of this Interim Order.

      **K.**      **Prepetition Secured Lenders Governed By Prepetition Intercreditor Agreement**.  The Prepetition ABL Agent and Prepetition Term Agent are parties to the Prepetition Intercreditor Agreement. The Prepetition Intercreditor Agreement is a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code in the Chapter 11 Cases.  The Prepetition Agents and Prepetition Secured Lenders have stipulated that their respective interests in the Prepetition Collateral shall continue to be governed by the Prepetition Intercreditor Agreement.

      **L.**      **Prepetition Agents' and Prepetition Secured Lenders' Consent**.  In exchange for the Adequate Protection, the Prepetition Secured Lenders have agreed to the Debtors' use of Cash Collateral on the terms set forth in this Interim Order and to the subordination of their Prepetition Liens to the DIP Liens, and the Carve Out as set forth herein. The Prepetition Agents and the Prepetition Secured Lenders have consented to the priming of the Prepetition Liens by the DIP Liens to the extent set forth herein.

      **M.**      **Adequacy of the Approved Budget.**  The Debtors have demonstrated that the budget, the short form of which is attached hereto as ***Exhibit "1"*** (as the same may be modified, supplemented, or updated from time to time consistent with the terms of the DIP Credit Agreement, this Interim Order, and upon its entry, the Final Order, the "***Approved Budget***")[3] is adequate, considering all the available assets, to pay the administrative expenses due and accruing during the Interim Period.

      **N.**      **Conditions Precedent to DIP Lenders' Extension of Financing.**  The DIP Lenders have indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and the other DIP Financing Agreements. The DIP Lenders are good faith financiers, and that the DIP Lenders' claims, superpriority claims, security interests, and Liens and other protections granted pursuant to this Interim Order (and upon its entry, the Final Order) and the DIP Facility will not be affected by any

---

[3]    All backup, schedules, and other detail contained in the Approved Budget is incorporated by reference, including accruals for professional fee estimates.

subsequent reversal, modification, vacation, or amendment of this Interim Order (and upon its entry, the Final Order) or any other order, as provided in section 364(e) of the Bankruptcy Code.

O.     **Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.**  The extension of credit under the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and the fees paid and to be paid thereunder (i) are fair, reasonable, and the best available under the circumstances, (ii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and (iii) are supported by reasonably equivalent value and consideration.  The DIP Facility were negotiated in good faith and at arms' length between the Debtors, the DIP Agent, and the DIP Lenders, and the use of the proceeds to be extended under the DIP Facility and the consent to use of Cash Collateral and Adequate Protection under this Interim Order will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Agent, DIP Lenders, Prepetition Agents and Prepetition Secured Lenders are entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

P.     **Relief Essential; Best Interest.**  The relief requested in the Motion (and as provided in this Interim Order) is necessary, essential and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets during the Interim Period.  It is in the best interest of the Debtors' estates that the Debtors be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other DIP Financing Agreements.  The Debtors have demonstrated good and sufficient cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

## I.

### DIP FINANCING

A.     **Approval of Entry into the DIP Facility**

1.     The Motion is granted as set forth herein.

2.      The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Credit Agreement and the other DIP Financing Agreements, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the respective DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Financing Agreements.  The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the respective DIP Financing Agreements as such become due, and, subject to the provisions of Paragraph 50 below, reasonable attorneys', financial advisors', consultants, and accountants' fees and disbursements as provided for in the respective DIP Financing Agreements, which amounts shall not otherwise be subject to approval of this Court.  Upon the entry of this Interim Order, all letters of credit outstanding under the Prepetition ABL Financing Documents, other than Specified Letters of Credit, shall be deemed to have been issued pursuant to and shall be deemed to be outstanding under the DIP Credit Agreement.

**B.      Authorization to Borrow**

3.      In order to enable them to continue to operate their businesses during the Interim Period, and subject to the terms and conditions of this Interim Order, the respective DIP Financing Agreements, and the Approved Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), the Debtors are hereby authorized to borrow under the DIP Financing Agreements an amount up to $12,500,000 in accordance with the terms and conditions of the DIP Credit Agreement.

**C.      Application of DIP Facility' Proceeds**

4.      The advances under the DIP Facility shall be used in each case in a manner consistent with the terms and conditions of the respective DIP Financing Agreements and in accordance with and as may be limited by the Approved Budget (subject to any permitted variances thereunder), solely as follows:

(a)      to pay fees, costs, and expenses as provided in the respective DIP Financing Agreements, including amounts incurred in connection with the preparation, negotiation,

execution, and delivery of the DIP Credit Agreement, the other DIP Financing Agreements, and this Interim Order;

(b)     for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper and lawful corporate purposes of the Debtors not otherwise prohibited by the terms hereof or under the DIP Credit Agreement and/or the other DIP Financing Agreements;

(c)     for making payments in respect of Adequate Protection and other payments as provided in this Interim Order;

(d)     to fund the Prepetition ABL Indemnity Account (as provided in Paragraph 16 below);

(e)     upon entry of a Final Order, for the payment of the Final Roll-Up; and

(f)     to fund the Carve Out Account (as defined below).

**D.     Roll-Up Authorization**

5.     <u>Interim Roll-Up</u>.  During the Interim Period, all cash, collections, and proceeds of the Prepetition Collateral and DIP Collateral, and/or proceeds realized in connection with the Sale Motion (as defined below), shall be immediately paid to the Prepetition ABL Agent for application in reduction of the Revolving Loans outstanding under the Prepetition ABL Credit Agreement in accordance with the Prepetition ABL Financing Documents, and upon payment in full thereof, to the DIP Agent for application in reduction of the Revolving Loans outstanding under the DIP Credit Agreement.

6.     <u>Final Roll-Up</u>.  Solely upon entry of the Final Order, and subject to the rights of parties set forth in Paragraphs 23-25 below, the Debtors shall use the proceeds of the next advance under the DIP Credit Agreement to satisfy all Prepetition ABL Debt (excluding any amounts in respect of Specified Letters of Credit) in full in accordance with the terms of the Prepetition ABL Credit Agreement ("***Final Roll-Up***"). The Final Roll-Up and deemed issuance of letters of credit under the DIP Credit Agreement as provided for in Paragraph 2 above and Section 2.11 of the DIP Financing Agreement will be without prejudice to the rights of any third party, including, without limitation, any Committee, to seek an appropriate remedy from the Court upon a successful Challenge (defined below).

**E.     Conditions Precedent**

7.      The DIP Lenders shall not have any obligation to make any loan or advance under the DIP

Facility during the Interim Period unless the conditions precedent to make such loan under the respective

DIP Financing Agreements have been satisfied in full or waived in accordance therewith.

**F.     The DIP Liens**

8.      Pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code,

and subject to the limitations set forth in Paragraph 9 below (and such limitations as may appear in the

Prepetition Intercreditor Agreement, if any), effective immediately upon the entry of this Interim Order the

DIP Agent is hereby granted the DIP Liens (which Liens are subject to the Permitted Prior Liens and the

Carve Out) for the ratable benefit of the DIP Lenders, which DIP Liens constitute priming, first priority,

continuing, valid, binding, enforceable, non-avoidable, and automatically perfected post-petition security

interests and Liens senior and superior in priority to all other secured and unsecured creditors of the

Debtors' estates, that are senior and superior in priority to all other secured and unsecured creditors of the

Debtors' estates, and except as otherwise expressly provided in this Interim Order and the Prepetition

Intercreditor Agreement, upon and to all of the following (but excluding the "Excluded Assets," as defined

in the Guaranty and Collateral Agreement) (collectively, the "***DIP Collateral***"):

(a)      The Collateral, as defined in the DIP Financing Agreements, including:

All: (a) Accounts, (b) Books, (c) Chattel Paper (d) Commercial Tort Claims, (e)
Deposit Accounts, (f) Equipment, (g) Farm Products, (h) Fixtures, (i) General
Intangibles, (j) Inventory, (k) Investment Property, (l) Intellectual Property, (m)
Negotiable Collateral, (n) Pledged Interests (including all of such Debtor's
Operating Agreements and Pledged Partnership Agreements), (o) Securities
Accounts, (p) Supporting Obligations, (q) all of such Debtor's money, Cash
Equivalents, or other assets of such Debtor that now or hereafter come into the
possession, custody, or control of the Prepetition ABL Agent (or its agent or
designee) or any other Prepetition ABL Lender, (r) all of the proceeds (as such
term is defined in the Code) and products, whether tangible or intangible, of any of
the foregoing, including proceeds of insurance or Commercial Tort Claims
covering or relating to any or all of the foregoing, and any and all Accounts,
Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General
Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable
Collateral, Pledged Interests, Securities Accounts, Supporting Obligations,
money, or other tangible or intangible property resulting from the sale, lease,
license, exchange, collection, or other disposition of any of the foregoing, the

proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds").  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Debtor or the Prepetition ABL Agent from time to time with respect to any of the Investment Property, and (s) any of the foregoing, whether now owned or now due, or in which any Debtor has an interest, or hereafter acquired, arising, or to become due, or in which any Debtor obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing.

(b)    Subject to entry of the Final Order, the Bankruptcy Recoveries (as defined below), but only (A) with respect to Bankruptcy Recoveries arising under section 549 of the Bankruptcy Code, the full amount of any such recovery, and (B) with respect to Bankruptcy Recoveries arising under all other sections of chapter 5 of the Bankruptcy Code, the amounts necessary to reimburse the DIP Lenders, as the case may be, for the amount of the Carve Out, if any, used to finance the pursuit of such recovery (the foregoing Bankruptcy Recoveries in (A) and (B) being referred to collectively as the "***Specified Bankruptcy Recoveries***"); provided, however, for the avoidance of doubt, the DIP Superpriority Claims (as defined below) and the Adequate Protection Superpriority Claims (as defined below) of the Prepetition Agents and the Prepetition Secured Lenders as provided in Paragraph 16 below shall be payable out of all Bankruptcy Recoveries, among other things.

As used herein, "***Bankruptcy Recoveries***" shall mean any recoveries of the Debtors, by settlement or otherwise, in respect of claims and causes of action to which the Debtors may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtors or the estates of the Debtors under chapter 5 of the Bankruptcy Code.

(c)    The Lease Proceeds, but not the Leases themselves, whether or not so perfected prior to the Petition Date.

(d)    Any cash held in any escrow or other account of the Debtors in respect of accrued and/or accruing employee benefit obligations as provided for in the Approved Budget.

## G.    DIP Lien Priority

9.    The DIP Liens to be created and granted to the DIP Agent, as provided herein, are:

(a)    created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code,

(b)    other than as set forth in (c) below, first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and

15

(c)    subject to the Prepetition Intercreditor Agreement, subject only to (i) the Carve Out, and (ii) the Permitted Prior Liens.

The DIP Liens shall secure all DIP Obligations, and the proceeds of the DIP Collateral shall be applied in the same order and priority set forth in the respective DIP Financing Agreements, subject to the Prepetition Intercreditor Agreement, the terms of this Interim Order, and upon its entry, the terms of the Final Order. The DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each a "***Successor Case***"), and/or upon the dismissal of the Chapter 11 Cases.  The DIP Liens shall not be subject to sections 510(c), 549, 550, or 551 of the Bankruptcy Code.

10.    Except as otherwise expressly set forth herein, (x) the DIP Agent and the DIP Lenders, the Prepetition Agents and the Prepetition Secured Lenders shall remain bound by the terms and conditions set forth in the Prepetition Intercreditor Agreement, including, without limitation, with respect to the Prepetition Collateral and the DIP Collateral, (y) nothing contained in this Interim Order shall be deemed to abrogate or limit  the respective, rights, claims and obligations of each of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Secured Lenders under the Prepetition Intercreditor Agreement, and (z) the Prepetition Intercreditor Agreement shall apply and govern the respective rights, obligations, and priorities of each of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Secured Parties in these Chapter 11 Cases.

H.    **Enforceable Obligations**

11.    The respective DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtors, and shall be enforceable against the Debtors, their estates, and any successors thereto, and their creditors in accordance with their terms.

**I.**     **Protection of the DIP Lenders and Other Rights**

12.    From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the respective DIP Financing Agreements and this Interim Order, in compliance with and as limited by the Approved Budget (subject to any permitted variances thereunder).

**J.**     **Superpriority Administrative Claim Status**

13.    Subject to the Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the DIP Liens, collectively, the "***DIP Protections***")), in each case with priority in the Chapter 11 Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, sections 506(c) and 552(b) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment; provided, however, that (i) the DIP Protections shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries and (ii) shall be subject to the Prepetition Intercreditor Agreement.

14.    Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the obligations under the respective DIP Financing Agreements or with any other claims of the DIP Lenders arising hereunder or thereunder.

## II.

### AUTHORIZATION FOR USE OF CASH COLLATERAL; ADEQUATE PROTECTION

15.     Pursuant to the terms and conditions of this Interim Order, the respective DIP Financing

Agreements, and in accordance with and as may be limited by the Approved Budget (subject to permitted

variances), the Debtors are authorized to use Cash Collateral and to use the advances under the DIP Facility

during the Interim Period and terminating upon notice being provided by the DIP Agent to the Debtors that

a DIP Order Event of Default (as defined below) has occurred and is continuing in the manner set forth in

Paragraphs 36 and 38 below.

16.     As adequate protection for any Diminution In Value of the interests of the Prepetition

Secured Lenders in the Prepetition Collateral (including Cash Collateral) on account of the granting of the

DIP Liens, and the incurrence of the DIP Obligations, the subordination to the Carve Out, and the Debtors'

use of Cash Collateral, and any other Diminution In Value arising out of the imposition of the automatic

stay or the Debtors' use, sale, depreciation, or disposition of the Prepetition Collateral and Cash Collateral

during the pendency of these Chapter 11 Cases, including the disposition of assets as contemplated by the

Sale Motion (collectively, "***Diminution In Value***"), the Prepetition Secured Lenders shall receive adequate

protection as follows (collectively, "***Adequate Protection***"):

      (a)     **Adequate Protection Liens**. Pursuant to sections 361 and 363(e) of the
Bankruptcy Code, and solely to the extent of the Diminution In Value of the respective interests of
the Prepetition Agents and the Prepetition Secured Lenders in the Prepetition Collateral (including
Cash Collateral):

           (i) the Prepetition ABL Agent (for the benefit of the Prepetition ABL Lenders)
shall have, subject to the terms and conditions set forth below, valid, perfected, and
enforceable additional and replacement security interests and Liens in the Prepetition
Collateral and the DIP Collateral (the "***ABL Adequate Protection Liens***") which shall be
(1) junior only to the Carve Out, the DIP Liens securing the DIP Obligations, and
Permitted Prior Liens, and (2) in all instances, subject to the Prepetition Intercreditor
Agreement; and

           (ii) the Prepetition Term Agent (for the benefit of the Prepetition Term Lenders)
shall have, subject to the terms and conditions set forth below, valid, perfected, and
enforceable additional and replacement security interests and Liens in the Prepetition
Collateral and the DIP Collateral (the "***Term Adequate Protection Liens***"; and together
with the ABL Adequate Protection Liens, the "***Adequate Protection Liens***") which shall be
(1) junior only to the Carve Out, the DIP Liens securing the DIP Obligations, the ABL

Adequate Protection Liens, the Prepetition ABL Liens, and Permitted Prior Liens, and (2) in all instances, subject to the Prepetition Intercreditor Agreement.

(b)    **Adequate Protection Superpriority Claim**. Solely to the extent of any Diminution In Value of the interests of the Prepetition Agents and the Prepetition Secured Lenders in the Prepetition Collateral,

(i) the Prepetition ABL Agent (for the benefit of the Prepetition ABL Lenders) shall have an allowed superpriority administrative expense claim (the "***ABL Adequate Protection Superpriority Claim***"), which shall have priority (except with respect to (1) the Carve Out and (2) the DIP Superpriority Claim) in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; and

(ii) the Prepetition Term Agent (for the benefit of the Prepetition Term Lenders) shall have an allowed superpriority administrative expense claim (the "***Term Adequate Protection Superpriority Claim***"; and together with the ABL Adequate Protection Superpriority Claim, the "***Adequate Protection Superpriority Claims***")), in each case which shall have priority (except with respect to (1) the Carve Out, (2) the DIP Superpriority Claim, and (3) the ABL Adequate Protection Superpriority Claim) in the Chapter 11 Cases under sections 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and upon entry of the Final Order, sections 506(c) and 552 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment.

Other than the DIP Liens, the DIP Superpriority Claims, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Case, will be senior to, prior to, or on parity with the Adequate Protection Superpriority Claims.

(c)    **Adequate Protection Payments**.

(i)    Until the repayment in full of the obligations under the Prepetition ABL Credit Agreement (including pursuant to the Final Roll-Up), on the last business day of each month, the Prepetition ABL Agent shall receive, for the ratable benefit of the Prepetition ABL Lenders, payment of all accrued and unpaid interest at the default rate set forth in the Prepetition ABL Credit Agreement; and

(ii)    Subject to the provisions of Paragraph 50 hereof, the Prepetition ABL Agent and the Prepetition ABL Lenders shall be reimbursed, on a current basis, for all

reasonable and documented out-of-pocket costs and expenses of the financial advisors and outside attorneys engaged by such parties, solely to the extent permitted under the Prepetition ABL Credit Agreement.

(d) **Adequate Protection With Respect to Sales.**

(i)     The comprehensive sale process to be implemented under section 363 of the Bankruptcy Code as contemplated by the Sale Motion (as defined in the DIP Credit Agreement), including the timeline and milestones contained therein, shall not be materially modified without the prior written consent of the Prepetition ABL Agent and the DIP Agent, failing which there shall occur an Event of Default under the DIP Credit Agreement and this Interim Order.

(ii)     Upon the disposition of Prepetition Collateral as contemplated in the Sale Motion (collectively, the "*Sale*"), any such Prepetition Collateral shall be sold free and clear of the DIP Liens, Prepetition Liens, and the Adequate Protection Liens; provided, however, that such DIP Liens, Prepetition Liens, and Adequate Protection Liens, respectively, shall attach to the proceeds of any such Sale to the same extent, validity and priority as such Liens attached to the DIP Collateral and Prepetition Collateral, respectively, which proceeds of the Prepetition Collateral shall be promptly paid at closing of the Sale (including if such Sale constitutes a DIP Maturity Event):

first, to fund the Carve Out Account (subject to the Carve Out Cap) in accordance with Paragraph 31 hereof;

second, to the DIP Agent for application to the Prepetition ABL Debt or the DIP Obligations in accordance with the terms of the DIP Credit Agreement, and after payment in full of the DIP Obligations in the event the Final Roll-Up has not occurred to the Prepetition ABL Agent to be applied to the Prepetition ABL Debt in accordance with the Prepetition ABL Credit Agreement;

third, subject to entry of the Final Order, to the Prepetition Term Agent to reimburse all reasonable and documented out-of-pocket costs and expenses of outside attorneys engaged by  the Prepetition Term Agent and the Prepetition Term Lenders, solely to the extent permitted under the Prepetition Term Credit Agreement and so long as the Prepetition Term Agent and the Prepetition Term Lenders have submitted invoices in accordance with and otherwise complied with the review procedures set forth in Paragraph 50 hereof; and

fourth, to the Debtors (provided, that either (x) subject to the Final Order or (y) absent an agreement among the Prepetition Term Agent, the Debtors and any Committee in furtherance of Paragraphs 32-33 hereof, any remaining proceeds of the Prepetition Collateral and/or DIP Collateral shall be deposited in a segregated account pending further order of the Court, and shall remain subject to the Prepetition Liens and Adequate Protection Liens of the Prepetition Term Agent and Prepetition Term Lenders to the same extent, validity and priority as such Liens attached to the Prepetition Collateral).

(iii)     The Debtors shall keep the DIP Agent and Prepetition Agents fully informed of the Debtors' efforts to consummate the Sale and any other sales of equity interests and/or assets of the Debtors after the Petition Date, and without limiting the

generality of the foregoing, the Debtors shall (A) promptly provide to the DIP Agent copies of all offers for the purchase of any asset(s) and/or equity interests of any of the Debtors, (B) provide, no less frequently than weekly, status updates on the Debtors' efforts to consummate the Sale and/or any other sales, and (C) promptly advise the DIP Agent and Prepetition Agents of any expressions of interest in any or all of the Debtors' assets and/or equity interests; provided, that the Debtors shall not be obligated to provide the DIP Agent or either Prepetition Agent with any of the foregoing information if such agent is participating as a bidder for the Debtors' assets.

(iv)    In connection with any sale process authorized under the Sale Motion, the Prepetition Agents and Prepetition Secured Lenders may seek to credit bid some or all of their claims for their respective collateral (each a "***Credit Bid***") pursuant to section 363(k) of the Bankruptcy Code; <u>provided</u>, that any such Credit Bid shall be subject to the Prepetition Intercreditor Agreement. A Credit Bid may be applied only to reduce the cash consideration with respect to those assets in which the party submitting such Credit Bid holds a security interest. Each of the Prepetition Agents shall be considered a "Qualified Bidder" with respect to its right to acquire all or any of the assets by Credit Bid.

(e)    **Access to Records; Reporting**.  The Prepetition Agents and Prepetition Secured Lenders shall retain the rights to access they have under the Prepetition Financing Documents, upon reasonable notice, at reasonable times during normal business hours.  In addition, the Debtors shall provide to the Prepetition Agents and Prepetition Secured Lenders all of the financial, collateral, and related reporting required under the DIP Financing Agreements as and when provided to the DIP Agent under the DIP Credit Agreement.

(f)    **Prepetition Indemnity Account.**  Upon the later to occur of: (i) entry of a Final Order, or (ii) closing of a Sale, and provided that the Challenge Period Termination Date (as defined below) has not yet occurred, the Debtors shall establish a segregated account in the control of the Prepetition ABL Agent (the "***Prepetition ABL Indemnity Account***"), into which the sum of $250,000.00 of Cash Collateral shall be deposited as security for any reimbursement, indemnification, or similar continuing obligations of the Debtors in favor of the Prepetition ABL Agent and Prepetition ABL Lenders under the Prepetition ABL Financing Documents, including, without limitation, the provisions of Section 10.3 of the Prepetition ABL Credit Agreement (the "***Prepetition ABL Indemnity Obligations***").

(A)    The funds in the Prepetition ABL Indemnity Account shall secure all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred by the Prepetition ABL Agent and the Prepetition ABL Lenders, to (1) respond to formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in Paragraph 24 hereof, or (2) any Challenge Proceeding against the Prepetition ABL Agent or Prepetition ABL Lenders related to the Prepetition ABL Financing Documents, the Prepetition ABL Liens, or the Prepetition ABL Debt, as applicable, whether in the Chapter 11 Cases or independently in another forum, court, or venue.

(B)    The Prepetition ABL Indemnity Obligations shall be secured by a first priority lien on the respective Prepetition ABL Indemnity Account and the funds therein and by a Lien on the Prepetition ABL Collateral (subject in all respects to the Prepetition Intercreditor Agreement).

(C)    The Prepetition ABL Agent and Prepetition ABL Lenders may apply amounts in the Prepetition ABL Indemnity Account against the Prepetition ABL Indemnity Obligations as and when they arise, without further notice to or consent from the Debtors, any Committee, or any other parties in interest and without further order of this Court, upon compliance with the provisions of Paragraph 50 below.

(D)    In addition to the establishment and maintenance of the Prepetition Indemnity Account, until the Challenge Period Termination Date (as defined below) the Prepetition ABL Agent (for itself and on behalf of the Prepetition ABL Lenders) shall retain and maintain the Prepetition ABL Liens as security for any the amount of any Prepetition ABL Indemnity Obligations not capable of being satisfied from application of the funds on deposit in the Prepetition ABL Indemnity Account; provided, that the Prepetition ABL Lien retention herein shall in all respects remain subject to the terms of the Prepetition Intercreditor Agreement; provided further that, (i) any such indemnification claim(s) shall (i) be subject to the terms of the Prepetition ABL Financing Documents, (ii) the rights of parties in interest with requisite standing to object to any such indemnification claim(s) are hereby reserved in accordance with Paragraphs 23-25 hereof, and (iii) the Court shall reserve jurisdiction to hear and determine any such disputed indemnification claim(s).

(E)    Upon the occurrence of the Challenge Period Termination Date, and provided that no Challenge Proceeding has commenced or any such Challenge Proceeding has been resolved by a final order of the Court in favor of the Prepetition ABL Agent, the Prepetition ABL Agent shall promptly return to the Debtors the remaining amount, if any, of the Prepetition ABL Lender Indemnity Account (if funded).

(g)    **Approved Budget**.  The Debtors shall consult with and provide prior notice to the Prepetition Term Agent prior to agreeing to any of the following with respect to the Approved Budget and DIP Financing Agreements, as applicable: (a) material changes to the Approved Budget; and (b) extensions of the case and/or sale milestones set forth in the DIP Credit Agreement that would extend the sale closing deadline beyond April 28, 2017, (collectively, the "*Subject Amendments*"); provided, however, none of the Debtors, the DIP Agent and the DIP Lenders shall incur any liability to the Prepetition Term Agent, the Prepetition Term Lenders or any other Person in consequence of a failure to make any consultation or provide such prior notice with respect to the Subject Amendments pursuant to the provisions hereof.

(h)    Nothing herein shall impair or modify the Prepetition Agents' or the Prepetition Secured Lenders' rights under section 507(b) of the Bankruptcy Code in the event that the Adequate Protection provided to the Prepetition Secured Lenders hereunder is insufficient to compensate for any Diminution In Value of the interest of the Prepetition Agents and Prepetition Secured Lenders in the Prepetition Collateral during the Chapter 11 Cases or any Successor Case; provided, however, that (a) nothing herein shall impair the Debtors' or any other party in interest's right to seek to contest any request for additional or different adequate protection, including, without limitation any objection permissible under the Prepetition Intercreditor Agreement, and (b) any section 507(b) claim granted in the Chapter 11 Cases to the Prepetition Agents and/or Prepetition Secured Lenders shall be junior in right of payment to all DIP Obligations and subject to the Carve Out.

## III.

### POST-PETITION LIEN PERFECTION

17.     This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein (subject, where applicable, to the Prepetition Intercreditor Agreement).

18.     Notwithstanding the foregoing, the DIP Agent and/or the Prepetition Agents may, in their discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens and/or the Adequate Protection Liens granted pursuant hereto, and are hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

19.     The Debtors shall execute and deliver to the DIP Agent and the Prepetition Agents all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens and other similar instruments and documents as the DIP Agent and the Prepetition Agents may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens and/or the Adequate Protection Liens granted pursuant hereto.

20.     The DIP Agent and the Prepetition Agents, in their discretion, may file a photocopy of the entered, docketed version of this Interim Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in

which any of the Debtors has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Interim Order.

21.    The DIP Agent shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be have co-equal rights with the Prepetition ABL Agents and succeed to the rights of the Prepetition ABL Agent with respect to all third party notifications in connection with the Prepetition ABL Financing Documents, all prepetition collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Prepetition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of the Debtors and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements.

22.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to:

    (a)    permit the Debtors to grant the DIP Liens and the Adequate Protection Liens, and to incur all liabilities and obligations to the DIP Lenders under the respective DIP Financing Agreements, the DIP Facility, and this Interim Order, and

    (b)    authorize the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders to retain and apply payments hereunder as provided by the respective DIP Financing Agreements and this Interim Order.

## IV.

### RESERVATION OF CERTAIN THIRD-PARTY
### RIGHTS AND BAR OF CHALLENGES AND CLAIMS

23.    Nothing in this Interim Order or the respective DIP Financing Agreements shall prejudice whatever rights any Committee or any other party-in-interest (other than the Debtors) with requisite standing that has been sought and granted by this Court may have to bring an adversary proceeding, cause of action, objection, claim, defense, or other challenge against the Prepetition Agents, the Prepetition Secured Lenders, the Prepetition Liens or the Prepetition Secured Debt (collectively, a "***Challenge Proceeding***"), including, but not limited to, any of the following:

      (a)    an objection to or challenge of the Debtors' Stipulations set forth in Paragraphs F(1) through F(7), including (i) the validity, extent, perfection, or priority of the security interests and Liens of the Prepetition Agents and Prepetition Secured Lenders in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Secured Debt, or

      (b)    a suit against one or more of the Prepetition Agent and/or one or more of the Prepetition Secured Lenders, or any of them, in connection with or related to the Prepetition Secured Debt or the Prepetition Liens, or the actions or inactions of the Prepetition Agents or Prepetition Secured Lenders arising out of or related to the Prepetition Secured Debt or Prepetition Liens;

provided, however, that any Committee or any other party-in-interest with requisite standing that has been sought and granted by this Court must commence a Challenge Proceeding asserting such objection or challenge, including, without limitation, any claim against one or more of the Prepetition Agents and/or one or more of the Prepetition Secured Lenders in the nature of a setoff, counterclaim, or defense to the Prepetition Secured Debt or Prepetition Liens (including but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against the Prepetition Agents or Prepetition Secured Lenders), by the later of (x) for any Committee, sixty (60) days following the appointment of the first official Committee or (y) for any party-in-interest other than an official Committee, seventy-five (75) days following entry of this Interim Order (collectively, (x) and (y) shall be referred to as the "***Challenge Period***", and the date that is the next calendar day after the termination of the Challenge Period, in the event that no Challenge Proceeding has been timely commenced during the Challenge Period, shall be referred to as the "***Challenge Period Termination Date***"; provided, that the Challenge Period shall be tolled for a period not to exceed thirty (30) days upon the filing of a motion by an interested party seeking standing to commence a Challenge in accordance with the terms of this Interim Order). In the event a third party, including any Committee, files a motion seeking standing to commence a Challenge in accordance with the terms of this Interim Order, any such motion shall, at a minimum, include a copy of any proposed objection or adversary complaint containing a detailed description of the claims and causes of action such party proposes to pursue. The Challenge Period Termination Date may occur as to some, but not all, of the Prepetition Agents or Prepetition Secured Lenders, if a Challenge Proceeding is brought against one or more but not all of the Prepetition Agents and Prepetition Secured Lenders. For the avoidance of doubt, in

the event any of the Chapter 11 Cases is converted to a case under Chapter 7 or if a Chapter 11 trustee is appointed prior to expiration of the Challenge Period, then the Challenge Period shall not expire until sixty (60) days after the trustee's appointment in the affected chapter 11 case only.  In the event that the Committee or any other party in interest with requisite standing has commenced a Challenge Proceeding prior to the conversion to Chapter 7 or appointment of a Chapter 11 trustee, the applicable trustee shall be entitled (but not required) to assume the prosecution of any pending Challenge Proceeding.  In either event, until the later of the expiration of the Challenge Period without commencement of a Challenge Proceeding or the entry of a final, non-appealable order or judgment on account of any Challenge Proceeding commenced within the Challenge Period, no such trustee shall be bound by the Debtors' Stipulations in this Order.

24.    Upon the Challenge Period Termination Date with respect to one or more or all of the Prepetition Agents and Prepetition Secured Lenders, as the case may be, any and all such challenges and objections by any party (including, without limitation, any Committee, any chapter 11 or chapter 7 trustee appointed herein or in any Successor Case, and any other party-in-interest) *shall be deemed to be forever waived and barred* with respect to the applicable Prepetition Agent(s) and Prepetition Secured Lender(s), and the Prepetition Secured Debt as to one or more or all of the Prepetition Secured Lenders, as the case may be, shall be deemed to be an allowed fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Chapter 11 Cases and the Debtors' Stipulations as to one or more or all of the Prepetition Secured Lenders, as the case may be, shall be binding on all creditors, interest holders, and parties-in-interest.

25.    To the extent any such Challenge Proceeding is commenced, the Prepetition Agents and Prepetition Secured Lenders, or any of them, as the case may be, shall be entitled to include the costs and expenses, including but not limited to reasonable and documented attorneys' fees and disbursements, incurred in responding to any inquiry, producing documents and/or witnesses in response to formal or informal discovery requests, or otherwise defending the objection or complaint, as part of the Prepetition Secured Debt to the extent permitted pursuant to the relevant Prepetition Financing Documents.  To the

extent any such inquiry or discovery is undertaken or any such objection or complaint is filed (or as part of any agreed upon resolution thereof), the Prepetition Agents and the Prepetition Secured Lenders, or any of them, as the case may be, shall, be entitled to include such costs and expenses, including, but not limited to, reasonable and documented attorneys' fees incurred in responding to the inquiry or discovery or in defending the objection or complaint, as part of the Prepetition Secured Debt and, in the case of the Prepetition ABL Agent and Prepetition ABL Secured Lenders, respectively, as part of the Prepetition ABL Indemnity Obligations, which shall be reimbursed by the Debtors including (x) each month as provided for in Paragraph 50, below and (y) as and to the extent applicable, out of the Prepetition ABL Indemnity Account, and as one of the Adequate Protection Superpriority Claims, and the Prepetition ABL Indemnity Account shall be maintained until the final resolution of all such objections or claims against the applicable Prepetition ABL Agent and/or the applicable Prepetition ABL Secured Lenders. The Debtors shall remain liable to the applicable Prepetition ABL Agent and Prepetition ABL Secured Lenders, or any of them, as the case may be, for all unpaid Prepetition ABL Indemnity Obligations to the extent that the funds in the Prepetition ABL Indemnity Account is insufficient to satisfy them in full.

## V.

### CARVE OUT AND PAYMENT OF PROFESSIONALS.

26.    Subject to the terms and conditions contained in this Paragraph 26, the DIP Liens, DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims are all subordinate to the following (collectively, the "**Carve Out**"):

(a)    (i) statutory fees and interest payable to the Office of the U.S. Trustee (pursuant to 28 U.S.C. § 1930(a)(6) and 31 U.S.C. § 3717, respectively), as determined by agreement of the U.S. Trustee or by final order of this Court, and (ii) 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;

(b)    all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals retained by the Debtors or a Committee, if any (collectively, the "**Case Professionals**"), through the date of service by the DIP Agent of a Carve Out Trigger Notice (as defined below), up to and as limited by the aggregate Approved Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to all carryforwards and carrybacks from prior or subsequent

27

favorable budget variances),[4] less the amount of prepetition retainers received by such Case Professionals and not previously applied to fees and expenses; and

   (c)  all accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice in an aggregate amount not to exceed $75,000 (the "***Carve Out Cap***"), less the amount of prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above.  The Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice.

For the avoidance of doubt, fees, disbursements, costs and expenses incurred by Case Professionals cannot be paid to Case Professionals unless and until allowed by the Court.  For the further avoidance of doubt, the Approved Budget includes fees payable to the Case Professionals on a "cash basis," but for purposes of the Carve Out, the amounts identified in a the Approved Budget for each Case Professional shall be equally allocated across the applicable Approved Budget period and treated on an "accrual basis," except that, where the terms of a Case Professional's engagement agreement with the Debtors (or applicable order approving such engagement) provide for a fixed payment to be made for a designated period of time or for any success or transaction fee, the amounts included in the Approved Budget shall be allocated on an accrual basis consistent with such payment terms.

For purposes of the foregoing, "***Carve Out Trigger Notice***" shall mean a written notice delivered by the DIP Agent to the Debtors and their counsel, counsel to the Prepetition Term Lenders, the U.S. Trustee, and lead counsel to any Committee, which notice may be delivered at any time by the DIP Agent following the occurrence and continuance of any DIP Order Event of Default and shall specify that it is a "Carve Out Trigger Notice", which notice may be delivered at any time following the occurrence and continuance of a Cash Collateral Termination Event.

  27.  For the avoidance of doubt, the Carve Out shall be senior to the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims, and any and all other forms of adequate protection, Liens or claims securing the DIP Obligations and/or the Prepetition Secured Debt granted or recognized as valid.

  28.  Further, the Carve Out shall exclude, and neither advances under the DIP Facility nor proceeds of the Prepetition Collateral and the DIP Collateral shall be used to pay, any fees and expenses incurred in connection with the assertion or joinder in any Challenge Proceeding or any other claim,

---

[4] Accordingly, to the extent that a particular Case Professional is over budget during any measurement period, it shall be entitled to offset such budget overage with any amounts such Case Professional is under budget in prior or subsequent periods prior to the delivery of a Carve Out Trigger Notice.

counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the

purpose of which is to seek any order, judgment, determination or similar relief:

> (A)    invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the DIP Liens in the DIP Collateral, (iii) the Prepetition Secured Debt, (iv) the Prepetition Liens in the Prepetition Collateral, and/or (v) the Adequate Protection Liens; or

> (B)    preventing, hindering, or delaying, whether directly or indirectly, the DIP Agent's, the DIP Lenders', the Prepetition Agents', or the Prepetition Secured Lenders' assertion or enforcement of their Liens and security interests, or their efforts to realize upon any DIP Collateral, Prepetition Collateral, the Adequate Protection Liens, or the Prepetition ABL Indemnity Account;

 provided, however, that such exclusion does not encompass any investigative work conducted by Case

Professionals retained by a Committee with regard to the Prepetition Liens and Prepetition Debt only, but

only up to $50,000.00 of the Carve Out may be used for such investigative work.

29.    Nothing herein, including the inclusion of line items in the Approved Budget for Case

Professionals, shall be construed as consent to the allowance of any particular professional fees or expenses

of the Debtors, of any Committee, or of any other person or shall affect the right of the DIP Agent, the DIP

Lenders, the Prepetition Agents, or the Prepetition Secured Lenders to object to the allowance and payment

of such fees and expenses.

## VI.

### MATURITY; DIP ORDER EVENTS OF DEFAULT; REMEDIES

**A.    Maturity**

30.    All DIP Obligations shall be due and payable on the date that is the earliest to occur of any

of the following (each, a "***DIP Maturity Event***"):

> (a)    April 28, 2017;

> (b)    the closing of a Sale of all or substantially all of the working capital assets of the Debtors pursuant to the provisions of section 363 of the Bankruptcy Code; or

> (c)    the effective date of any chapter 11 plan of reorganization/liquidation for the Debtors (a "***Plan***").

31.    Following a DIP Maturity Event, and unless the DIP Facility has been extended, the

Debtors shall be required to transfer to a segregated account subject to the control of an escrow agent

reasonably acceptable to the Debtors (the "***Carve Out Account***"), an amount of Cash Collateral equal (i) to the Carve Out Cap, plus (ii) the then accrued and unpaid fees and expenses of the Case Professionals through the date on which a DIP Maturity Event first occurs, to the extent in compliance with the Approved Budget (after giving effect to all carryforwards and carrybacks from prior favorable budget variances for each Case Professional), which Carve Out Account shall be available only to satisfy obligations benefitting from the Carve Out.  All funds on deposit in the Carve Out Account, however funded and from whatever source derived, shall at all times continue to constitute Cash Collateral, subject to the prior payment of all amounts covered by the Carve Out.  Once the Carve Out Account has been funded, either by the Debtors as provided in this Paragraph 31 or by the DIP Agent as provided in Paragraph 40 below, none of the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent, nor the DIP Lenders shall have any further liability for nor responsibility with respect to the Carve Out, including any application or disbursement of funds in the Carve Out Account.

32.      In the event that (A) all Prepetition ABL Debt and DIP Obligations have been paid in full in cash and (B) the DIP Commitments have irrevocably terminated, the Debtors, in consultation with any Committee and the Prepetition Term Agent shall consult with each other as to the terms and conditions of continued consensual use of Cash Collateral in light of the then present circumstances of these Chapter 11 Cases.  If the Debtors, any Committee and the Prepetition Term Agent are not able to agree on such terms and conditions, the Prepetition Term Agent shall be entitled to declare that the Debtors' rights to use Cash Collateral on the terms provided in this Interim Order are terminated (a "***Cash Collateral Termination Event***")  with such termination to take effect immediately upon delivery of notice (a "***Cash Collateral Termination Notice***") by the Prepetition Term Agent to the Debtors and their counsel, the U.S. Trustee, and lead counsel to any Committee.

33.      Following the delivery of a Cash Collateral Termination Notice, the Debtors shall be entitled to an emergency hearing before this Court, including for the purposes of determining whether the use of Cash Collateral by the Debtors should be granted and on what terms and conditions, even if on a non-consensual basis, with any such hearing to be held on not less than three (3) days' notice to lead

30

counsel to any Committee, the Prepetition Agents, and the Prepetition Term Agent.  In the event that the Debtors either accept the termination of use of Cash Collateral (by written correspondence to the Prepetition Term Agent) or the Court determines that the Debtors are not permitted to use Cash Collateral, the delivery of the Cash Collateral Termination Notice shall automatically constitute delivery of a Carve Out Trigger Notice as set forth in Paragraph 26 hereof. Following delivery of a Cash Collateral Termination Notice, unless and until the Court enters an order authorizing the use of Cash Collateral, the Debtors may not use Cash Collateral without the prior written consent of the Prepetition Term Agent; provided, however, that the Debtors' may use Cash Collateral solely to fund payroll (other than severance) incurred through the date that is seven-days after the date of delivery of a Cash Collateral Termination Notice.

34.    Unless and until the Prepetition ABL Debt and the DIP Obligations have been irrevocably repaid in full in cash (or other arrangements for payment of (i) the Prepetition ABL Debt satisfactory to the Prepetition ABL Agent and (ii) the DIP Obligations satisfactory to the DIP Agent, in each case in their sole and exclusive discretion have been made) and all DIP Commitments have been irrevocably terminated, the protections afforded to the Prepetition ABL Agent, the Prepetition ABL Lenders, the DIP Agent, and the DIP Lenders pursuant to this Interim Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming any Plan or converting the Chapter 11 Cases into a Successor Case, and the DIP Liens, the DIP Superpriority Claim, the ABL Adequate Protection Liens, and the ABL Adequate Protection Superpriority Claims shall continue in the Chapter 11 Cases and in any Successor Case, and such DIP Liens, DIP Superpriority Claim, ABL Adequate Protection Liens, and ABL Adequate Protection Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.

35.    Unless and until the Prepetition Term Loan Debt has been irrevocably repaid in full in cash, the protections afforded to the Prepetition Term Agent and the Prepetition Term Lenders pursuant to this Interim Order and any actions taken pursuant thereto shall survive the entry of any order confirming any Plan or converting the Chapter 11 Cases into a Successor Case, and the Term Adequate Protection Liens and the Term Adequate Protection Superpriority Claim shall continue in the Chapter 11 Cases and in

31

any Successor Case, and such Term Adequate Protection Liens and Term Adequate Protection Superpriority Claims shall maintain their respective priorities as provided by this Interim Order.

**B.    DIP Order Events of Default**

36.    All DIP Obligations shall be immediately due and payable and all authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (each, a "***DIP Order Event of Default***"):

(a)    delivery of written notice of the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement; or

(b)    the failure of the Debtors to obtain entry of the Final Order on or before the date that is 30 calendar days after the Petition Date;

**C.    Rights and Remedies Upon DIP Order Event of Default**

37.    Any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified so that after the occurrence of any DIP Order Event of Default, upon five (5) days prior written notice (a "***Remedies Notice***") of such occurrence (the "***Remedies Notice Period***"), in each case given to each of (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel to each of the Prepetition Agents, (iv) lead counsel for any Committee, and (v) the U.S. Trustee, the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the DIP Financing Agreements.

38.    Upon the service of a Remedies Notice after the occurrence of a DIP Order Event of Default:

(a)    the Debtors shall continue to deliver and cause the delivery of the proceeds of the Prepetition Collateral to the Prepetition ABL Agent and the DIP Collateral to the DIP Agent as provided in this Interim Order and in the DIP Financing Agreements;

(b)    the Prepetition ABL Agent and the DIP Agent shall continue to apply such proceeds in accordance with the provisions of this Interim Order and the DIP Financing Agreements and the Prepetition ABL Financing Agreements, as applicable;

(c)    the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the Prepetition ABL Debt, the DIP Obligations, and the Carve Out; provided, that the Debtors shall be permitted to use Cash Collateral to pay their employees ordinary wages accrued up to and including the date of service of the Remedies Notice; and

(d)     any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended, and any loan or advance made thereafter shall be made by the DIP Lenders in their sole and exclusive discretion.

39.     Following the giving of a Remedies Notice by the DIP Agent, the Debtors and any Committee appointed in the Chapter 11 Cases shall be entitled to an emergency hearing before this Court, with any such hearing to be held on not less than three (3) days' notice to lead counsel for any Committee, the Prepetition ABL Agent, the DIP Agent, the DIP Lenders, the Prepetition Term Agent and the Prepetition Term Lenders.  If (x) the Debtors or any such Committee do not contest the occurrence of a DIP Order Event of Default and/or the right of the DIP Agent and the DIP Lenders to exercise their remedies, or (y) the Debtors or any such Committee do timely contest the occurrence of a DIP Order Event of Default and/or the right of the DIP Agent and the DIP Lenders to exercise their remedies, and unless this Court, after notice and hearing prior to the expiry of the Remedies Notice Period stays the enforcement thereof, the automatic stay, solely as to the DIP Agent and the DIP Lenders, shall automatically terminate at the end of the Remedies Notice Period.

40.     Subject to the provisions of Paragraphs 37-39 above, upon the occurrence of a DIP Order Event of Default, the DIP Agent and the DIP Lenders are authorized to exercise their remedies and proceed under or pursuant to the DIP Financing Agreements; except that, (A) with respect to any of the Debtors' leasehold locations, the DIP Agent's and the DIP Lenders' rights shall be limited to such rights (i) as may be ordered by this Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Agent; or (iii) which the DIP Agent and the DIP Lenders have under applicable non-bankruptcy law, and (B) prior to exercising any such remedies, the DIP Agent shall fund the Carve Out Account as set forth in Paragraph 31 hereof (provided that such Carve Out Account shall be subject to the control of the DIP Agent).

41.     Nothing included herein shall prejudice, impair or otherwise affect the Prepetition Agents' or the DIP Agent's rights to seek any other or supplemental relief from the Court in respect of the Debtors,

nor the DIP Lenders' rights, as provided herein and in the DIP Credit Agreement, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement.

**D.** **No Waiver of Remedies**

42. The delay in or the failure of the Prepetition Agents or the DIP Agent to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the Prepetition Agents', the Prepetition Secured Lenders', or the DIP Agent's rights and remedies. Notwithstanding anything herein, and subject to the Prepetition Intercreditor Agreement, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly or otherwise impair the rights and remedies of the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent or the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Prepetition Agents and the DIP Agent to: (i) request conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan; or (iii) subject to section 362 of the Bankruptcy Code exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the Prepetition Agents and the DIP Agent may have.

## VII.

### CERTAIN LIMITING PROVISIONS

**A.** **Section 506(c) Claims and Waiver**

43. Nothing contained in this Interim Order shall be deemed a consent by the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent or the DIP Lenders to any charge, Lien, assessment, or claim against the DIP Collateral, the DIP Liens, the Prepetition Collateral, or the Adequate Protection Liens under section 506(c) of the Bankruptcy Code or otherwise; *provided*, *however*, that during the Interim Period there shall be no waiver of section 506(c) of the Bankruptcy Code.

44. As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions, and in consideration of the Prepetition Agents' and Prepetition Secured Lenders' consent to the priming of the Prepetition Liens by the DIP Liens, subordination to the Carve Out, and the use of their

Cash Collateral, upon entry of the Final Order the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Cases or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code with respect to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent, the DIP Lenders, the Prepetition Collateral, and the DIP Collateral.

**B.        Proceeds of Subsequent Financing**

45.        If at any time prior to the irrevocable repayment in full in cash of all Prepetition ABL Debt and DIP Obligations and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Financing Agreements, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over first, to the Prepetition ABL Agent to be applied in reduction of the Prepetition ABL Debt, and second, to the DIP Agent to be applied in reduction of the DIP Obligations.

**C.        No Priming of DIP Facility**

46.        As consideration for the Prepetition ABL Lenders and the DIP Lenders entering into the DIP Financing Agreements, and consenting to the subordination to the Carve Out and the use of Cash Collateral, each of the Debtors hereby agrees that until such time as all Prepetition ABL Debt and all DIP Obligations have been irrevocably paid in full in cash (or other arrangements for payment of the Prepetition ABL Debt and the DIP Obligations satisfactory to the Prepetition ABL Lenders and the DIP Lenders, as applicable, in their sole and exclusive discretion have been made) and the DIP Financing Agreements have been terminated in accordance with the terms thereof, the Debtors shall not (unless otherwise agreed to by the DIP Agent, DIP Lenders, Prepetition ABL Agent and Prepetition ABL Lenders, in their sole respective discretion) in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lenders or the Prepetition ABL Liens or ABL Adequate Protection Liens granted to the Prepetition ABL Agent or Prepetition ABL Lenders under this Interim Order by offering a subsequent lender or a

party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise; <u>provided</u>, that this Paragraph 46 shall not be deemed to amend the Prepetition Intercreditor Agreement.

47.     [RESERVED].

## VIII.

### O<small>THER</small> R<small>IGHTS AND</small> O<small>BLIGATIONS</small>

**A.      Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**

48.     Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility and the use of Cash Collateral and Adequate Protection contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, the Prepetition Agents, Prepetition Secured Lenders the DIP Agent, and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and, no such appeal, modification, amendment, or vacation shall affect the validity and enforceability of any advances made hereunder or the Liens or priority authorized or created hereby.

49.     Notwithstanding any modification, amendment, or vacation of any or all of the provisions of this Interim Order, any claim or protection granted to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent and/or the DIP Lenders hereunder arising prior to the effective date of such modification, amendment, or vacation of any such claim or protection granted to the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent or the DIP Lenders shall be governed in all respects by the original provisions of this Interim Order, and the Prepetition Agents, the Prepetition Secured Lenders, the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges, and benefits, including the Adequate Protection and the DIP Protections granted herein, with respect to any such claim, including those found under section 364(e) of the Bankruptcy Code.

**B.**     **Prepetition Agents', Prepetition Secured Lenders',
DIP Agent's, and DIP Lenders' Expenses**

50.     To the extent required to be paid under the DIP Financing Agreement or Prepetition ABL Credit Agreement, all reasonable out-of-pocket costs and expenses of the Prepetition ABL Agent, the Prepetition ABL Secured Lenders, the DIP Agent, and the DIP Lenders, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses, whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates contained in the Approved Budget, shall promptly be paid by the Debtors.  Payment of such fees shall not be subject to allowance by this Court; provided, however, the Debtors, the U.S. Trustee or counsel for any Committee may seek a determination by this Court whether such fees and expenses are reasonable in the manner set forth below. Under no circumstances shall professionals for the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, or the Prepetition ABL Secured Lenders be required to comply with the U.S. Trustee fee guidelines; provided, however, the Debtors shall provide to the U.S. Trustee and any Committee a copy of any invoices received from the DIP Agent, the DIP Lenders, the Prepetition Agents, or the Prepetition Secured Lenders for professional fees and expenses during the pendency of the Chapter 11 Cases. Each such invoice shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential, or sensitive information).  If the Debtors, U.S. Trustee or counsel for any Committee object to the reasonableness of the invoices submitted by the DIP Agent, the DIP Lenders, the Prepetition ABL Agent, or the Prepetition ABL Secured Lenders, and the parties cannot resolve such objection within 10 days of receipt of such invoices, the Debtors, U.S. Trustee or the Committee, as the case may be, shall file with the Court and serve on the applicable DIP Agent, DIP Lender, Prepetition ABL Agent, or Prepetition ABL Secured Lender an objection (a "***Fee Objection***") limited to the issue of reasonableness of such fees and expenses.  The Debtors shall promptly pay, and/or the DIP Agent are hereby authorized to make an advance under the DIP

Facility to timely pay, the submitted invoices after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period. If a Fee Objection is timely received, only the undisputed amount of the invoice shall be paid and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

**C.      Binding Effect**

51.      The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agents, the Prepetition Secured Lenders, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors), and any Committee (subject to the provisions of Paragraphs 23-25 above), whether in the Chapter 11 Cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

**D.      No Third Party Rights**

52.      Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary, other than the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders.

**E.      No Marshaling**

53.      Upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable.

**F.      Section 552(b) of the Bankruptcy Code**

54.      Upon entry of the Final Order, the DIP Agent, the DIP Lenders, the Prepetition Agents, and the Prepetition Secured Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the Debtors shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Agent, the DIP Lenders, the Prepetition Agents, or

the Prepetition Secured Lenders with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the DIP Collateral.

**G.      Amendments**

55.      The Debtors and the DIP Agent may amend, modify, supplement, or waive any provision of the DIP Financing Agreements without further approval of this Court, but only after notice to the Prepetition Agents, the Prepetition Secured Lenders, and any Committee; <u>provided</u>, <u>however</u>, that notice of any "material" amendment, modification, supplement, or waiver shall be filed with this Court and the Prepetition Agents, the Prepetition Secured Lenders, and any Committee shall have five (5) business days from the date of such filing within which to object in writing to such proposed amendment, modification, supplement, or waiver; <u>provided</u>, <u>further</u>, that if a Prepetition Agent, Prepetition Secured Lender, or Committee timely objects to any material amendment, modification, supplement, or waiver, then such amendment, modification, supplement, or waiver shall only be permitted pursuant to an order of this Court after notice and a hearing.  For purposes of this Paragraph 55, a "material" amendment shall include, but not be limited to, any amendment, modification, supplement, or waiver that (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the DIP Commitments, (iii) changes the maturity date of the DIP Facility, (iv) amends any Event of Default under the DIP Credit Agreement, (v) revises any case or sale milestone set forth in the DIP Credit Agreement, or (vi) otherwise modifies the DIP Financing Agreements in a manner materially less favorable to the Debtors, the Prepetition Agents, or the Prepetition Secured Lenders.  All amendments, modifications, supplements, or waivers of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtors, the DIP Agent, the Prepetition Agents, and/or the Prepetition Secured Lenders, and, if required, approved by this Court.

**H.      Survival of Interim Order**

56.      The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:

(a)      confirming any Plan in the Chapter 11 Cases,

39

(b)      converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code,

(c)      dismissing the Chapter 11 Cases,

(d)      withdrawing of the reference of the Chapter 11 Cases from this Court, or

(e)      providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court.

57.      The terms and provisions of this Interim Order, including the DIP Protections granted pursuant to this Interim Order and the DIP Financing Agreements, and any protections granted the Prepetition Agents or the Prepetition Secured Lenders, shall continue in full force and effect notwithstanding the entry of any order described in Paragraph 49, and such DIP Protections and protections for the Prepetition Secured Lenders shall maintain their priority as provided by this Interim Order (subject to the Prepetition Intercreditor Agreement) until all of the DIP Obligations of the Debtors to the DIP Lenders pursuant to the DIP Financing Agreements and the Prepetition Secured Debt has been irrevocably paid in full in cash and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

**I.**      **Inconsistency**

58.      In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and this Interim Order, the provisions of this Interim Order shall govern and control.

**J.**      **Enforceability**

59.      This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

**K.**      **Objections Overruled**

60.      All objections to the Motion to the extent not withdrawn or resolved, are hereby overruled.

**L.**      **Waiver of Any Applicable Stay**

61.      Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

**M.     Proofs of Claim**

62.     The Prepetition ABL Agent, the Prepetition Term Agent, the Prepetition Secured Lenders, the DIP Agent, and the DIP Lenders will not be required to file proofs of claim in the Chapter 11 Cases or in any Successor Case.

**N.     Headings**

63.     The headings in this Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Order.

**O.     Retention of Jurisdiction.**

64.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

## IX.

### FINAL HEARING

65.     The Final Hearing on the Motion shall be held before this Court on _____ __, 2016, at __:00 _.m. (ET) before the Honorable _____, United States Bankruptcy Judge, at the United States Bankruptcy Court, District of Delaware, located at 824 Market Street North, Wilmington, Delaware 19801. The Debtors shall, within three (3) business days of the entry of this Interim Order, serve (A) the U.S. Trustee; (B) counsel to the DIP Agent, the DIP Lenders, and the Prepetition ABL Agent; (C) holders of the 30 largest unsecured claims on a consolidated basis against the Debtors; (D) counsel for the Prepetition Term Agent and Prepetition Term Lenders; (E) the Internal Revenue Service; (F) all appropriate state taxing authorities; (G) all landlords, owners, and/or operators of premises at which any of the Debtors' material assets are located; and (H) any other party that files a request for notices with the Court as of the date of such service, a copy of the Interim Order and a notice of the Final Hearing to consider entry of the Final Order.

66.     If no objections to the relief sought in the Motion are filed and served in accordance with this Interim Order, no Final Hearing shall be held, and a separate Final Order may be presented jointly by the Debtors and by the DIP Agent and entered by this Court upon certification of counsel by the Debtors.

67. Any party in interest objecting to the relief sought in the Motion shall submit any such objection in writing and file same with this Court and serve such objection so as to be received no later than _____ __, **2017 at 4:00 p.m. (ET)** on the following parties:

| *Proposed Counsel for the Debtors* | *Office of the United States Trustee* |
|---|---|
| Daniel J. McGuire, Esq.<br>Winston & Strawn LLP<br>35 West Wacker Drive<br>Chicago, IL 60601-9703<br>Phone: (312) 558-6154<br>Fax: (312) 558-5700<br>Email: dmcguire@winston.com<br>    -and-<br>M. Blake Cleary, Esq.<br>Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>Phone: (302) 571-6714<br>Fax: (302) 576-3287<br>Email: mbcleary@ycst.com | Office Of The United States Trustee<br>844 King Street<br>Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801<br>Attn:  David L. Buchbinder<br>Email: David.L.Buchbinder@usdoj.gov |
| *Counsel for the DIP Agent* | *Counsel for the Prepetition Term Agent* |
| Riemer & Braunstein LLP<br>Times Square Tower<br>Seven Times Square, Suite 2506<br>New York, New York 10036<br>Attn:  Steven E. Fox, Esq.<br>Email:  sfox@riemerlaw.com<br>   -and-<br>Ashby & Geddes, P.A.<br>500 Delaware Avenue<br>P.O. Box 1150<br>Wilmington, DE 19899<br>Attn:  Gregory Taylor, Esq.<br>Email: GTaylor@ashby-geddes.com | Dennis A. Meloro (DE Bar No. 4435)<br>The Nemours Building<br>1007 North Orange Street, Suite 1200<br>Wilmington, Delaware 19801<br>Telephone: (302) 661-7000<br>Facsimile:  (302) 661-7360<br>Email:  melorod@gtlaw.com<br>-and-<br>Maria J. DiConza<br>Greenberg Traurig, LLP<br>200 Park Avenue<br>New York, New York 10166<br>Telephone:  (212) 801-9200<br>Facsimile:  (212) 801-6400<br>Email:  diconzam@gtlaw.com |

Dated: _____ __, 2017

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit "1"**

**Approved Budget**

DIP Budget 2/6/2017

| | | 2/10/2017 Wk 1 | 2/17/2017 Wk 2 | 2/24/2017 Wk 3 | 3/3/2017 Wk 4 | 3/10/2017 Wk 5 | 3/17/2017 Wk 6 | 3/24/2017 Wk 7 | 3/31/2017 Wk 8 | 4/7/2017 Wk 9 | 4/14/2017 Wk 10 | 4/21/2017 Wk 11 | 4/28/2017 Wk 12 | 5/5/2017 Wk 13 | Wk 1-13 Subtotal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Additional Financing (DIP) | 2,500.0 | | | | | | | | | | | | | 2,500.0 |
| Line 2 | Beginning Availability-DIP Financing | 2,500.0 | 1,866.7 | 2,961.4 | 2,763.0 | 1,953.6 | 1,894.6 | 1,836.2 | 2,053.1 | 2,424.3 | 1,270.8 | 1,543.8 | 1,579.3 | 2,343.3 | 2,500.0 |
| Line 3 | | | | | | | | | | | | | | | |
| Line 4 | Inflows (Receipts) | | | | | | | | | | | | | | |
| Line 5 | Receipts | 1,929.7 | 1,929.7 | 1,838.7 | 1,932.8 | 1,918.4 | 1,903.0 | 1,918.4 | 1,918.4 | 1,952.0 | 1,927.0 | 1,927.0 | 1,927.0 | 2,005.7 | 25,027.8 |
| Line 6 | City of Chicago | - | 825.0 | - | - | - | - | - | 728.0 | - | - | - | 685.0 | - | 2,238.0 |
| Line 8 | San Antonio - transfers from separate account | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 | 975.0 |
| Line 9 | San Antonio - Dispatch contract | - | 215.0 | 215.0 | 215.0 | - | 215.0 | - | 215.0 | - | 215.0 | - | 215.0 | - | 1,505.0 |
| Line 10 | NV DOT payments | - | 185.0 | - | 185.0 | - | - | - | 185.0 | - | - | - | 185.0 | - | 740.0 |
| Line 11 | Mass DOT payments | - | - | - | 56.0 | - | - | - | 56.0 | - | - | - | 56.0 | - | 168.0 |
| Line 12 | DRT Receipts from IAA | 63.0 | - | - | - | - | - | - | - | - | - | - | - | - | 63.0 |
| Line 14 | Total Inflows (Receipts) | 2,067.7 | 3,229.7 | 2,128.7 | 2,463.8 | 1,993.4 | 2,193.0 | 1,993.4 | 3,177.4 | 2,027.0 | 2,217.0 | 2,002.0 | 3,143.0 | 2,080.7 | 30,716.8 |
| Line 15 | | | | | | | | | | | | | | | |
| Line 16 | Operating Outflows (Disbursements) | | | | | | | | | | | | | | |
| Line 17 | A/P Disbursements-non fuel, includes repair CAPEX | 50.0 | 165.0 | 235.0 | 245.0 | 245.0 | 307.5 | 307.5 | 307.5 | 310.1 | 310.0 | 312.5 | 312.5 | 312.5 | 3,420.1 |
| Line 18 | A/P Disbursements fuel | 50.0 | 65.0 | 72.0 | 64.0 | 96.0 | 64.0 | 64.0 | 64.0 | 96.0 | 64.0 | 64.0 | 64.0 | 96.0 | 923.0 |
| Line 19 | Payroll and related payroll taxes | 753.0 | 740.0 | 720.0 | 749.0 | 685.0 | 685.0 | 685.0 | 697.0 | 717.0 | 690.0 | 690.0 | 690.0 | 722.0 | 9,223.0 |
| Line 20 | Advance charges | 515.0 | 515.0 | 422.0 | 515.0 | 515.0 | 515.0 | 515.0 | 515.0 | 515.0 | 515.0 | 515.0 | 515.0 | 515.0 | 6,602.0 |
| Line 22 | Non-A/P expenditures | 217.0 | 205.0 | 222.0 | 173.0 | 118.0 | 138.0 | 148.0 | 135.0 | 239.0 | 128.0 | 148.0 | 170.0 | 155.0 | 2,196.0 |
| Line 23 | Health Insurance - BCBS payments | - | - | - | 510.0 | - | - | - | 510.0 | - | - | - | 510.0 | - | 1,530.0 |
| Line 24 | City of Chicago | - | - | 284.0 | - | - | - | - | - | 265.0 | - | - | - | 265.0 | 814.0 |
| Line 25 | DRT Brokers | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 26 | San Antonio Dispatch contract brokers | 186.0 | 155.0 | 140.0 | 155.0 | 46.0 | 155.0 | - | - | 201.0 | - | 155.0 | - | 155.0 | 1,348.0 |
| Line 27 | Rent | - | - | - | 285.4 | - | - | - | - | 285.4 | - | - | - | - | 570.8 |
| Line 30 | Utility Deposits | - | - | - | 135.0 | - | 90.0 | - | - | - | - | - | - | - | 225.0 |
| Line 31 | Insurance loss payments | 32.0 | 32.0 | 57.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 441.0 |
| Line 32 | Insurance premiums | - | 228.0 | - | 480.0 | - | 195.0 | - | 428.0 | - | 195.0 | - | 428.0 | - | 1,954.0 |
| Line 33 | Total Operating Outflows (Disbursements) | 1,803.0 | 2,105.0 | 2,152.0 | 3,058.0 | 2,022.4 | 2,181.5 | 1,751.5 | 2,688.5 | 2,660.5 | 1,934.0 | 1,916.5 | 2,211.5 | 3,333.3 | 29,817.7 |
| Line 34 | | | | | | | | | | | | | | | |
| Line 35 | Financing and Capital Expenditures and Non Recurring | | | | | | | | | | | | | | |
| Line 36 | CAPEX - new vehicles | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 37 | Interest & fees - WF (pre-petition revolver) | - | - | - | 49.1 | - | - | - | 5.7 | - | - | - | - | - | 54.8 |
| Line 38 | LC fees - WF | - | - | - | 15.0 | - | - | - | 15.0 | - | - | - | - | 15.0 | 45.0 |
| | WF Unused Facility fee | - | - | - | 8.0 | - | - | - | 7.0 | - | - | - | - | 6.0 | 21.0 |
| Line 40 | Interest - WF DIP | - | - | - | 10.6 | - | - | - | 35.0 | - | - | - | - | 39.3 | 84.9 |
| Line 42 | DIP financing costs (fee + expenses) | 100.0 | - | - | - | - | - | - | - | - | - | - | - | - | 100.0 |
| Line 43 | Cash collaterize unsecured Letter of Credit | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 44 | Subtotal Financing, Capital Expenditures, and Non Recurring | 100.0 | - | - | 82.7 | - | - | - | 62.7 | - | - | - | - | 60.3 | 305.7 |
| Line 45 | Bankruptcy and Reorganization Costs: | | | | | | | | | | | | | | |
| Line 46 | SSG Investment Banker - Total | - | - | - | 75.0 | - | - | - | - | 25.0 | - | 25.0 | - | 225.0 | 350.0 |
| Line 47 | URT Bankruptcy process attorneys - Winston Strawn | - | - | - | - | - | - | - | - | 225.0 | - | - | - | 205.0 | 430.0 |
| Line 48 | URT Bankruptcy process attorneys - Delaware local | - | - | - | - | - | - | - | - | 90.0 | - | - | - | 130.0 | 220.0 |
| Line 49 | URT Financial Advisory and assistance | - | - | - | - | - | - | - | - | 80.0 | 5.0 | - | - | - | 85.0 |
| Line 50 | Secured Lenders attorney costs (Wells Fargo) | 50.0 | - | - | - | - | - | - | - | 75.0 | - | - | - | 125.0 | 250.0 |
| Line 51 | Secured Lenders (Wells Fargo) Fin. Advisor | - | - | - | - | 25.0 | - | - | - | 20.0 | - | - | - | - | 65.0 |
| Line 54 | Filing and trustee costs | 20.0 | - | - | - | - | - | - | - | - | - | - | 15.0 | - | 35.0 |
| Line 55 | Unsecured Creditor Committee legal and fees | - | 25.0 | - | - | - | 65.0 | - | - | - | - | - | - | 85.0 | 175.0 |
| Line 56 | Unsecured Creditor Committee financial advisor | - | - | 20.0 | - | - | - | 20.0 | - | - | - | 20.0 | - | 15.0 | 75.0 |
| Line 57 | Contingencies | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 65.0 |
| Line 59 | Claims agent | - | - | - | 52.5 | - | - | - | 50.0 | - | - | - | 47.5 | 15.0 | 165.0 |
| Line 60 | Subtotal Re-org professional fees | 75.0 | 30.0 | 25.0 | 132.5 | 30.0 | 70.0 | 25.0 | 55.0 | 520.0 | 10.0 | 50.0 | 67.5 | 825.0 | 1,915.0 |
| Line 61 | Total Financing and Capital Expenditures, non recurring and bankruptcy | 175.0 | 30.0 | 25.0 | 215.2 | 30.0 | 70.0 | 25.0 | 117.7 | 520.0 | 10.0 | 50.0 | 67.5 | 885.3 | 2,220.7 |
| Line 63 | | | | | | | | | | | | | | | |
| Line 64 | Net Pre-filing Revolver Repayments (Borrowings) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 65 | Net DIP Repayments (Borrowings) - excluding rolling and other WF repayments | 89.7 | 1,094.7 | (48.3) | (809.4) | (59.0) | (58.5) | 216.9 | 371.2 | (1,153.5) | 273.0 | 35.5 | 864.0 | (2,137.9) | (1,321.6) |
| Line 66 | | | | | | | | | | | | | | | |
| Line 67 | Changes in Borrowing Base | | | Any A/R Increase excluded - assumed borrowing base locked maximum at pre-filing level | | | | | | | | | | | |
| Line 68 | Accounts Receivable - Payment to WF after filing | - | - | (150.0) | - | - | - | - | - | - | - | - | (100.0) | - | (250.0) |
| Line 69 | Inventory | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 70 | Fixed Assets - Additions | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 71 | Fixed Assets - Disposals | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 72 | Change in Fixed Asset advance rate - Payment to WF | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 73 | Change in appraisal value | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 74 | Overadvance repayment - due to appraisal adjustments | (723.0) | - | - | - | - | - | - | - | - | - | - | - | - | (723.0) |
| Line 75 | Letters of credit change and change in LC reserve | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 76 | Total changes in Borrowing Base | (723.0) | - | (150.0) | - | - | - | - | - | - | - | - | (100.0) | - | (973.0) |
| Line 80 | Net Change in availability | (633.3) | 1,094.7 | (198.3) | (809.4) | (59.0) | (58.5) | 216.9 | 371.2 | (1,153.5) | 273.0 | 35.5 | 764.0 | (2,137.9) | (2,294.6) |
| Line 82 | Ending Availability | 1,866.7 | 2,961.4 | 2,763.0 | 1,953.6 | 1,894.6 | 1,836.2 | 2,053.1 | 2,424.3 | 1,270.8 | 1,543.8 | 1,579.3 | 2,343.3 | 205.4 | |
| Line 84 | Change in Outstanding Checks | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Line 85 | Net Availability | 1,866.7 | 2,961.4 | 2,763.0 | 1,953.6 | 1,894.6 | 1,836.2 | 2,053.1 | 2,424.3 | 1,270.8 | 1,543.8 | 1,579.3 | 2,343.3 | 205.4 | 205.4 |

**DIP Budget 2/6/2017**

| | 2/10/2017 Wk 1 | 2/17/2017 Wk 2 | 2/24/2017 Wk 3 | 3/3/2017 Wk 4 | 3/10/2017 Wk 5 | 3/17/2017 Wk 6 | 3/24/2017 Wk 7 | 3/31/2017 Wk 8 | 4/7/2017 Wk 9 | 4/14/2017 Wk 10 | 4/21/2017 Wk 11 | 4/28/2017 Wk 12 | 5/5/2017 Wk 13 | Wk 1-13 Subtotal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Financing (DIP)  2,500.0 | | | | | | | | | | | | | | |
| **Line 86** | | | | | | | | | | | | | | |
| **Line 92** Debt Roll forward | | | | | | | | | | | | | | |
| **Line 93** WF Pre-Filing Revolver Begin | 14,332.0 | 11,541.3 | 8,311.6 | 6,033.0 | 3,569.2 | 1,575.8 | - | - | - | - | - | - | - | 14,332.0 |
| Collections to repay collateralized 1st lien debt | (2,067.7) | (3,229.7) | (2,128.7) | (2,463.8) | (1,993.4) | (1,575.8) | - | - | - | - | - | - | - | (13,459.0) |
| **Line 94** WF Revolver Borrow  (Pmts] | (723.0) | - | (150.0) | - | - | - | - | - | - | - | - | - | - | (873.0) |
| **Line 95** WF Pre-Filing Revolver Ending | 11,541.3 | 8,311.6 | 6,033.0 | 3,569.2 | 1,575.8 | - | - | - | - | - | - | - | - | - |
| **Line 96** | | | | | | | | | | | | | | |
| **Line 97** WF DIP Begin | - | 2,701.0 | 5,297.4 | 7,426.0 | 10,436.2 | 12,488.6 | 14,122.8 | 13,905.9 | 13,534.7 | 14,688.2 | 14,415.2 | 14,379.7 | 13,615.7 | - |
| Borrowings for cash receipts used to repay collateralized 1st lien debt | 2,067.7 | 3,229.7 | 2,128.7 | 2,463.8 | 1,993.4 | 1,575.8 | - | - | - | - | - | - | - | 13,459.0 |
| **Line 98** DIP Borrowing to repay borrowing base changes | 723.0 | - | 150.0 | - | - | - | - | - | - | - | - | - | - | 873.0 |
| **Line 99** DIP Borrowing (repayment) | (89.7) | (633.3) | (150.0) | 546.4 | 59.0 | 58.5 | (216.9) | (371.2) | 1,153.5 | (273.0) | (35.5) | (764.0) | 2,137.9 | 1,421.6 |
| **Line 100** Ending DIP | 2,701.0 | 5,297.4 | 7,426.0 | 10,436.2 | 12,488.6 | 14,122.8 | 13,905.9 | 13,534.7 | 14,688.2 | 14,415.2 | 14,379.7 | 13,615.7 | 15,753.6 | 15,753.6 |
| **Line 105** Total Revolver, DIP and new Non DIP Funding | 14,242.3 | 13,609.0 | 13,459.0 | 14,005.4 | 14,064.4 | 14,122.8 | 13,905.9 | 13,534.7 | 14,688.2 | 14,415.2 | 14,379.7 | 13,615.7 | 15,753.6 | 15,753.6 |

**Exhibit "2"**

**DIP Credit Agreement**

2090273.3



**SENIOR SECURED SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**by and among**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

**as Agent,**

**THE LENDERS THAT ARE PARTIES HERETO**

**as the Lenders,**

**URT HOLDINGS, INC.**

**as Parent**

**and**

**UNITED ROAD TOWING, INC.**

**as Borrower**

**Dated as of February [__], 2017**

**TABLE OF CONTENTS**

1.  DEFINITIONS AND CONSTRUCTION. ........................................................2
    1.1  Definitions ........................................................................2
    1.2  Accounting Terms................................................................2
    1.3  Code ...................................................................................2
    1.4  Construction ......................................................................3
    1.5  Time References ................................................................3
    1.6  Schedules and Exhibits .....................................................4

2.  LOANS AND TERMS OF PAYMENT. ..................................................4
    2.1  Revolving Loans. ...............................................................4
    2.2  Reserved.............................................................................4
    2.3  Borrowing Procedures and Settlements. ............................4
    2.4  Payments; Reductions of Commitments; Prepayments. ...10
    2.5  Promise to Pay; Promissory Notes....................................15
    2.6  Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations. ...15
    2.7  Crediting Payments ...........................................................17
    2.8  Designated Account ..........................................................17
    2.9  Maintenance of Loan Account; Statements of Obligations ...17
    2.10 Fees. ...................................................................................18
    2.11 Letters of Credit. ...............................................................18
    2.12 Certain Bankruptcy Matters ..............................................26
    2.13 Capital Requirements ........................................................27

3.  CONDITIONS; TERM OF AGREEMENT. ...........................................28
    3.1  Conditions Precedent to the Initial Extension of Credit ......28
    3.2  Conditions Precedent to all Extensions of Credit ...............28
    3.3  Maturity .............................................................................29
    3.4  Effect of Maturity ..............................................................29
    3.5  Early Termination by Borrower .........................................29
    3.6  Conditions Subsequent ......................................................30

4.  REPRESENTATIONS AND WARRANTIES.........................................30
    4.1  Due Organization and Qualification; Subsidiaries...............30
    4.2  Due Authorization; No Conflict.........................................31
    4.3  Governmental Consents .....................................................31
    4.4  Binding Obligations; Perfected Liens.................................31
    4.5  Title to Assets; No Encumbrances .....................................32
    4.6  Litigation............................................................................32
    4.7  Compliance with Laws ......................................................32
    4.8  No Material Adverse Effect ...............................................32
    4.9  Reserved.............................................................................32
    4.10 Employee Benefits..............................................................33
    4.11 Environmental Condition ...................................................33
    4.12 Complete Disclosure ..........................................................33
    4.13 Patriot Act ..........................................................................34
    4.14 Indebtedness........................................................................34
    4.15 Payment of Taxes...............................................................34
    4.16 Margin Stock.......................................................................34

### TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 4.17 | Governmental Regulation | 34 |
| 4.18 | OFAC | 35 |
| 4.19 | Employee and Labor Matters | 35 |
| 4.20 | Parent as a Holding Company | 35 |
| 4.21 | Leases | 35 |
| 4.22 | Eligible Accounts | 35 |
| 4.23 | Eligible Inventory | 36 |
| 4.24 | Eligible Rolling Stock | 36 |
| 4.25 | Location of Inventory; Chief Executive Office | 36 |
| 4.26 | Inventory Records | 36 |
| 4.27 | Reserved | 36 |
| . | | 36 |
| 4.28 | Approved Budget | 36 |
| 4.29 | DIP Orders | 36 |
| 4.30 | Collateral Documents | 36 |
| 4.31 | Hedge Agreements | 37 |
| 4.32 | Material Contracts | 37 |
| 5. | AFFIRMATIVE COVENANTS. | 37 |
| 5.1 | Financial Statements, Reports, Certificates | 37 |
| 5.2 | Reporting | 37 |
| 5.3 | Existence | 38 |
| 5.4 | Maintenance of Properties | 38 |
| 5.5 | Taxes | 38 |
| 5.6 | Insurance | 38 |
| 5.7 | Inspection | 39 |
| 5.8 | Compliance with Laws | 39 |
| 5.9 | Environmental | 39 |
| 5.10 | Disclosure Updates | 40 |
| 5.11 | Formation of Subsidiaries | 40 |
| 5.12 | Further Assurances | 41 |
| 5.13 | Lender Meetings | 41 |
| 5.14 | Location of Inventory | 41 |
| 5.15 | Compliance with ERISA and the IRC | 42 |
| 5.16 | Bank Products | 42 |
| 5.17 | Hedge Agreements | 42 |
| 5.18 | Material Contracts | 42 |
| 5.19 | Payment of Obligations | 43 |
| 5.20 | Use of Proceeds | 43 |
| 5.21 | Cash Management | 43 |
| 5.22 | Compliance with Terms of Leaseholds | 43 |
| 5.23 | Additional Information Obligations | 43 |
| 5.24 | Retention and Communication with Consultants | 44 |
| 5.25 | Performance Within Approved Budget | 44 |
| 5.26 | Additional Bankruptcy Related Affirmative Covenants | 45 |
| 6. | NEGATIVE COVENANTS. | 46 |
| 6.1 | Indebtedness | 47 |
| 6.2 | Liens | 47 |

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 6.3 | Restrictions on Fundamental Changes | 47 |
| 6.4 | Disposal of Assets | 47 |
| 6.5 | Nature of Business | 47 |
| 6.6 | Prepayments and Amendments | 47 |
| 6.7 | Restricted Payments | 48 |
| 6.8 | Accounting Methods | 49 |
| 6.9 | Investments | 49 |
| 6.10 | Transactions with Affiliates | 49 |
| 6.11 | Use of Proceeds | 50 |
| 6.12 | Limitation on Issuance of Equity Interests | 51 |
| 6.13 | Inventory with Bailees | 51 |
| 6.14 | Parent as Holding Company | 52 |
| 6.15 | Employee Benefits | 52 |
| 6.16 | Capital Expenditures | 52 |
| 6.17 | Deposit Accounts | 52 |
| 6.18 | Chapter 11 Claims | 52 |
| 6.19 | Additional Bankruptcy-Related Negative Covenants | 52 |
| 7. | FINANCIAL COVENANTS | 53 |
| 8. | EVENTS OF DEFAULT | 53 |
| 8.1 | Payments | 53 |
| 8.2 | Covenants | 53 |
| 8.3 | Judgments | 54 |
| 8.4 | Reserved | 54 |
| 8.5 | Reserved | 54 |
| 8.6 | Default Under Other Agreements | 54 |
| 8.7 | Representations, etc. | 54 |
| 8.8 | Guaranty | 54 |
| 8.9 | Security Documents | 54 |
| 8.10 | Loan Documents | 54 |
| 8.11 | Change of Control | 55 |
| 8.12 | ERISA | 55 |
| 8.13 | Reserved | 55 |
| 8.14 | Cases, Motions, Etc. | 55 |
| 8.15 | Approved Budget | 56 |
| 8.16 | Subrogation | 56 |
| 8.17 | Chapter 11 Case Milestones | 56 |
| 8.18 | Restrainment | 56 |
| 8.19 | Challenge | 57 |
| 8.20 | Sections 506(c) and 552(b) | 57 |
| 9. | RIGHTS AND REMEDIES | 57 |
| 9.1 | Rights and Remedies | 57 |
| 9.2 | Remedies Cumulative | 58 |
| 9.3 | Reserved | 58 |
| 10. | WAIVERS; INDEMNIFICATION | 58 |
| 10.1 | Demand; Protest; etc. | 58 |

# TABLE OF CONTENTS
(continued)

Page

|  | 10.2 | The Lender Group's Liability for Collateral | 58 |
|  | 10.3 | Indemnification | 58 |
| 11. | | NOTICES | 59 |
| 12. | | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION. | 60 |
| 13. | | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS. | 63 |
|  | 13.1 | Assignments and Participations | 63 |
|  | 13.2 | Successors | 67 |
| 14. | | AMENDMENTS; WAIVERS. | 67 |
|  | 14.1 | Amendments and Waivers. | 67 |
|  | 14.2 | Replacement of Certain Lenders. | 69 |
|  | 14.3 | No Waivers; Cumulative Remedies | 70 |
| 15. | | AGENT; THE LENDER GROUP. | 70 |
|  | 15.1 | Appointment and Authorization of Agent | 70 |
|  | 15.2 | Delegation of Duties | 71 |
|  | 15.3 | Liability of Agent | 71 |
|  | 15.4 | Reliance by Agent | 71 |
|  | 15.5 | Notice of Default or Event of Default. | 71 |
|  | 15.6 | Credit Decision | 72 |
|  | 15.7 | Costs and Expenses; Indemnification | 72 |
|  | 15.8 | Agent in Individual Capacity | 73 |
|  | 15.9 | Successor Agent. | 73 |
|  | 15.10 | Lender in Individual Capacity | 74 |
|  | 15.11 | Collateral Matters. | 74 |
|  | 15.12 | Restrictions on Actions by Lenders; Sharing of Payments. | 75 |
|  | 15.13 | Agency for Perfection | 76 |
|  | 15.14 | Payments by Agent to the Lenders | 76 |
|  | 15.15 | Concerning the Collateral and Related Loan Documents | 76 |
|  | 15.16 | Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information | 76 |
|  | 15.17 | Several Obligations; No Liability | 77 |
| 16. | | WITHHOLDING TAXES. | 77 |
|  | 16.1 | Payments | 77 |
|  | 16.2 | Exemptions. | 78 |
|  | 16.3 | Reductions. | 79 |
|  | 16.4 | Refunds | 80 |
|  | 16.5 | FATCA | 80 |
| 17. | | GENERAL PROVISIONS. | 80 |
|  | 17.1 | Effectiveness | 80 |
|  | 17.2 | Section Headings | 80 |
|  | 17.3 | Interpretation | 80 |
|  | 17.4 | Severability of Provisions | 80 |
|  | 17.5 | Bank Product Providers | 81 |

# TABLE OF CONTENTS
(continued)

**Page**

17.6     Debtor-Creditor Relationship.................................................................. 81
17.7     Counterparts; Electronic Execution ....................................................... 81
17.8     Revival and Reinstatement of Obligations; Certain Waivers. ............. 82
17.9     Confidentiality. ........................................................................................ 82
17.10    Survival...................................................................................................... 83
17.11    Patriot Act ................................................................................................. 84
17.12    Integration ................................................................................................ 84

**TABLE OF CONTENTS**
(continued)

**Page**

**EXHIBITS AND SCHEDULES**

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit B-1 | Form of Borrowing Base Certificate |
| Exhibit C-1 | Form of Compliance Certificate |
| Exhibit D | Form of Interim Borrowing Order |
| | |
| Schedule A-1 | Agent's Account |
| Schedule A-2 | Authorized Persons |
| Schedule C-1 | Commitments |
| Schedule D-1 | Designated Account |
| Schedule E-1 | Eligible Inventory; Eligible Scrap Inventory; Eligible Spare Parts Inventory |
| Schedule E-2 | Appraised Eligible Rolling Stock |
| Schedule P-1 | Permitted Investments |
| Schedule P-2 | Permitted Liens |
| Schedule R-1 | Real Property Collateral |
| Schedule 1.1 | Definitions |
| Schedule 1.2 | Form of Initial Approved Budget |
| Schedule 3.1 | Conditions Precedent |
| Schedule 3.6 | Conditions Subsequent |
| Schedule 4.1(b) | Capitalization of Borrower |
| Schedule 4.1(c) | Capitalization of Borrower's Subsidiaries |
| Schedule 4.1(d) | Subscriptions, Options, Warrants, Calls |
| Schedule 4.6(a) | Litigation - MAE |
| Schedule 4.6(b) | Other Litigation |
| Schedule 4.10 | Employee Benefits |
| Schedule 4.11 | Environmental Matters |
| Schedule 4.14 | Permitted Indebtedness |
| Schedule 4.25 | Location of Inventory; Chief Executive Office |
| Schedule 4.30 | Material Contracts |
| Schedule 5.1 | Financial Statements, Reports, Certificates |
| Schedule 5.2 | Collateral Reporting |

# SENIOR SECURED SUPERPRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "<u>Agreement</u>"), is entered into as of February [__], 2017 by and among the lenders identified on the signature pages hereof (each of such lenders, together with its successors and permitted assigns, is referred to hereinafter as a "<u>Lender</u>", as that term is hereinafter further defined), **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, as Agent for each member of the Lender Group and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "<u>Agent</u>"), **URT HOLDINGS, INC.**, a Delaware corporation ("<u>Parent</u>"), **UNITED ROAD TOWING, INC.**, a Delaware corporation ("<u>Borrower</u>"), and each Subsidiary and/or Affiliate (each as defined herein) of Parent and/or Borrower signatory hereto as either borrower and/or guarantor and obligors hereunder.

## R E C I T A L S:

WHEREAS, prior to the date hereof Borrower and Parent entered into that certain (i) Credit Agreement, dated as of August 21, 2014 (as amended, modified, restated and supplemented and in effect from time to time, the "<u>Existing Credit Agreement</u>"), among the Borrower, Parent, the "Revolving Lenders" (as defined therein (herein collectively the "<u>Prepetition Lenders</u>")), and Wells Fargo Bank, National Association, as agent for the Prepetition Lenders (in such capacity, the "<u>Prepetition Agent</u>"), and (ii) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition Agent or Prepetition Lenders, including, without limitation, that certain Intercreditor Agreement dated as of August 21, 2014 between and among the Prepetition Agent (for the benefit of the Prepetition Lenders) and Medley Capital Corporation (the "<u>Prepetition Intercreditor Agreement</u>"), control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, and collectively with the Existing Credit Agreement, the "<u>Prepetition Financing Documents</u>");

WHEREAS, on February [__], 2017 (the "<u>Petition Date</u>"), each of the Loan Parties (as defined herein, collectively, the "<u>Debtors</u>") filed a voluntary petition for relief (collectively, the "<u>Cases</u>") under Chapter 11 of the Bankruptcy Code (defined herein) with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). The Debtors are continuing in the possession of their assets and continuing to manage and operate their respective businesses and their respective properties as debtors and debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower and the other Loan Parties have requested that the Agent and Revolving Lenders (as defined herein) make available to them from and after the date of entry of the Interim Borrowing Order (defined herein)(the "<u>Interim Order Date</u>"), a senior secured, superpriority debtor-in-possession revolving credit loan facility; and

WHEREAS, to provide security for the repayment of all Obligations (defined herein) of the Loan Parties (defined herein) hereunder and under the other Loan Documents (defined herein), and in addition to all other property of any Loan Party that is subject to the Liens (defined herein) granted on the "Collateral" (as defined in the Existing Credit Agreement) in favor of the Prepetition Agent securing the Existing Liabilities (as defined herein) (such Liens, the "<u>Existing Liens</u>"), each of the Debtors will provide to the Agent (for the benefit of the Lender Group (defined herein)) the DIP ABL Protections (as defined in the DIP Orders (defined below)).

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned hereby agree follows:

1.    **DEFINITIONS AND CONSTRUCTION.**

1.1    **Definitions**.  Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1.

1.2    **Accounting Terms**.  All accounting terms not specifically defined herein and all accounting determinations required to be made hereunder, in each case, shall be so construed or made in accordance with GAAP (as in effect on the date on which such term is construed, such determination is made or any financial statement including such term or determination is prepared); provided, that if Borrower notifies Agent that Borrower requests an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision (or if Agent notifies Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such Accounting Change or in the application thereof, then Agent and Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lenders and Borrower after such Accounting Change conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon and agreed to by the Required Lenders, the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Parent" is used in respect of a financial covenant or a related definition, it shall be understood to mean Parent and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise.  Notwithstanding anything to the contrary contained herein, (a) all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof, (b) the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is not qualified as to scope or contain any going concern or other qualification (other than any qualification (i) relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by such accountants, (ii) as a result of the impending Maturity Date or (iii) solely as a result of the inability of Parent, Borrower and their Subsidiaries to demonstrate prospective compliance with the financial covenants set forth in Section 7), and (c) to the extent that any change in GAAP after the Closing Date results in any lease which is, or would be, classified as an operating lease under GAAP as it exists on the Closing Date being classified as a capital lease under revised GAAP, such change in classification of leases from operating leases to capital leases shall be ignored for purposes of this Agreement.  Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that Parent and its Subsidiaries may elect to change their method of accounting to purchase accounting on or about the Closing Date; provided, that to the extent that such change occurs after the Closing Date, the Borrower shall provide no less than ten (10) Business Days prior notice to the Agent, which notice shall be delivered together with a reconciliation in reasonable detail to the Loan Parties' current method of accounting and the Loan Parties shall promptly provide all other information reasonably requested by the Agent in connection therewith in connection with any such change.

1.3    **Code**.  Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

1.4    **Construction**.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or" (which shall mean "and" or "or", but shall not exclusively mean "and").  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, restatements, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, restatements, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties.  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of all (but not less than all) Obligations shall mean (a) the payment or repayment in full in immediately available funds of (i) the outstanding principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (ii) all Lender Group Expenses that have accrued and are unpaid (other than unasserted contingent indemnification or unasserted expense reimbursement obligations), and (iii) all other fees or charges that have accrued hereunder or under any other Loan Document (including the Letter of Credit Fee and the Unused Line Fee) and are unpaid, (b) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Letter of Credit Collateralization (other than unasserted contingent indemnification or unasserted expense reimbursement obligations), (c) in the case of obligations with respect to Bank Products (other than Hedge Obligations), providing Bank Product Collateralization (other than unasserted contingent indemnification or unasserted expense reimbursement obligations), (d) the receipt by Agent of cash collateral in order to secure any other contingent Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorney's fees and legal expenses), such cash collateral to be in such amount as Agent reasonably determines is appropriate to secure such contingent Obligations, (e) the payment or repayment in full in immediately available funds of all other outstanding Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Hedge Agreements provided by Hedge Providers) other than (i) unasserted contingent indemnification or unasserted expense reimbursement obligations, (ii) any Bank Product Obligations (other than Hedge Obligations) that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (iii) any Hedge Obligations that, at such time, are allowed by the applicable Hedge Provider to remain outstanding without being required to be repaid, and (f) the termination of all of the Commitments of the Lenders.  Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns.  Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

1.5    **Time References**.  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, all references to time of day refer to Pacific Standard Time or Pacific Daylight Saving Time, as in effect in Los Angeles, California on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided, that with respect to a computation of fees or interest payable to Agent or any Lender, such period shall in any event consist of at least one full day.

- 3 -

1.6    **Schedules and Exhibits**.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

2.    **LOANS AND TERMS OF PAYMENT.**

2.1    **Revolving Loans.**

(a)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Revolving Lender agrees (severally, not jointly or jointly and severally) to make revolving loans ("Revolving Loans") to Borrower in an amount at any one time outstanding not to exceed *the lesser of:*

(i)    such Lender's Revolver Commitment, or

(ii)    such Lender's Pro Rata Share of an amount equal to *the lesser of:*

(A)    the amount equal to (1) the Maximum Revolver Amount *less* (2) the Letter of Credit Usage (except and excluding Specified Letter of Credit Usage) at such time, and

(B)    the amount equal to (1) the Borrowing Base as of such date (based upon the most recent Borrowing Base Certificate delivered by Borrower to Agent) *less* the Letter of Credit Usage (except and excluding Specified Letter of Credit Usage) at such time.

(b)    Amounts borrowed pursuant to this Section 2.1 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.  The outstanding principal amount of the Revolving Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

(c)    Anything to the contrary in this Section 2.1 notwithstanding, Agent shall have the right (but not the obligation), in the exercise of its Permitted Discretion, to establish and increase or decrease Receivable Reserves, Inventory Reserves, Bank Product Reserves, and other Reserves against the Borrowing Base or the Maximum Revolver Amount.  The amount of any Receivable Reserve, Inventory Reserve, Bank Product Reserve, or other Reserve established by Agent shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such Reserve and shall not be duplicative of any other Reserve established and currently maintained.

2.2    **Reserved.**

2.3    **Borrowing Procedures and Settlements.**

(a)    **Procedure for Borrowing Revolving Loans.**  So long as Wells Fargo has not separately agreed that Borrower may use the Loan Management Service (in which case, Section 2.3(c)(iii) shall apply), each Borrowing shall be made by a written request by an Authorized Person delivered to Agent and received by Agent no later than 10:00 a.m. on the Business Day that is one (1) Business Day prior to the requested Funding Date, specifying (A) the amount of such Borrowing, and (B) the requested Funding Date (which shall be a Business Day); provided, that Agent may, in its sole discretion, elect to accept as timely requests that are received later than 10:00 a.m. on the applicable Business Day.  At Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Agent telephonic notice of such request by the required time.  In such circumstances, Borrower agrees that the Agent is authorized to make the Borrowings, and to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person and any such telephonic notice will

- 4 -

be confirmed in writing within 24 hours of the giving of such telephonic notice, but the failure to provide such written confirmation shall not affect the validity of the request.

      (b)      **Intentionally Omitted.**

      (c)      **Making of Revolving Loans.**

      (i)      In the event Section 2.3(c)(iii) is not applicable, then after receipt of a request for a Borrowing pursuant to Section 2.3(a), Agent shall notify the Lenders by telecopy, telephone, email, or other electronic form of transmission, of the requested Borrowing; such notification to be sent on the Business Day that is one (1) Business Day prior to the requested Funding Date.  If Agent has notified the Lenders of a requested Borrowing on the Business Day that is one (1) Business Day prior to the Funding Date, then each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, not later than 10:00 a.m. on the Business Day that is the requested Funding Date.  After Agent's receipt of the proceeds of such Revolving Loans from the Lenders, Agent shall make the proceeds thereof available to Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to the Designated Account; provided, that, subject to the provisions of Section 2.3(d)(ii), no Lender shall have an obligation to make any Revolving Loan, if (1) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the Availability on such Funding Date.

      (ii)      Unless Agent receives notice from a Lender prior to 9:30 a.m. on the Business Day that is the requested Funding Date relative to a requested Borrowing as to which Agent has notified the Lenders of a requested Borrowing that such Lender will not make available as and when required hereunder to Agent for the account of Borrower the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrower a corresponding amount.  If, on the requested Funding Date, any Lender shall not have remitted the full amount that it is required to make available to Agent in immediately available funds and if Agent has made available to Borrower such amount on the requested Funding Date, then such Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, no later than 10:00 a.m. on the Business Day that is the first Business Day after the requested Funding Date (in which case, the interest accrued on such Lender's portion of such Borrowing for the Funding Date shall be for Agent's separate account).  If any Lender shall not remit the full amount that it is required to make available to Agent in immediately available funds as and when required hereby and if Agent has made available to Borrower such amount, then that Lender shall be obligated to immediately remit such amount to Agent, together with interest at the Defaulting Lender Rate for each day until the date on which such amount is so remitted.  A notice submitted by Agent to any Lender with respect to amounts owing under this Section 2.3(c)(ii) shall be conclusive, absent manifest error.  If the amount that a Lender is required to remit is made available to Agent, then such payment to Agent shall constitute such Lender's Revolving Loan for all purposes of this Agreement.  If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Borrower of such failure to fund and, upon demand by Agent, Borrower shall pay such amount to Agent for Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Revolving Loans composing such Borrowing.

      (iii)      If Wells Fargo is the only Lender hereunder and it has separately agreed that Borrower may use the Loan Management Service, Borrower shall not request and Agent shall no longer honor a request for a Borrowing made in accordance with Section 2.3(a) and all Borrowings will instead be initiated

by the Agent and credited to the Designated Account as Borrowings as of the end of each Business Day in an amount sufficient to maintain an agreed upon ledger balance in the Designated Account, subject only to Availability as provided in Section 2.1(a).  If Wells Fargo terminates Borrower's access to the Loan Management Service or any Person other than Wells Fargo becomes a Lender hereunder (whether in addition to or in lieu of Wells Fargo), Borrower may continue to request Borrowings as provided in Section 2.3(a), subject to the other terms and conditions of this Agreement.  Wells Fargo and the Agent shall have no obligation to make a Borrowing through the Loan Management Service after the occurrence of a Default or an Event of Default, or in an amount in excess of Availability, and Wells Fargo may terminate the Loan Management Service at any time in its sole discretion.

(d)    <strong>Protective Advances and Optional Overadvances.</strong>

(i)    Any contrary provision of this Agreement or any other Loan Document notwithstanding,  at any time (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) that any of the other applicable conditions precedent set forth in Section 3 are not satisfied, Agent hereby is authorized by Borrower and the Lenders, from time to time, in Agent's Permitted Discretion, to make Revolving Loans to, or for the benefit of, Borrower, on behalf of the Revolving Lenders, that Agent, in its Permitted Discretion, deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations (other than the Bank Product Obligations) (the Revolving Loans described in this Section 2.3(d)(i) shall be referred to as "Protective Advances") and Borrower hereby agrees that the Agent may (i) disburse the proceeds directly to third Persons for such purposes, or (ii) apply the proceeds to outstanding Obligations then due and payable.

(ii)    Any contrary provision of this Agreement or any other Loan Document notwithstanding, the Lenders hereby authorize Agent, and Agent may, but is not obligated to, knowingly and intentionally, continue to make Revolving Loans to Borrower notwithstanding that an Overadvance exists or would be created thereby, so long as, after giving effect to such Revolving Loans, the outstanding Revolver Usage (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Maximum Revolver Amount.  In the event Agent obtains actual knowledge that the Revolver Usage exceeds the amounts permitted by the immediately foregoing provisions, regardless of the amount of, or reason for, such excess, Agent shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) unless Agent determines that prior notice would result in imminent harm to the Collateral or its value, in which case Agent may make such Overadvances and provide notice as promptly as practicable thereafter), and the Lenders with Revolver Commitments thereupon shall, together with Agent, jointly determine the terms of arrangements that shall be implemented with Borrower intended to reduce, within a reasonable time, the outstanding principal amount of the Revolving Loans to Borrower to an amount permitted by the preceding sentence.  In such circumstances, if any Lender with a Revolver Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders.  The foregoing provisions are meant for the benefit of the Lenders and Agent and are not meant for the benefit of Borrower, which shall continue to be bound by the provisions of Section 2.4(e)(i). Each Lender with a Revolver Commitment shall be obligated to settle with Agent as provided in Section 2.3(e) (or Section 2.3(g), as applicable) for the amount of such Lender's Pro Rata Share of any unintentional Overadvances by Agent reported to such Lender, any intentional Overadvances made as permitted under this Section 2.3(d)(ii), and any Overadvances resulting from the charging to the Loan Account of interest, fees, or Lender Group Expenses.

(iii)    Each Protective Advance and each Overadvance (each, an "Extraordinary Advance") shall be deemed to be a Revolving Loan hereunder, except that no Extraordinary Advance shall be eligible to be a LIBOR Rate Loan and, prior to Settlement therefor, all payments on the Extraordinary

Advances shall be payable to Agent solely for its own account.  The Extraordinary Advances shall be repayable on demand, secured by Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans.  The provisions of this <u>Section 2.3(d)</u> that are applicable to Protective Advances, including the ability of Agent to make Protective Advances and the limitations on Agent's ability to make Protective Advances, are separate and distinct from any such provisions that are applicable to Overadvances, including the ability of Agent to make Overadvances and the limitations on Agent's ability to make Overadvances.  The provisions of this <u>Section 2.3(d)</u> are for the exclusive benefit of Agent and the Lenders and are not intended to benefit Borrower (or any other Loan Party) in any way.

(e)     **Settlement.**  It is agreed that each Lender's funded portion of the Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Revolving Loans.  Such agreement notwithstanding, Agent and the Lenders agree (which agreement shall not be for the benefit of Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Revolving Loans and the Extraordinary Advances shall take place on a periodic basis in accordance with the following provisions:

(i)     Agent shall request settlement ("<u>Settlement</u>") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent in its sole discretion (1) for itself, with respect to the outstanding Extraordinary Advances, and (2) with respect to Borrower's or its Subsidiaries' payments or other amounts received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "<u>Settlement Date</u>").  Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Revolving Loans and Extraordinary Advances for the period since the prior Settlement Date.  Subject to the terms and conditions contained herein (including <u>Section 2.3(g)</u>): (y) if the amount of the Revolving Loans (including Extraordinary Advances) made by a Lender that is not a Defaulting Lender exceeds such Lender's Pro Rata Share of the Revolving Loans (including Extraordinary Advances) as of a Settlement Date, then Agent shall, by no later than 12:00 p.m. on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including and Extraordinary Advances), and (z) if the amount of the Revolving Loans (including Extraordinary Advances) made by a Lender is less than such Lender's Pro Rata Share of the Revolving Loans (including Extraordinary Advances) as of a Settlement Date, such Lender shall no later than 12:00 p.m. on the Settlement Date transfer in immediately available funds to Agent's Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including Extraordinary Advances).  Such amounts made available to Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Extraordinary Advances and shall constitute Revolving Loans of such Lenders.  If any such amount is not made available to Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)     In determining whether a Lender's balance of the Revolving Loans and Extraordinary Advances is less than, equal to, or greater than such Lender's Pro Rata Share of the Revolving Loans and Extraordinary Advances as of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by Borrower and allocable to the Lenders hereunder, and proceeds of Collateral.

(iii)    Between Settlement Dates, Agent, to the extent Extraordinary Advances are outstanding, may pay over to Agent any payments or other amounts received by Agent, which in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to the Extraordinary Advances.    During the period between Settlement Dates, Agent with respect to Extraordinary Advances, and each Lender with respect to the Revolving Loans other than Extraordinary Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Agent, or the Lenders, as applicable.

(iv)    Anything in this Section 2.3(e) to the contrary notwithstanding, in the event that a Lender is a Defaulting Lender, Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in Section 2.3(g).

(f)    **Notation.**    Agent, as an agent for Borrower, shall maintain a register showing the principal amount of the Revolving Loans, owing to each Lender, and Extraordinary Advances owing to Agent, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g)    **Defaulting Lenders.**

(i)    Notwithstanding the provisions of Section 2.4(b)(iii), Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrower to Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments (A) first, to Issuing Bank, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (B) second, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (C) third, to a suspense account maintained by Agent, the proceeds of which shall be retained by Agent and may be made available to be re-advanced to or for the benefit of Borrower (upon the request of Borrower and subject to the satisfaction or waiver of the conditions set forth in Section 3.2) as if such Defaulting Lender had made its portion of Revolving Loans (or other funding obligations) hereunder, and (E) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with tier (L) of Section 2.4(b)(iii).    Subject to the foregoing, Agent may hold and, in its Permitted Discretion, re-lend to Borrower for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender.    Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith) and for the purpose of calculating the fee payable under Section 2.10(b), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 14.1(a)(i) through (iii).    The provisions of this Section 2.3(g) shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, Agent, Issuing Bank, and Borrower shall have waived, in writing, the application of this Section 2.3(g) to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by Agent pursuant to Section 2.3(g)(ii) shall be released to Borrower).    The operation of this Section 2.3(g) shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrower of its duties and obligations hereunder to

Agent, Issuing Bank, or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrower, at its option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of its participation in the Letters of Credit); <u>provided</u>, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrower's rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.  In the event of a direct conflict between the priority provisions of this <u>Section 2.3(g)</u> and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.3(g)</u> shall control and govern.

(ii)    If any Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(A)    such Defaulting Lender's Letter of Credit Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent (x) the sum of all Non-Defaulting Lenders' Revolving Loan Exposures plus such Defaulting Lender's Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' Revolver Commitments and (y) the conditions set forth in <u>Section 3.2</u> are satisfied or waived at such time;

(B)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, Borrower shall within one (1) Business Day following receipt by Borrower of written notice from Agent provide Letter of Credit Collateralization for such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (A) above) for so long as such Letter of Credit Exposure is outstanding; <u>provided</u>, that Borrower shall not be obligated to provide Letter of Credit Collateralization for a Defaulting Lender's Letter of Credit Exposure if such Defaulting Lender is also the Issuing Bank;

(C)    if Borrower provides Letter of Credit Collateralization for any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this <u>Section 2.3(g)(ii)</u>, Borrower shall not be required to pay any Letter of Credit Fees to Agent for the account of such Defaulting Lender pursuant to <u>Section 2.6(b)</u> with respect to such portion of such Defaulting Lender's Letter of Credit Exposure for which Borrower has provided Letter of Credit Collateralization for the applicable period during which such Letter of Credit Collateralization is so provided;

(D)    to the extent the Letter of Credit Exposure of the Non-Defaulting Lenders is adjusted pursuant to this <u>Section 2.3(g)(ii)</u> (after giving effect to any reallocation pursuant to clause (A) above), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to <u>Section 2.6(b)</u> shall be adjusted by a corresponding amount in accordance with such Non-Defaulting Lenders' Letter of Credit Exposure (but such adjustment shall not result in an increase in the aggregate amount of Letter of Credit Fees payable by Borrower in respect of the aggregate amount of outstanding Letter of Credit Exposure);

(E)     to the extent any Defaulting Lender's Letter of Credit Exposure is neither supported by Letter of Credit Collateralization nor reallocated pursuant to this <u>Section 2.3(g)(ii)</u>, then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under <u>Section 2.6(b)</u> with respect to such portion of such Letter of Credit Exposure shall instead be payable to the Issuing Bank until such portion of such Defaulting Lender's Letter of Credit Exposure is so supported by Letter of Credit Collateralization or reallocated;

(F)     so long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to (but may in its sole discretion) issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Pro Rata Share of such Letter of Credit cannot be reallocated pursuant to this <u>Section 2.3(g)(ii)</u> or (y) the Issuing Bank, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Issuing Bank, as applicable, and Borrower to eliminate the Issuing Bank's risk with respect to the Defaulting Lender's participation in Letters of Credit; and

(G)     Agent may release any Letter of Credit Collateralization of the type described in clause (a) of the definition thereof that is provided by Borrower pursuant to this <u>Section 2.3(g)(ii)</u> to the Issuing Bank and the Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Pro Rata Share of any Letter of Credit Disbursement that is not reimbursed by Borrower pursuant to <u>Section 2.11(d)</u>.

(h)     **Independent Obligations.**   All Revolving Loans (other than Extraordinary Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares.  It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Revolving Loan (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4     <u>**Payments; Reductions of Commitments; Prepayments.**</u>

(a)     **Payments by Borrower.**

(i)     Except as otherwise expressly provided herein, all payments by Borrower shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 1:30 p.m. on the date specified herein.  Any payment received by Agent later than 1:30 p.m. shall be deemed to have been received (unless Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)     Unless Agent receives notice from Borrower prior to the date on which any payment is due to the Lenders that Borrower will not make such payment in full as and when required, Agent may assume that Borrower has made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent Borrower does not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)    **Apportionment and Application.**

(i)    So long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Agent (other than fees or expenses that are for Agent's separate account or for the separate account of Issuing Bank) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee or expense relates.  Notwithstanding the foregoing, except as set forth in Section 2.4(d), all principal payments received by Agent shall be applied (i) *first*, to reduce the outstanding principal balance of the Revolving Loans (other than Specified Revolving Loans) until paid down to $0.00, with no corresponding permanent reduction in the Maximum Revolver Amount, (ii) *second*, to provide Letter of Credit Collateralization with respect to all outstanding Letter of Credit Usage, and (iii) *third*, to reduce the outstanding principal balance of the Specified Revolving Loans until paid in full, with no corresponding permanent reduction in the Maximum Revolver Amount.

(ii)    Subject to Section 2.4(b)(v), Section 2.4(d) and Section 2.4(e), all payments to be made hereunder by Borrower shall be remitted to Agent and all such payments, and all proceeds of Collateral received by Agent, shall be applied, so long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, (i) *first*, to reduce the outstanding principal balance of the Revolving Loans (other than Specified Revolving Loans) until paid down to $0.00, with no corresponding permanent reduction in the Maximum Revolver Amount, (ii) *second*, to provide Letter of Credit Collateralization with respect to all outstanding Letter of Credit Usage, (iii) third, to reduce the outstanding principal balance of the Specified Revolving Loans until paid in full, with no corresponding permanent reduction in the Maximum Revolver Amount, and (iv) thereafter, to Borrower (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iii)    At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all payments remitted to Agent and all proceeds of Collateral received by Agent shall be applied as follows:

(A)    first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents, until paid in full,

(B)    second, to pay any fees or premiums then due to Agent under the Loan Documents until paid in full,

(C)    third, to pay interest then accrued and unpaid in respect of all outstanding Extraordinary Advances until paid in full,

(D)    fourth, to pay the principal of all outstanding Extraordinary Advances until paid in full,

(E)    fifth, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(F)    sixth, to pay any fees or premiums then due to any of the Lenders under the Loan Documents until paid in full,

(G)    seventh, ratably, to pay interest then accrued and unpaid in respect of the outstanding Revolving Loans (other than, at Agent's option, any Specified Revolving Loans) until paid in full,

(H)    eighth, ratably

i.    ratably, to pay the principal of all outstanding Revolving Loans (other than, at Agent's option, any Specified Revolving Loans) until paid in full,

ii.    to Agent, to be held by Agent, for the benefit of Issuing Bank (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of Issuing Bank, a share of each Letter of Credit Disbursement), to provide Letter of Credit Collateralization with respect to all outstanding Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement as and when such disbursement occurs and, if a Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this Section 2.4(b)(iii), beginning with tier (A) hereof),

iii.    up to the amount (after taking into account any amounts previously paid pursuant to this clause iii. during the continuation of the applicable Application Event) of the most recently established Bank Product Reserve to (y) the Bank Product Providers based upon amounts then certified by the applicable Bank Product Provider to Agent (in form and substance satisfactory to Agent) to be then due and payable to such Bank Product Providers on account of Bank Product Obligations, and (z) with any balance to be paid to Agent, to be held by Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts then due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this Section 2.4(b)(iii), beginning with tier (A) hereof),

(I)    ninth, to pay any other outstanding Obligations (other than, at Agent's option, any Obligations in respect of Specified Revolving Loans), other than any such Obligations owed to Defaulting Lenders,

(J)    tenth, ratably, to pay any outstanding Obligations (other than, at Agent's option, any Obligations in respect of Specified Revolving Loans) owed to Defaulting Lenders, and

(K)    eleventh, ratably, to pay interest then accrued and unpaid in respect of any outstanding Specified Revolving Loans not paid pursuant to clause seventh or clause ninth above until paid in full,

(L)    twelfth, ratably, to pay the principal of any outstanding Specified Revolving Loans not paid pursuant to clause eighth or clause tenth above until paid in full, and

(M)    thirteenth, to Borrower (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iv)    Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.3(e).

(v)    In each instance, so long as no Application Event has occurred and is continuing, Section 2.4(b)(iii) shall not apply to any payment made by Borrower to Agent and specified by Borrower to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(vi)    For purposes of Section 2.4(b)(iii), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements (other than unasserted contingent indemnification or unasserted expense reimbursement obligations), irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(vii)    In the event of a direct conflict between the priority provisions of this Section 2.4 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the provisions of Section 2.3(g) and this Section 2.4, then the provisions of Section 2.3(g) shall control and govern, and if otherwise, then the terms and provisions of this Section 2.4 shall control and govern.

(c)    **Reduction of Revolver Commitments.** The Revolver Commitments shall terminate on the Maturity Date. Borrower may reduce the Revolver Commitments, subject to the payment of any amount required by Section 2.10(d), to an amount (which may be zero) not less than the sum of (A) the Revolver Usage as of such date, plus (B) the principal amount of all Revolving Loans not yet made as to which a request has been given by Borrower under Section 2.3(a), plus (C) the amount of all Letters of Credit not yet issued as to which a request has been given by Borrower pursuant to Section 2.11(a). Each such reduction shall be in an amount which is not less than $1,000,000 (unless (i) the Revolver Commitments are being reduced to zero and the amount of the Revolver Commitments in effect immediately prior to such reduction are less than $1,000,000 or (ii) the Revolver Commitments are being reduced to the minimum amount permitted by the immediately preceding sentence and the amount of such reduction is less than $1,000,000), shall be made by providing not less than five (5) Business Days' prior written notice to Agent, and shall be irrevocable (provided that the effectiveness of such reduction may be conditioned upon the happening or occurrence of an event, in which case, such reduction (or notice thereof) may be revoked if such event does not so happen or occur). Once reduced, the Revolver Commitments may not be increased. Each such reduction of the Revolver Commitments shall reduce the Revolver Commitments of each Lender proportionately in accordance with its Pro Rata Share thereof. Without limiting the foregoing, if a Letter of Credit Disbursement with respect to the Specified Letter of Credit is deemed to be a Revolving Loan hereunder, the Revolver Commitments shall automatically be reduced by the face amount of such Specified Letter of Credit.

(d)    **Optional Prepayments of Revolving Loans**. Borrower may prepay the principal of any Revolving Loan at any time in whole or in part, without premium or penalty and with no corresponding permanent reduction in the Maximum Revolver Amount; provided that all principal payments received by Agent pursuant to this Section 2.4(d) shall be applied (i) *first*, to reduce the outstanding principal balance of the Revolving Loans (other than Specified Revolving Loans) until paid down to $0.00, with no corresponding permanent reduction in the Maximum Revolver Amount, (ii) *second*, to provide Letter of Credit Collateralization with respect to all outstanding Letter of Credit Usage, and (iii) *third*, to reduce the outstanding principal balance of the Specified Revolving Loans until paid in full, with no corresponding permanent reduction in the Maximum Revolver Amount..

(e)    **Mandatory Prepayments.**

(i)     **Borrowing Base**.  If, at any time, (A) the Revolver Usage on such date exceeds (B) the Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrower to Agent, then, Borrower shall on that same Business Day prepay the Obligations in accordance with Section 2.4(f) in an aggregate amount equal to the amount of such excess.

(ii)     **Dispositions**.  Within five (5) Business Days of the date of receipt by any Loan Party of the Net Cash Proceeds of any Permitted Disposition of the type described in clauses (g), (h), (o), or (q) of the definition of "Permitted Dispositions", to the extent that the aggregate amount of Net Cash Proceeds received by the Loan Parties during any fiscal year exceeds $100,000, Borrower shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f) in an amount equal to 100% of such Net Cash Proceeds in excess of $100,000 received by the Loan Parties during such fiscal year in connection with all such Permitted Dispositions; provided, that so long as (A) no Event of Default shall have occurred and is continuing or would result therefrom, (B) Borrower shall have given Agent prior written notice of Borrower's intention to apply such monies to the costs of replacement of the properties or assets that are the subject of such Permitted Disposition or the costs of purchase or construction of other assets useful in the business of the Loan Parties, (C) the monies are held in a Deposit Account in which Agent has a perfected first-priority Lien (subject to Permitted Priority Liens), and (D) (1) within 180 days after the initial receipt of such Net Cash Proceeds, the applicable Loan Party enters into a binding obligation for such replacement, purchase or construction of assets useful in its business and gives the Agent written notice thereof, and (2) within 270 days after the initial receipt of such Net Cash Proceeds, the applicable Loan Party completes such replacement, purchase, or construction, then the Loan Party whose assets were the subject of such Permitted Disposition shall have the option to apply such monies to the costs of replacement of the properties or assets that are the subject of such Permitted Disposition or the costs of purchase or construction of other assets useful in the business of the Loan Parties, unless and to the extent that such applicable period shall have expired without such replacement, purchase, or construction being made or completed, in which case, any amounts remaining in the Deposit Account referred to in clause (C) above shall be paid to Agent and applied in accordance with Section 2.4(f).  Nothing contained in this Section 2.4(e)(ii) shall permit any Loan Party to sell or otherwise dispose of any assets other than in accordance with Section 6.4.

(iii)     **Extraordinary Receipts**.  Within five (5) Business Days of the date of receipt by any Loan Party of any Extraordinary Receipts, to the extent that the aggregate amount of Net Cash Proceeds received by the Loan Parties during any fiscal year exceeds $250,000, Borrower shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f) in an amount equal to 100% of such Extraordinary Receipts in excess of $250,000 received by the Loan Parties during such fiscal year, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.

(iv)     **Indebtedness**.  Within five (5) Business Days of the date of incurrence by any Loan Party of any Indebtedness (other than Permitted Indebtedness), Borrower shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such incurrence.  The provisions of this Section 2.4(e)(iv) shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms of this Agreement.

(v)     **Equity**.  Within five (5) Business Days of the date of the issuance by any Loan Party of any Equity Interests (other than (A) the issuance of Equity Interests by any Subsidiary of Parent to Parent or to another Subsidiary of Parent, including in connection with the formation of a new Subsidiary by Parent or any Subsidiary of Parent, in each case, to the extent not prohibited hereunder, (B) the issuance of Equity Interests by Parent to any Person that is an equity holder of Parent prior to such issuance (a "Subject Holder") so long as such Subject Holder did not acquire any Equity Interest of Parent so as to become a Subject Holder concurrently with, or in contemplation of, the issuance of such Equity Interest to such Subject Holder, (C) the issuance of Equity Interests of Parent to directors, individual consultants, officers and

employees of Parent and its Subsidiaries pursuant to employee stock option plans (or other employee incentive plans or other compensation arrangements) approved by the Board of Directors or otherwise constituting "directors qualifying shares" (or other similar Equity Interests issued to directors for such purpose), (D) the issuance of Equity Interests of Parent in order to finance all or any portion of the purchase consideration in connection with a Permitted Acquisition or to finance all or any portion of any other Permitted Investment or any Capital Expenditures, (E) the issuance of Equity Interests of Parent in connection with an exercise of the Cure Right and (F) any issuance of Equity Interests not described in the foregoing clauses (A) through (E) to the extent that such issuance does not result in a Change of Control and is not otherwise prohibited hereunder), Borrower shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(f) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such issuance.  The provisions of this Section 2.4(e)(v) shall not be deemed to be implied consent to any such issuance otherwise prohibited by the terms of this Agreement.

(f)        **Application of Payments.**  Each prepayment pursuant to Section 2.4(e) shall, (A) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to reduce the outstanding principal balance of the Revolving Loans (other than Specified Revolving Loans) until paid down to $0.00, with no corresponding permanent reduction in the Maximum Revolver Amount, *second*, to provide Letter of Credit Collateralization with respect to all outstanding Letter of Credit Usage, and *third*, to reduce the outstanding principal balance of the Specified Revolving Loans until paid in full, with no corresponding permanent reduction in the Maximum Revolver Amount, and (B) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in Section 2.4(b)(iii).

2.5     **Promise to Pay; Promissory Notes.**

(a)        Borrower agrees to pay the Lender Group Expenses in accordance with the provisions of Section 2.6(d).  Borrower promises to pay all of the outstanding Obligations (including principal, interest, premiums, if any, fees, costs, and expenses (including Lender Group Expenses)) in full on the Maturity Date or, if earlier, on the date on which the Obligations (other than the Bank Product Obligations) become due and payable pursuant to the terms of this Agreement.  Borrower agrees that its obligations contained in the first sentence of this Section 2.5(a) shall survive payment or satisfaction in full of all other Obligations.

(b)        Any Lender may request that any portion of its Commitments or the Loans made by it be evidenced by one or more promissory notes.  In such event, Borrower shall execute and deliver to such Lender the requested promissory notes payable to the order of such Lender in a form furnished by Agent and reasonably satisfactory to Borrower.  Thereafter, the portion of the Commitments and Loans evidenced by such promissory notes and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein.

2.6     **Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations.**

(a)        **Interest Rates.**  Except as provided in Section 2.6(c), all Obligations (except for the face amount of any issued and undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest as follows:

(i)        the outstanding principal amount of all Obligations shall accrue interest, at a *per annum* rate equal to the LIBOR Rate plus the LIBOR Rate Margin, and

(ii)        Reserved.

- 15 -

(b)    **Letter of Credit Fee.**  Borrower shall pay Agent (for the ratable benefit of the Revolving Lenders), a Letter of Credit fee (the "Letter of Credit Fee") (which fee shall be in addition to the fronting fees and commissions, other fees, charges and expenses set forth in Section 2.11(k)) that shall accrue at a rate equal to 2.50% *per annum* times the face amount of all issued and undrawn Letters of Credit.

(c)    **Default Rate.**  Upon the occurrence and during the continuation of an Event of Default and at the written election of Agent or the Required Lenders,

(i)    all Obligations (except for the face amount of any issued and undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest at a *per annum* rate equal to 2.00% in excess of the *per annum* rate otherwise applicable to such Obligations, and

(ii)    the Letter of Credit Fee shall be increased by 2.00% *per annum* in excess of the Letter of Credit Fee otherwise applicable hereunder.

(d)    **Payment.**  Except to the extent provided to the contrary in Section 2.10 or Section 2.11(k), (i) all interest, all Letter of Credit Fees and all other recurring fees payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month, (ii) all costs and expenses and all Lender Group Expenses (other than Lender Group Expenses that are out-of-pocket fees, costs, or expenses payable to third parties) payable hereunder or under any of the other Loan Documents shall be due and payable on the earlier of (x) the first day of the month following the date on which such costs, expenses, or Lender Group Expenses were first incurred or (y) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of the following sentence shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (y)) and (iii) all Lender Group Expenses that are out-of-pocket fees, costs and expenses payable to third parties payable hereunder or under any of the other Loan Documents shall be due and payable on the earlier of (x) the first day of the month following the date on which such Lender Group Expenses were first incurred (but in no event earlier than ten (10) Business Days after Borrower's receipt of an invoice therefor) or (y) ten (10) Business Days after Borrower's receipt of an invoice thereof.  Borrower hereby authorizes Agent, without prior notice to Borrower, to charge to the Loan Account (A) as and when incurred or accrued hereunder, any amounts that are due pursuant to Section 2.10(a), (c), or (d) (other than any Lender Group Expenses that are out-of-pocket fees, costs and expenses payable to third parties), (B) on the first day of each month, the Unused Line Fee that accrued during the prior month pursuant to Section 2.10(b), (C) as and when incurred or accrued hereunder, any amounts, including fronting fees, commissions, other fees, charges and expenses, that are due pursuant to Section 2.11(k), (D) on the first day of each month, all interest, all Letter of Credit Fees and all other recurring fees that accrued during the prior month pursuant to the terms hereof or of any of the other Loan Documents, (E) as and when incurred or accrued hereunder or under any of the other Loan Documents, all costs and expenses and all Lender Group Expenses (other than any Lender Group Expenses that are out-of-pocket fees, costs and expenses payable to third parties) that are due pursuant to the terms hereof or thereof, (F) on the earlier of (x) the first day of the month, following the date on which such Lender Group Expenses were first incurred (but in no event earlier than ten (10) Business Days after Borrower's receipt of an invoice therefor), or (y) ten (10) Business Days after Borrower's receipt of an invoice thereof, all Lender Group Expenses that are out-of-pocket fees, costs and expenses payable to third parties that are due pursuant to the terms hereof or of any of the other Loan Documents, and (G) as and when incurred or accrued hereunder or under any of the other Loan Documents, all other payment obligations not described in clauses (A) through (F) above that are due pursuant to the terms hereof or thereof, including any such obligations that are due pursuant to any Bank Product Agreement to any Bank Product Providers in respect of Bank Products. All amounts (including interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable hereunder or under any other Loan Document or under any Bank Product Agreement) charged to the Loan

Account shall thereupon constitute Revolving Loans hereunder, shall constitute Obligations hereunder, and shall initially accrue interest at the rate then applicable to Revolving Loans that are LIBOR Rate Loans.

(e)    **Computation.**  All interest (other than interest that is calculated with reference to the Base Rate) and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year, in each case, for the actual number of days elapsed in the period during which such interest or fees accrue. All interest that is calculated with reference to the Base Rate under the Loan Documents shall be computed on the basis of a 365-day or 366-day year, as applicable, for the actual number of days elapsed in the period during which such interest accrues.  In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f)    **Intent to Limit Charges to Maximum Lawful Rate.**  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrower and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrower is and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.7    **Crediting Payments**.  The receipt of any payment item by Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to Agent's Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrower shall be deemed not to have made such payment and interest shall be calculated accordingly.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into Agent's Account on a Business Day on or before 1:30 p.m.  If any payment item is received into Agent's Account on a non-Business Day or after 1:30 p.m. on a Business Day (unless Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.  If any payment is due hereunder on a day that is not a Business Day, such payment shall be deemed to be due on the immediately succeeding Business Day.

2.8    **Designated Account**.  Agent is authorized to make the Revolving Loans, and Issuing Bank is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.6(d).  Borrower agrees to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Revolving Loans requested by Borrower and made by Agent or the Lenders hereunder.  Unless otherwise agreed by Agent and Borrower, any Revolving Loan requested by Borrower and made by Agent or the Lenders hereunder shall be made to the Designated Account.

2.9    **Maintenance of Loan Account; Statements of Obligations**.  Agent shall maintain an account on its books in the name of Borrower (the "Loan Account") on which Borrower will be charged with all Revolving Loans (including Extraordinary Advances) made by Agent or the Lenders to Borrower or for Borrower's account, the Letters of Credit issued or arranged by Issuing Bank for Borrower's account, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses.  In accordance with Section 2.7, the Loan Account will be credited with all payments received by Agent from Borrower or for Borrower's account.  Agent shall make available to Borrower monthly statements regarding the Loan Account, including the principal amount of the

Revolving Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses constituting Lender Group Expenses accrued hereunder or under the other Loan Documents, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrower and the Lender Group unless, within 30 days after receipt thereof, Borrower shall deliver to Agent written objection thereto describing the error or errors contained in such statement.

2.10    **Fees.**

(a)    **Agent Fees**.  Borrower shall pay to Agent, for the account of Agent, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

(b)    **Unused Line Fee.**  Borrower shall pay to Agent, for the ratable account of the Revolving Lenders, an unused line fee (the "Unused Line Fee") in an amount equal to 0.375% *per annum* times the result of (i) the aggregate amount of the Maximum Revolver Amount, less (ii) the Average Revolver Usage during the immediately preceding month (or portion thereof), which Unused Line Fee shall be due and payable, in arrears, on the first day of each month from and after the Closing Date up to the first day of the month prior to the date on which the Obligations are paid in full and on the date on which the Obligations are paid in full.

(c)    **Field Examination and Other Fees**.  Borrower shall pay to Agent field examination, appraisal, and valuation fees and charges, as and when incurred or chargeable, as follows: a fee not to exceed $1,000 per day, per examiner, plus reasonable and documented out-of-pocket expenses (including travel, meals, and lodging) incurred by Agent for each field examination of Borrower performed by personnel employed by Agent or by personnel employed by one or more third party appraisal companies engaged by Agent to perform field examinations of the Loan Parties, to establish electronic collateral reporting systems, or to appraise the Collateral, or any portion thereof, or to assess the Loan Parties' business valuation; provided, that so long as no Event of Default shall have occurred and be continuing, Borrower shall not be obligated to reimburse Agent for more than two (2) such field examinations and two (2) such appraisals of the Collateral during any fiscal year.

(d)    **Intentionally Omitted**.

2.11    **Letters of Credit.**

(a)    Effective upon entry of the Interim Borrowing Order, all Letters of Credit issued and outstanding under the Existing Credit Agreement (including the Specified Letter of Credit) that remain outstanding as of the Closing Date hereunder shall be deemed issued under the term of this Agreement and shall be deemed Letters of Credit hereunder.  Borrower may request that Issuing Bank issue one or more additional Letter(s) of Credit denominated in Dollars for the account of Borrower; provided, however, the determination whether to accept Borrower's request and issue the requested Letter(s) of Credit shall be made in the exclusive discretion of Agent and the Issuing Bank, which request may be denied, withheld and/or delayed in Agent's and Issuing Bank's exclusive discretion.  Agent and/or Issuing Bank, as the case may be, shall provide Borrower with notice of its/their determination whether to issue the requested Letter of Credit not later than three (3) Business Days after receipt of Borrower's written request for issuance of such Letter of Credit.  By submitting a request to Issuing Bank for the issuance of a Letter of Credit, Borrower shall be deemed to have requested that Issuing Bank issue the requested Letter of Credit.  Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be irrevocable and shall be made in writing by an Authorized Person and delivered to Issuing Bank via telefacsimile or other electronic method of transmission reasonably acceptable to Issuing Bank and reasonably in advance of the requested date of issuance, amendment, renewal, or extension.  Each such request shall be in

form and substance reasonably satisfactory to Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the requested date of issuance, amendment, renewal, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as Agent or Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that Issuing Bank generally requests for Letters of Credit in similar circumstances.  Issuing Bank's records of the content of any such request will be conclusive absent manifest error.  Anything contained herein to the contrary notwithstanding, Issuing Bank may, but shall not be obligated to, issue a Letter of Credit that supports the obligations of Borrower or its Subsidiaries at any time that one or more Lenders is a Defaulting Lender unless Borrower shall have provided Letter of Credit Collateralization in accordance with Section 2.3(g).

(b)    Issuing Bank shall have no obligation to issue a Letter of Credit if any of the following would result after giving effect to the requested issuance:

(i)    the Letter of Credit Usage (except and excluding Specified Letter of Credit Usage) would exceed $5,000,000, or

(ii)    the Letter of Credit Usage (except and excluding Specified Letter of Credit Usage) would exceed the Maximum Revolver Amount *less* the outstanding principal amount of Revolving Loans at such time, or

(iii)    the Letter of Credit Usage (except and excluding Specified Letter of Credit Usage) would exceed the Borrowing Base at such time *less* the outstanding principal balance of the Revolving Loans at such time, or

(iv)    the proposed expiration date of such Letter of Credit would exceed the earlier of (A) the Maturity Date, or (B) one year from the date of issuance.

(c)    In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, the Issuing Bank shall not be required to (but may in its sole discretion) issue such Letter of Credit to the extent (i) the Defaulting Lender's Letter of Credit Exposure with respect to such Letter of Credit may not be reallocated pursuant to Section 2.3(g)(ii), or (ii) the Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and Borrower to eliminate the Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include the provision of Letter of Credit Collateralization for such Defaulting Lender's Letter of Credit Exposure in accordance with Section 2.3(g)(ii).  Additionally, Issuing Bank shall have no obligation to (but may in its sole discretion) issue a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain Issuing Bank from issuing such Letter of Credit, or any law applicable to Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over Issuing Bank shall prohibit or request that Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, or (B) the issuance of such Letter of Credit would violate one or more policies of Issuing Bank applicable to letters of credit generally, or (C) if amounts demanded to be paid under any Letter of Credit will or may not be in United States Dollars.

(d)    Each Letter of Credit shall be in form and substance reasonably acceptable to Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars.  If Issuing Bank makes a payment under a Letter of Credit, Borrower shall pay to Agent an amount equal to the

applicable Letter of Credit Disbursement on the Business Day on which such Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Revolving Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in <u>Section 3</u>) and, initially, shall bear interest at the rate then applicable to Revolving Loans that are Base Rate Loans. If a Letter of Credit Disbursement is deemed to be a Revolving Loan hereunder, Borrower's obligation to pay the amount of such Letter of Credit Disbursement to Issuing Bank shall be automatically converted into and replaced with an obligation to pay the resulting Revolving Loan. Promptly following receipt by Agent of any payment from Borrower pursuant to this paragraph, Agent shall distribute such payment to Issuing Bank or, to the extent that Revolving Lenders have made payments pursuant to <u>Section 2.11(e)</u> to reimburse Issuing Bank, then to such Revolving Lenders and Issuing Bank as their interests may appear. If, immediately prior to the time of the making or deemed making of a Revolving Loan with respect to any Letter of Credit Disbursement with respect to the Specified Letter of Credit, (i) Availability is then less than $750,000, then, pursuant to the terms and conditions of the Medley Participation Agreement, Medley shall, within three (3) Business Days after the making or deemed making of such Revolving Loan, effectuate the purchase from the Lenders of a participation in the outstanding Revolving Loans in an aggregate amount equal to 100% of the amount of such Letter of Credit Disbursement, or (ii) Availability is then greater than $750,000 but less than the amount of such Letter of Credit Disbursement, then, pursuant to the terms and conditions of the Medley Participation Agreement, Medley shall, within three (3) Business Days after the making or deemed making of such Revolving Loan, effectuate the purchase from the Lenders of a participation in the outstanding Revolving Loans in an aggregate amount equal to (x) the amount of such Letter of Credit Disbursement minus (y) the difference between the then Availability and $750,000. Each portion of the outstanding Revolving Loans in which Medley is required to purchase a participation pursuant to <u>clause (i)</u> or <u>(ii)</u> of the immediately preceding sentence is referred to herein as a "<u>Specified Revolving Loan</u>".

(e)     Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to <u>Section 2.11(d)</u>, each Revolving Lender agrees to fund its Pro Rata Share of any Revolving Loan deemed made pursuant to <u>Section 2.11(d)</u> on the same terms and conditions as if Borrower had requested the amount thereof as a Revolving Loan and Agent shall promptly pay to Issuing Bank the amounts so received by it from the Revolving Lenders. By the issuance of a Letter of Credit (or an amendment, renewal, or extension of a Letter of Credit) and without any further action on the part of Issuing Bank or the Revolving Lenders, Issuing Bank shall be deemed to have granted to each Revolving Lender, and each Revolving Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by Issuing Bank, in an amount equal to its Pro Rata Share of such Letter of Credit, and each such Revolving Lender agrees to pay to Agent, for the account of Issuing Bank, such Revolving Lender's Pro Rata Share of any Letter of Credit Disbursement made by Issuing Bank under the applicable Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to Agent, for the account of Issuing Bank, such Revolving Lender's Pro Rata Share of each Letter of Credit Disbursement made by Issuing Bank and not reimbursed by Borrower on the date due as provided in <u>Section 2.11(d)</u>, or of any reimbursement payment that is required to be refunded (or that Agent or Issuing Bank elects, based upon the advice of counsel, to refund) to Borrower for any reason. Each Revolving Lender acknowledges and agrees that its obligation to deliver to Agent, for the account of Issuing Bank, an amount equal to its respective Pro Rata Share of each Letter of Credit Disbursement pursuant to this <u>Section 2.11(e)</u> shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in <u>Section 3</u>. If any such Revolving Lender fails to make available to Agent the amount of such Revolving Lender's Pro Rata Share of a Letter of Credit Disbursement as provided in this Section, such Revolving Lender shall be deemed to be a Defaulting Lender and Agent (for the account of Issuing Bank) shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon at the Defaulting Lender Rate until paid in full. Notwithstanding anything herein to the contrary, no Revolving Lender shall be required to fund its Pro Rata Share of any Revolving Loan deemed made pursuant to <u>Section 2.11(d)</u> with respect to a Letter of Credit

Disbursement on account of a Specified Letter of Credit, as required pursuant to this <u>Section 2.11(e)</u>, to the extent that Medley purchases a participation in Revolving Loans as required pursuant to the Medley Participation Agreement within three (3) Business Days after the applicable Specified Revolving Loan is made.

(f)    Borrower agrees to indemnify, defend and hold harmless each member of the Lender Group (including Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including Issuing Bank, a "<u>Letter of Credit Related Person</u>") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any such Letter of Credit Related Person (other than Taxes, which shall be governed by <u>Section 16</u>) (the "<u>Letter of Credit Indemnified Costs</u>"), and which arise out of or in connection with, or as a result of:

(i)    any Letter of Credit or any pre-advice of its issuance;

(ii)    any transfer, sale, delivery, surrender or endorsement of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

(iii)    any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

(iv)    any independent undertakings issued by the beneficiary of any Letter of Credit;

(v)    any unauthorized instruction or request made to Issuing Bank in connection with any Letter of Credit or requested Letter of Credit or error in computer or electronic transmission;

(vi)    an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated;

(vii)    any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

(viii)    the fraud, forgery or illegal action of parties other than the Letter of Credit Related Person;

(ix)    Issuing Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation; or

(x)    the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person;

in each case, including that resulting from the Letter of Credit Related Person's own negligence; <u>provided</u>, <u>however</u>, that such indemnity shall not be available to any Letter of Credit Related Person claiming

- 21 -

indemnification under clauses (i) through (x) above to the extent that such Letter of Credit Indemnified Costs (A) may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity, (B) may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from a material breach by the Letter of Credit Related Person claiming indemnity of its obligations hereunder, under any other Loan Document or under any Issuer Document or other document governing any Letter of Credit or (C) result from or arise out of a dispute solely among Letter of Credit Related Persons that do not involve acts or omissions of any Loan Party; provided, further, that notwithstanding the foregoing, in no event shall Borrower's indemnification obligations under this Section 2.11(f) include any Letter of Credit Indemnified Costs in respect of legal fees, disbursements and expenses in excess of the reasonable and documented out-of-pocket fees, disbursements and expenses of one outside legal counsel for Issuing Bank and all other Letter of Credit Related Persons and, to the extent necessary, one local counsel in each relevant jurisdiction and one regulatory counsel (if reasonably required) for Issuing Bank and all other Letter of Credit Related Persons (but excluding the allocated costs of in-house or internal counsel to any Letter of Credit Related Person), and, in the case of an actual or perceived conflict of interest where such Letter of Credit Related Person affected by such conflict informs Borrower of such conflict and thereafter retains its own counsel, another firm of counsel for such affected Letter of Credit Related Persons.  Borrower hereby agrees to pay the Letter of Credit Related Person claiming indemnity on demand from time to time all Letter of Credit Indemnified Costs payable by Borrower under this Section 2.11(f).  If and to the extent that the obligations of Borrower under this Section 2.11(f) are unenforceable for any reason, Borrower agrees to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under applicable law.  This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)    The liability of Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Borrower that are caused directly by gross negligence or willful misconduct of Issuing Bank or such other Letter of Credit Related Person in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit.  Issuing Bank shall be deemed to have acted with due diligence and reasonable care if Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement.  Borrower's aggregate remedies against Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Borrower to Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.11(d), plus interest at the rate then applicable to Base Rate Loans hereunder.  Borrower shall take reasonable action to avoid and mitigate the amount of any damages claimed against Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit.  Any claim by Borrower under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by Borrower as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had Borrower taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing Issuing Bank to effect a cure.

(h)    Borrower is responsible for preparing or approving the final text of the Letter of Credit as issued by Issuing Bank, irrespective of any assistance Issuing Bank may provide such as drafting or recommending text or by Issuing Bank's use or refusal to use text submitted by Borrower.  Borrower is solely responsible for the suitability of the Letter of Credit for Borrower's purposes.  With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, Issuing

Bank, in its sole and absolute discretion, may give notice of nonrenewal of such Letter of Credit and, if Borrower does not at any time want such Letter of Credit to be renewed, Borrower will so notify Agent and Issuing Bank at least 15 calendar days before Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such Letter of Credit.

(i)    Borrower's reimbursement and payment obligations under this <u>Section 2.11</u> are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)    any lack of validity, enforceability or legal effect of any Letter of Credit or this Agreement or any term or provision therein or herein;

(ii)    payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii)    Issuing Bank or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv)    Issuing Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)    the existence of any claim, set-off, defense or other right that Borrower or any other Person may have at any time against any beneficiary, any assignee of proceeds, Issuing Bank or any other Person;

(vi)    any other event, circumstance or conduct whatsoever, whether or not similar to any of the foregoing that might, but for this <u>Section 2.11(i)</u>, constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, Borrower's reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against Issuing Bank, the beneficiary or any other Person; or

(vii)    the fact that any Default or Event of Default shall have occurred and be continuing;

<u>provided</u>, <u>however</u>, that subject to <u>Section 2.11(g)</u> above, the foregoing shall not release Issuing Bank from such liability to Borrower as (x) may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of Borrower to Issuing Bank arising under, or in connection with, this <u>Section 2.11</u> or any Letter of Credit or (y) may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from a material breach by Issuing Bank of its obligations hereunder, under any other Loan Document or under any Issuer Document or other document governing any Letter of Credit.

(j)    Without limiting any other provision of this Agreement, Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to Borrower for, and Issuing Bank's rights and remedies against Borrower and the obligation of Borrower to reimburse Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)      honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)      honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)      acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)      the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)      acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)      any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to Borrower;

(vii)      any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between the beneficiary and Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)      assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)      payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)      acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)      honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by Issuing Bank if subsequently Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)      dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)    honor of a presentation that is subsequently determined by Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)    Borrower shall pay the following non-refundable fees, commissions and charges to Agent, for the account of Issuing Bank, in accordance with Section 2.6(d): (i) a fronting fee which shall be charged by Issuing Bank upon the issuance of each Letter of Credit in an aggregate amount equal to 0.250% per annum of the face amount thereof, *plus* (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all reasonable and documented out-of-pocket expenses incurred by, Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations).

(l)    If by reason of (x) any Change in Law, or (y) compliance by Issuing Bank or any other member of the Lender Group with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board of Governors as from time to time in effect (and any successor thereto):

(i)    any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or

(ii)    there shall be imposed on Issuing Bank or any other member of the Lender Group any other condition regarding any Letter of Credit,

and the result of the foregoing is to increase, directly or indirectly, the cost to Issuing Bank or any other member of the Lender Group of issuing, making, participating in, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrower, and Borrower shall pay within 30 days after demand therefor, such amounts as Agent may specify to be necessary to compensate Issuing Bank or any other member of the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder; provided, that (A) Borrower shall not be required to provide any compensation pursuant to this Section 2.11(l) for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to Borrower, (B) if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof, and (C) Borrower shall not be required to provide any compensation pursuant to this Section 2.11(l) for any Excluded Taxes and Indemnified Taxes.  The determination by Agent of any amount due pursuant to this Section 2.11(l), as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(m)    Unless otherwise expressly agreed by Issuing Bank and Borrower when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.

(n)    In the event of a direct conflict between the provisions of this Section 2.11 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.11 shall control and govern.

2.12    **Certain Bankruptcy Matters**.

(a)    Except to the extent expressly provided otherwise in a DIP Order, the Loan Parties hereby agree that, subject only to the Carve Out, the Obligations shall be deemed to (i) constitute DIP Superpriority Claims over all administrative expense claims and claims against the Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Borrowing Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and, to the extent provided in any of the DIP Orders.

(b)    In the event of a conflict between, or inconsistency among, the Interim Borrowing Order or the Final Borrowing Order, on the one hand, and any Loan Document, on the other hand, the Interim Borrowing Order or the Final Borrowing Order, as the case may be, shall control.

(c)    Notwithstanding anything to the contrary contained herein or elsewhere:

(i)    the parties hereto agree, and the DIP Orders shall provide, that the Credit Parties shall not be required to prepare, file, register or publish any financing statements, mortgages, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the DIP Orders or any other Loan Document. If the Agent (in its sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Borrowing Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.12(c) or of the perfection of any other Liens in favor of the Agent, for the benefit of the Lenders and the other Credit Parties, on the Collateral; and

(ii)    except as otherwise agreed to by the Lenders, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Credit Parties pursuant to this Agreement, the DIP Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Cases, or by any other act or omission whatsoever.

(d)    Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    subject only to the Carve Out and to the extent provided in any of the DIP Orders and subject to the DIP Orders, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Agent against the Borrower in respect of any Obligations;

(ii)        other than as provided in the DIP Orders or the Loan Documents, the Agent's Liens on the Collateral shall constitute valid, enforceable and perfected Liens, and, except with respect to the Carve Out and Permitted Priority Liens (and as otherwise set forth in the Intercreditor Agreement and in the DIP Orders), shall be prior to all other Liens now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)        the parties hereto agree, and the DIP Orders shall provide, that the Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the Agent or any Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Agent's Liens under applicable non-bankruptcy law.

(e)        In connection with any sale or Disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Agent, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, Borrower and each other Loan Party hereby gives the Agent (at the direction of the Required Lenders) the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations and any Existing Liabilities then outstanding, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

2.13    **Capital Requirements**.

(a)        If, after the date hereof, Issuing Bank or any Lender determines that (i) any Change in Law regarding capital or reserve requirements for banks or bank holding companies, or (ii) compliance by Issuing Bank or such Lender, or their respective parent bank holding companies, with any guideline, request or directive of any Governmental Authority regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on Issuing Bank's, such Lender's, or such holding companies' capital as a consequence of Issuing Bank's or such Lender's commitments hereunder to a level below that which Issuing Bank, such Lender, or such holding companies could have achieved but for such Change in Law or compliance (taking into consideration Issuing Bank's, such Lender's, or such holding companies' then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by Issuing Bank or such Lender to be material, then Issuing Bank or such Lender may notify Borrower and Agent thereof.  Following receipt of such notice, Borrower agrees to pay Issuing Bank or such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 30 days after presentation by Issuing Bank or such Lender of a statement in the amount and setting forth in reasonable detail Issuing Bank's or such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, Issuing Bank or such Lender may use any reasonable averaging and attribution methods.  Failure or delay on the part of Issuing Bank or any Lender to demand compensation pursuant to this Section shall not constitute a waiver of Issuing Bank's or such Lender's right to demand such compensation; <u>provided</u> that Borrower shall not be required to compensate Issuing Bank or a Lender pursuant to this Section for any reductions in return incurred more than 180 days prior to the date that Issuing Bank or such Lender notifies Borrower of such Change in Law giving rise to such reductions and of such Lender's intention to claim compensation therefor; <u>provided</u>, <u>further</u>, that if such claim arises by reason of the Change in Law that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)        If Issuing Bank or any Lender requests additional or increased costs referred to in Section 2.11(l) or amounts under Section 2.13(a) (such Issuing Bank or Lender, an "Affected Lender"), then

such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to <u>Section 2.11(l)</u> or <u>Section 2.13(a)</u>, as applicable, and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it.  Borrower agrees to pay all reasonable and documented out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment.  If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrower's obligation to pay any future amounts to such Affected Lender pursuant to <u>Section 2.11(l)</u> or <u>Section 2.13(a)</u>, as applicable, then Borrower (without prejudice to any amounts then due to such Affected Lender under <u>Section 2.11(l)</u> or <u>Section 2.13(a)</u>, as applicable), may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under <u>Section 2.11(l)</u> or <u>Section 2.13(a)</u>, as applicable, may designate a different Issuing Bank or substitute a Lender, in each case, reasonably acceptable to Agent to purchase the Obligations owed to such Affected Lender and such Affected Lender's Commitments hereunder (a "<u>Replacement Lender</u>"), and if such Replacement Lender agrees to such purchase, such Affected Lender shall assign to the Replacement Lender its Obligations and Commitments, and upon such purchase by the Replacement Lender, which such Replacement Lender shall be deemed to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement and such Affected Lender shall cease to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement.

(c)    Notwithstanding anything herein to the contrary, the protection of <u>Section 2.11(l)</u> and <u>Section 2.13(a)</u> shall be available to Issuing Bank and each Lender (as applicable) regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, judicial ruling, judgment, guideline, treaty or other change or condition which shall have occurred or been imposed, so long as it shall be customary for issuing banks or lenders affected thereby to comply therewith.  Notwithstanding any other provision herein, neither Issuing Bank nor any Lender shall demand compensation pursuant to <u>Section 2.11(l)</u> or <u>Section 2.13(a)</u> if it shall not at the time be the general policy or practice of Issuing Bank or such Lender (as the case may be) to demand such compensation in similar circumstances under comparable provisions of other credit agreements, if any.

3.    **CONDITIONS; TERM OF AGREEMENT.**

3.1    <u>**Conditions Precedent to the Initial Extension of Credit**</u>.  The obligation of each Lender to make the initial extensions of credit provided for hereunder is subject to the satisfaction (or waiver in accordance with <u>Section 14.1</u>) of each of the conditions precedent set forth on <u>Schedule 3.1</u> (the making of such initial extensions of credit by a Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent).

3.2    <u>**Conditions Precedent to all Extensions of Credit**</u>.  The obligation of the Lender Group (or any member thereof) to make any Revolving Loans hereunder (or, except as expressly set forth herein, to extend any other credit hereunder) at any time shall be subject to the satisfaction (or waiver in accordance with <u>Section 14.1</u>) of the following conditions precedent:

(a)    the representations and warranties of the Loan Parties contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that

such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date); and

(b)     no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

(c)     Each request for a Revolving Loan shall be made in accordance with the Approved Budget.

(d)     No Overadvance shall result from such credit extension.

(e)     There shall not have been any order granted by the Bankruptcy Court sustaining (i) any motion, complaint, objection or other pleading filed by any party, any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations, or (ii) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Agent or the Lenders hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the DIP Orders).

(f)     There shall not have been any order granted by the Bankruptcy Court sustaining any motion, complaint, objection or other pleading filed by any party, challenging, in either case, the validity, priority, perfection, or enforceability of the Existing Loan Documents, the Existing Liabilities, or any Existing Lien granted pursuant to the Existing Loan Documents, and no Existing Lien granted pursuant to the Existing Loan Documents shall have been determined to be null and void, invalid or unenforceable by the Bankruptcy Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Cases, including, without limitation, the Committee.

3.3     **Maturity**.  Subject to Section 3.5 below, this Agreement shall continue in full force and effect for a term ending on the Maturity Date.

3.4     **Effect of Maturity**.  On the Maturity Date, all Commitments of the Lender Group to provide additional credit hereunder shall automatically be terminated and all of the Obligations immediately shall become due and payable without notice or demand and Borrower shall be required to repay all of the Obligations in full.  No termination of the obligations of the Lender Group (other than payment in full of the Obligations and termination of the Commitments) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitments have been terminated.  When all of the Obligations have been paid in full and the Lender Group's Commitments have been terminated irrevocably, Agent will, at Borrower's sole expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Agent's Liens and all notices of security interests and liens previously filed by Agent.

3.5     **Early Termination by Borrower**.  Borrower has the option, at any time upon not less than 10 Business Days' prior written notice to Agent (or such shorter notice period as Agent may agree in its sole discretion), to terminate this Agreement and terminate the Commitments hereunder by repaying to Agent all of the Obligations in full.  The foregoing notwithstanding, (a) any such termination notice may be conditioned upon the happening or occurrence of an event, in which case, such termination (or notice thereof) may be revoked if such event does not so happen or occur on or before the date of the proposed termination (in which case, a new notice shall be required to be sent in connection with any subsequent termination) and (b) the

- 29 -

proposed date of termination specified in such notice may be extended by Borrower at any time prior to such proposed date of termination (provided that any such extension that exceeds ten (10) Business Days shall be subject to Agent's consent, which shall not be unreasonably withheld, conditioned or delayed).

3.6    **Conditions Subsequent**.  The obligation of the Lender Group (or any member thereof) to continue to make Revolving Loans (or otherwise extend credit hereunder) is subject to the satisfaction (or waiver in accordance with Section 14.1), on or before the date applicable thereto (or such later date as Agent may reasonably agree), of the conditions subsequent set forth on Schedule 3.6 (the failure by Borrower to so perform or cause to be performed such conditions subsequent as and when required by the terms thereof (unless such date is extended, in writing, by Agent, which Agent may do without obtaining the consent of the other members of the Lender Group), shall constitute an Event of Default); provided, that notwithstanding the foregoing, (i) to the extent that the existence of any such condition subsequent would otherwise cause any representation, warranty or covenant in this Agreement or any other Loan Document to be breached, Agent hereby waives such breach for the period from the Closing Date until the date on which such condition subsequent is required to be fulfilled pursuant to this Section 3.6 and (ii) in no event shall there be a breach, default or violation of any provision hereunder (or an Event of Default hereunder) with respect to any matter set forth on Schedule 3.6 unless such matter has not been so completed by the applicable Loan Party or waived in writing by Agent prior to the expiration of the applicable period provided for therein (after giving effect to any extensions granted by Agent in accordance with this Section 3.6).

4.    **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender Group to enter into this Agreement, each of Parent and Borrower makes the following representations and warranties to the Lender Group, which shall be true, correct, and complete in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date, and shall be true, correct, and complete in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the date of the making of each Revolving Loan (or other extension of credit) made thereafter, as though made on and as of the date of such Revolving Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1    **Due Organization and Qualification; Subsidiaries.**

(a)    Each Loan Party (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any jurisdiction where the failure to be so qualified would reasonably be expected to result in a Material Adverse Effect, and (iii) subject to the entry of the DIP Orders and receipt of such other and/or additional authorizations as may be required under the Bankruptcy Code, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    Set forth on Schedule 4.1(b) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement) is a complete and accurate description of the authorized Equity Interests of Borrower, by class, and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding.  Borrower is not subject to any

obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or any security convertible into or exchangeable for any of its Equity Interests.

(c)     Set forth on Schedule 4.1(c) (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under this Agreement) is a complete and accurate list of the Loan Parties' direct and indirect Subsidiaries, showing: (i) the number of shares of each class of common and preferred Equity Interests authorized for each of such Subsidiaries, and (ii) the number and the percentage of the outstanding shares of each such class owned directly by such Loan Party or Subsidiary thereof.  All of the outstanding Equity Interests of each such Subsidiary have been validly issued and, to the extent applicable, are fully paid and non-assessable.

(d)     Except as set forth on Schedule 4.1(d), there are no subscriptions, options, warrants, or calls relating to any shares of Borrower's or its Subsidiaries' Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument.

4.2     **Due Authorization; No Conflict.**

(a)     As to each Loan Party, subject to the entry of the DIP Orders, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or other organizational action on the part of such Loan Party.

(b)     As to each Loan Party, subject to the entry of the DIP Orders, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party do not and will not (i) violate any material provision of federal, state, or local law or regulation applicable to such Loan Party, the Governing Documents of such Loan Party, or any order, judgment, or decree of any court or other Governmental Authority binding on such Loan Party, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of such Loan Party to the extent that any such conflict, breach or default would individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of such Loan Party, other than Permitted Liens, or (iv) require any approval of any holder of Equity Interests of such Loan Party or any approval or consent of any Person under any Material Contract of such Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and, in the case of Material Contracts, except for consents or approvals which the failure to obtain would not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

4.3     **Governmental Consents**.  Subject to the entry of the DIP Orders, the execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than (i) registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect, (ii) filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation, as of the Closing Date and (iii) registrations, consents, approvals, notices, or other actions the failure to obtain, make or take which would not, individually or in the aggregate, be reasonably be expected to cause a Material Adverse Effect.

4.4     **Binding Obligations; Perfected Liens.**

(a)     Subject to the entry of the DIP Orders, each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as (i)

- 31 -

enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally and (ii) the availability of the remedy of specific performance or injunctive or other equitable relief is subject to the discretion of the court before which any proceeding therefor may be brought.

(b)    Subject to the entry of the DIP Orders, Agent's Liens in the Collateral are validly created, perfected (other than any such Collateral in which Agent's Lien is not required to be perfected in accordance with the Loan Documents) and first priority Liens (subject in priority only to Permitted Priority Liens and Permitted Liens of the type described in clause (f) of the definition thereof).

4.5    **Title to Assets; No Encumbrances**.  Each of the Loan Parties and its Subsidiaries has (a) good, sufficient and legal title to (in the case of fee interests in Real Property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (c) good and marketable title to (in the case of all other personal property), all of their respective assets reflected in their most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby.  All of such assets are free and clear of Liens except for Permitted Liens.

4.6    **Litigation.**

(a)    Other than the Bankruptcy Events and the litigation disclosed on Schedule 4.6(a), there are no actions, suits, or proceedings pending or, to the knowledge of Borrower, threatened in writing against a Loan Party or any of its Subsidiaries that either individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect.

(b)    Schedule 4.6(b) sets forth a complete and accurate description, with respect to each of the actions, suits, or proceedings asserting damages in excess of $750,000 that, as of the Closing Date, is pending or, to the knowledge of Borrower, threatened in writing against a Loan Party or any of its Subsidiaries, of (i) the parties to such actions, suits, or proceedings, (ii) the nature of the dispute that is the subject of such actions, suits, or proceedings, (iii) the procedural status, as of the Closing Date, with respect to such actions, suits, or proceedings, and (iv) whether any liability of the Loan Parties' and their Subsidiaries in connection with such actions, suits, or proceedings is covered by insurance.

4.7    **Compliance with Laws**.  Subject to the entry of the DIP Orders, no Loan Party nor any of its Subsidiaries (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

4.8    **No Material Adverse Effect**.  All historical financial statements relating to the Loan Parties and their Subsidiaries that have been delivered by Borrower to Agent have been prepared in accordance with GAAP (or, in the case of unaudited interim financial statements, have been prepared in accordance with GAAP in all material respects, subject to the lack of footnotes and year-end audit adjustments) and present fairly in all material respects the Loan Parties' and their Subsidiaries' consolidated financial condition as of the date thereof and results of operations for the period then ended.  Since December 31, 2015, no event, circumstance, or change has occurred that has or would reasonably be expected to result in a Material Adverse Effect with respect to the Loan Parties.

4.9    **Reserved.**

4.10    **Employee Benefits.**

(a)    Except as set forth on <u>Schedule 4.10</u>, as of the date of this Agreement, no Loan Party, nor any of its Subsidiaries maintains or contributes to any Pension Plan.

(b)    Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) each Loan Party and each of the ERISA Affiliates has complied in all respects with ERISA, the IRC and all applicable laws regarding each Employee Benefit Plan; (ii) each Employee Benefit Plan is, and for the past five years has been, maintained in substantial compliance with ERISA, the IRC, all other applicable laws and the terms of each such Employee Benefit Plan; (iii) each Employee Benefit Plan that is intended to qualify under Section 401(a) of the IRC has received a favorable determination, opinion or advisory letter from the Internal Revenue Service or an application for such letter is currently being processed by the Internal Revenue Service and to the knowledge of each Loan Party nothing has occurred which would reasonably be expected to prevent, or cause the loss of, such qualification; (iv) no outstanding liability to the PBGC (other than for the payment of current premiums which are not past due) by any Loan Party has been incurred or is expected by any Loan Party to be incurred with respect to any Pension Plan; (v) no Notification Event exists or has occurred in the past six (6) years; (vi) no Loan Party sponsors, maintains, or contributes to any Employee Benefit Plan, including, without limitation, any such plan maintained to provide benefits to former employees of such entities that may not be terminated by any Loan Party in its sole discretion at any time without liability (other than payment of earned and vested benefits and administrative wind-up costs, if any), and (vii) no Loan Party has provided any security under Section 436 of the IRC.

4.11    **Environmental Condition**.    Except as set forth on <u>Schedule 4.11</u>, (a) to Borrower's knowledge, no Loan Party's nor any of its Subsidiaries' properties or assets has ever been used by a Loan Party, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation of, and would reasonably be expected to require Remedial Action by Borrower or any of its Subsidiaries pursuant to, any applicable Environmental Law, (b) to Borrower's knowledge, no Loan Party's nor any of its Subsidiaries' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) no Loan Party nor any of its Subsidiaries has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by a Loan Party or its Subsidiaries, and (d) neither Borrower nor any of its Subsidiaries nor, to Borrower's knowledge, any of their respective facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or Environmental Liability; with respect to <u>Sections 4.11(a)</u>, <u>(b)</u> or <u>(d)</u> that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

4.12    **Complete Disclosure**.    All factual information taken as a whole (other than forward-looking information, projections and other financial forecasts and budgets, information of a general economic nature, and general information about Borrower's industry) furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents is, and all other factual information taken as a whole (other than forward-looking information, projections and other financial forecasts and budgets, information of a general economic nature, and general information about Borrower's industry) hereafter furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender will be, when furnished and taken as a whole, true and accurate in all material respects on the date as of which such information is dated or certified and is not and will not, when furnished and taken as a whole, omit to state a material fact necessary in order to make such information so furnished (when furnished and taken as a whole) not misleading in any material respect at such time in light

of the circumstances under which such information was provided.  The Projections delivered to Agent on July 21, 2014 were prepared and any future Projections delivered to Agent will be prepared in good faith based upon assumptions believed by the Loan Parties to be reasonable at the time of the delivery thereof to the Agent (it being understood and agreed that financial performance projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and their Subsidiaries, that no assurances can be given that any particular financial projections will be realized, that actual results during the periods covered thereby may differ from such projected results and such differences may be material).

4.13    **Patriot Act**.  To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act").  No part of the proceeds of the Loans made hereunder will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.14    **Indebtedness**.  Set forth on Schedule 4.14 is a true and complete list of all Indebtedness of each Loan Party and each of its Subsidiaries with an aggregate outstanding principal balance in excess of $50,000 that is outstanding immediately prior to the Closing Date and will remain outstanding immediately after giving effect to the closing hereunder on the Closing Date, and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of the Closing Date.

4.15    **Payment of Taxes**.  Except as otherwise permitted under Section 5.5, and/or except to the extent failure to do so is the result of commencing the Cases or otherwise permitted by the Bankruptcy Code or pursuant to the DIP Orders, all federal, all income, and all other material tax returns and reports of each Loan Party and its Subsidiaries required to be filed by any of them have been timely filed, and all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon a Loan Party and its Subsidiaries and upon their respective assets, income, businesses and franchises that are due and payable have been paid when due and payable except for such amount that are being contested in good faith by proper proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Loan Party.  Each Loan Party and each of its Subsidiaries have made adequate provision in accordance with GAAP for all taxes not yet due and payable.  Borrower knows of no proposed tax assessment against a Loan Party or any of its Subsidiaries that is not being actively contested by such Loan Party or such Subsidiary diligently, in good faith, and by appropriate proceedings; provided such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

4.16    **Margin Stock**.  No Loan Party or any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the loans made to Borrower will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.

4.17    **Governmental Regulation**.  No Loan Party or any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.  No Loan Party or any of its Subsidiaries is a "registered

investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18    **OFAC**.  No Loan Party or any of its Subsidiaries is in violation of any of the country or list based economic and trade sanctions administered and enforced by OFAC.  No Loan Party or any of its Subsidiaries (a) is a Sanctioned Person or a Sanctioned Entity, (b) has its assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. No proceeds of any loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

4.19    **Employee and Labor Matters**.  There is (i) no unfair labor practice complaint pending or, to the knowledge of Borrower, threatened in writing against any Loan Party before any Governmental Authority and no arbitration proceeding pending or, to the knowledge of Borrower, threatened against any Loan Party which arises out of or under any collective bargaining agreement and that would reasonably be expected to result in a Material Adverse Effect, (ii) no strike, labor dispute, slowdown, stoppage or similar action pending or, to the knowledge of Borrower, threatened in writing against any Loan Party that would reasonably be expected to result in a Material Adverse Effect, or (iii) to the knowledge of Borrower, no union election petition pending with respect to the employees of any Loan Party in connection with their employment by such Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan Party in connection with their employment by such Loan Party.  Since January 1, 2016, none of any Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied, except to the extent such violations would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  Since January 1, 2016, the hours worked and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act, except to the extent such violations would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All material payments due from any Loan Party on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Parent, except where the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.20    **Parent as a Holding Company**.  Parent is a holding company and does not (a) have any material liabilities (other than liabilities (i) arising under the Loan Documents, and the Medley Credit Documents, (ii) in respect of taxes, (iii) in respect of Permitted Intercompany Advances and (iv) in respect of any Permitted Acquisition), (b) own any material assets (other than the Equity Interests of Borrower and other Permitted Investments) or (c) engage in any material business activities (other than (x) activities that are ancillary, incidental or reasonably related to its ownership of the Equity Interests of Borrower, (y) activities that are permitted by this Agreement and the other Loan Documents with respect to Parent (subject to any limitations applicable thereto as are expressly set forth herein), and (z) activities necessary to maintain its legal existence and other legal, accounting, tax and administrative matters).

4.21    **Leases**.  Each Loan Party and its Subsidiaries enjoy peaceful and undisturbed possession under all leases material to their respective business and to which they are parties or under which they are operating, and, subject to Permitted Protests, all of such material leases are valid and subsisting and no default by the applicable Loan Party or its Subsidiaries exists under any of such leases, except for matters which, either individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

4.22    **Eligible Accounts**.  With respect to each Account that is identified by Borrower as an Eligible Account in a Borrowing Base Certificate submitted to Agent, as of the date of such Borrowing Base Certificate, such Account is not excluded as ineligible by virtue of one or more of the excluding criteria (other

than any such criteria that is subject to the discretion or Permitted Discretion of Agent) set forth in the definition of "Eligible Accounts".

4.23    **Eligible Inventory**.  With respect to each item of Inventory that is identified by Borrower as Eligible Inventory in a Borrowing Base Certificate submitted to Agent, as of the date of such Borrowing Base Certificate, such Inventory is not excluded as ineligible by virtue of one or more of the excluding criteria (other than any such criteria that is subject to the discretion or Permitted Discretion of Agent) set forth in the definition of "Eligible Inventory".

4.24    **Eligible Rolling Stock**.  With respect to each item of Rolling Stock that is identified by Borrower as Eligible Rolling Stock in a Borrowing Base Certificate submitted to Agent, as of the date of such Borrowing Base Certificate, such Rolling Stock is not excluded as ineligible by virtue of one or more of the excluding criteria (other than any such criteria that is subject to the discretion or Permitted Discretion of Agent) set forth in the definition of "Eligible Rolling Stock".

4.25    **Location of Inventory; Chief Executive Office**.  The Inventory of Borrower and its Subsidiaries (other than (i) Inventory having a fair market value not in excess of $25,000 in the aggregate and (ii) any Inventory that is temporarily out for repair) is not stored with a bailee, warehouseman, or similar party (except as set forth on Schedule 4.25) and is located only at, or in-transit between, the locations identified on Schedule 4.25 (as such Schedule may be updated pursuant to Section 5.14).  Borrower's chief executive office as of the Closing Date is set forth on Schedule 4.25.

4.26    **Inventory Records**.  Each Loan Party keeps books and records with respect to its Inventory that are correct in all material respects and are sufficient to allow the preparation of financial statements in accordance with GAAP to the extent required by this Agreement and such other reports with respect to Inventory as are required by this Agreement.

4.27    **Reserved.**

4.28    **Approved Budget**.  A true and complete copy of the Approved Budget is attached as Schedule 1.2 hereto.

4.29    **DIP Orders**.  The Loan Parties are in compliance with the terms and conditions of the DIP Orders.  Each of the Interim Borrowing Order (to the extent necessary during the Interim Order Period) or the Final Borrowing Order (from and after the Final Order Date) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Agent and each Lender, no change, amendment or modification or any application or motion for any change, amendment or modification to any DIP Order shall be made, in each case, that is adverse to the interests of the Agent and/or Lenders.

4.30    **Collateral Documents**.  The Collateral Documents, taken together with the DIP Orders, are effective to create in favor of the Agent (for the benefit of itself and the other applicable Credit Parties) a legal, valid, continuing and enforceable security interest in the Collateral pledged hereunder or thereunder, in each case subject to no Liens other than the Carve Out and Permitted Liens.  Pursuant to the terms of the DIP Orders, no filing or other action will be necessary to perfect or protect such Liens and security interests.  Pursuant to and to the extent provided in the DIP Orders, the Obligations of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (excluding, for the avoidance of doubt, Avoidance Actions and the proceeds of thereof; provided, that the Obligations shall be secured by Avoidance Actions arising under Section 549 of the Bankruptcy Code and amounts necessary to reimburse the Agent and the Lenders for the amount of the Carve Out,

if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions), subject only to the Carve Out.  Notwithstanding anything to the contrary herein, the Carve Out shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, the Loan Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and DIP Superpriority Claims) granted to the Agent and the other Credit Parties.

4.31    **Hedge Agreements**.  On the date on which any Hedge Agreement is executed by any Hedge Provider and any Loan Party, such Loan Party shall satisfy all eligibility, suitability and other requirements under the Commodity Exchange Act (7 U.S.C. § 1, et seq., as in effect from time to time) and the Commodity Futures Trading Commission regulations, subject in all respect to the applicable provisions of the Guaranty and Security Agreement relating to any Excluded Swap Obligations of any Guarantor.

4.32    **Material Contracts**.  Set forth on Schedule 4.30 (as such Schedule may be updated from time to time in accordance herewith) is a list of the Material Contracts of each Loan Party as of the most recent date on which  Borrower provided the Compliance Certificate pursuant to Section 5.1; provided, however, that Borrower may amend Schedule 4.30 to add additional Material Contracts so long as such amendment occurs by written notice to Agent on the date that Borrower provides the Compliance Certificate. Except for matters which, either individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, each Material Contract (other than those that have expired at the end of their normal terms or have otherwise been terminated in the ordinary course of business) (a) is in full force and effect and is binding upon and enforceable against the applicable Loan Party or its Subsidiary, and, to Borrower's actual knowledge, each other Person that is a party thereto in accordance with its terms, in each case, except (i) as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditor's rights generally and (ii) the availability of the remedy of specific performance or injunctive or other equitable relief is subject to the discretion of the court before which any proceeding therefor may be brought, (b) has not been amended or modified (other than amendments or modifications permitted by Section 6.6(b)), and (c) is not in default due to the action or inaction of the applicable Loan Party or its Subsidiary.

5.    **AFFIRMATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations:

5.1    **Financial Statements, Reports, Certificates**.  Borrower (a) will deliver to Agent each of the financial statements, reports, and other items set forth on Schedule 5.1 no later than the times specified therein, (b) agrees that no Subsidiary of Parent will have a fiscal year different from that of Parent, (c) agrees to maintain a system of accounting that enables Borrower to produce financial statements in accordance with GAAP (to the extent required by this Agreement), and (d) agrees that it will, and will cause each other Loan Party to, (i) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to its and its Subsidiaries' sales, (ii) maintain its billing systems and practices substantially as in effect as of the Closing Date, and (iii) keep books and records that are correct in all material respects and sufficient to allow Borrower to prepare such other reports with respect to its assets and business activities as are required by this Agreement.

5.2    **Reporting**.  Borrower (a) will deliver to Agent each of the reports set forth on Schedule 5.2 at the times specified therein, (b) agrees to use commercially reasonable efforts in cooperation with Agent to implement a system of electronic collateral reporting in order to provide electronic reporting of each of the

items set forth on such Schedule, (c) promptly deliver to the Agent, (i) a copy of the Approved Budget, and (ii) a copy of each Variance Report, (d) promptly upon receipt thereof, copies of all reports submitted to Borrower and/or Parent by independent certified public accountants in connection with each annual, interim or special audit of the books of the Borrower and/or Parent or any of their Subsidiaries made by such accountants, including any management letter commenting on the Applicants' internal controls submitted by such accountants to management in connection with their annual audit, and (e) promptly following any request therefor, such other information regarding the operations, business affairs, financial condition and properties of Borrower and/or Parent, or compliance with the terms of any Loan Document, as the Agent, Lenders and/or Issuer may reasonably request.

5.3     **Existence**.  Except as otherwise permitted under Section 6.3 or Section 6.4, each Loan Party will at all times preserve and keep in full force and effect (i) such Person's existence and good standing in its jurisdiction of organization, (ii) except as would not reasonably be expected to result in a Material Adverse Effect, good standing in all other jurisdictions in which it is qualified to do business and (iii) any rights, franchises, permits, licenses, accreditations, authorizations, or other approvals related to such Person's business, except to the extent that the failure to so preserve and keep in full force and effect would not reasonably be expected to result in a Material Adverse Effect.

5.4     **Maintenance of Properties**.  Each Loan Party will maintain and preserve all of its assets that are necessary or material in the proper conduct of its business in good working order and condition (ordinary wear, tear, casualty, and condemnation and Permitted Dispositions excepted), and except where the failure to so maintain and preserve such assets would not reasonably be expected to result in a Material Adverse Effect.

5.5     **Taxes**.  To the extent either required and/or permitted by the Bankruptcy Code or an order of the Bankruptcy Court, but subject to inclusion in the Approved Budget, each Loan Party will pay in full before delinquency or before the expiration of any extension period all material governmental assessments and taxes imposed, levied, or assessed against it, or any of its assets or in respect of any of its income, businesses, or franchises, except to the extent that the validity of such governmental assessment or tax is the subject of a Permitted Protest.

5.6     **Insurance**.  Each Loan Party will, at Borrower's expense, (a) maintain insurance covering such Loan Parties' assets wherever located, covering liabilities, losses or damages as are customarily insured against by other Persons engaged in businesses of the same size and owning similar assets in similar localities.  All such policies of insurance shall be with financially sound and reputable insurance companies acceptable to Agent (it being agreed that the insurers of Borrower as of the Closing Date are acceptable to Agent) and in such amounts as are carried generally in accordance with sound business practice by other Persons engaged in businesses of similar size and owning similar assets in similar localities and, in any event, in amount, adequacy, and scope reasonably satisfactory to Agent (it being agreed that the amount, adequacy, and scope of the policies of insurance of Borrower in effect as of the Closing Date are acceptable to Agent). All property insurance policies covering the Collateral shall be endorsed in favor of Agent, for the benefit of Agent and the Lenders, as their interests may appear, in the case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and shall contain such other provisions as Agent may reasonably request to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies (in each case, to the extent that Borrower is able to obtain such provisions from the providers of such policies after its use of commercially reasonable efforts to do so).  All certificates of property and general liability insurance (other than any pollution legal liability policy, representation and warranty policy, workers' compensation policy, directors and officers indemnification policy) are to be delivered to Agent, with loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Agent, and shall provide for not less than 30 days' prior written notice (or not less than 10 days' prior written notice in the case of non-payment) to Agent of the exercise of any right of cancellation. If the Loan Parties fail to maintain such insurance, Agent may arrange for such insurance, but at

Borrower's expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Borrower shall give Agent prompt notice of any casualty loss exceeding $750,000 covered by the Loan Parties' casualty or business interruption insurance.  Upon the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral on which Agent is identified as lender loss payee or additional insured, as applicable, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

      5.7    **Inspection.**

      (a)    Each Loan Party will permit Agent and its duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Agent may designate and, so long as no Default or Event of Default has occurred and is continuing, with reasonable prior notice to Borrower and during regular business hours; provided, that Agent shall direct such representatives or agents of Agent to comply with the confidentiality provisions of Section 17.9; provided, further, that, so long as no Event of Default has occurred and is continuing, Borrower shall not be required to pay fees and expenses for more than one such visit or inspection during any fiscal year.  Notwithstanding the foregoing, any Lender may accompany Agent on any such visit or inspection at such Lender's sole cost and expense.

      (b)    Each Loan Party will permit Agent and each of its duly authorized representatives or agents to conduct appraisals and valuations at such reasonable times and intervals as Agent may designate and, so long as no Default or Event of Default has occurred and is continuing, with reasonable prior notice to Borrower and during regular business hours; provided that the Loan Parties shall only be required to reimburse Agent for its costs related thereto to the extent required by Section 2.10(c); provided further that Agent shall direct such representatives or agents of Agent to comply with the confidentiality provisions of Section 17.9.

      5.8    **Compliance with Laws**.  Each Loan Party will comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, or as to which the failure to comply therewith is otherwise permitted under the Bankruptcy Code or the DIP Orders.

      5.9    **Environmental**.  Each Loan Party will:

      (a)    Keep any property either owned or operated by any Loan Party free of any Environmental Liens or post or cause to be posted bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens,

      (b)    Comply, in all material respects, with Environmental Laws and provide to Agent documentation of such compliance which Agent reasonably requests,

      (c)    Promptly notify Agent of any release of which Borrower has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party and take any Remedial Actions if and to the extent required to be performed by any Loan Party or any of their Subsidiaries pursuant to Environmental Law to abate said release or otherwise to come into compliance, in all material respects, with applicable Environmental Law, and

(d)    Promptly, but in any event within 5 Business Days of its receipt thereof, provide Agent with written notice of any of the following:  (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Loan Party, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan Party, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority applicable to any Loan Party or any of its Subsidiaries or any property owned or operated by them.

5.10    **Disclosure Updates**.  Borrower will, promptly and in no event later than 5 Business Days after obtaining knowledge thereof, notify Agent if any of the representations and warranties made by the Loan Parties in the Loan Documents is not true and correct in all material respects.  From time to time as may be reasonably requested by the Agent, but no more often than once per fiscal quarter, the Borrower shall supplement each Schedule hereto, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or that is necessary to correct any information in such Schedule which has been rendered untrue or incorrect in any material respect thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule shall be deemed the Lender Group's consent to the matters reflected in such updated Schedules nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules; nor shall any such supplement or revision to any Schedule be deemed the Lender Group's waiver of any Default or Event of Default resulting from the matters disclosed therein.

5.11    **Formation of Subsidiaries**.  Borrower will, at the time that any Loan Party forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Closing Date, within 30 days of such formation or acquisition (or such later date as Agent may agree in its sole discretion) (a) cause such new Subsidiary to provide to Agent a joinder to the Guaranty and Security Agreement, together with such other security agreements with respect to its assets (other than Excluded Assets) required to be pledged under the Loan Documents (including mortgages with respect to any Real Property Collateral) as well as appropriate financing statements (and with respect to all property subject to a mortgage, fixture filings), all in form and substance reasonably satisfactory to Agent (including being sufficient to grant Agent a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary); <u>provided</u>, that the joinder to the Guaranty and Security Agreement and such other security agreements shall not be required to be provided to Agent with respect to any Subsidiary of Parent that is a CFC or Disregarded Subsidiary if providing such agreements would result in adverse tax consequences or the costs to the Loan Parties of providing such agreements or such security agreements are unreasonably excessive (as determined by Agent in consultation with Borrower) in relation to the benefits to Agent and the Lenders of the security or guarantee afforded thereby (it being understood that, if, after the Closing Date, providing such agreements would no longer result in adverse tax consequences (as determined by the Borrower in its reasonable business judgment) or the costs to the Loan Parties of providing such guaranty or such security agreements are not unreasonably excessive (as determined by Agent in consultation with Borrower) in relation to the benefits to Agent and the Lenders of the security or guarantee afforded thereby, at Agent's request, the Loan Parties shall provide such joinder and other agreements no later than 30 days after such request (or such later date as Agent may agree in its sole discretion)); provided, further, that any security agreements and financing statements (including fixture filings) required hereunder to grant Agent a first priority Lien (subject to Permitted Liens) in any fee-owned Real Property that constitutes Real Property Collateral shall be provided within ninety (90) days following the Closing Date (to the extent such Real Property is owned on the Closing Date) or within ninety (90) days following the formation or acquisition of such new Subsidiary or the acquisition of such fee-owned Real Property after the Closing Date, (b) provide, or cause the applicable Loan Party to provide, to Agent a pledge agreement (or an addendum to the Guaranty and Security Agreement) and appropriate certificates and powers or financing statements, in form and substance reasonably satisfactory to Agent, pledging all of the direct or beneficial ownership interest in such new Subsidiary; <u>provided</u>, that not more than

- 40 -

65% of the total outstanding voting Equity Interests of any first tier Subsidiary of Parent that is a CFC or Disregarded Subsidiary (and none of the Equity Interests of any Subsidiary of such CFC or Disregarded Subsidiary) shall be required to be pledged hereunder if providing such agreements would result in adverse tax consequences or the costs to the Loan Parties of providing such guaranty or such security agreements are unreasonably excessive (as determined by Agent in consultation with Borrower) in relation to the benefits to Agent and the Lenders of the security or guarantee afforded thereby (it being understood that, if, after the Closing Date, pledging more than 65% of the outstanding Equity Interests of any such Person would no longer result in adverse tax consequences (as determined by the Borrower in its reasonable business judgment) or the costs to the Loan Parties of providing pledge are not unreasonably excessive (as determined by Agent in consultation with Borrower) in relation to the benefits to Agent and the Lenders of the security or guarantee afforded thereby, at Agent's request, the Loan Parties shall pledge 100% of the outstanding Equity Interests of such Person no later than 30 days after such request (or such later date as Agent may agree in its sole discretion), which pledge, if reasonably requested by Agent, shall be governed by the laws of the jurisdiction of such Subsidiary), and (c) provide to Agent all other documentation reasonably requested by Agent, including one or more opinions of counsel reasonably satisfactory to Agent, which, in its opinion, is customary and appropriate with respect to the execution and delivery of the applicable documentation referred to above (including policies of title insurance or other documentation with respect to all Real Property owned in fee and subject to a Mortgage).  Any document, agreement, or instrument executed or issued pursuant to this Section 5.11 shall constitute a Loan Document.

5.12    **Further Assurances**.  Each Loan Party will, at any time upon the reasonable request of Agent, execute or deliver to Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, mortgages, deeds of trust, opinions of counsel, and all other documents (the "Additional Documents") that Agent may reasonably request in form and substance reasonably satisfactory to Agent, to create, perfect, and continue perfected or to better perfect Agent's Liens in all of the assets (other than Excluded Assets) of the Loan Parties  in which a security interest is required to be granted to the Agent under the Loan Documents (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), to create and perfect Liens in favor of Agent in any fee-owned Real Property acquired by Borrower or any other Loan Party that constitutes Real Property Collateral and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents, subject in all cases to any limitations set forth in this Agreement and the other Loan Documents (including Section 5.11).  To the maximum extent permitted by applicable law, if Borrower or any other Loan Party refuses or fails to execute or deliver any reasonably requested Additional Documents within a reasonable period of time following the request to do so, Borrower and each other Loan Party hereby authorizes Agent to execute any such Additional Documents in the applicable Loan Party's name and authorizes Agent to file such executed Additional Documents in any appropriate filing office.  In furtherance of, and not in limitation of, the foregoing, each Loan Party shall take such actions as Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by all of the assets (other than Excluded Assets) of the Loan Parties in which a security interest is required to be granted to the Agent under the Loan Documents, including all of the outstanding Equity Interests owned by any Loan Party that constitute Collateral.

5.13    **Lender Meetings**.  Parent will, within 30 days after delivery of the annual audited financial statements of Parent for each fiscal year, at the request of Agent or of the Required Lenders and upon reasonable prior notice, hold a meeting (at a mutually agreeable location and time or, at the option of Agent, by conference call) with all Lenders who choose to attend such meeting at which meeting shall be reviewed the financial results of the previous fiscal year and the financial condition of Parent and its Subsidiaries and the projections presented for the current fiscal year of Parent.

5.14    **Location of Inventory**.  Each Loan Party will keep its Inventory (other than (i) Inventory having a fair market value not in excess of $25,000 in the aggregate and (ii) any Inventory that is temporarily out for repair) only at the locations identified on Schedule 4.25; provided, that Borrower may update or

amend Schedule 4.25 at any time and from time to time in the event that any Inventory is relocated to a new location (so long as such new location is located within the continental United States).

5.15    **Compliance with ERISA and the IRC**.  In addition to and without limiting the generality of Section 5.8, Borrower will (i) not allow any factors or circumstances to exist with respect to one or more Employee Benefit Plans that, in the aggregate, would be expected to result in a Material Adverse Effect; (ii) furnish to Agent upon Agent's written request such additional information (to the extent in such Loan Party's possession or control) about any Employee Benefit Plan for which any Loan Party would reasonably expect to incur any material liability as Agent may reasonably request, and (iii) except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect (a) comply with the applicable provisions of ERISA and the IRC with respect to all Employee Benefit Plans, (b) without the prior written consent of Agent and the Required Lenders, not take any action or fail to take action which would reasonably be expected to result in a Loan Party incurring any liability to the PBGC or to a Multiemployer Plan (other than to pay contributions or premiums payable in the ordinary course), (c) not participate in any "prohibited transaction" (as defined under Section 406 of ERISA or Section 4975 of the IRC) that could result in other than a de minimis civil penalty excise tax, fiduciary liability or correction obligation under ERISA or the IRC and (d) operate each Employee Benefit Plan in such a manner that will not incur any excise tax liability under the IRC (including Section 4980B of the IRC).  With respect to each Pension Plan maintained or contributed to by any Loan Party (other than a Multiemployer Plan), except as would not reasonably be expected to result in a Material Adverse Effect, the Loan Parties shall (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any Lien, all of the contribution and funding requirements of the IRC and of ERISA, and (ii) pay, or cause to be paid, to the PBGC in a timely manner, without incurring any late payment or underpayment charge or penalty, all premiums required pursuant to ERISA.

5.16    **Bank Products**.  The Loan Parties shall establish and maintain their primary depository and treasury management relationships with Wells Fargo or one or more of its Affiliates and enter into one or more deposit account control agreements, in form and substance satisfactory to Agent, with respect thereto, and will maintain such depository and treasury management relationships at all times during the term of the Agreement.

5.17    **Hedge Agreements.**

Borrower shall offer to Wells Fargo the first opportunity to bid for all Hedge Agreements to be entered into by any Loan Party or any of its Subsidiaries during the term of this Agreement, provided that, if Wells Fargo does not provide such requested bid or enter into such requested Hedge Agreement within a reasonable period of time following such offer from Borrower (which reasonable period of time shall not exceed ten (10) Business Days), no Loan Party shall be prohibited or otherwise restricted from soliciting bids from, and entering into Hedge Agreements with, any other provider of hedging products in its discretion.

5.18    **Material Contracts**.

(a)    Contemporaneously with the delivery of each Compliance Certificate pursuant to Section 5.1, the Loan Parties will provide Agent with copies of (i) each Material Contract entered into since the delivery of the previous Compliance Certificate, and (ii) each material amendment or modification of any Material Contract entered into since the delivery of the previous Compliance Certificate.

(b)    Each Loan Party will use its commercially reasonable efforts to ensure that any Material Contract entered into after the Closing Date by any Loan Party that generates or, by its terms, will generate revenue permits the collateral assignment of such Material Contract (and all rights of such Loan Party thereunder) to such Loan Party's lenders or an agent for any lenders (and any transferees of such lenders

or such agent, as applicable), in each case, without waiving any legal rights, incurring any obligation for the payment of any additional consideration or agreeing to any material obligations of the Loan Parties that would not, but for the inclusion of collateral assignment provisions, have been included in any such Material Contract.

5.19    **Payment of Obligations**.  To the extent required by any DIP Order or the Bankruptcy Code, pay and discharge as the same shall become due and payable, all obligations and liabilities incurred after the Petition Date consisting of all lawful claims which, if unpaid, would by law become a Lien upon its property.

5.20    **Use of Proceeds**.  In accordance with and subject to the Approved Budget, and upon entry of the Interim Borrowing Order, use the proceeds of the credit extensions to finance  (in accordance with the terms of and procedures set forth in the Interim Borrowing Order): (i) the payment of transaction expenses, (ii) the payment of fees, expenses and costs incurred in connection with the  Cases, (iii) the payment of any adequate protection payments approved in the DIP Orders and (iv) working capital, capital expenditures, and other general corporate purposes of the Borrower and other Loan Parties.  Upon entry of the Final Borrowing Order, in addition to the above, the proceeds of Revolving Loans shall be used for the repayment of all Revolving Loans (but not, for the avoidance of doubt, Letters of Credit, which shall be deemed issued under this Agreement upon entry of the Interim Borrowing Order) under the Existing Credit Agreement.

5.21    **Cash Management**.  Manage all cash in accordance with the provisions of the Existing Loan Documents, and as provided in the DIP Orders and/or the Cash Management Order, in each case as entered by the Bankruptcy Court.   Between the Interim Order Date and Final Order Date, all collections and other proceeds of Collateral shall be applied to repay the Revolving Loans under the Existing Credit Agreement (but not, for the avoidance of doubt, Letters of Credit under the Existing Credit Agreement, which shall be deemed issued hereunder as of the date of entry of the Interim Borrowing Order) pursuant to a "creeping roll up" (post-petition collections applied to repay prepetition obligations with corresponding advances to be made with Revolving Loans hereunder).  In the event that, notwithstanding the provisions of this Section 5.21, any Loan Party receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into a blocked account or dealt with in such other fashion as such Loan Party may be instructed by the Agent. For the avoidance of doubt, it is understood and agreed that all cash, money and proceeds shall at all times constitute Collateral, whether or not located in blocked account.

5.22    **Compliance with Terms of Leaseholds**  Only to the extent required pursuant to any Order or the Bankruptcy Code, make all payments and otherwise perform all obligations becoming due following the Petition Date in respect of all leases of Real Estate to which Parent or any of its Subsidiaries is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

5.23    **Additional Information Obligations**.

        (a)    Case Documents and Motions.  As soon as practicable in advance of filing with the Bankruptcy Court of all documents, motions and pleadings related to the Sale Process, the DIP Orders or this Agreement, deliver to the Agent and the Lenders all such documents to be filed and provide the Agent and Lenders with a reasonable opportunity to review and comment on all such documents.

        (b)    Other Information.  Deliver to the Agent and the Lenders promptly after the same are available, copies of all pleadings, applications, judicial information, financial information and other documents filed on behalf of any Borrower or Loan Party with the Bankruptcy Court in the Cases, or

- 43 -

distributed by or on behalf of any Borrower or Loan Party to the Committee, except that the Loan Parties shall not be obligated to deliver any items that can be publicly accessed through the Bankruptcy Court's website.

(c)    <u>Access to Advisors</u>.  Allow the Agent and the Lenders access to, upon reasonable notice during normal business hours, all financial professionals engaged by the Loan Parties (which engagement, with respect to any financial professionals engaged after the Closing Date, shall be on terms and conditions reasonably satisfactory to the Agent and Lenders).

5.24    **Retention and Communication with Consultants**.

(a)    Subject to such Bankruptcy Court approvals as may be required, Borrower shall continue to retain the Financial Advisor, the scope and terms of such engagement to be reasonably satisfactory to the Agent.  Until such time as all Existing Liabilities and all Obligations have been repaid in full (or cash collateralized in accordance with the terms hereof) and all Commitments have been terminated, the Borrower shall continue to retain the Financial Advisor to assist the Loan Parties with the Sale Process and with the preparation of the Approved Budget and the other financial and Collateral reporting required to be delivered to the Agent and the Lenders pursuant to this Agreement.

(b)    Subject to such Bankruptcy Court approvals as may be required, Borrower shall continue to retain the I-Banker for the purpose of soliciting interest in the Loan Parties' assets and/or businesses, whether for sale or investment. Additionally, the I-Banker shall deliver to the Agent and Lenders a weekly status/progress report as to its activities.

(c)    The Borrower authorizes the Agent to communicate directly with the Financial Advisor and I-Banker, and authorizes and shall instruct the Financial Advisor and I-Banker to communicate to and with the Agent information relating to each Loan Party with respect to, among other things, the business, results of operations, prospects and financial condition of such Loan Party, and the Sale Process. Senior management of the Loan Parties and the Financial Advisor and I-Banker shall participate in weekly telephonic calls with the Agent and Lenders (and/or their advisors and counsel) to discuss various matters, including the Approved Budget, Variance Reports, and Sale Process.

(d)    Each Loan Party acknowledges that the Agent shall be permitted to engage such outside consultants and advisors (each, a "<u>Lender Group Consultant</u>"), for the sole benefit of the Agent and other Credit Parties, as the Agent may determine to be necessary or appropriate in its sole discretion.  Each Loan Party and agrees that: (i) such Loan Party shall use best efforts to cooperate during business hours with any Lender Group Consultant (including, without limitation, providing reasonable access to such Loan Party's business, books and records), provided that such cooperation does not interfere with the Loan Parties' operation of their businesses in the ordinary course; and (ii) all reasonable costs and expenses of any such Lender Group Consultant shall be Loan Party Expenses; and (iii) all reports, determinations and other written and verbal information provided by any Lender Group Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

5.25    **Performance Within Approved Budget**.  At all times following the Closing Date, strictly perform in accordance with the Approved Budget, including having made all scheduled payments to the Existing Loan Parties and Credit Parties as applicable as and when required, subject to the following (the "<u>Permitted Variances</u>"):

(a)    the Borrower's Net Cash Flow (as reflected in the Approved Budget) shall be at least equal to 85% of the amount reflected in the Approved Budget;

(b)    the Borrower's revenues shall be at least 85% of the projected amounts set forth in the Approved Budget;

(c)    the Borrower's cumulative Total Disbursements shall be not more than 110% of the projected amounts set forth in the Approved Budget;

(d)    the Loan Parties' inventory levels, as tested on an average trailing 2 weeks' basis, shall not be less than 80% of the amount thereof projected in the Budget; and

(e)    the Loan Parties' Eligible Accounts levels, as tested on an average trailing 2 weeks' basis, shall not be less than 80% of the amount thereof projected in the Budget.

Except as otherwise provided herein, the foregoing shall be reported on Friday of each week, starting with the Friday following the first two full weeks of the Cases, and reported (a) on a cumulative basis for the first 2 full weeks after the Petition Date, (b) on a cumulative basis for the first 3 full weeks following the Petition Date, and (c) thereafter weekly on a trailing 4 week basis (clauses (a) through (c), collectively, the "Testing Period") pursuant to the Variance Report delivered by the Borrower to the Agent. Furthermore, Approved Budget and covenant compliance will be tested against the most recent Approved Budget approved by the Agent, in its exclusive discretion, and not against any prior version of such budget.

5.26    **Additional Bankruptcy Related Affirmative Covenants**.

(a)    Within five (5) days of the Petition Date, the Borrower shall file motion (the "Sale Motion") requesting, among other things, approval of a comprehensive sale process ("Sale Process") under Section 363 of the Bankruptcy Code to sell all of the Loan Parties' businesses and assets ("363 Sale"), which Sale Motion shall include a motion seeking authority to establish bidding procedures for the proposed Sale Process on terms reasonably acceptable to the Agent. The Sale Motion, as well as the order approving the related bid procedures ("Bidding Procedures Order") shall be reasonably acceptable to the Agent.

(b)    Incidental to the filing of the Sale Motion and the entry of the Bidding Procedures Order:

(i)    From and after the Petition Date, the Borrower shall establish and maintain an electronic data room with current information to facilitate diligence by any potential bidders with respect to such sale;

(ii)    No later than five (5) days after the Petition Date, the Borrower shall forward so-called "bid packages" to any potential bidders to whom bid packages had not already been delivered prior to the Petition Date, including, without limitation, to potential bidders identified by the Agent, provided such potential bidders have entered into confidentiality agreements reasonably acceptable to the Borrower, with the deadline for submitting binding bids with respect to the sale of the Borrower's assets on or before March 29, 2017;

(iii)    No later than February 22, 2017, the Loan Parties shall have entered into a definitive agreement with a "stalking horse" purchaser(s) providing for the sale and purchase of all or substantially all of the Loan Parties' assets and/or businesses, with the designation of stalking horse purchaser, and the terms and provisions of any such definitive agreement being subject to the reasonable satisfaction of Agent and Lenders;

(iv)  One or more binding bids for some or all of the assets of the Loan Parties upon terms and conditions acceptable to the Agent in its reasonable discretion shall have been received by no later than March 22, 2017.  Without limiting the discretion of the Agent in determining the acceptability of such a bid or bids, in no event shall any bid which contains a financing contingency be reasonably acceptable;

(v)  Upon receipt thereof, the Loan Parties shall deliver to the Agent copies of all formal proposals, letters of interest, letters of intent, bids, agreements and any final proposed definitive documentation for any sale of any or all its assets or any other investment pursuant to which additional capital is to be received by the Loan Parties;

(vi)  On or before March 27, 2017, an auction among all qualified bidders shall be conducted with the highest and best bid or combination of bids being selected, in consultation with the Agent;

(vii)  No later than March 30, 2017, the Bankruptcy Court shall have conducted a sale hearing with respect to such sale;

(viii)  The Borrower shall have obtained an order of the Bankruptcy Court approving the Sale Motion on or before April 3, 2017; and

(ix)  The Borrowers shall consummate the 363 Sale on or before the first Business Day that is at least fifteen (15) days after entry of the order approving the 363 Sale.

Notwithstanding anything herein to the contrary, should any Lender (or the Agent, acting at the direction of any Lender or Lenders) affirmatively participate in the Sale Process as a bidder (and not pursuant to its rights as a Prepetition Lender, the Prepetition Agent, a Lender or the Agent, as applicable), than such Lender (or the Agent, as applicable) shall not be entitled to participate in nor receive the consultation, consent and information rights set forth in clauses (iv) through (vi) until such Lender (or the Agent, as applicable) irrevocably withdraws from the Sale Process.

(c)  The Loan Parties shall promptly, punctually, and faithfully perform all of the terms and conditions of the DIP Orders.

(d)  On or before the date that is sixty (60) days following the Petition Date, the Loan Parties shall have filed a motion under Section 365 of the Bankruptcy Code requesting extension of the date on which the Loan Parties must assume or reject leases to 210 days after the entry of the order for relief, with an order so extending that deadline to be have been entered by the Bankruptcy Court within ninety (90) days after the Petition Date.  The Loan Parties may not, without the prior written consent of the Agent, assume, assume and assign, or reject leases.

(e)  On or before the date that is thirty (30) days following the Petition Date, the Bankruptcy Court shall have entered the Final Borrowing Order acceptable to the Agent.

6.    **NEGATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations:

6.1     **Indebtedness**.  Except to the extent provided for under the DIP Orders and/or the Approved Budget, no Loan Party will create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness.

6.2     **Liens**.  Except to the extent provided for under the DIP Orders, no Loan Party will create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3     **Restrictions on Fundamental Changes**.  No Loan Party will:

(a)     enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Equity Interests, except for (i) any such transaction between Loan Parties, provided, that Borrower must be the surviving entity of any such merger or consolidation to which it is a party and no merger or consolidation may occur between Parent and Borrower, (ii) any such transaction between a Loan Party and a Subsidiary of such Loan Party that is not a Loan Party so long as such Loan Party is the surviving entity of any such merger or consolidation, (iii) any such transaction between Subsidiaries of Parent that are not Loan Parties and (iv) any such transaction in order to consummate a Permitted Acquisition,

(b)     liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), except for (i) the liquidation or dissolution of non-operating Subsidiaries of Parent with nominal assets and nominal liabilities, (ii) the liquidation or dissolution of a Loan Party (other than Parent or Borrower) or any of its wholly-owned Subsidiaries so long as all of the assets (including any interest in any Equity Interests) of such liquidating or dissolving Loan Party or Subsidiary are transferred to a Loan Party that is not liquidating or dissolving, or (iii) the liquidation or dissolution of a Subsidiary of Parent that is not a Loan Party so long as all of the assets of such liquidating or dissolving Subsidiary are transferred to a Subsidiary of Parent that is not liquidating or dissolving (provided that if the Equity Interests of such liquidating or dissolving Subsidiary (or any portion thereof) are subject to a Lien in favor of Agent, the assets of such Subsidiary shall be transferred to a Loan Party), or

(c)     suspend or cease operating a substantial portion of its or their business, except (i) as permitted pursuant to clauses (a) or (b) above, (ii) in connection with a transaction permitted under Section 6.4 and (iii) solely with respect to any Subsidiary of Borrower, if such suspension or cessation of business would not reasonably be expected to be materially adverse to the Loan Parties, taken as a whole, or the Lenders.

6.4     **Disposal of Assets**.  Other than Permitted Dispositions or transactions expressly permitted by Section 6.3 or Section 6.9, no Loan Party will convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any of its assets.

6.5     **Nature of Business**.  No Loan Party will make any material change in the nature of its or their business as conducted on the Closing Date or otherwise ancillary, incidental or reasonably related thereto.

6.6     **Prepayments and Amendments**.  Except as required by this Agreement or permitted pursuant to the DIP Orders, no Loan Party will:

(a)     Except in connection with Refinancing Indebtedness permitted by Section 6.1,

(i)        optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Loan Party, other than (A) the Obligations in accordance with this Agreement, or (B) Permitted Intercompany Advances, or

(ii)        make any payment on account of any Indebtedness that has been contractually subordinated in right of payment to the Obligations if such payment is not permitted at such time pursuant to the subordination terms and conditions applicable to such Indebtedness, or

(b)        Directly or indirectly, amend, modify, or change any of the terms or provisions of

(i)        any agreement, instrument, document, indenture or other writing evidencing or governing Permitted Indebtedness other than (A) the Obligations in accordance with this Agreement, (B) Permitted Intercompany Advances, and (C) any other Permitted Indebtedness (including any Refinancing Indebtedness permitted hereunder) so long as any such amendment, modification or change under this clause (C) is not materially adverse to the interests of the Lenders,

(ii)        the Governing Documents of such Loan Party, other than any such amendments, modifications or other changes that are not materially adverse to the interests of the Lenders (it being agreed that any amendment, modification or other change to the Governing Documents of any Loan Party that is necessary to effect any transaction permitted by Section 6.3 or Section 6.9 shall be deemed to be not materially adverse to the Lenders in any respect),

(iii)        any Material Contract (other than any Material Contract that is expressly covered by another clause of this Section 6.6(b)), other than any such amendments, modifications or other changes that would not reasonably be expected to be materially adverse to the interests of the Lenders (it being agreed that amendments, modifications and other changes in the ordinary course of business to the rights and obligations of the Loan Parties thereunder shall be deemed to be not materially adverse to the Lenders in any respect), or

(iv)        the Medley Credit Documents, except in accordance with the Intercreditor Agreement, or

(c)        Amend, modify or change in any manner any term or condition of any agreement entered into in connection with the Sale Process, or give any consent, waiver or approval thereunder, without the prior written consent of the Agent, or

(d)        Make any payment or prepayment of principal in respect of the Medley Indebtedness, except in accordance with the Intercreditor Agreement.

6.7        **Restricted Payments**.  No Loan Party will make any Restricted Payment, except that:

(a)        Intentionally omitted,

(b)        Intentionally omitted,

(c)        Borrower may make distributions to Parent to permit Parent to (i) pay franchise or similar taxes and other fees required to maintain the legal existence of Parent (or any direct or indirect parent entity thereof), (ii) pay out-of-pocket legal, accounting and filing costs and other expenses in the nature of overhead and liabilities in the ordinary course of business of Parent (or any direct or indirect parent entity thereof) in an aggregate amount not to exceed $250,000 in any fiscal year and (iii) pay directors' fees,

expenses, and (subject to obtaining Bankruptcy Court-approval upon motion, with notice to the Agent) indemnities owing to directors of Parent (or any direct or indirect parent entity thereof),

        (d)      Distributions may be made (i) by any Subsidiary to any Loan Party (other than Parent), (ii) by any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party, (iii) by any non-wholly owned Subsidiary (excluding any directors' qualifying shares in such determination) to each owner of Equity Interests of such Subsidiary pro rata based on their relative ownership interests and (iv) by any Subsidiary payable solely in Qualified Equity Interests of such Subsidiary,

        (e)      Intentionally omitted,

        (f)      Borrower may make distributions to Parent to permit Parent to make (i) any payment in respect of a transaction permitted by Section 6.9 or Section 6.10, (ii) any payment required to be made, including any working capital adjustment, expense reimbursement payment or purchase price adjustment, pursuant to any documentation governing a Permitted Acquisition effectuated after the Petition Date and consistent with any applicable approvals obtained from the Bankruptcy Court in the Cases, (iii) any payment required to be made, including any working capital adjustment, expense reimbursement payment or purchase price adjustment, pursuant to any documentation governing a Permitted Disposition effectuated after the Petition Date and consistent with any applicable approvals obtained from the Bankruptcy Court in the Cases, and (iv) Permitted Intercompany Advances described in clauses (i)(a) and (ii)(x) of the definition thereof, and

        (g)      Borrower may declare and pay dividends to Parent in amounts necessary to pay Taxes owed by Parent; provided, that (i) such Taxes are attributable to the income of Borrower and its subsidiaries (and not to Parent), and (ii) that the aggregate amount of dividends to be paid in respect of this section for Taxes shall not be greater than the aggregate amount of Taxes that would have been due and owing by Borrower (other than Parent) had Borrower and its subsidiaries filed a consolidated, combined, unitary or similar type return (without including Parent or any other persons other than Borrower and its Subsidiaries).

        Notwithstanding anything to the contrary in this Section 6.7, any Restricted Payment that is described above may be made, directly or indirectly, by any Subsidiary of Borrower to Borrower, further distributed by Borrower to Parent and further distributed by Parent to any direct or indirect parent entity thereof, so long as such Restricted Payment is applied toward the purpose or payment that is described in the applicable clauses above (if any).

        6.8      **Accounting Methods**.  No Loan Party will modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP), provided, that Parent may elect to change its method of accounting to purchase accounting on or about the Closing Date so long as, to the extent that such change occurs after the Closing Date, Borrower shall provide no less than ten (10) Business Days prior notice to Agent, which notice shall be delivered together with a reconciliation in reasonable detail to the Loan Parties' method of accounting and the Loan Parties shall promptly provide all other information reasonably requested by the Agent in connection therewith prior to any such change.

        6.9      **Investments**.  No Loan Party will, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment, in each case, except for Permitted Investments.

        6.10      **Transactions with Affiliates**.  No Loan Party will, directly or indirectly, enter into or permit to exist any transaction with any Affiliate of any Loan Party (other than transactions between or among Loan Parties and transactions between or among Subsidiaries of Parent that are not Loan Parties), except for:

- 49 -

(a)    transactions between any Loan Party, on the one hand, and any Affiliate of any Loan Party, on the other hand, so long as such transactions (i) are disclosed in reasonable detail to Agent prior to the consummation thereof, if such transactions involve one or more payments by any Loan Party to any such Affiliate in excess of $2,500,000 for any single transaction or series of related transactions, and (ii) are no less favorable, taken as a whole, to any Loan Party, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate,

(b)    so long as it has been approved by such Loan Party's Board of Directors in accordance with applicable law, any indemnity provided for the benefit of any officers and directors of such Loan Party or any direct or indirect parent entity of Parent,

(c)    except as may be authorized by order of the Bankruptcy Court, where required, and so long as, in each case, it has been approved by such Loan Party's Board of Directors if required by applicable law or it is in the ordinary course of business, with respect to, or for the benefit of, any officer, or director of any Loan Party, (i) payment of compensation, severance, bonuses, commissions and other amounts (including, without limitation, reasonable expense reimbursement of business expenses), (ii) employment and severance, (iii) entering into, and payments in accordance with, employment agreements, services agreements, consulting agreements and other similar agreements for the performance of duties or services for or on behalf of any Loan Party, (iv) establishment and maintenance of, and payments in respect of, benefit programs or arrangements, including vacation plans, health and life insurance plans, deferred compensation plans and retirement or savings plans and similar plans, and (v) establishment and maintenance of, and payments in respect of, employee incentive programs, including equity option plans, equity incentive plans and other similar equity-based compensation and benefits programs,

(d)    transactions permitted by Section 6.3 or Section 6.7, or any Permitted Intercompany Advance,

(e)    Intentionally omitted,

(f)    the issuance of Qualified Equity Interests so long as such issuance does not result in a Change of Control,

(g)    transactions between or among any Loan Party and any Subsidiary of Parent that is not a Loan Party that are otherwise expressly set forth herein, subject in all cases to any limitations or conditions applicable thereto,

(h)    Intentionally omitted,

(i)    transactions contemplated by the Governing Documents of Parent or any other documents, instruments or agreements governing the rights and obligations of any holder of Equity Interests in Parent, in each case to the extent disclosed to Agent as of the date hereof and as in effect on the date hereof, to the extent, if any, expressly permitted hereunder, and

(j)    Intentionally omitted.

6.11    **Use of Proceeds; Collateral**.  (a)  No Loan Party will use the proceeds of any Loan made hereunder for any purpose other than (i) to repay the aggregate outstanding principal amount, together with accrued interest, accrued fees, expenses, premiums, indemnities and other amounts, owing under or in connection with the Existing Credit Agreement, (ii) to issue Letters of Credit hereunder to replace, backstop or otherwise provide credit support for any existing letters of credit issued for the account of any Loan Party, (iii) to pay the fees, costs, and expenses incurred in connection with the negotiation, execution and delivery of

this Agreement, the other Loan Documents, and the consummation of the transactions contemplated hereby and thereby, (iv) thereafter, consistent with the terms and conditions hereof and as may be provided for under the DIP Orders, subject to the Approved Budget, for their lawful and permitted purposes, including to finance the working capital needs of the Loan Parties and for general corporate purposes.

(b)    No Loan Party will use or permit the use of Collateral, proceeds of Revolving Loans, portion of the Carve Out or any other amounts directly or indirectly by any of the Loan Parties, the Committee, if any, or any trustee or other estate representative appointed in the Cases (or any Successor Case) or any other Person (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(i)    other than as expressly permitted in the DIP Orders, to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Lenders in "full" in cash; or

(ii)    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the Agent, the Lenders, the other Credit Parties or the Existing Loan Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Avoidance Actions; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the Liens granted under the Loan Documents, the Loan Documents, the Existing Credit Agreement, the Existing Liabilities or the Existing Liens; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations; or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Agent or the Lenders hereunder or under any of the other Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the Loan Documents and the DIP Orders).  Notwithstanding anything to the contrary herein, the Committee may use up to $50,000 in the aggregate (the "Committee Investigation Budget") amount of the Carve Out, any cash-collateral, or proceeds of the Loan to investigate the Existing Credit Agreement, the Existing Liabilities and/or the Existing Liens; provided, that the Borrower's stipulations as to validity, priority and security of the Existing Liabilities as set forth in the DIP Orders shall be binding upon each other party in interest, including the Committee, unless such party in interest commences a challenge by (x) with respect to the Committee, 60 days after the initial appointment of the Committee, and (y) with respect to any other party in interest, 75 days after the date of entry of the Interim Borrowing Order.

6.12    **Limitation on Issuance of Equity Interests**.  Except for the issuance or sale of Qualified Equity Interests, no Loan Party will issue or sell or enter into any agreement or arrangement for the issuance or sale of any of its Equity Interests.

6.13    **Inventory with Bailees**.  Except as permitted by Section 5.14, no Loan Party will store its Inventory at any time with a bailee, warehouseman, or similar party unless such party shall have entered into a Collateral Access Agreement.

6.14    **Parent as Holding Company**.  Parent will not (a) incur any material liabilities (other than liabilities (i) arising under the Loan Documents, (ii) in respect of taxes, (iii) in respect of Permitted Intercompany Advances and (iv) in respect of any Permitted Acquisition), (b) own any material assets (other than the Equity Interests of Borrower and other Permitted Investments) or (c) engage in any material business activities (other than (x) activities that are ancillary, incidental or reasonably related to its ownership of the Equity Interests of Borrower, (y) activities that are permitted by this Agreement and the other Loan Documents with respect to Parent (subject to any limitations applicable thereto as are expressly set forth herein), and (z) activities necessary to maintain its legal existence and other legal, accounting, tax and administrative matters).

6.15    **Employee Benefits**.

(a)    Terminate, or cause any ERISA Affiliate to terminate, any Pension Plan in a manner which would reasonably be expected to result in any material liability of any Loan Party to the PBGC.

(b)    Except where such failure is excused under the Bankruptcy Code or order of the Bankruptcy Court, fail to make, or cause any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Pension Plan, agreement relating thereto or applicable Law relating thereto, any Loan Party is required to pay, if such failure would reasonably be expected to have a Material Adverse Effect.

(c)    Unless required by applicable law, amend, or permit any ERISA Affiliate to amend, a Pension Plan resulting in a material increase in current liability such that a Loan Party is required to provide security to such Pension Plan under the IRC.

6.16    **Capital Expenditures.**  The Loan Parties shall not permit the aggregate amount of Capital Expenditures made by the Loan Parties in any fiscal year to exceed $100,000.

6.17    **Deposit Accounts**.  Open any new deposit account unless permitted by the Cash Management Order.  No Loan Party shall maintain any bank accounts other than the ones expressly contemplated herein and consistent with the Cash Management Order.

6.18    **Chapter 11 Claims**.  Until payment in full of the Obligations under this Agreement, no Loan Party shall directly or indirectly incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is *pari passu* with or senior to the claims or Liens, as the case may be, of the Agent and the Credit Parties hereunder or under the DIP Orders, or apply to the Bankruptcy Court for authority to do so, except (a) with respect to the Existing Liabilities and the Carve Out, and (b) otherwise to the extent permitted under the DIP Orders.

6.19    **Additional Bankruptcy-Related Negative Covenants**.  The Borrower will not consent to or permit to exist any of the following:

(a)    Any order which authorizes the rejection or assumption of any lease of any Loan Party without the Agent's written consent;

(b)    Any modification, stay, vacation or amendment to the DIP Orders to which the Agent and the Required Lenders have not consented in writing;

(c)    A priority claim or administrative expense or unsecured claim against Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Borrowing Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the

- 52 -

Bankruptcy Code) equal or superior to the priority claim of the Agent in respect of the Obligations, except with respect to the Existing Liabilities, Permitted Priority Liens and the Carve Out;

(d)     Except as agreed to by the Agent, any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(e)     Any order which authorizes the payment of any Indebtedness (other than the Existing Liabilities, Indebtedness reflected in the Approved Budget, and other Indebtedness approved by the Agent) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien (other than as expressly set forth in the DIP Orders or the Approved Budget); or

(f)     Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

7.     **FINANCIAL COVENANTS.**

7.1     **Intentionally Omitted**.

8.     **EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

8.1     **Payments**. If Borrower fails to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due to the Lender Group, reimbursement of Lender Group Expenses, or other amounts constituting Obligations (excluding any portion thereof constituting principal, the amount of any Letter of Credit Disbursement due in respect of any Letter of Credit and any Bank Product Obligations, but including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of 3 Business Days, (b) all or any portion of the principal of the Loans, or (c) the amount of any Letter of Credit Disbursement payable to Issuing Bank in respect of any Letter of Credit;

8.2     **Covenants**. If any Loan Party:

(a)     fails to perform or observe any covenant or other agreement contained in any of (i) Sections 3.6, 5.1, 5.2, 5.3 (solely with respect to the obligation of each Loan Party to maintain its existence), 5.6, 5.7, 5.11, 5.13, 5.14, 5.15, 5.16, 5.19, 5.20, 5.21, 5.22, 5.23, 5.24, 5.25, or 5.26 of this Agreement, (ii) Section 6 of this Agreement, or (iii) Section 7 of the Guaranty and Security Agreement;

(b)     fails to perform or observe any covenant or other agreement contained in any of Sections 5.3 (other than with respect to the obligation of each Loan Party to maintain its existence), 5.5, 5.8, 5.10, and 5.12 of this Agreement and such failure continues for a period of 15 days after the earlier of (i) the date on which such failure shall first become known to any officer of Borrower or (ii) the date on which written notice thereof is given to Borrower by Agent; or

(c)     fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 8 (in which event such other provision of this Section 8

shall govern), and such failure continues for a period of 30 days after the earlier of (i) the date on which such failure shall first become known to any officer of Borrower or (ii) the date on which written notice thereof is given to Borrower by Agent;

8.3    **Judgments**.  If one or more final judgments, orders, or awards for the payment of money in an aggregate amount of $750,000 or more (except to the extent paid or covered by insurance (subject to any applicable deductible) as to which the insurer has not disputed or otherwise contested coverage) is entered or filed against any Loan Party, and either (a) there is a period of 30 consecutive days at any time after the entry of any such judgment, order, or award during which (1) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (2) a stay of enforcement thereof is not in effect, in each case, except to the extent that the terms of such judgment, order or award specifically provide for a longer payment term and the applicable Loan Party timely discharges or satisfies such obligations during such specified longer term, or (b) enforcement proceedings are commenced upon such judgment, order, or award;

8.4    **Reserved.**

8.5    **Reserved.**

8.6    **Default Under Other Agreements**.  Other than as a consequence of the Bankruptcy Events, if any Loan Party defaults in the performance of its obligations under any agreement governing Indebtedness in an outstanding principal amount of $250,000 or more (including any such Indebtedness owing under any Hedge Agreement) to which a Loan Party is a party (other than the Loan Documents), and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's obligations thereunder and/or terminate such agreement prior to its maturity date as a consequence of such default;

8.7    **Representations, etc.**  If any warranty, representation, certificate, statement, or Record made by any Loan Party herein or in any other Loan Document or delivered in writing to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

8.8    **Guaranty**.  If the obligation of any Guarantor under the guaranty contained in the Guaranty and Security Agreement is limited or terminated by operation of law or by such Guarantor, other than in connection with any transaction permitted by this Agreement or any other Loan Document (including any release of such Guarantor from the Obligations under the Guaranty and Security Agreement and the other Loan Documents);

8.9    **Security Documents**.  If the Guaranty and Security Agreement or any other Loan Document that purports to create a Lien in favor of Agent in any Collateral, shall, for any reason, fail or cease to create a valid, perfected and first priority Lien (subject to Permitted Liens) on the Collateral covered thereby, other than (a) in connection with any transaction permitted by this Agreement or any other Loan Document (including any release of any Lien on any Collateral), or (b) as a result of an action taken or not taken by Agent or any Lender;

8.10    **Loan Documents**.  The validity or enforceability of any Loan Document shall at any time for any reason (other than solely as a result of an action taken or not taken by Agent or any Lender) be declared to be null and void, or a proceeding shall be commenced by a Loan Party, or by any Governmental Authority having jurisdiction over any Loan Party, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny that such Loan Party has any liability or obligation purported to be created under any

Loan Document, in each case, exclusive of questions of interpretation of any provision thereof and other than any denial by any Loan Party that has been released from the Obligations in accordance with the terms of the Loan Documents;

8.11    **Change of Control**.  A Change of Control shall occur; or

8.12    **ERISA**.  The occurrence of any of the following events: (a) any Loan Party or ERISA Affiliate fails to make full payment when due of all amounts which any Loan Party or ERISA Affiliate is required to pay as contributions, installments, or otherwise to or with respect to a Pension Plan or Multiemployer Plan, and such failure would reasonably be expected to result in, or results in, liability to any Loan Party in excess of $750,000, (b) a Notification Event, which would reasonably be expected to result in liability to any Loan Party in excess of $750,000, either individually or in the aggregate, or (c) any Loan Party or ERISA Affiliate completely or partially withdraws from one or more Multiemployer Plans and such withdrawal results in any Loan Party incurring Withdrawal Liability in excess of $750,000 in the aggregate.

8.13    **Reserved**.

8.14    **Cases, Motions, Etc.**  Any of the following shall occur in the Cases:

(a)    the filing by Borrower of a plan other than (i) a plan that provides for the payment in full in cash of the Obligations hereunder and the obligations under the Existing Credit Agreement on the effective date of such plan, or (ii) as approved by the Agent, or the filing by Borrower of any motion or pleading that is inconsistent with the prosecution of any such plan;

(b)    the Borrower shall file a pleading seeking to vacate or modify any of the DIP Orders in a manner adverse to the Lenders and/or the Agent;

(c)    entry of an order without the prior consent of the Agent and the Required Lenders amending, supplementing or otherwise modifying any DIP Order in a manner adverse to the Lenders and/or the Agent;

(d)    entry of any order without the prior consent of the Agent and the Required Lenders that authorizes any of the following:

(i)    a priority claim or administrative expense or unsecured claim against the Loan Parties (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c) (subject to entry of the Final Borrowing Order), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations, except with respect to the Carve Out;

(ii)    any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, except (a) with respect to the Carve Out, or (b) Permitted Priority Liens;

(iii)    except as consented to by the Agent, the return of any of the Loan Parties' property pursuant to section 546(h) of the Bankruptcy Code; or

(iv)    the payment of any Indebtedness (other than Indebtedness reflected in the Approved Budget) or as permitted by the DIP Orders;

(e)    reversal, vacation or stay of the effectiveness of any DIP Order;

(f)    any violation of the terms of any DIP Order;

(g)    the dismissal of the Cases or conversion of the Cases to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion to so dismiss or convert brought by any Loan Party;

(h)    appointment of a Chapter 11 trustee or an examiner, or any similar insolvency official or administrator, with expanded powers, or the filing of any motion to so appoint brought by any Loan Party; or

(i)    the filing by Borrower of, or the consummation of any sale of all or substantially all the working capital assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code that does not conform with the Sale Motion or the Bidding Procedures;

(j)    except as provided for herein or in the DIP Orders, granting of relief from the automatic stay in the Cases to permit foreclosure or enforcement on, or any right or remedy with respect to any material asset of any Borrower;

(k)    the Borrower's filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein or in the Orders) that is senior to or *pari passu* with the Lenders' claims under the Loan Documents and the Existing Credit Agreement and the transactions contemplated hereby and thereby to the extent that, upon approval of such motion and closing of the transactions contemplated thereby, the Obligations and the Existing Liabilities would not be paid in full;

(l)    payment of or granting adequate protection with respect to prepetition Indebtedness, other than as expressly set forth in the DIP Orders and the Approved Budget; or

(m)    any of the Liens or the DIP Superpriority Claims granted hereunder cease to be valid, perfected and enforceable in any respect;

8.15    **Approved Budget**.  Any variance to the Approved Budget shall occur, other than  Permitted Variances.

8.16    **Subrogation**.  Any of the Loan Parties shall assert (other than for purposes of disclosure) any right of subrogation or contribution against any other Loan Party prior to the payment in full of the Obligations.

8.17    **Chapter 11 Case Milestones**.  The failure to meet any of the following milestones:

(i)    file the Chapter 11 Case on the Petition Date;

(ii)    obtain entry of the Interim Borrowing Order on or before the date that is three (3) Business Days following the Petition Date; or

(iii)    obtain entry of the Final Borrowing Order on or before the date that is thirty (30) days after the entry of the Interim Borrowing Order.

8.18    **Restrainment**.  Any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole.

8.19    **Challenge**.  Any Loan Party engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of any of the Existing Credit Agreement or the Existing Loan Documents or the Liens securing the Existing Credit Agreement or the Existing Loan Documents, including without limitation seeking to equitably subordinate or avoid the Liens securing the Existing Credit Agreement; or any Loan Party engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the Existing Loan Parties.

8.20    **Sections 506(c) and 552(b)**.  From and after the Petition Date, entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral.

For the avoidance of doubt, none of the existing defaults or events of default under the Existing Credit Agreement or the existing Medley Credit Documents outstanding on the Petition Date shall constitute Events of Default hereunder.

9.    **RIGHTS AND REMEDIES.**

9.1    **Rights and Remedies**.  Notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the DIP Orders, if any Event of Default occurs and is continuing, the Agent may (and at the request of, or with the consent of, the Required Lenders, shall) take any or all of the following actions, at the same time or different times, in each case without further order of or application to the Bankruptcy Court:

(a)    (i) declare the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations (other than the Bank Product Obligations), whether evidenced by this Agreement or by any of the other Loan Documents to be immediately due and payable, whereupon the same shall become and be immediately due and payable and Borrower shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by Borrower, and (ii) direct Borrower to provide (and Borrower agrees that upon receipt of such notice it will provide) Letter of Credit Collateralization to Agent with respect to any issued and outstanding Letters of Credit;

(b)    declare the Commitments terminated, whereupon the Commitments shall immediately be terminated together with (i) any obligation of any Revolving Lender to make Revolving Loans, and (ii) the obligation of Issuing Bank to issue Letters of Credit;

(c)    exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents, under applicable law, or in equity;

(d)    intentionally omitted; and

(e)    subject to the DIP Orders, in case any one or more of the covenants and/or agreements set forth in this Agreement or any other Loan Document shall have been breached by any Loan Party, then the Agent may proceed to protect and enforce the Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Loan Document. Without limitation of the foregoing, the Borrower agrees that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof.  The Agent shall be indemnified by the Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with the terms hereof.

9.2    **Remedies Cumulative**.  The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative.  The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity.  No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver.  No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

9.3    **Reserved**.

10.    **WAIVERS; INDEMNIFICATION.**

10.1    **Demand; Protest; etc.**  Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which Borrower may in any way be liable.

10.2    **The Lender Group's Liability for Collateral**.  Borrower hereby agrees that:  (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrower.

10.3    **Indemnification**.  Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution, the delivery (provided that Borrower shall not be liable for costs and expenses (including attorney's fees) of any Lender (other than Wells Fargo) incurred in advising, structuring, drafting, reviewing, administering or syndicating the Loan Documents), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Loan Parties' compliance with the terms of the Loan Documents (provided, that the indemnification in this Section 10.3 shall not extend to (i) disputes solely between or among the Lenders that do not involve any acts or omissions of any Loan Party, or (ii) disputes solely between or among the Lenders and their respective Affiliates that do not involve any acts or omissions of any Loan Party; it being understood and agreed that the indemnification in this Section 10.3 shall extend to Agent (but not the Lenders) relative to disputes between or among Agent on the one hand, and one or more Lenders, or one or more of their Affiliates, on the other hand, or (iii) any Taxes or any costs attributable to Taxes, which shall be governed by Section 16), (b) with respect to any actual or prospective investigation, litigation, or proceeding related to this Agreement, any other Loan Document, the making of any Loans or issuance of any Letters of Credit hereunder, or the use of the proceeds of the Loans or the Letters of Credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by Borrower or any of its Subsidiaries or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any such assets or properties of Borrower or any of its Subsidiaries (each and all of the foregoing, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, Borrower shall have no obligation

to any Indemnified Person under this <u>Section 10.3</u> to the extent that such Indemnified Liabilities (A) may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of such Indemnified Person, (B) may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from a material breach by such Indemnified Person of its obligations hereunder or under any other Loan Document or (C) result from or arise out of a dispute solely among Indemnified Persons that does not involve any acts or omissions of any Loan Party; <u>provided</u>, that notwithstanding the foregoing, in no event shall Borrower's indemnification obligations under this <u>Section 10.3</u> include any Indemnified Liabilities in respect of legal fees, disbursements and expenses in excess of the reasonable and documented out-of-pocket fees, disbursements and expenses of one outside legal counsel for all Indemnified Persons and, to the extent necessary, one local counsel in each relevant jurisdiction and one regulatory counsel (if reasonably required) for all Indemnified Persons (but excluding the allocated costs of in-house or internal counsel to any Indemnified Person), and, in the case of an actual or perceived conflict of interest where such Indemnified Person affected by such conflict informs Borrower of such conflict and thereafter retains its own counsel, another firm of counsel for such affected Indemnified Persons. This provision shall survive the termination of this Agreement and the repayment in full of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrower with respect thereto. SUBJECT TO THE SECOND SENTENCE OF THIS <u>SECTION 10.3</u>, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.

11.    **NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile. In the case of notices or demands to any Loan Party or Agent, as the case may be, they shall be sent to the respective address set forth below:

|  |  |
|---|---|
| If to a Loan Party: | **UNITED ROAD TOWING, INC.** |
|  | 9550 Bormet Drive, Suite 301 |
|  | Mokena, IL  60448 |
|  | Attn:  Gerald Corcoran |
|  | Attn:  Michael Mahar |
|  | Fax No.:  _____ |
| with a copy to: | Young Conaway Stargatt & Taylor, LLP |
|  | 1000 North King Street |
|  | Wilmington, Delaware 19801 |
|  | Attn:  M. Blake Cleary, Esq. |
|  | Fax No.: 302-576-1253 |
|  | -and- |
|  | Winston & Strawn LLP |
|  | 35 West Wacker Drive |

- 59 -

                                  Chicago, Illinois 60601
                                  Attn:  Daniel McGuire, Esq.
                                  Fax No.: 312-558-5700

        If to Agent:              **WELLS  FARGO  BANK,  NATIONAL
                                  ASSOCIATION**
                                  10 S. Wacker Drive, 13th Floor
                                  MAC N8405-131
                                  Chicago, IL  60606
                                  Attn:  Portfolio Manager
                                  Fax No.:  877-302-9116

        with copies to:           Riemer & Braunstein LLP
                                  Three Center Plaza
                                  Boston, Massachusetts 02108
                                  Attn: Kevin M. Murtagh, Esq.
                                  Fax No.:  (617) 880-3456

                                  Riemer & Braunstein LLP
                                  Times Square Tower
                                  Seven Times Squire, Suite 2506
                                  New York, New York 10036
                                  Attn:  Steven E. Fox, Esq.
                                  Fax No.:  212-789-3195

        Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party.  All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

12.     **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER; JUDICIAL REFERENCE PROVISION.**

        (a)     **THE  VALIDITY  OF  THIS  AGREEMENT  AND  THE  OTHER  LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, THE RIGHTS OF THE PARTIES  HERETO  AND  THERETO  WITH  RESPECT  TO  ALL  MATTERS  ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO  OR  THERETO  SHALL  BE  DETERMINED  UNDER,  GOVERNED  BY,  AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE BANKRUPTCY CODE, AS THE CONTEXT MAKES APPLICABLE.**

        (b)     THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED

AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, TO THE EXTENT THE BANKRUPTCY COURT DECLINES OR IS OTHERWISE UNABLE TO EXERCISE JURISDICTION, THE COURTS OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; <u>PROVIDED</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH OF PARENT AND BORROWER AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM NON CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>.

(c)     TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF PARENT AND BORROWER AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "<u>CLAIM</u>").  EACH OF PARENT AND BORROWER AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)     EACH OF PARENT AND BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, TO THE EXTENT THE BANKRUPTCY COURT DECLINES OR IS OTHERWISE UNABLE TO EXERCISE JURISDICTION, THE COURTS OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK AND THE STATE OF NEW YORK, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(e)     NO CLAIM MAY BE MADE BY ANY PARTY HERETO AGAINST ANY OTHER PARTY HERETO FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES OR LOSSES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION THEREWITH, AND EACH PARTY HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

(f)    IN THE EVENT ANY LEGAL PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA (THE "<u>COURT</u>") BY OR AGAINST ANY PARTY HERETO IN CONNECTION WITH ANY CLAIM AND THE WAIVER SET FORTH IN CLAUSE (e) ABOVE IS NOT ENFORCEABLE IN SUCH PROCEEDING, THE PARTIES HERETO AGREE AS FOLLOWS:

(i)    **WITH THE EXCEPTION OF THE MATTERS SPECIFIED IN SUBCLAUSE (ii) BELOW, ANY CLAIM SHALL BE DETERMINED BY A GENERAL REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1. THE PARTIES INTEND THIS GENERAL REFERENCE AGREEMENT TO BE SPECIFICALLY ENFORCEABLE. VENUE FOR THE REFERENCE PROCEEDING SHALL BE IN THE COUNTY OF LOS ANGELES, CALIFORNIA.**

(ii)    THE FOLLOWING MATTERS SHALL NOT BE SUBJECT TO A GENERAL REFERENCE PROCEEDING: (A) NON-JUDICIAL FORECLOSURE OF ANY SECURITY INTERESTS IN REAL OR PERSONAL PROPERTY, (B) EXERCISE OF SELF-HELP REMEDIES (INCLUDING SET-OFF OR RECOUPMENT), (C) APPOINTMENT OF A RECEIVER, AND (D) TEMPORARY, PROVISIONAL, OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS, OR PRELIMINARY INJUNCTIONS). THIS AGREEMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (A) - (D) AND ANY SUCH EXERCISE OR OPPOSITION DOES NOT WAIVE THE RIGHT OF ANY PARTY TO PARTICIPATE IN A REFERENCE PROCEEDING PURSUANT TO THIS AGREEMENT WITH RESPECT TO ANY OTHER MATTER.

(iii)    UPON THE WRITTEN REQUEST OF ANY PARTY, THE PARTIES SHALL SELECT A SINGLE REFEREE, WHO SHALL BE A RETIRED JUDGE OR JUSTICE. IF THE PARTIES DO NOT AGREE UPON A REFEREE WITHIN 10 DAYS OF SUCH WRITTEN REQUEST, THEN, ANY PARTY SHALL HAVE THE RIGHT TO REQUEST THE COURT TO APPOINT A REFEREE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 640(B). THE REFEREE SHALL BE APPOINTED TO SIT WITH ALL OF THE POWERS PROVIDED BY LAW. PENDING APPOINTMENT OF THE REFEREE, THE COURT SHALL HAVE THE POWER TO ISSUE TEMPORARY OR PROVISIONAL REMEDIES.

(iv)    EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE REFEREE SHALL DETERMINE THE MANNER IN WHICH THE REFERENCE PROCEEDING IS CONDUCTED INCLUDING THE TIME AND PLACE OF HEARINGS, THE ORDER OF PRESENTATION OF EVIDENCE, AND ALL OTHER QUESTIONS THAT ARISE WITH RESPECT TO THE COURSE OF THE REFERENCE PROCEEDING. ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT WHEN ANY PARTY SO REQUESTS A COURT REPORTER AND A TRANSCRIPT IS ORDERED, A COURT REPORTER SHALL BE USED AND THE REFEREE SHALL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT. THE PARTY MAKING SUCH REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY THE COSTS OF THE COURT REPORTER, PROVIDED THAT SUCH COSTS, ALONG WITH THE REFEREE'S FEES, SHALL ULTIMATELY BE BORNE BY THE PARTY WHO DOES NOT PREVAIL, AS DETERMINED BY THE REFEREE.

(v)    THE REFEREE MAY REQUIRE ONE OR MORE PREHEARING CONFERENCES. THE PARTIES HERETO SHALL BE ENTITLED TO DISCOVERY, AND THE REFEREE SHALL OVERSEE DISCOVERY IN ACCORDANCE WITH THE RULES OF DISCOVERY,

AND SHALL ENFORCE ALL DISCOVERY ORDERS IN THE SAME MANNER AS ANY TRIAL COURT JUDGE IN PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA.

(vi)    THE REFEREE SHALL APPLY THE RULES OF EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA AND SHALL DETERMINE ALL ISSUES IN ACCORDANCE WITH CALIFORNIA SUBSTANTIVE AND PROCEDURAL LAW.  THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING MOTIONS FOR DEFAULT JUDGMENT OR SUMMARY JUDGMENT.  THE REFEREE SHALL REPORT HIS OR HER DECISION, WHICH REPORT SHALL ALSO INCLUDE FINDINGS OF FACT AND CONCLUSIONS OF LAW.  THE REFEREE SHALL ISSUE A DECISION AND PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE, SECTION 644, THE REFEREE'S DECISION SHALL BE ENTERED BY THE COURT AS A JUDGMENT IN THE SAME MANNER AS IF THE ACTION HAD BEEN TRIED BY THE COURT.  THE FINAL JUDGMENT OR ORDER FROM ANY APPEALABLE DECISION OR ORDER ENTERED BY THE REFEREE SHALL BE FULLY APPEALABLE AS IF IT HAS BEEN ENTERED BY THE COURT.

(vii)    THE PARTIES RECOGNIZE AND AGREE THAT ALL CLAIMS RESOLVED IN A GENERAL REFERENCE PROCEEDING PURSUANT HERETO WILL BE DECIDED BY A REFEREE AND NOT BY A JURY.  AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR OWN CHOICE, EACH PARTY HERETO KNOWINGLY AND VOLUNTARILY AND FOR THEIR MUTUAL BENEFIT AGREES THAT THIS REFERENCE PROVISION SHALL APPLY TO ANY DISPUTE BETWEEN THEM THAT ARISES OUT OF OR IS RELATED TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

13.    **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.**

13.1    <u>**Assignments and Participations**</u>.

(a)    (i)  Subject to the conditions set forth in clause (a)(ii) below, any Lender may assign and delegate all or any portion of its rights and duties under the Loan Documents (including the Obligations owed to it and its Commitments) to one or more assignees (each, an "<u>Assignee</u>"), with the prior written consent (such consent not be unreasonably withheld or delayed) of:

(A)    Borrower; <u>provided</u>, that no consent of Borrower shall be required (1) if an Event of Default has occurred and is continuing, or (2) in connection with an assignment to a Person that is a Lender or an Affiliate (other than natural persons) of a Lender; <u>provided, further</u>, that Borrower shall be deemed to have consented to a proposed assignment unless it objects thereto by written notice to Agent within 5 Business Days after having received notice thereof; and

(B)    Agent and Issuing Bank.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    no assignment may be to a natural person,

(B)    Intentionally omitted,

(C)    the amount of the Commitments and the other rights and obligations of the assigning Lender hereunder and under the other Loan Documents subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to

Agent) shall be in a minimum amount (unless waived by Agent) of $5,000,000 (except such minimum amount shall not apply to (I) an assignment or delegation by any Lender to any other Lender, an Affiliate of any Lender, or a Related Fund of such Lender or (II) a group of new Lenders, each of which is an Affiliate of each other or a Related Fund of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $5,000,000),

(D)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement,

(E)    the parties to each assignment shall execute and deliver to Borrower and Agent, as applicable, an Assignment and Acceptance; provided, that Borrower and Agent may continue to deal solely and directly with the assigning Lender in connection with the interest so assigned to an Assignee until written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Borrower and Agent by such Lender and the Assignee, the Assignment and Acceptance shall include a representation and warranty (which shall be expressly for the benefit of the Lender Group) that, as of the date of the assignment, it does not have any material non-public information with respect to the Loan Parties that (I) has not been disclosed to the Lenders (other than Lenders that do not wish to receive material non-public information with respect to the Loan Parties) prior to such time and (II) would not reasonably be expected to have a material effect upon, or otherwise be material, to a Lender's decision to participate in any assignment pursuant to this Section 13.1,

(F)    unless waived by Agent, the assigning Lender or Assignee has paid to Agent, for Agent's separate account, a processing fee in the amount of $3,500, and

(G)    the assignee, if it is not a Lender, shall deliver to Agent an Administrative Questionnaire in a form approved by Agent (the "Administrative Questionnaire").

(b)    From and after the date that Agent receives the executed Assignment and Acceptance and, if applicable, payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall be a "Lender" and shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto); provided, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15 and Section 17.9(a).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrower or the performance or observance by Borrower of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such

- 64 -

Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 13.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom.  The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender *pro tanto*.

(e)    Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in all or any portion of its Obligations, its Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrower, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, *except* to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender (other than a waiver of default interest), or (E) decreases the amount or postpones the due dates of scheduled principal repayments or prepayments or premiums payable to such Participant through such Lender, or (v) no participation shall be sold to a natural person; provided, that any such Person that becomes a Participant hereunder shall be subject to the provisions of Section 13.1(k) hereof as if it were an assignee rather than a participant, and (viii) all amounts payable by Borrower hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement.  The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrower, the Collateral, or otherwise in respect of the Obligations.  No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register");

<u>provided</u>, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)       In connection with any such assignment or participation or proposed assignment or participation or any grant of a security interest in, or pledge of, its rights under and interest in this Agreement, a Lender may, subject to the provisions of <u>Section 17.9</u>, disclose all documents and information which it now or hereafter may have relating to the Loan Parties and their respective businesses.

(g)       Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

(h)       Reserved.

(i)       Reserved.

(j)       Reserved.

(k)       (i) Each Medley Affiliated Entity (solely in its capacity as a holder of Specified Revolving Loans), in connection with any (A) consent (or decision not to consent) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or in respect of any consent, waiver, vote, or other action in connection with an Insolvency Proceeding involving a Loan Party, (B) other action on any matter related to any Loan Document or occurring in relation to any Insolvency Proceeding involving a Loan Party, or (C) direction to Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, agrees that, except with respect to any amendment, modification, waiver, consent or other action with respect to the matters governed by (1)   <u>Sections 14.1(a)(i)</u> through <u>(iv)</u>, (2) <u>Section 14.1(a)(xi)</u> (solely to the extent that such amendment, modification, waiver, consent or other action would change the payment provisions referred to in such <u>clause (x</u>i) to pay amounts owing in respect of the Specified Revolving Loans in a lower priority than the Specified Revolving Loans are afforded on the Closing Date or would result in Medley Participant receiving a lesser amount (or having greater obligations) than such Person would have received had such amendment, modification, waiver, consent or other action not occurred or been effected), (3) <u>Section 14.1(a)(xii)</u> (solely to the extent that such amendment, modification, waiver, consent or other action would (w) prohibit or make unenforceable the Medley Participation Agreement, (x) be materially adverse to any Medley Participant (for the avoidance of doubt, any change to <u>Section 13.1(k)</u> shall be deemed materially adverse to the Medley Participant), or (y) allow any assignment or participation to (A) Milestone or any of its Affiliates, (B) any current or former director, officer or employee of Parent or the Borrower or any of their respective Affiliates, or (C) any Affiliate of the Borrower or Parent (other than Medley and the Medley Affiliated Entities)) or (4) <u>Section 14.1(b)</u>, each of which shall require the written consent of Medley Participant, shall be deemed to have voted (and, at the request of Agent, shall so vote, and if it fails to promptly so vote, Agent shall have a proxy and the right to vote) its interest as a Lender without discretion in such proportion as the allocation of voting with respect to such matter by Lenders who are not Medley Affiliated Entities.  Borrower and each Medley Affiliated Entity (solely in its capacity as a Participant with respect to Specified Revolving Loans),

including Medley Participant (by its acceptance of an assignment) agrees that if a case under the Bankruptcy Code is commenced against Borrower or any other Loan Party, then, at the request of Agent, Borrower, with respect to any plan of reorganization that does not adversely affect Medley Participant in any material respect as compared to other Lenders, shall seek (and each Medley Affiliated Entity (solely in its capacity as a Participant with respect to Specified Revolving Loans), including Medley Participant, shall consent) to designate that the vote of any Medley Affiliated Entity with respect to any such plan of reorganization of Borrower or other Loan Party not be counted.  Subject to <u>clause (ii)</u> below, each Medley Affiliated Entity (solely in its capacity as a Participant with respect to Specified Revolving Loans), including Medley Participant, hereby irrevocably appoints Agent (such appointment being coupled with an interest) as such Medley Affiliated Entity's attorney-in-fact, with full authority in the place and stead of such Medley Affiliated Entity and in the name of such Medley Affiliated Entity, from time to time in Agent's discretion to take any action and to execute any instrument that Agent may deem reasonably necessary to carry out the provisions of this <u>clause (i)</u>.

(ii)    Notwithstanding anything to the contrary in this Agreement, no Medley Affiliated Entity (solely in its capacity as a holder of Specified Revolving Loans) shall have any right to (A) attend (including by telephone) any meeting or discussions (or portion thereof) among Agent and any Lender to which representatives of Borrower are not then present, (B) receive any information or material prepared by Agent or any Lender or any communication by or among Agent or one or more Lenders, except to the extent such information or materials have been made available to Borrower or its representatives, or (C) make or bring (or participate in, other than as a passive participant in or recipient of its pro rata benefits of) any claim, in its capacity as a Lender, against Agent or any other member of the Lender Group with respect to any duties or obligations or alleged duties or obligations of such Agent or any other member of the Lender Group under the Loan Documents.

13.2    <u>**Successors**</u>.  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; <u>provided</u>, that Borrower may not assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void *ab initio*.  No consent to assignment by the Lenders shall release Borrower from its Obligations.  A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to <u>Section 13.1</u> and, except as expressly required pursuant to <u>Section 13.1</u>, no consent or approval by Borrower is required in connection with any such assignment.

14.    **AMENDMENTS; WAIVERS.**

14.1    <u>**Amendments and Waivers.**</u>

(a)    No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document (other than Bank Product Agreements or the Fee Letter), and no consent with respect to any departure by Parent or Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and the Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; <u>provided</u>, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly affected thereby and all of the Loan Parties that are party thereto, do any of the following:

(i)    increase the amount of or extend the expiration date of any Commitment of any Lender or amend, modify, or eliminate the penultimate sentence of <u>Section 2.4(e)</u>,

(ii)    postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other

Loan Document (provided, that any postponement or delay of any mandatory prepayments pursuant to Section 2.4(e) (other than Section 2.4(e)(i)) shall only require the consent of Required Lenders),

(iii)    reduce the principal of, or the rate of interest on, any Loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document (except (x) in connection with the imposition, rescission or waiver of default rate interest pursuant to Section 2.6(c) (which shall only require the consent of Required Lenders), (y) that any reduction of or with respect to any mandatory prepayments pursuant to Section 2.4(e) (other than Section 2.4(e)(i)) shall only require the consent of Required Lenders, and (z) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or a reduction of fees for purposes of this clause (iii) notwithstanding that any such amendment or modification may effect such result),

(iv)    amend, modify, or eliminate this Section or any provision of this Agreement providing for consent or other action by all Lenders,

(v)    amend, modify, or eliminate Section 3.1 or 3.2,

(vi)    amend, modify, or eliminate Section 15.11,

(vii)    other than as permitted by Section 15.11, release Agent's Lien in and to any of the Collateral,

(viii)    amend, modify, or eliminate the definitions of "Required Lenders" or "Pro Rata Share",

(ix)    contractually subordinate any of Agent's Liens,

(x)    other than in connection with a transaction expressly permitted by the terms hereof or the other Loan Documents, release Borrower or any Guarantor from any obligation for the payment of money or consent to the assignment or transfer by Borrower or any Guarantor of any of its rights or duties under this Agreement or the other Loan Documents,

(xi)    amend, modify, or eliminate any of the provisions of Section 2.4(b)(i), (ii) or (iii) or Section 2.4(e) or (f),

(xii)    amend, modify, or eliminate any of the provisions of Section 13.1 with respect to assignments to, or participations with, Persons who are Medley Affiliated Entities, or

(xiii)    amend, modify, or eliminate any of the provisions of Section 5.26, Section 6.19, or Section 8.14.

(b)    (b)    No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate Section 13.1(k) or any of the provisions of Section 2.11 that specifically relate to the Specified Letter of Credit, Specified Revolving Loans, or Medley's obligations under the Medley Participation Agreement, in each case without the written consent of Medley;

(c)    No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate,

- 68 -

(i) the definition of, or any of the terms or provisions of, the Fee Letter, without the written consent of Agent and Borrower (and shall not require the consent of any of the Lenders), or

(ii) any provision of Section 15 pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other Loan Documents, without the written consent of Agent, Borrower, and the Required Lenders;

(d) No amendment, waiver, modification, elimination, or consent shall, without written consent of Agent, Borrower and the Supermajority Lenders, amend, modify, or eliminate the definition of "Borrowing Base" or any of the defined terms that are used in such definition (including the definitions of "Eligible Accounts", "Eligible Inventory", and "Eligible Rolling Stock") to the extent that any such change results in more credit being made available to Borrower based upon the Borrowing Base, but not otherwise, or the definition of "Maximum Revolver Amount" or change Section 2.1(c);

(e) No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Issuing Bank, or any other rights or duties of Issuing Bank under this Agreement or the other Loan Documents, without the written consent of Issuing Bank, Agent, Borrower, and the Required Lenders;

(f) Intentionally omitted; and

(g) Anything in this Section 14.1 to the contrary notwithstanding, (i) any amendment, modification, elimination, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of Borrower, shall not require consent by or the agreement of any Loan Party, and (ii) any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other Loan Document may be entered into without the consent of, or over the objection of, any Defaulting Lender other than any of the matters governed by Section 14.1(a)(i) through (iii) that affect such Lender.

14.2    **Replacement of Certain Lenders.**

(a) If (i) any action to be taken by the Lender Group or Agent hereunder requires the consent, authorization, or agreement of all Lenders or all Lenders affected thereby and if such action has received the consent, authorization, or agreement of the Required Lenders but not of all Lenders or all Lenders affected thereby, or (ii) any Lender makes a claim for compensation under Section 16, then Borrower or Agent, upon at least 5 Business Days prior irrevocable notice, may permanently replace any Lender that failed to give its consent, authorization, or agreement (a "Non-Consenting Lender") or any Lender that made a claim for compensation (a "Tax Lender") with one or more Replacement Lenders, and the Non-Consenting Lender or Tax Lender, as applicable, shall have no right to refuse to be replaced hereunder.  Such notice to replace the Non-Consenting Lender or Tax Lender, as applicable, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b) Prior to the effective date of such replacement, the Non-Consenting Lender or Tax Lender, as applicable, and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Non-Consenting Lender or Tax Lender, as applicable, being repaid in full its share of the outstanding Obligations (without any premium or penalty of any kind whatsoever, but including (i) all interest, fees and other amounts that may be due in payable in respect thereof, and (ii) an assumption of its Pro Rata Share of participations in the Letters of Credit).  If the Non-Consenting Lender or Tax Lender, as applicable, shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, Agent may, but shall not be required to, execute and deliver such

Assignment and Acceptance in the name or and on behalf of the Non-Consenting Lender or Tax Lender, as applicable, and irrespective of whether Agent executes and delivers such Assignment and Acceptance, the Non-Consenting Lender or Tax Lender, as applicable, shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Non-Consenting Lender or Tax Lender, as applicable, shall be made in accordance with the terms of <u>Section 13.1</u>.  Until such time as one or more Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Non-Consenting Lender or Tax Lender, as applicable, hereunder and under the other Loan Documents, the Non-Consenting Lender or Tax Lender, as applicable, shall remain obligated to make the Non-Consenting Lender's or Tax Lender's, as applicable, Pro Rata Share of Revolving Loans and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of participations in such Letters of Credit.

14.3    **No Waivers; Cumulative Remedies**.  No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof.  No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Parent and Borrower of any provision of this Agreement.  Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

15.    **AGENT; THE LENDER GROUP.**

15.1    **Appointment and Authorization of Agent**.  Each Lender hereby designates and appoints Wells Fargo as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to designate, appoint, and authorize) Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Agent agrees to act as agent for and on behalf of the Lenders (and the Bank Product Providers) on the conditions contained in this <u>Section 15</u>.  Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender (or Bank Product Provider), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties.  Each Lender hereby further authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral.  Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect:  (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents,

instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Revolving Loans, for itself or on behalf of Lenders, as provided in the Loan Documents, (d) exclusively receive, apply, and distribute payments and proceeds of the Collateral as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to any Loan Party, the Obligations, the Collateral, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

15.2   **Delegation of Duties**.   Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.   Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

15.3   **Liability of Agent**.   None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders (or Bank Product Providers) for any recital, statement, representation or warranty made by any Loan Party or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder.   No Agent-Related Person shall be under any obligation to any Lenders (or Bank Product Providers) to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Loan Party.

15.4   **Reliance by Agent**.   Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrower or counsel to any Lender), independent accountants and other experts selected by Agent.   Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable.   If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders (and, if it so elects, the Bank Product Providers) against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.   Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders (and Bank Product Providers).

15.5   **Notice of Default or Event of Default**.   Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default or Event of

Default, and stating that such notice is a "notice of default." Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to Section 15.4, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 9; provided, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

    15.6 **Credit Decision**. Each Lender (and Bank Product Provider) acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of the Loan Parties or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender (or Bank Product Provider). Each Lender represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrower. Each Lender also represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties or any other Person party to a Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender (or Bank Product Provider) with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrower or any other Person party to a Loan Document that may come into the possession of any of the Agent-Related Persons. Each Lender acknowledges (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender (or Bank Product Provider) with any credit or other information with respect to Borrower, its Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement (or such Bank Product Provider entered into a Bank Product Agreement).

    15.7 **Costs and Expenses; Indemnification**. Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorney's fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrower is obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the Collateral received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders (or Bank Product Providers). In the event Agent is not reimbursed for such costs and expenses by the Loan Parties, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's ratable

thereof. Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrower and without limiting the obligation of Borrower to do so) from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make a Revolving Loan or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Loan Document to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrower. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent. For the avoidance of doubt, this Section 15.7 shall not apply with respect to Taxes, which shall be governed by Section 16.

        15.8    **Agent in Individual Capacity**. Wells Fargo and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with the Loan Parties and Affiliates and any other Person party to any Loan Document as though Wells Fargo were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, Wells Fargo or its Affiliates may receive information regarding the Loan Parties or their Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of the Loan Parties or such other Person and that prohibit the disclosure of such information to the Lenders (or Bank Product Providers), and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them. The terms "Lender" and "Lenders" include Wells Fargo in its individual capacity.

        15.9    **Successor Agent**. Agent may resign as Agent upon 30 days (10 days if an Event of Default has occurred and is continuing) prior written notice to the Lenders (unless such notice is waived by the Required Lenders) and Borrower (unless such notice is waived by Borrower) and without any notice to the Bank Product Providers. If Agent resigns under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of Borrower (such consent not to be unreasonably withheld, delayed, or conditioned), appoint a successor Agent for the Lenders (and the Bank Product Providers). If, at the time that Agent's resignation is effective, it is acting as Issuing Bank, such resignation shall also operate to effectuate its resignation as Issuing Bank and it shall automatically be relieved of any further obligation to issue Letters of Credit. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders and Borrower, a successor Agent. If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders with (so long as no Event of Default has occurred and is continuing) the consent of Borrower (such consent not to be unreasonably withheld, delayed, or conditioned). In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no

successor Agent has accepted appointment as Agent by the date which is 30 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

15.10  **Lender in Individual Capacity**.  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Parent and its Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group (or the Bank Product Providers).  The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding the Loan Parties  or their Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of the Loan Parties or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

15.11  **Collateral Matters.**

(a)  The Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by Borrower of all of the Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith to the extent that such the sale or disposition is a Permitted Disposition, (iii) constituting property in which any Loan Party owned no interest at the time Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to any Loan Party under a lease or license that has expired or is terminated in a transaction permitted under this Agreement, or (v) in connection with a credit bid or purchase authorized under this Section 15.11.  The Loan Parties and the Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent, based upon the instruction of the Required Lenders, to (a) consent to the sale of, credit bid, or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, or in connection with any 363 Sale conducted in accordance with the Bankruptcy Code or order of the Bankruptcy Court, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by Agent in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy.  In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders and the Bank Product Providers shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders and the Bank Product Providers whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so

credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith Agent may reduce the Obligations owed to the Lenders and the Bank Product Providers (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration.  Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders (without requiring the authorization of the Bank Product Providers), or (z) otherwise, the Required Lenders (without requiring the authorization of the Bank Product Providers).  Upon request by Agent or Borrower at any time, the Lenders will (and if so requested, the Bank Product Providers will) confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 15.11; provided, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in Agent's opinion, could expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of Borrower in respect of) any and all interests retained by Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Each Lender further hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to irrevocably authorize) Agent, at its option and in its sole discretion, to subordinate any Lien granted to or held by Agent under any Loan Document to the holder of any Permitted Lien on such property if such Permitted Lien secures Permitted Purchase Money Indebtedness.

(b)     Agent shall have no obligation whatsoever to any of the Lenders (or the Bank Product Providers) (i) to verify or assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected, or insured or has been encumbered, (ii) to verify or assure that Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) to verify or assure that any particular items of Collateral meet the eligibility criteria applicable in respect thereof, (iv) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not, or (v) to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender (or Bank Product Provider) as to any of the foregoing, except as otherwise expressly provided herein.

15.12    **Restrictions on Actions by Lenders; Sharing of Payments.**

(a)     Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to any Loan Party or any deposit accounts of any Loan Party now or hereafter maintained with such Lender.  Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against Borrower or any Guarantor or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)      If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's Pro Rata Share of all such distributions by Agent, such Lender promptly shall (A) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

15.13    **Agency for Perfection**.  Agent hereby appoints each other Lender (and each Bank Product Provider) as its agent (and each Lender hereby accepts (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to accept) such appointment) for the purpose of perfecting Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected by possession or control.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

15.14    **Payments by Agent to the Lenders**.  All payments to be made by Agent to the Lenders (or Bank Product Providers) shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent.  Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

15.15    **Concerning the Collateral and Related Loan Documents**.  Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents.  Each member of the Lender Group agrees (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to agree) that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders (and such Bank Product Provider).

15.16    **Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information**.  By becoming a party to this Agreement, each Lender:

(a)      is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field examination report respecting any Loan Party (each, a "Report") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

(b)      expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any field examination will inspect only specific

information regarding Parent and its Subsidiaries and will rely significantly upon Parent's and its Subsidiaries' books and records, as well as on representations of Borrower's personnel,

(d)     agrees to keep all Reports and other material, non-public information regarding Parent and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 17.9, and

(e)     without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrower, and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorney's fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

(f)     In addition to the foregoing, (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by any Loan Party to Agent that has not been contemporaneously provided by Parent or such Subsidiary to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from any Loan Party, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Borrower the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Parent or such Subsidiary, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent renders to Borrower a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

15.17   **Several Obligations; No Liability**.  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.  Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in Section 15.7, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group.  No Lender shall be responsible to Borrower or any other Person for any failure by any other Lender (or Bank Product Provider) to fulfill its obligations to make credit available hereunder, nor to advance for such Lender (or Bank Product Provider) or on its behalf, nor to take any other action on behalf of such Lender (or Bank Product Provider) hereunder or in connection with the financing contemplated herein.

16.   **WITHHOLDING TAXES.**

16.1   **Payments**.  All payments made by Borrower hereunder or under any other Loan Document will be made without setoff, counterclaim, or other defense.  In addition, all such payments will be made free

and clear of, and without deduction or withholding for, any present or future Indemnified Taxes (except as required by applicable law), and in the event any deduction or withholding of Indemnified Taxes is required, Borrower shall comply with the next sentence of this <u>Section 16.1</u>.  If any Indemnified Taxes are so levied or imposed on payments to a Lender or Participant, Borrower agrees to pay the full amount of such Indemnified Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement or any other Loan Document to a Lender or Participant, including any amount paid pursuant to this <u>Section 16.1</u> after withholding or deduction for or on account of any Indemnified Taxes, will not be less than the amount provided for herein.  Borrower will furnish to Agent as promptly as possible after the date the payment of any Indemnified Tax is due pursuant to applicable law, certified copies of tax receipts evidencing such payment by Borrower.  Borrower agrees to pay any present or future stamp, value added or documentary taxes or any other excise or property taxes, charges, or similar levies that arise from any payment made to a Lender or Participant hereunder or from the execution, delivery, performance, recordation, or filing of, or otherwise with respect to this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 14.2(a)</u>).

16.2    **Exemptions.**

(a)    If a Lender or Participant is entitled to claim an exemption or reduction from United States withholding tax, such Lender or Participant agrees with and in favor of Agent, to deliver to the Borrower and  Agent (or, in the case of a Participant, to the Borrower and the Lender granting the participation only) one of the following before receiving its first payment under this Agreement:

(i)    if such Lender or Participant is entitled to claim an exemption from United States withholding tax pursuant to the portfolio interest exception, (A) a statement of the Lender or Participant, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to Borrower within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN-E or Form W-8IMY (with proper attachments);

(ii)    if such Lender or Participant is entitled to claim an exemption from, or a reduction of, withholding tax under a United States tax treaty, a properly completed and executed copy of IRS Form W-8BEN-E;

(iii)    if such Lender or Participant is entitled  to claim that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, a properly completed and executed copy of IRS Form W-8ECI;

(iv)    if such Lender or Participant is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because such Lender or Participant serves as an intermediary, a properly completed and executed copy of IRS Form W-8IMY (with proper attachments); or

(v)    a properly completed and executed copy of any other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax.

(b)    Each Lender or Participant shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and promptly notify Agent (or, in the case of a Participant, the Borrower and the Lender granting the participation only) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(c)	If a Lender or Participant claims an exemption from withholding tax in a jurisdiction other than the United States, such Lender or such Participant agrees with and in favor of Agent, to deliver to Agent (or, in the case of a Participant, to the Borrower and the Lender granting the participation only) any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement, but only if such Lender or such Participant is legally able to deliver such forms, provided, that nothing in this Section 16.2(c) shall require a Lender or Participant to disclose any information that it deems to be confidential (including without limitation, its tax returns).  Each Lender and each Participant shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and promptly notify Agent (or, in the case of a Participant, the Borrower and the Lender granting the participation only) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)	If a Lender or Participant claims exemption from, or reduction of, withholding tax and such Lender or Participant sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrower to such Lender or Participant, such Lender or Participant agrees to notify Agent (or, in the case of a sale of a participation interest, the Lender granting the participation only) of  the percentage amount in which it is no longer the beneficial owner of Obligations of Borrower to such Lender or Participant.  To the extent of such percentage amount, Agent will treat such Lender's or such Participant's documentation provided pursuant to Section 16.2(a) or 16.2(c) as no longer valid.  With respect to such percentage amount, such Participant or Assignee may provide new documentation, pursuant to Section 16.2(a) or 16.2(c), if applicable.  Borrower agrees that each Participant shall be entitled to the benefits of this Section 16 with respect to its participation in any portion of the Commitments and the Obligations so long as such Participant complies with the obligations set forth in this Section 16 with respect thereto.

16.3	**Reductions.**

(a)	If a Lender or a Participant is subject to an applicable withholding tax, the Borrower or Agent (or, in the case of a Participant, the Borrower and the Lender granting the participation) may withhold from any payment to such Lender or such Participant an amount equivalent to the applicable withholding tax.  If the forms or other documentation required by Section 16.2(a) or 16.2(c) are not delivered to the Borrower or the Agent (or, in the case of a Participant, to the Borrower and the Lender granting the participation), then the Borrower or the Agent (or, in the case of a Participant, the Borrower or the Lender granting the participation) may withhold from any payment to such Lender or such Participant not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(b)	If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent (or, in the case of a Participant, to the Lender granting the participation) did not properly withhold tax from amounts paid to or for the account of any Lender or any Participant due to a failure on the part of the Lender or any Participant (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent (or such Participant failed to notify the Lender granting the participation) of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent harmless (or, in the case of a Participant, such Participant shall indemnify and hold the Lender granting the participation harmless) for all amounts paid, directly or indirectly, by Agent (or, in the case of a Participant, to the Lender granting the participation), as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent (or, in the case of a Participant, to the Lender granting the participation only) under this Section 16, together with all costs and expenses (including attorney's fees and expenses).  The obligation of the Lenders and the Participants under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

16.4    **Refunds**.  If Agent or a Lender determines, in its sole and reasonable discretion, that it has received a refund or credit of any Indemnified Taxes to which Borrower has paid additional amounts pursuant to this Section 16, it shall pay over the amount of such refund or credit to Borrower (but only to the extent of payments made, or additional amounts paid, by Borrower under this Section 16 with respect to Indemnified Taxes giving rise to such a refund or credit), net of all out-of-pocket expenses of Agent or such Lender and without interest (other than any interest paid by the applicable Governmental Authority with respect to such a refund); provided, that Borrower, upon the request of Agent or such Lender, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges, imposed by the applicable Governmental Authority, other than such penalties, interest or other charges imposed as a result of the willful misconduct or gross negligence of Agent or such Lender hereunder) to Agent or such Lender in the event Agent or such Lender is required to repay such refund or credit to such Governmental Authority.  In the event a Default or Event of Default has occurred and is continuing, Lender or Agent (as applicable) shall, in lieu of paying the amount of any refund or credit to Borrower under this Section 16.4, apply such amount to reduce the outstanding Obligations.  Notwithstanding anything in this Agreement to the contrary, this Section 16 shall not be construed to require Agent or any Lender to make available its tax returns (or any other information which it deems confidential) to Borrower or any other Person.

16.5    **FATCA**.  If a payment made to a Lender or Participant by Borrower hereunder or under any Loan Document would be subject to United States federal withholding Tax imposed by FATCA if such Lender or Participant were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the IRC, as applicable), such Lender or Participant shall deliver to the Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the IRC) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender or Participant has complied with such Lender's or Participant's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 16.5, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

17.    **GENERAL PROVISIONS.**

17.1    **Effectiveness**.  Subject to the entry of the Interim Borrowing Order, this Agreement shall be binding and deemed effective when executed by Parent, Borrower, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2    **Section Headings**.  Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3    **Interpretation**.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or Parent or Borrower, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4    **Severability of Provisions**.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5    **Bank Product Providers**.  Each Bank Product Provider in its capacity as such shall be deemed a third party beneficiary hereof and of the provisions of the other Loan Documents for purposes of any reference in a Loan Document to the parties for whom Agent is acting.  Agent hereby agrees to act as agent for such Bank Product Providers and, by virtue of entering into a Bank Product Agreement, the applicable Bank Product Provider shall be automatically deemed to have appointed Agent as its agent and to have accepted the benefits of the Loan Documents.  It is understood and agreed that the rights and benefits of each Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein.  In addition, each Bank Product Provider, by virtue of entering into a Bank Product Agreement, shall be automatically deemed to have agreed that Agent shall have the right, but shall have no obligation, to establish, maintain, relax, or release reserves in respect of the Bank Product Obligations and that if reserves are established there is no obligation on the part of Agent to determine or insure whether the amount of any such reserve is appropriate or not.  In connection with any such distribution of payments or proceeds of Collateral, Agent shall be entitled to assume no amounts are due or owing to any Bank Product Provider unless such Bank Product Provider has provided a written certification (setting forth a reasonably detailed calculation) to Agent as to the amounts that are due and owing to it and such written certification is received by Agent a reasonable period of time prior to the making of such distribution.  Agent shall have no obligation to calculate the amount due and payable with respect to any Bank Products, but may rely upon the written certification of the amount due and payable from the applicable Bank Product Provider.  In the absence of an updated certification, Agent shall be entitled to assume that the amount due and payable to the applicable Bank Product Provider is the amount last certified to Agent by such Bank Product Provider as being due and payable (less any distributions made to such Bank Product Provider on account thereof).  Borrower may obtain Bank Products from any Bank Product Provider, although Borrower is not required to do so.  Borrower acknowledges and agrees that no Bank Product Provider has committed to provide any Bank Products and that the providing of Bank Products by any Bank Product Provider is in the sole and absolute discretion of such Bank Product Provider.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Product shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or Guarantors.

17.6    **Debtor-Creditor Relationship**.  The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor.  No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

17.7    **Counterparts; Electronic Execution**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

17.8    **Revival and Reinstatement of Obligations; Certain Waivers.**

(a)      If any member of the Lender Group or any Bank Product Provider repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously paid or transferred to such member of the Lender Group or such Bank Product Provider in full or partial satisfaction of any Obligation or on account of any other obligation of any Loan Party under any Loan Document or any Bank Product Agreement, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such member of the Lender Group or Bank Product Provider elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group or Bank Product Provider elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and attorney's fees of such member of the Lender Group or Bank Product Provider related thereto, (i) the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist and (ii) Agent's Liens securing such liability shall be effective, revived, and remain in full force and effect, in each case, as fully as if such Voidable Transfer had never been made.  If, prior to any of the foregoing, (A) Agent's Liens shall have been released or terminated or (B) any provision of this Agreement shall have been terminated or cancelled, Agent's Liens, or such provision of this Agreement, shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligation of any Loan Party in respect of such liability or any Collateral securing such liability.

17.9    **Confidentiality.**

(a)      Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding Parent and its Subsidiaries, their operations, assets, and existing and contemplated business plans ("Confidential Information") shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except:  (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group and to employees, directors and officers of any member of the Lender Group (the Persons in this clause (i), "Lender Group Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (ii) to Subsidiaries and Affiliates of any member of the Lender Group (including the Bank Product Providers), provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 17.9, (iii) as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided, that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrower with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrower pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance in writing by Borrower, (vi) as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, provided, that, (x) prior to any disclosure under this clause (vi) the disclosing party agrees to provide Borrower with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrower pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (vi) shall be limited to the portion of the Confidential Information as may

be required by such Governmental Authority pursuant to such subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders or the Lender Group Representatives), (viii) in connection with any assignment, participation  or pledge of any Lender's interest under this Agreement, provided that prior to receipt of Confidential Information any such assignee, participant, or pledgee shall have agreed in writing to receive such Confidential Information either subject to the terms of this <u>Section 17.9</u> or pursuant to confidentiality requirements substantially similar to those contained in this <u>Section 17.9</u> (and such Person may disclose such Confidential Information to Persons employed or engaged by them as described in clause (i) above), (ix) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents; <u>provided</u>, that, prior to any disclosure to any Person (other than any Loan Party, Agent, any Lender, any of their respective Affiliates, or their respective counsel) under this clause (ix) with respect to litigation involving any Person (other than Borrower, Agent, any Lender, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide Borrower with prior written notice thereof, and (x) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Loan Document.

(b)        Anything in this Agreement to the contrary notwithstanding, Agent may disclose information concerning the terms and conditions of this Agreement and the other Loan Documents to loan syndication and pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of Borrower or the other Loan Parties and the Commitments provided hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of the Agent.

(c)        The Loan Parties hereby acknowledge that Agent or its Affiliates may make available to the Lenders materials or information provided by or on behalf of Borrower hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks, SyndTrak or another similar electronic system (the "<u>Platform</u>") and certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "<u>Public Lender</u>"). The Loan Parties shall be deemed to have authorized Agent and its Affiliates and the Lenders to treat Borrower Materials marked "PUBLIC" or otherwise at any time filed with the SEC as not containing any material non-public information with respect to the Loan Parties or their securities for purposes of United States federal and state securities laws. All Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor" (or another similar term). Agent and its Affiliates and the Lenders shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" or that are not at any time filed with the SEC as being suitable only for posting on a portion of the Platform not marked as "Public Investor" (or such other similar term).

17.10    **Survival**.    All representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent, Issuing Bank, or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding or unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or been terminated.

17.11    **Patriot Act**.  Each Lender that is subject to the requirements of the Patriot Act hereby notifies Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow such Lender to identify Borrower in accordance with the Patriot Act.  In addition, if Agent is required by law or regulation or internal policies to do so, it shall have the right to periodically conduct (a) Patriot Act searches, OFAC/PEP searches, and customary individual background checks for the Loan Parties and (b) OFAC/PEP searches and customary individual background checks for the Loan Parties' senior management and key principals, and Borrower agrees to cooperate in respect of the conduct of such searches and further agrees that the reasonable costs and charges for such searches shall constitute Lender Group Expenses hereunder and be for the account of Borrower.

17.12    **Integration**.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.  The foregoing to the contrary notwithstanding, all Bank Product Agreements, if any, are independent agreements governed by the written provisions of such Bank Product Agreements, which will remain in full force and effect, unaffected by any repayment, prepayments, acceleration, reduction, increase, or change in the terms of any credit extended hereunder, except as otherwise expressly provided in such Bank Product Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**PARENT:**                **URT HOLDINGS, INC.,**
                           a Delaware corporation


                           By:    _____
                           Name:  _____
                           Title: _____

**BORROWER:**              **UNITED ROAD TOWING, INC.,**
                           a Delaware corporation


                           By:    _____
                           Name:  _____
                           Title: _____


                           **WELLS FARGO BANK, NATIONAL ASSOCIATION,**
                           a national banking association, as Agent and as a Lender


                           By:    _____
                           Name:  _____
                           Title:    Vice President

**Schedule A-1**

**Agent's Account**

An account at a bank designated by Agent from time to time as the account into which Borrowers shall make all payments to Agent for the benefit of the Lender Group and into which the Lender Group shall make all payments to Agent under this Agreement and the other Loan Documents; unless and until Agent notifies Borrower and the Lender Group to the contrary, Agent's Account shall be that certain deposit account bearing account number 4993597210, and maintained by Agent with Wells Fargo Bank, N.A., 420 Montgomery Street, San Francisco, CA, ABA #121-000-248.

**Schedule A-2**

**Authorized Persons**

**Schedule C-1**

**Commitments**

| Lender | Revolver Commitment | Total Commitment |
|---|---|---|
| **Wells Fargo Bank, National Association** | $35,250,000 | $35,250,000 |
| | | |
| **All Lenders** | $35,250,000 | $35,250,000 |

**Schedule D-1**

**Designated Account**

**Schedule 1.1**

As used in the Agreement, the following terms shall have the following definitions:

"363 Sale" has the meaning specified in Section 5.26(a).

"Account" means an account (as that term is defined in the Code).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"Accounting Changes" means changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions).

"Acquired Indebtedness" means Indebtedness of a Person whose assets or Equity Interests are acquired by Parent or any of its Subsidiaries in a Permitted Acquisition so long as such Indebtedness (a) was in existence prior to the date of such Permitted Acquisition, and (b) was not incurred in connection with, or in contemplation of, such Permitted Acquisition.

"Acquisition" means (a) the purchase or other acquisition by a Person or its Subsidiaries of all or substantially all of the assets of (or any division or business line of) any other Person, or (b) the purchase or other acquisition (whether by means of a merger, consolidation, or otherwise) by a Person or its Subsidiaries of all or substantially all of the Equity Interests of any other Person and otherwise causing such Person to become a Subsidiary of such acquiring Person.

"Additional Documents" has the meaning specified therefor in Section 5.12 of the Agreement.

"Administrative Questionnaire" has the meaning specified therefor in Section 13.1(a) of the Agreement.

"Affected Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Equity Interests, by contract, or otherwise; provided, that, for purposes of Section 6.10 of the Agreement: (a) any Person which owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agent" has the meaning specified therefor in the preamble to the Agreement.

"Agent-Related Persons" means Agent, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"Agent's Account" means the Deposit Account of Agent identified on Schedule A-1 to the Agreement (or such other Deposit Account of Agent that has been designated as such, in writing, by Agent to Borrower and the Lenders).

"Agent's Liens" means the Liens granted by the Loan Parties to Agent under the Loan Documents and securing the Obligations.

"Agreement" means the Credit Agreement to which this Schedule 1.1 is attached.

"Applicable Margin" means (a) in the case of a Base Rate Loan, 1.5 percentage points (the "Base Rate Margin"), and (b) in the case of all LIBOR Rate Loan, 2.5 percentage points (the "LIBOR Rate Margin").

"Application Event" means the occurrence of (a) a failure by Borrower to repay all of the Obligations in full on the Maturity Date, or (b) an Event of Default and the election by Agent or the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to Section 2.4(b)(iii) of the Agreement.

"Appraised Eligible Rolling Stock" means Eligible Rolling Stock as to which the Agent has obtained an appraisal. As of the Closing Date, the Appraised Eligible Rolling Stock is set forth in Schedule E-2.

"Approved Budget" means the financial projections for the Loan Parties covering the thirteen-week period commencing on the Petition Date on a weekly basis, which projections shall include, at a minimum, cash receipts, operating disbursements, payroll disbursements, a reasonably detailed professional fee budget, non-operating disbursements (including, for the avoidance of doubt, professional fees) and inventory for the period covered thereby, substantially in the form of the initial budget annexed hereto as Schedule 1.2 and any subsequent projections furnished pursuant to Section 5.2 hereof, in each case, in form and substance reasonably satisfactory to the Agent.  The Agent acknowledges and agrees that the budget attached hereto as Schedule 1.2 and in effect as of the date of this Agreement is in form and substance satisfactory to the Agent.

"Assignee" has the meaning specified therefor in Section 13.1(a) of the Agreement.

"Assignment and Acceptance" means an Assignment and Acceptance Agreement substantially in the form of Exhibit A-1 to the Agreement.

"Authorized Person" means any one of the individuals identified on Schedule A-2 to the Agreement, as such schedule is updated from time to time by written notice from Borrower to Agent.

"Availability" means, as of any date of determination, the amount that Borrower is entitled to borrow as Revolving Loans under Section 2.1 of the Agreement (after giving effect to the then outstanding Revolver Usage).

"Average Revolver Usage" means, with respect to any period, the sum of the aggregate amount of Revolver Usage for each Business Day in such period (calculated as of the end of each respective Business Day) divided by the number of Business Days in such period.

"Avoidance Action" means any causes of action under chapter 5 of the Bankruptcy Code.

"Bank Product" means any one or more of the following financial products or accommodations extended to Parent or its Subsidiaries by a Bank Product Provider:  (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")), (b) credit card processing

services, (c) debit cards, (d) stored value cards, (e) Cash Management Services, or (f) transactions under Hedge Agreements.

"Bank Product Agreements" means those agreements entered into from time to time by Parent or its Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Collateralization" means providing cash collateral (pursuant to documentation reasonably satisfactory to Agent) to be held by Agent for the benefit of the Bank Product Providers (other than the Hedge Providers) in an aggregate amount not to exceed 105% of the aggregate outstanding amount of all then-existing Bank Product Obligations (other than Hedge Obligations).

"Bank Product Obligations" means, without duplication, (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by Parent or its Subsidiaries to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) all Hedge Obligations, and (c) all amounts that Agent or any Lender is obligated to pay to a Bank Product Provider as a result of Agent or such Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to Parent or its Subsidiaries.

"Bank Product Provider" means Wells Fargo or any of its Affiliates, including each of the foregoing in its capacity, if applicable, as a Hedge Provider.

"Bank Product Reserves" means, as of any date of determination, those reserves that Agent deems necessary or appropriate, in its Permitted Discretion, to establish (based upon the aggregate outstanding amount of such Bank Product Obligations) in respect of Bank Products then provided or outstanding.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Cases.

"Bankruptcy Events" means, the commencement of the Chapter 11 Cases and any events that lead up to, and typically result from, the commencement of a case under Chapter 11 of the Bankruptcy Code.

"Base Rate" means the greatest of (a) 3.25% per annum, (b) the Federal Funds Rate plus ½%, and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate.

"Base Rate Loan" means a Revolving Loan that that bears interest at a rate determined by reference to the Base Rate.

"Base Rate Margin" has the meaning set forth in the definition of Applicable Margin.

"Bidding Procedures Order" has the meaning specified in Section 5.26(a).

"<u>Board of Directors</u>" means, as to any Person, the board of directors (or comparable managers or other governing body) of such Person, or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers or other governing body).

"<u>Board of Governors</u>" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Borrower</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>Borrower Materials</u>" has the meaning specified therefor in <u>Section 17.9(c)</u> of the Agreement.

"<u>Borrowing</u>" means a borrowing consisting of Revolving Loans made on the same day by the Lenders (or Agent on behalf thereof), or by Agent in the case of an Extraordinary Advance.

"<u>Borrowing Base</u>" means, as of any date of determination, the result of:

(a)     85% of the amount of Eligible Accounts, *less* the amount, if any, of the Dilution Reserve, *plus*

(b)     *the lesser of*

(i) $1,000,000, and

(ii) the sum of (x) the product of 50% multiplied by the value (calculated at the lower of cost or fair market value on a basis consistent with Borrower's historical accounting practices) (subject to <u>Section 1.2</u> of the Agreement)) of Eligible Inventory (other than Eligible Scrap Inventory) at such time plus (y) the product of 85% multiplied by the value (calculated at the lower of cost or net book value on a basis consistent with Borrower's historical accounting practices (subject to <u>Section 1.2</u> of the Agreement)) of Eligible Scrap Inventory at such time, *plus*

(c)     *the lesser of*

(i) $22,000,000, and

(ii) 75% multiplied by the Net Orderly Liquidation Value of Appraised Eligible Rolling Stock, *plus*

(d)     an amount not to exceed $2,500,000 to fund amounts in accordance with and as set forth in the Approved Budget; *minus*

(e)     solely to the extent that the Specified Letter(s) of Credit is issued and outstanding, the Specified Letter of Credit Reserve, *minus*

(f)     the Carve Out Reserve, *minus*

(g)     prior to entry of the Final Order and the repayment in full of the Existing Liabilities under the Existing Credit Agreement, a reserve equal to the indebtedness outstanding under the Existing Credit Agreement, *minus*

(h)     without duplication, the aggregate amount of reserves, if any, established by Agent in its Permitted Discretion subject to <u>Section 2.1(c)</u> of the Agreement.

Inventory, Accounts, or Rolling Stock acquired in a Permitted Acquisition shall not be included in the Borrowing Base, unless and until the Agent has completed or received (A) an appraisal of such Inventory, Accounts, or Rolling Stock, as applicable, from appraisers satisfactory to the Agent and establishes an advance rate and reserves (if applicable) therefor in accordance with Section 2.1(c), and otherwise agrees that such Inventory shall be deemed Eligible Inventory, such Accounts shall be deemed Eligible Accounts, or such Rolling Stock shall be deemed Eligible Rolling Stock, and (B) such other due diligence as the Agent may require, all of the results of the foregoing to be reasonably satisfactory to the Agent.

"Borrowing Base Certificate" means a certificate in substantially the form of Exhibit B-1.

"Brazil Joint Venture" means a joint venture investment between Borrower and JSL SA, a public company organized under the laws of Brazil, in respect of which Borrower shall provide certain consulting and advising services and from which Borrower shall receive five percent (5%) of the net profits from any business opportunity conducted by such joint venture, subject in all cases to the terms of the joint venture documents entered into by and between Borrower and JSL SA as of February 14, 2014.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York, except that, if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"Capital Expenditures" means, with respect to any Person for any period, the amount of all expenditures by such Person and its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed, but excluding, without duplication, (a) expenditures made during such period with the proceeds of any Permitted Disposition, including proceeds of Permitted Dispositions that are applied to the costs of the replacement, purchase or construction of properties or assets that were the subject of such Permitted Disposition in accordance with Section 2.4(e)(ii) of the Agreement, (b) with respect to the purchase price of assets that are purchased within 90 days of the trade-in of existing assets during such period, the amount that the gross amount of such purchase price is reduced by the credit granted by the seller of such assets for the assets being traded in at such time, (c) expenditures made during such period to the extent made with the proceeds of an equity investment made to Parent and contributed to Borrower or any of its Subsidiaries, which equity investment is made within 90 days of the making of the expenditure, and (d) expenditures during such period that, pursuant to a written agreement, are reimbursed or reimbursable by a third Person (excluding Parent or any of its Affiliates).

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve Out" has the meaning specified therefor in the DIP Orders.

"Carve Out Reserve" means a Reserve established by the Agent in the amount of the Carve Out.

"Case Professionals" has the meaning specified therefor in the Orders.

"Cases" has the meaning set forth in the Recitals hereto.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $250,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Cash Management Order" means an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Agent, (i) approving and authorizing the Borrower to use its existing cash management systems, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code and (v) authorizing the Debtors to use existing bank accounts and existing business forms, as such order may be amended or modified as may be consented to by the Agent.

"Cash Management Reserves" means such reserves as the Agent, from time to time, determines in its reasonable discretion as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Borrowers and their Subsidiaries with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other cash management arrangements.

"CFC" means a controlled foreign corporation (as that term is defined in Section 957 of the IRC).

"Change of Control" means that:

(a) Permitted Holders collectively fail to own and control, directly or indirectly, 50.1%, or more, of: (i) prior to the Class B Common Voting Effective Time, the Series C Stock; or (ii) on and after the Class B Common Voting Effective Time, the Equity Interests of Parent entitled (without regard to the occurrence of any contingency) to vote for the election of members of the Board of Directors of Parent,

(b) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act), other than Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the

Exchange Act), directly or indirectly, of 20%, or more, of the Equity Interests of Parent entitled (without regard to the occurrence of any contingency) to vote for the election of members of the Board of Directors of Parent,

       (c) a majority of the members of the Board of Directors of Parent do not constitute Continuing Directors, or

       (d) Parent fails to own and control, directly or indirectly, 100% of the Equity Interests of each other Loan Party (other than pursuant to a transaction permitted by the Agreement).

"<u>Change in Law</u>" means the occurrence after the date of the Agreement of:  (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that notwithstanding anything in the Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "<u>Change in Law</u>," regardless of the date enacted, adopted or issued.

"<u>Class B Common Stock</u>" means the Class B Common Stock, $0.001 par value per share, of Parent.

"<u>Class B Common Voting Effective Time</u>" means the time of the effectiveness of the election, in accordance with the Certificate of Incorporation of Parent, by the holders of a majority of the Class B Common Stock to cause the Class B Common Stock to vote on matters required or permitted to be voted upon by the stockholders of Parent.

"<u>Closing Date</u>" means the date that is the first Business Day following entry of the Interim Borrowing Order by the Bankruptcy Court.

"<u>Code</u>" means the New York Uniform Commercial Code, as in effect from time to time.

"<u>Collateral</u>" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by the Loan Parties in or upon which a Lien is granted by such Person in favor of Agent or the Lenders under any of the Loan Documents.

"<u>Collateral Access Agreement</u>" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Loan Party's books and records or Collateral, in each case, in form and substance reasonably satisfactory to Agent.

"<u>Collateral Documents</u>" means, collectively, the Security and Guaranty Agreement, the Intercreditor Agreement, each of the collateral assignments, security agreements, pledge agreements or other similar agreements, documents and/or instruments delivered to the Agent that creates or purports to create a Lien in favor of the Agent for the benefit of the Credit Parties.

"<u>Commitment</u>" means, with respect to each Lender, its Revolver Commitment, and, with respect to all Lenders, their Revolver Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on <u>Schedule C-1</u> to the Agreement or in the Assignment and

Acceptance pursuant to which such Lender became a Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Committee" means an official committee of unsecured creditors appointed in the Case pursuant to Section 1102 of the Bankruptcy Code.

"Committee Investigation Budget" has the meaning specified in Section 6.11(b).

"Competitor" means any Person that owns, manages or operates a similar business to that of the Borrower or its Subsidiaries in the same market or markets with the Borrower or its Subsidiaries and is a direct competitor of Borrower or its Subsidiaries, or any affiliate of any such Person, excluding any Person or affiliate that is an investment bank, a commercial bank, a finance company, a fund, or other debt investor, in each case, that is engaged in the business of making, purchasing, holding or otherwise investing in commercial loans, bonds, debt securities or other similar extensions of credit in the ordinary course of its business.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 to the Agreement delivered by the chief financial officer (or other appropriate officer) of Parent to Agent.

"Confidential Information" has the meaning specified therefor in Section 17.9(a) of the Agreement.

"Continuing Director" means (a) any member of the Board of Directors who was a director (or comparable manager) of Parent on the Closing Date, and (b) any individual who becomes a member of the Board of Directors after the Closing Date if such individual was approved, appointed or nominated for election to the Board of Directors by either the Permitted Holders or a majority of the Continuing Directors, but excluding any such individual originally proposed for election in opposition to the Board of Directors in office at the Closing Date in an actual or threatened election contest relating to the election of the directors (or comparable managers) of Parent and whose initial assumption of office resulted from such contest or the settlement thereof.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by a Loan Party, Agent, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account).

"Copyright Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

"Cure Amount" has the meaning specified therefor in Section 9.3 of the Agreement.

"Cure Right" has the meaning specified therefor in Section 9.3 of the Agreement.

"Daily Three Month LIBOR" means, for any day, the rate per annum for United States dollar deposits determined by Agent for the purpose of calculating the effective interest rate for loans that reference Daily Three Month LIBOR as the Inter-Bank Market Offered Rate in effect from time to time for the 3 month delivery of funds in amounts approximately equal to the principal amount of such loans. Borrower understands and agrees that Agent may base its determination of the Inter-Bank Market Offered Rate upon such offers or other market indicators of the Inter-Bank Market as Agent in its discretion deems appropriate, including but not limited to the rate offered for U.S. dollar deposits on the London Inter-Bank Market. When interest is determined in relation to Daily Three Month LIBOR, each change in the interest rate shall become effective each Business Day that Agent determines that Daily Three Month LIBOR has changed.

"Debtors" has the meaning set forth in the Recitals hereto.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to fund any amounts required to be funded by it under the Agreement on the date that it is required to do so under the Agreement (including the failure to make available to Agent amounts required pursuant to a Settlement or to make a required payment in connection with a Letter of Credit Disbursement), (b) has notified the Borrower, Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under the Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under the Agreement or under other agreements generally (as reasonably determined by Agent) under which it has committed to extend credit, (d) failed, within 1 Business Day after written request by Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement, (e) otherwise failed to pay over to Agent or any other Lender any other amount required to be paid by it under the Agreement on the date that it is required to do so under the Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Defaulting Lender Rate" means (a) for the first 3 days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Revolving Loans that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto).

"Deposit Account" means any deposit account (as that term is defined in the Code).

"Designated Account" means the Deposit Account of Borrower identified on Schedule D-1 to the Agreement (or such other Deposit Account of Borrower located at Designated Account Bank that has been designated as such, in writing, by Borrower to Agent).

"Designated Account Bank" has the meaning specified therefor in Schedule D-1 to the Agreement (or such other bank that is located within the United States that has been designated as such, in writing, by Borrower to Agent).

"Dilution" means, as of any date of determination, a percentage, based upon the experience of the immediately prior twelve (12) months, that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Borrower's Accounts during such period, by (b) Borrower's billings with respect to Accounts during such period.

"Dilution Reserve" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Accounts by 1 percentage point for each percentage point by which Dilution is in excess of 5%.

"DIP Orders" means and refers to the Interim Borrowing Order and the Final Borrowing Order, individually and collectively.

"<u>DIP Superpriority Claim</u>" means the allowed superpriority administrative expense claim granted to the Credit Parties in the Cases and any Successor Cases pursuant to Section 364(c)(1) of the Bankruptcy Code for all of the Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth in the DIP Orders), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative; <u>provided</u>, <u>however</u>, that the DIP Superpriority Claim shall not have recourse to any Avoidance Actions or the proceeds thereof, other than (i) the proceeds of Avoidance Actions arising under Section 549 of the Bankruptcy Code and (ii) the proceeds of other Avoidance Actions in the amounts necessary to reimburse the Agent and the Lenders for the amount of the Carve Out, if any, used to finance the pursuit of recovery or settlement of such other Avoidance Actions; <u>provided</u>, <u>further</u>, that the DIP Superpriority Claim shall be subject to the Carve Out.

"<u>Disqualified Equity Interests</u>" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures (other than as a result of the optional redemption by the issuer thereof) or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash (other than dividends in respect of taxes), or (d) is or becomes convertible into or exchangeable (other than at the option of the issuer thereof) for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Maturity Date.

"<u>Disregarded Subsidiary</u>" means a Subsidiary of a Loan Party that is disregarded as an entity separate from its owner for U.S. federal income tax purposes and that has no material assets other than Equity Interests of one or more Subsidiaries that are not organized and existing under the laws of the United States or any state thereof or under the laws of the District of Columbia.

"<u>Dollars</u>" or "<u>$</u>" means United States dollars.

"<u>Drawing Document</u>" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"<u>EBITDA</u>" means, with respect to any fiscal period, with respect to Parent and its Subsidiaries on a consolidated basis:

    (a)    Parent's consolidated net income (or loss),

        *minus*

    (b)    without duplication, the sum of the following amounts of Parent for such period to the extent included in determining consolidated net income (or loss) for such period:

        (i)    extraordinary gains, and

        (ii)    interest income,

*plus*

(c)     without duplication, the sum of the following amounts of Parent for such period to the extent included in determining consolidated net income (or loss) for such period:

(i)     any extraordinary, unusual or non-recurring cash charges or expenses (including restructuring charges, integration charges and severance, relocation expenses, retention bonuses or other similar one-time compensation payments made to current and former employees, officers, directors and consultants of Parent or any of its Subsidiaries or made in connection with any Permitted Acquisition or any disposition outside of the ordinary course of business) in an amount not in excess of $250,000 in any period of four consecutive fiscal quarters,

(ii)    Interest Expense,

(iii)   tax expense based on income, profits or capital, including federal, foreign, state, franchise and similar taxes (and for the avoidance of doubt, specifically excluding any sales taxes or any other taxes held in trust for a Governmental Authority),

(iv)    depreciation and amortization (including amortization of goodwill and other intangibles),

(v)     all non-cash charges, expenses or losses (including non-cash rent expense, impairment or write-offs of goodwill or other intangible assets, exchange rate losses, restructuring charges and amortized or unamortized fees, premiums or expenses in connection with the prepayment or retirement of existing indebtedness), excluding from the foregoing any such charge, expense or loss incurred that constitutes an accrual of or a reserve for cash charges for any future period or an amortization of a prepaid cash expense paid in a prior period or write-off or write-down of reserves with respect to current assets,

(vi)    management, consulting, monitoring, advisory and transaction fees, expense reimbursement and indemnification paid or accrued in accordance with Section 6.10 of the Agreement; provided, that in the event that any of the foregoing amounts have accrued but not actually been paid during the relevant period, such amounts shall be included in the calculation of "EBITDA" for such period and not for any subsequent period in which such amount is actually paid,

(vii)   any decrease in consolidated net earnings resulting from a re-measurement of contingent consideration payable in connection with a Permitted Acquisition and classified as an asset or liability on Parent's consolidated balance sheet in accordance with FASB 805-30-35-1 b,

(viii)  Intentionally omitted,

(ix)    deferred compensation, stock-option or employee benefits-based and other equity-based compensation expenses,

(x)     fees, costs and expenses in an amount not in excess of $250,000 in any period of four consecutive fiscal quarters incurred in connection with any Permitted Acquisition or other Permitted Investment, Capital Expenditure, issuance of Permitted Indebtedness, issuance of Equity Interests or Permitted Disposition outside of the ordinary course of business, in each case, to the extent not prohibited by the Agreement and whether or not such transaction is successfully consummated,

(xi)    fees, costs and expenses that have been reimbursed by third parties pursuant to an indemnity or otherwise,

(xii)   unrealized losses in respect of activities under Hedge Agreements,

(xiii)  losses or expenses incurred from discontinued or divested operations or any loss or expense incurred in connection with the disposal of discontinued or divested operations,

(xiv)   purchase accounting adjustments (including any such adjustments that are applicable to future acquisitions),

(xv)    fees, costs and expenses incurred under the Loan Documents and the Medley Credit Documents,

(xvi)   fees, costs and expenses incurred in connection with the settlement of any litigation or claim involving any Loan Party,

(xvii)  the amount of debt discount and debt issuance costs, fees, charges and commissions incurred in connection with any Permitted Indebtedness and fees, premiums and expenses incurred in connection with the prepayment or retirement of existing Indebtedness,

(xviii) cash proceeds of business interruption insurance received by Parent or any of its Subsidiaries,

(xix)   Intentionally omitted, and

(xx)    to the extent not specifically described above, such other expenses, charges or items that are approved by Agent in its reasonable discretion,

in each case determined on a consolidated basis in accordance with GAAP.

For the purposes of calculating EBITDA for any period of measurement (each, a "Reference Period"), if at any time during such Reference Period (and after the Closing Date), Parent or any of its Subsidiaries shall have made a Permitted Acquisition or a Permitted Disposition, EBITDA for such Reference Period shall be calculated after giving pro forma effect thereto, assuming the consummation of such Permitted Acquisition or Permitted Disposition and the incurrence or assumption of any Indebtedness permitted to be incurred or assumed and the repayment or refinancing of any Indebtedness to be repaid or refinanced, as the case may be, in connection therewith had occurred on the first day of such Reference Period, including pro forma adjustments arising out of events which are directly attributable to such Permitted Acquisition (and to the extent such adjustments include purchasing synergies, such synergies shall be reasonably believed by Parent and its Subsidiaries to be reasonably likely to be realized within 12 months of the date of the closing of the

proposed acquisition, shall be reasonably computed and shall be certified in writing by a responsible officer of Borrower), are factually supportable, and are expected to have a continuing impact, in each case, determined on a basis consistent with Article 11 of Regulation S-X promulgated under the Securities Act and as interpreted by the staff of the SEC, or in such other manner reasonably acceptable to Agent.

"Eligible Accounts" means those Accounts created by any Loan Party in the ordinary course of its business, that (i) are bona fide existing payment obligations of the applicable Account Debtor created by the sale and delivery of Inventory or the rendition of services by a Loan Party to such Account Debtor in the ordinary course of such Loan Party's business, (ii) are owed to a Loan Party without any known defenses, disputes, offsets, counterclaims, or rights of return or cancellation, (iii) comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and (iv) are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination performed by (or on behalf of) Agent from time to time after the Closing Date.  In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits, unapplied cash, taxes, discounts, credits, allowances, and rebates.  Eligible Accounts shall not include the following:

(a)  Accounts that the Account Debtor has failed to pay (i) within 90 days of original invoice date or (ii) within 60 days of the original stated due date therefor (assuming that such Account is due to be paid within 30 days of the original date thereof),

(b)  Accounts owed by an Account Debtor (or its Affiliates) where more than 50% of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

(c)  Accounts with respect to which the Account Debtor is an Affiliate of Borrower or an employee or agent thereof, including any Subsidiary of Borrower or a Loan Party,

(d)  Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, progress billing, or any other terms by reason of which the payment by the Account Debtor may be conditional,

(e)  Accounts that are not payable in Dollars,

(f)  Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States or Canada (excluding the Province of Quebec), or (ii) is not organized under the laws of the United States or any state thereof or Canada (excluding the Province of Quebec), or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (A) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Agent (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Agent and is directly drawable by Agent, or (B) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Agent, or (C) the Account is guaranteed pursuant to an approved working capital guarantee from the Export-Import Bank of the United States in favor of Agent and reasonably acceptable to Agent in all respects,

(g)  Accounts with respect to which the Account Debtor is either (i) the United States or any department, agency, or instrumentality of the United States, or (ii) any state of the United States, in each case, exclusive, however, of (x) Accounts with respect to which Borrower has complied, to the reasonable satisfaction of Agent, with the Assignment of Claims Act, 31 USC §3727 and (y) Accounts with respect to

which the Account Debtor is the Nevada Department of Transportation or the Massachusetts Department of Transportation,

(h)  Accounts with respect to which the Account Debtor is a creditor of Borrower, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, but solely to the extent of such claim, right of recoupment or setoff, or dispute,

(i)  Accounts owed by (A) an Account Debtor (other than the City of Chicago, Illinois, or any governmental agency or subdivision thereof) to the extent that the aggregate amount of Eligible Accounts owed to Borrower and its Subsidiaries by such Account Debtor exceeds 15% of the aggregate amount of all Eligible Accounts of all Account Debtors, but solely to the extent of the amount of such excess, and (B) the City of Chicago, Illinois (or any governmental agency or subdivision thereof) to the extent that the aggregate amount of Eligible Accounts owed to Borrower and its Subsidiaries by such Account Debtor exceeds 30% of the aggregate amount of all Eligible Accounts of all Account Debtors, but solely to the extent of the amount of such excess; provided, that, in each case, the amount of Eligible Accounts that are excluded under clause (A) or (B) above shall be determined by Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limits,

(j)  Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(k)  Accounts, the collection of which, Agent, in its Permitted Discretion, believes to be doubtful, or otherwise are of poor quality, including by reason of the Account Debtor's financial condition,

(l)  Accounts that are not subject to a valid and perfected first priority Lien (subject to Permitted Priority Liens) in favor of Agent, free and clear of any other Liens (other than Permitted Eligible Asset Liens and the Permitted Lien of Agent and any Affiliate of Agent that is a Bank Product Provider pursuant to clause (n) of the definition of Permitted Liens),

(m)  Accounts with respect to which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor,

(n)  Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity,

(o)  Accounts representing credit card sales or "C.O.D." sales, or

(p)  Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by a Loan Party of the subject contract for goods or services.

"Eligible Inventory" means Inventory (including Eligible Scrap Inventory and Eligible Spare Parts Inventory) of a Loan Party that consists of vehicle parts and vehicles (other than Rolling Stock) acquired in the ordinary course of business, that complies with each of the representations and warranties respecting Eligible Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination or appraisal performed by Agent from time to time after the Closing Date.  In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with Borrower's historical

accounting practices (subject to <u>Section 1.2</u> of the Agreement).  An item of Inventory shall not be included in Eligible Inventory if:

(a)  a Loan Party does not have good, valid, and marketable title thereto (other than with respect to Eligible Scrap Inventory),

(b)  a Loan Party does not have actual and exclusive possession thereof (either directly or through a bailee, landlord, warehouseman or agent thereof),

(c)  it is not located at one of the locations in the continental United States set forth on <u>Schedule E-1</u> to the Agreement (or in-transit from one such location to another such location),

(d)  it is in-transit to or from a location of a Loan Party (other than in-transit from one location set forth on <u>Schedule E-1</u> to the Agreement to another location set forth on <u>Schedule E-1</u> to the Agreement), unless it is subject to a Collateral Access Agreement executed by the carrier of such Inventory,

(e)  it is located on real property leased by a Loan Party or in a contract warehouse, in each case, unless it is subject to a Collateral Access Agreement executed by the lessor or warehouseman, as the case may be, and unless it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises, <u>provided</u>, that, with respect to any Inventory that is not otherwise ineligible pursuant to clauses (a) through (d) and clauses (f) through (p) hereof that is located on real property leased by any Loan Party that is not subject to a Collateral Access Agreement, such Inventory may be included as Eligible Inventory hereunder at any time during the period beginning on the Closing Date and ending forty five (45) days after the Closing Date,

(f)  it is the subject of a bill of lading or other document of title,

(g)  it is not subject to a valid and perfected first priority Lien (subject to Permitted Priority Liens) in favor of Agent, free and clear of any other Liens (other than Permitted Eligible Asset Liens and the Permitted Liens of Agent and any Affiliate of Agent that is a Bank Product Provider pursuant to clause (n) of the definition of Permitted Liens) (other than with respect to Eligible Scrap Inventory),

(h)  it consists of goods returned or rejected by a Loan Party's customers,

(i)  it consists of (x) goods that are perishable, obsolete or slow moving, restrictive or custom items, work-in-process, raw materials, or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in Borrower's business, bill and hold goods, damaged goods, defective goods, contaminated goods, discontinued goods, "seconds," in each case, other than Eligible Spare Parts Inventory or (y) Inventory acquired on consignment,

(j)  it consists of goods that are restricted or controlled, or regulated items,

(k)  it consists of goods that are fabricated parts,

(l)  it is stored at locations holding less than 10% of the aggregate value of all Inventory of the Loan Parties,

(m)  it is subject to third party trademark, licensing or other proprietary rights, unless Agent is reasonably satisfied that such Inventory can be freely sold by Agent on and after the occurrence of an Event of a Default despite such third party rights,

(n)  it consists of customer-specific Inventory not supported by purchase orders (other than with respect to Eligible Scrap Inventory),

(o)  it is not insured as required by this Agreement (other than with respect to Eligible Scrap Inventory), or

(p)  it is otherwise deemed ineligible by the Agent in its Permitted Discretion.

"Eligible Rolling Stock" means Rolling Stock of a Loan Party that complies with each of the representations and warranties respecting Eligible Rolling Stock made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination or appraisal performed by Agent from time to time after the Closing Date.  An item of Rolling Stock shall not be included in Eligible Rolling Stock if:

(a)  a Loan Party does not have good, valid, and marketable title thereto;

(b)  it is not subject to a valid and perfected first priority Lien (subject to Permitted Priority Liens) in favor of Agent, free and clear of any other Liens (other than Permitted Eligible Asset Liens and the Permitted Liens of Agent and any Affiliate of Agent that is a Bank Product Provider pursuant to clause (n) of the definition thereof));

(c)  it is located outside the United States of America or Canada;

(d)  it is worn out or obsolete, not used or usable in the ordinary course of the Loan Parties' business, or is damaged or in inoperable condition and such condition continues for any period of more than thirty (30) consecutive days;

(e)  it does not meet, in all material respects, all applicable safety or regulatory standards applicable to it for the use for which it is intended or for which it is being used;

(f)  it is on lease or rented to any other Person or otherwise being primarily used by any Person other than a Loan Party;

(g)  the ownership of which is not evidenced by a certificate of title that has the name of a Loan Party noted thereon as the owner of it (noting the Agent as first lien holder with respect to such motor vehicle) or is not otherwise properly registered in one of the states of the United States to a Loan Party in the state that has issued such certificate of title in accordance with all applicable laws; provided, that, with respect to any Rolling Stock that is not otherwise ineligible pursuant to clauses (a), (b)(except to the extent due to the Agent not being noted as first Lien holder in the applicable certificate of title), (c) through (f), and clauses (h) through (j) of this definition but the Agent has not been noted as first Lien holder on the certificate of title of such motor vehicle, such Rolling Stock may be included as Eligible Rolling Stock hereunder at any time during the period beginning on the Closing Date and ending forty five (45) days after the Closing Date;

(h)  if it does not meet, in all material respects, all applicable standards of all motor vehicle laws or other statutes and regulations established by any Governmental Authority or is subject to any licensing or similar requirement that would limit the right of the Agent to sell or otherwise dispose of such Rolling Stock;

(i)  it is not insured as required by this Agreement; or

(j)       it is otherwise deemed ineligible by the Agent in its Permitted Discretion.

"Eligible Rolling Stock Advance Rate" means, as to Appraised Eligible Rolling Stock, 75%.

"Eligible Scrap Inventory" means scrap Inventory that consists of unclaimed, abandoned, seized motor vehicles or parts thereof held for sale by a Loan Party in which such Loan Party has rights to proceeds of the sale of such scrap Inventory, that complies with each of the representations and warranties respecting Eligible Scrap Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of "Eligible Inventory".  An item of scrap Inventory shall also not be included in Eligible Scrap Inventory if the claims of a Loan Party therein and the proceeds and products of such claims are not subject to a valid and perfected first priority Lien in favor of Agent (subject to Permitted Priority Liens), free and clear of any other Liens (other than Permitted Eligible Asset Liens and the Permitted Lien of Agent and any Affiliate of Agent that is a Bank Product Provider pursuant to clause (n) of the definition thereof).

"Eligible Spare Parts Inventory" means Inventory that consists of spare parts of a Loan Party held to use for Equipment or of a type and quality viable in the repair of Equipment, valued at the net book value thereof, that complies in all material respects with each of the representations and warranties respecting Eligible Spare Parts Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of "Eligible Inventory".

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (a) that is sponsored, maintained or contributed to by any Loan Party or ERISA Affiliate or (b) to which any Loan Party or ERISA Affiliate would have, or would reasonably be expected to have, any liability, contingent or otherwise.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any assets, properties, or businesses of any Borrower, any Subsidiary of a Borrower, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by any Borrower, any Subsidiary of a Borrower, or any of their predecessors in interest.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on Parent or its Subsidiaries, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code).

"Equity Interest" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statutes, and all regulations and guidance promulgated thereunder. Any reference to a specific section of ERISA shall be deemed to be a reference to such section of ERISA and any successor statutes, and all regulations and guidance promulgated thereunder.

"ERISA Affiliate" means each entity, trade or business (whether or not incorporated) that together with a Loan Party or a Subsidiary would be treated as a "single employer" within the meaning of section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of section 414 of the IRC.

"Event of Default" has the meaning specified therefor in Section 8 of the Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Assets" has the meaning specified therefor in the Guaranty and Security Agreement.

"Excluded Taxes" means (i) any tax imposed on the net income or net profits of any Lender or any Participant (including any franchise and branch profits taxes), in each case imposed (A) by the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender or such Participant is organized or the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender's or such Participant's principal office (or, in the case of any Lender, its applicable lending office) is located or (B) as a result of a present or former connection between such Lender or such Participant and the jurisdiction or taxing authority imposing the tax (other than any such connection arising solely from such Lender or such Participant having executed, delivered or performed its obligations or received payment under, or enforced its rights or remedies under the Agreement or any other Loan Document); (ii) taxes resulting from a Lender's or a Participant's failure to comply with the requirements of Section 16.2 of the Agreement, (iii) any United States federal withholding Taxes that would be imposed on amounts payable to or for the account of a Foreign Lender or Participant based upon the applicable withholding rate in effect at the time such Foreign Lender or Participant becomes a party to the Agreement (or designates a new lending office), except to the extent of (A) any amount that the assignor of a Foreign Lender was previously entitled to receive pursuant to Section 16.1 of the Agreement, if any, with respect to such withholding tax at the time such assignee becomes a party to the Agreement, (B) any amount that a Foreign Lender was previously entitled to receive pursuant to Section 16.1 of the Agreement, if any, with respect to such withholding tax at the time such Foreign Lender designates a new lending office, and (C) additional United States federal withholding Taxes that may be imposed after the time such Foreign Lender becomes a party to the Agreement (or designates a new lending office), as a result of a change in law, rule, regulation, order or other decision with respect to any of the foregoing by any Governmental Authority, and (iv) any United States federal withholding Taxes imposed under FATCA.

"Existing Bank Products" means those Bank Products described on Schedule 1.01(a) hereto.

"Existing Credit Agreement" has the meaning set forth in the Recitals hereto.

"Existing Guaranty" means that certain Guaranty and Security Agreement dated as of August 21, 2014 made by the Guarantors (as defined in the Existing Credit Agreement) in favor of the Prepetition Agent and the other Existing Loan Parties under the Existing Credit Agreement, as the same now exists or may hereafter be amended, modified, supplemented, renewed, restated or replaced.

"Existing Letters of Credit" means those letters of credit described on Schedule 1.01(b) hereto.

"Existing Liabilities" means (i) the "Obligations" as defined in the Existing Credit Agreement, (ii) the "Secured Obligations", as defined in the security documents executed and delivered in connection with the Existing Credit Agreement, and (iii) the "Guaranteed Obligations", as defined in the Existing Guaranty.

"Existing Liens" has the meaning set forth in the Recitals hereto.

"Existing Loan Documents" means the "Loan Documents" as defined in the Existing Credit Agreement.

"Existing Loan Parties" means the "Agent", the "Issuing Bank", the "Swing Line Lender" and the other "Credit Parties" under (and as defined in) the Existing Credit Agreement.

"Extraordinary Advances" has the meaning specified therefor in Section 2.3(d)(iii) of the Agreement.

"Extraordinary Receipts" means any payments received in cash by Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.4(e)(ii) of the Agreement) consisting of: (a) so long as no Event of Default has occurred and is continuing, proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim, and (b) if an Event of Default has occurred and is continuing, (i) proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim, (ii) indemnity payments (other than to the extent such indemnity payments are then payable to a Person that is not an Affiliate of Borrower or any of its Subsidiaries), and (iii) any purchase price adjustment (other than a working capital adjustment) received in connection with any purchase agreement governing a Permitted Acquisition; provided, that Extraordinary Receipts shall not include any such payments that are received by Borrower or any of its Subsidiaries as reimbursement for any payment permitted to be made under the Loan Documents and previously made to a Person that is not an Affiliate of Borrower or any of its Subsidiaries.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of the Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the IRC, and any U.S. or non-U.S. fiscal or regulatory legislation, rules, guidance, notes or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the IRC or analogous provisions of non-U.S. law.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means that certain fee letter, dated as of even date with the Agreement, between Borrower and Agent, in form and substance reasonably satisfactory to Agent.

"Final Borrowing Order" means an order of the Bankruptcy Court, which order is a Final Order and shall be in form, scope and substance reasonably acceptable to the Issuing Bank, which, among other matters but not by way of limitation, (i) authorizes the Loan Parties to obtain credit, incur (or guaranty) Obligations, grant Liens under this Agreement, the other Loan Documents and the DIP Orders and otherwise perform their obligations under this Agreement and the other Loan Documents, (ii) provides for the superpriority of the Agent's and Lenders' claims under this Agreement, and (iii) grants the credit parties under the Existing Credit Agreement adequate protection of their interests as further set forth therein.

"Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Final Order Date" means the date of the entry of the Final Borrowing Order.

"Financial Advisor" means a financial and/or restructuring consultant or consulting firm reasonably satisfactory to the Agent to provide services on terms reasonably satisfactory to the Agent until the obligations under the Existing Credit Agreement and the this Credit Agreement and the other Loan Documents, respectively, have been repaid in full and all Revolving Commitments thereunder terminated. The Agent acknowledges that Getzler Henrich & Associates LLC, and Mark Samson, a principal thereof, is satisfactory to Agent and the Lenders.

"Foreign Lender" means any Lender or Participant that is not a United States person within the meaning of IRC section 7701(a)(30).

"Funding Date" means the date on which a Borrowing occurs.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational documents of such Person.

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" means (a) Parent, (b) each Subsidiary of Borrower and (c) each other Person that becomes a Guarantor after the Closing Date pursuant to Section 5.11 of the Agreement.

"Guaranty and Security Agreement" means a guaranty and security agreement, dated as of even date with the Agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by Borrower and each of the Guarantors to Agent.

"Hard Costs" shall mean, with respect to the purchase by any Loan Party of an item of Eligible Rolling Stock, the net cash amount actually paid to acquire title to such item, net of all incentives, trade in allowances, discounts and rebates, and exclusive of freight, delivery charges, installation costs and charges, software costs, charges and fees, warranty costs, taxes, insurance and other incidental costs or expenses and all indirect costs or expenses of any kind.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Hedge Agreement" means a "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"Hedge Obligations" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of Parent or its Subsidiaries arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Hedge Providers.

"Hedge Provider" means Wells Fargo or any of its Affiliates.

"I-Banker" means an investment banker or similar professional firm reasonably satisfactory to the Agent for the purpose of soliciting interest in the Loan Parties' assets and/or businesses, whether for sale or investment, with such services to be provided on terms reasonably satisfactory to the Agent until the obligations under the Existing Credit Agreement and the this Credit Agreement and the other Loan Documents, respectively, have been repaid in full and all Revolving Commitments thereunder terminated. The Agent acknowledges that SSG Advisors LLC is satisfactory to Agent and the Lenders.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases, (d) all obligations or liabilities exclusively of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed (but limited to the lesser of fair market value of such assets and the outstanding principal amount of the Indebtedness secured thereby), (e) all obligations of such Person to pay the deferred purchase price of assets (including royalty payments payable in the ordinary course of business in respect of non-exclusive licenses, but excluding (i) trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practice, and (ii) accrued expenses and other accrued obligations in the ordinary course of business and not overdue), (f) all monetary obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Disqualified Equity Interests of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying

such Indebtedness, (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation, and (iii) the following shall not constitute "Indebtedness": (1) intercompany Indebtedness among Loan Parties and their Subsidiaries, (2) deferred management, management, consulting, monitoring, advisory and transaction fees that are not permitted to be paid in accordance with <u>Section 6.10</u> of the Agreement, (3) deferred or prepaid revenue, (4) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the applicable seller thereof, (5) deferred compensation under agreements with officers, directors and employees entered into in the ordinary course of business and permitted under <u>Section 6.10</u> hereof, (6) any obligations in respect of preferred Equity Interests (other than Disqualified Equity Interests), and (7) any portion of any earn-out or other contingent consideration that is not due and owing and required to be paid.

"<u>Indemnified Liabilities</u>" has the meaning specified therefor in <u>Section 10.3</u> of the Agreement.

"<u>Indemnified Person</u>" has the meaning specified therefor in <u>Section 10.3</u> of the Agreement.

"<u>Indemnified Taxes</u>" means, any Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower or any other Loan Party under any Loan Document.

"<u>Insolvency Proceeding</u>" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"<u>Intercreditor Agreement</u>" means that certain Intercreditor Agreement, dated as of August 21, 2014, by and among the Agent and Second Lien Agent (as defined thereunder), as acknowledged by the Borrowers and the Guarantors party to the Existing Credit Agreement, as amended, modified, restated, extended, renewed, replaced or supplemented in accordance with the terms of the Intercreditor Agreement and the Existing Credit Agreement and in effect from time to time.

"<u>Interest Expense</u>" means, for any period, the aggregate of the interest expense of Parent and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"<u>Interim Borrowing Order</u>" means an order entered by the Bankruptcy Court, in form and substance reasonably satisfactory to Agent and Lenders, approving, on an interim basis, the Loan Parties' obtaining credit and incurring (or guarantying) Obligations, granting Liens to secure the Obligations, approving the Interim Roll-Up, subject to the terms thereof, approving the payment by the Borrower of the fees and other amounts contemplated by this Agreement, and providing for the superpriority of the Agent's and Lenders' claims and granting the credit parties under the Existing Credit Agreement adequate protection of their interests (as provided therein), and entering into and performing their obligations under this Agreement and the other Loan Documents, as further set forth herein, which order shall not have been vacated, reversed, modified, amended or stayed.

"<u>Interim Order Date</u>" has the meaning set forth in the Recitals hereto.

"<u>Interim Order Period</u>" means the period of time from the time at which the Bankruptcy Court enters the Interim Borrowing Order until the time at which the Bankruptcy Court enters the Final Borrowing Order.

"<u>Interim Roll-Up</u>" has the meaning set forth in the Interim Borrowing Order.

"Inventory" means inventory (as that term is defined in the Code).

"Inventory Reserves" means, as of any date of determination and without duplication, (a) Landlord Reserves, and (b) those Reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c) of the Agreement, to establish (including reserves for slow moving Inventory and Inventory shrinkage) with respect to Eligible Inventory or the Maximum Revolver Amount.

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* accounts receivable arising in the ordinary course of business), or acquisitions of Indebtedness, Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment, but giving effect to any repayments, interest, returns, profits, dividends, distributions, proceeds, fees, income and other amounts received or realized in respect of such Investment and determined without regard to any write-downs or write-offs of any investments, loans or advances in connection therewith.

"IRC" means the Internal Revenue Code of 1986, as amended, and any successor statutes, and all regulations and guidance promulgated thereunder. Any reference to a specific section of the IRC shall be deemed to be a reference to such section of the IRC and any successor statutes, and all regulations and guidance promulgated thereunder.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Document" means, with respect to any Letter of Credit, a letter of credit application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by Borrower in favor of Issuing Bank and relating to such Letter of Credit.

"Issuing Bank" means Wells Fargo.

"Landlord Reserve" means, as to each location at which Borrower has Inventory (other than Inventory described in the proviso set forth in clause (e) of the definition of "Eligible Inventory") or books and records located and as to which a Collateral Access Agreement has not been received by Agent (at any time after the day that is forty five (45) days after the Closing Date), a reserve that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c) of the Agreement, to establish in an amount not to exceed the aggregate amount of rent payable for three months under the lease for such location.

"Lender" has the meaning set forth in the preamble to the Agreement, shall include Issuing Bank, and shall also include any other Person made a party to the Agreement pursuant to the provisions of Section 13.1 of the Agreement and "Lenders" means each of the Lenders or any one or more of them.

"Lender Group" means each of the Lenders (including Issuing Bank) and Agent, or any one or more of them.

"Lender Group Expenses" means all (a) costs or expenses (including taxes and insurance premiums) required to be paid by any Loan Party under any of the Loan Documents that are paid, advanced, or incurred

by the Lender Group, (b) reasonable and documented out-of-pocket fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with any Loan Party under any of the Loan Documents, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Loan Party, (d) Agent's customary out-of-pocket fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Agent resulting from the dishonor of checks payable by or to any Loan Party, (f) reasonable documented out-of-pocket costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (g) field examination and appraisal fees and expenses of Agent incurred in connection with any field examinations and appraisals, to the extent payable by Borrower pursuant to and in accordance with <u>Section 2.10</u> of the Agreement, (h) Agent's reasonable and documented out-of-pocket fees, costs and expenses (including reasonable and documented attorneys' fees expenses) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, Agent's Liens in and to the Collateral, or the Lender Group's relationship with any Loan Party, (i) Agent's reasonable and documented out-of-pocket fees, costs and expenses (including reasonable and documented attorneys' fees and due diligence expenses) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), syndicating (CUSIP, DXSyndicate™, SyndTrak or other communication costs incurred in connection with a syndication of the loan facilities), or amending, waiving, or modifying the Loan Documents, and (j) Agent's and each Lender's reasonable and documented out-of-pocket fees, costs and expenses (including reasonable and documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Loan Party or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any enforcement action or any Remedial Action with respect to the Collateral; <u>provided</u> that, notwithstanding the foregoing, in no event shall Borrower or any other Loan Party or any of their respective Subsidiaries or Affiliates be liable in respect of legal fees, costs or expenses in excess of the reasonable and documented out-of-pocket fees and expenses of one outside legal counsel to the Lender Group and, to the extent necessary, one local counsel in each relevant jurisdiction and one regulatory counsel (if reasonably required) for the Lender Group (but excluding the allocated costs of in-house or internal counsel to any member of the Lender Group), and, in the case of an actual or perceived conflict of interest where such member of the Lender Group affected by such conflict informs Borrower of such conflict and thereafter retains its own counsel, another firm of counsel for such affected member of the Lender Group.

"<u>Lender Group Representatives</u>" has the meaning specified therefor in <u>Section 17.9</u> of the Agreement.

"<u>Lender-Related Person</u>" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"<u>Letter of Credit</u>" means a letter of credit (as that term is defined in the Code) issued by Issuing Bank.

"<u>Letter of Credit Collateralization</u>" means any of the following with respect to an issued and outstanding Letter of Credit: (a) providing cash collateral (pursuant to documentation reasonably satisfactory to Agent, including provisions that specify that such Letter of Credit Fees and all commissions, fees, charges

and expenses provided for in <u>Section 2.11(k)</u> of the Agreement (including any fronting fees) will continue to accrue while the Letters of Credit are outstanding) to be held by Agent for the benefit of the Revolving Lenders in an amount equal to 105% of the then outstanding Letter of Credit Usage, (b) delivering to Agent documentation executed by the beneficiary under such Letter of Credit, in form and substance reasonably satisfactory to Agent and Issuing Bank, terminating all of such beneficiary's rights under such Letter of Credit or otherwise causing such Letter of Credit to be returned to Issuing Bank, or (c) providing Agent with a standby letter of credit, in form and substance reasonably satisfactory to Agent, from a commercial bank acceptable to Agent (in its Permitted Discretion) in an amount equal to 105% of the then outstanding Letter of Credit Usage (it being understood that the Letter of Credit Fee and all fronting fees set forth in the Agreement will continue to accrue while the Letters of Credit are outstanding and that any such fees that accrue must be an amount that can be drawn under any such standby letter of credit).

"<u>Letter of Credit Disbursement</u>" means a payment made by Issuing Bank pursuant to a Letter of Credit.

"<u>Letter of Credit Exposure</u>" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Letter of Credit Usage on such date.

"<u>Letter of Credit Fee</u>" has the meaning specified therefor in <u>Section 2.6(b)</u> of the Agreement.

"<u>Letter of Credit Indemnified Costs</u>" has the meaning specified therefor in <u>Section 2.11(f)</u> of the Agreement.

"<u>Letter of Credit Related Person</u>" has the meaning specified therefor in <u>Section 2.11(f)</u> of the Agreement.

"<u>Letter of Credit Usage</u>" means, as of any date of determination, the aggregate undrawn face amount of all issued and outstanding Letters of Credit.

"<u>LIBOR Rate</u>" means an interest rate equal to the Daily Three Month LIBOR, which interest rate shall change whenever the Daily Three Month LIBOR changes.

"<u>LIBOR Rate Loan</u>" means a Revolving Loan that bears interest at a rate determined by reference to the LIBOR Rate.

"<u>LIBOR Rate Margin</u>" has the meaning set forth in the definition of Applicable Margin.

"<u>Lien</u>" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"<u>Loan</u>" shall mean any Revolving Loan or Extraordinary Advance made hereunder.

"<u>Loan Account</u>" has the meaning specified therefor in <u>Section 2.9</u> of the Agreement.

"<u>Loan Documents</u>" means the Agreement, the Control Agreements, the Copyright Security Agreement, any Borrowing Base Certificate, the Fee Letter, the Guaranty and Security Agreement, any Issuer Documents, the Letters of Credit, the Mortgages (if any), the Patent Security Agreement, the Trademark

Security Agreement, any note or notes executed by Borrower in connection with the Agreement and payable to any member of the Lender Group, and any other instrument or agreement entered into, now or in the future, by any Loan Party and any member of the Lender Group in connection with the Agreement.

"Loan Management Service" means Wells Fargo's proprietary automated loan management program currently known as "Loan Manager" and any successor service or product of Wells Fargo which performs similar services.

"Loan Party" means Borrower or any Guarantor.

"Margin Stock" as defined in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" means (a) a material adverse effect in the business, operations, results of operations, assets, liabilities or financial condition of Parent and its Subsidiaries, taken as a whole, (b) a material impairment of Parent's and its Subsidiaries ability to perform their obligations under the Loan Documents to which they are parties or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral (other than as a result of an action taken or not taken by Agent or any Lender), or (c) a material impairment of the enforceability or priority of Agent's Liens with respect to all or a material portion of the Collateral (other than as a result of an action taken or not taken by Agent or any Lender). Notwithstanding anything herein to the contrary, the Bankruptcy Events, collectively, shall not in and of themselves constitute a Material Adverse Effect.

"Material Contract" means, with respect to any Person, (a) each written contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $250,000 or more during any fiscal year (other than purchase orders in the ordinary course of the business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the ordinary course of its business upon less than 60 days' notice without penalty or premium), and (b) all other written contracts or agreements to which a Loan Party is a party, the loss of which would reasonably be expected to result in a Material Adverse Effect, but excluding the Loan Documents, and the Medley Credit Documents.

"Maturity Date" means April 28, 2017.

"Maximum Revolver Amount" means $35,250,000 as of the Closing Date, as such amount may be decreased by the amount of reductions in the Revolver Commitments made in accordance with Section 2.4(c) of the Agreement.

"Medley" means Medley Capital Corporation.

"Medley Affiliated Entity" means Medley or any of its Affiliates (other than Loan Parties or their Subsidiaries and other than operating portfolio companies of Medley and its Affiliates).

"Medley Credit Agreement" means that certain Second Lien Credit Agreement, dated as of the date hereof, by and among Medley, the Medley Lenders, Parent and Borrower.

"Medley Credit Documents" means the "Loan Documents" (as such term is defined in the Medley Credit Agreement).

"Medley Indebtedness" means the Indebtedness due and owing to Second Lien Agent and the other Medley Lenders under and pursuant to the Medley Credit Documents.

"Medley Lenders" means Second Lien Agent and such other Persons which are lenders pursuant to the Medley Credit Agreement.

"Medley Participant" means Medley Capital Corporation, in its capacity as the Participant under the Medley Participation Agreement.

"Medley Participation Agreement" means that certain Participation Agreement dated as of the August 21, 2014, as amended and in effect from time to time, by and among the Agent, Wells Fargo as a Lender, Medley and the Borrower with respect to any Specified Revolving Loan.

"Moody's" has the meaning specified therefor in the definition of Cash Equivalents.

"Mortgages" means, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by any Loan Party in favor of Agent, in form and substance reasonably satisfactory to Agent, that encumber the Real Property Collateral.

"Multiemployer Plan" means any "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA with respect to which any Loan Party or ERISA Affiliate has an obligation to contribute or has any liability, contingent or otherwise or would be assessed withdrawal liability assuming a complete withdrawal from any such multiemployer plan.

"Net Unfinanced Capital Expenditures" means, with respect to any fiscal period and with respect to Parent determined on a consolidated basis in accordance with GAAP, all Capital Expenditures made during such fiscal period, *minus* the portion of all such Capital Expenditures that (i) is financed with the proceeds of Capitalized Lease Obligations or other Indebtedness (other than Revolving Loans) or (ii) constitutes capitalized Interest Expense.

"Net Cash Proceeds" means:

(a)  with respect to any Permitted Disposition of the type described in clauses (g), (h), (o), (q) or (r) of the definition of "Permitted Dispositions", the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of any Loan Party in connection therewith, after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset subject to such Permitted Disposition (other than (A) Indebtedness owing to Agent or any Lender under the Agreement the other Loan Documents, or the Existing Loan Documents, (B) the Medley Indebtedness and (C) Indebtedness assumed by the purchaser of such asset) which is repaid in connection with such Permitted Disposition, (ii) reasonable fees, commissions, and expenses (including reasonable broker's fees or commissions, investment banking fees, accounting fees and legal fees) related thereto and paid or payable by such Loan Party in connection with such Permitted Disposition, (iii) taxes paid or payable to any taxing authorities by such Loan Party in connection with such Permitted Disposition, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of a Loan Party, and are properly attributable to such transaction, and (iv) all amounts that are set aside as a reserve (A) for adjustments in respect of the purchase price of such assets, (B) for any liabilities associated with such Permitted Disposition, to the extent such reserve is required by GAAP, and (C) except to the extent payment is excused by operation of the Bankruptcy Code or order of the Bankruptcy Court, for the payment of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 30 days after, the date of such Permitted Disposition, to the extent that in each case the funds described above in this clause (iv) are (x) deposited into escrow with a third party escrow agent or set aside in a separate Deposit Account that is subject to a Control Agreement in favor of Agent and (y) to the extent required by Section 2.4(e)(ii) of the Agreement, paid to Agent as a prepayment of the applicable Obligations and/or Existing Liabilities, as

applicable, in accordance therewith at such time when such amounts are no longer required to be set aside as such a reserve; and

(b)   with respect to the issuance or incurrence of any Indebtedness by any Loan Party or the issuance by any Loan Party of any Equity Interests, the aggregate amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of Parent or such Subsidiary in connection with such issuance or incurrence, after deducting therefrom only (i) reasonable fees, commissions, and expenses (including underwriting discounts and reasonable broker's fees or commissions, investment banking fees, accounting fees and legal fees) related thereto and paid or payable by such Loan Party in connection with such issuance or incurrence, and (ii) taxes paid or payable to any taxing authorities by such Loan Party in connection with such issuance or incurrence, in each case, to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of a Loan Party, and are properly attributable to such transaction.

"Net Orderly Liquidation Value" means with respect to Rolling Stock of any Person, a professional opinion of an appraiser selected or reasonably approved by Agent of the probable Net Cash Proceeds that could be realized at a properly advertised and professionally conducted liquidation sale, conducted under orderly sale conditions for an extended period of time (as determined by such appraiser and approved by Agent), under the economic trends currently existing at the time of the appraisal, which appraisal shall be in form, scope and methodology reasonably acceptable to Agent.

"Non-Consenting Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Notification Event" means (a) the occurrence of a "reportable event" described in Section 4043(c) of ERISA for which the 30-day notice requirement has not been waived by applicable regulations issued by the PBGC, (b) the withdrawal of any Loan Party or ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the termination of a Pension Plan, the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination, under Section 4041 of ERISA, if the plan assets are not sufficient to pay all plan liabilities, (d) the institution of proceedings to terminate, or the appointment of a trustee with respect to, any Pension Plan by the PBGC or any Pension Plan or Multiemployer Plan administrator, (e) any other event or condition that would constitute grounds under Section 4042(a) of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (f) the imposition of a Lien pursuant to the IRC or ERISA in connection with any Employee Benefit Plan or the existence of any facts or circumstances that would reasonably be expected to result in the imposition of such a Lien, (g) the partial or complete withdrawal of any Loan Party or ERISA Affiliate from a Multiemployer Plan (other than any withdrawal that would not constitute an Event of Default under Section 8.12), (h) any event or condition that results in the reorganization or insolvency of a Multiemployer Plan under Sections 4241 or 4245 of ERISA, (i) any event or condition that results in the termination of a Multiemployer Plan under Section 4041A of ERISA or the institution by the PBGC of proceedings to terminate or to appoint a trustee to administer a Multiemployer Plan under ERISA, (j) any Pension Plan being in "at risk status" within the meaning of IRC Section 430(i), (k) the determination that any Multiemployer Plan is or is expected to be insolvent or in reorganization within the meaning of Title IV of ERISA, (l) with respect to any Pension Plan, any Loan Party or ERISA Affiliate incurring a substantial cessation of operations within the meaning of ERISA Section 4062(e), (m) the failure of any Pension Plan or Multiemployer Plan to meet the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA), in each case, whether or not waived, (n) the filing of an application for a waiver of the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA) with respect to any Pension

Plan, (o) the failure to make by its due date a required payment or contribution with respect to any Pension Plan or Multiemployer Plan, or (p) any event that results in or would reasonably be expected to result in a material liability by a Loan Party pursuant to Title I of ERISA or the excise tax provisions of the IRC relating to Employee Benefit Plans or any event that results in or would reasonably be expected to result in a liability to any Loan Party or ERISA Affiliate pursuant to Title IV of ERISA or Section 401(a)(29) of the IRC.

"Obligations" means (a) all loans (including the Revolving Loans (inclusive of Extraordinary Advances)), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), reimbursement or indemnification obligations with respect to Letters of Credit (irrespective of whether contingent), premiums, liabilities (including all amounts charged to the Loan Account pursuant to the Agreement), obligations (including indemnification obligations), fees (including the fees provided for in the Fee Letter), Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), guaranties, and all covenants and duties of any other kind and description owing by any Loan Party to any member of the Lender Group arising out of, under, pursuant to, in connection with, or evidenced by the Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Borrower is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, and (b) all Bank Product Obligations. Without limiting the generality of the foregoing, the Obligations of Borrower under the Loan Documents include the obligation to pay to the Lender Group (i) the principal of the Revolving Loans, (ii) interest accrued on the Revolving Loans, (iii) the amount necessary to reimburse Issuing Bank for amounts paid or payable pursuant to Letters of Credit, (iv) Letter of Credit commissions, fees (including fronting fees) and charges, (v) Lender Group Expenses, (vi) fees payable under the Agreement or any of the other Loan Documents, and (vii) indemnities and other amounts payable by any Loan Party under any Loan Document. Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Originating Lender" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Other Connection Taxes" means, with respect to any Lender or Participant, Taxes imposed as a result of a present or former connection between such Lender or such Participant and the jurisdiction or taxing authority imposing the Tax (other than any such connection arising solely from such Lender or such Participant having executed, delivered or performed its obligations or received payment under, or enforced its rights or remedies under the Agreement or any other Loan Document).

"Overadvance" means, as of any date of determination, that the Revolver Usage is greater than any of the limitations set forth in Section 2.1 or Section 2.11.

"Parent" has the meaning specified therefor in the preamble to the Agreement.

"Participant" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Participant Register" has the meaning specified therefor in Section 13.1(e) of the Agreement.

"Patent Security Agreement" has the meaning specified therein in the Guaranty and Security Agreement.

"Patriot Act" has the meaning specified therefor in Section 4.13 of the Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to the provisions of Title IV or Section 302 of ERISA or Sections 412 or 430 of the IRC and in respect of which any Loan Party or any ERISA Affiliate thereof is (or if such Plan were terminated under Section 4069 of ERISA, would be deemed to be) a "contributing sponsor" as defined in Section 4001(a)(13) of ERISA.

"Permitted Acquisition" means any Acquisition so long as:

(i)       no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the proposed acquisition and the proposed acquisition is consensual,

(ii)      no Indebtedness will be incurred or assumed as a result of such Acquisition, other than Permitted Indebtedness, and no Liens will be incurred or assumed as a result of such Acquisition, other than Permitted Liens,

(iii)     Intentionally omitted,

(iv)     Borrower has provided Agent with (A) not later than 10 Business Days prior to the anticipated closing date of the proposed acquisition (or such shorter period as Agent may reasonably agree), written notice of the proposed acquisition, (B) not later than 5 Business Days prior to the anticipated closing date of the proposed acquisition (or such shorter period as Agent may reasonably agree), copies of substantially final drafts of the applicable acquisition agreement and other material documents to be executed and delivered by such acquiring Loan Party in connection with the closing of such proposed acquisition, which agreement and documents shall be in form and substance reasonably acceptable to Agent for any acquisition with aggregate consideration (calculated in accordance with clause (v) below) in excess of $2,500,000, (C) not later than 5 Business Days prior the anticipated closing date of the proposed Acquisition (or such short period as Agent may reasonably agree), its due diligence package relative to the proposed Acquisition, including forecasted balance sheets, profit and loss statements, and cash flow statements of the Person or assets to be acquired, all prepared on a basis consistent with such Person's (or assets') historical financial statements, together with appropriate supporting details and a statement of underlying assumptions for the 1 year period following the date of the proposed Acquisition, on a quarter by quarter basis), in form and substance (including as to scope and underlying assumptions) reasonably satisfactory to Agent, subject to customary non-reliance letters with respect to any third-party diligence reports to the extent required by the provider thereof, and (D) to the extent not previously provided to Agent in accordance with clauses (A) through (C) above, promptly following the consummation of the proposed acquisition, copies of the material definitive acquisition documentation for such acquisition, historical financial statements of the acquired Person or business and any material diligence reports or other results of any material diligence investigation with respect to such acquisition or the Person or business acquired,

(v)      the aggregate purchase consideration (whether paid in cash or by exchange of properties or otherwise and whether payable at or prior to the consummation of such acquisition or deferred for payment at any future time, whether or not any such future payment is subject to the occurrence of any contingency, and includes any and all payments by any Loan Party representing the purchase price and any assumptions of Indebtedness) for all such acquisitions shall not exceed $12,500,000 in the aggregate since the Closing Date; provided that the amount of such consideration shall exclude (1) any consideration paid in the form of Equity Interests issued to the applicable sellers, (2) any cash consideration paid to the applicable seller with the proceeds of the issuance of Equity Interests of Parent and (3) any portion of any earn-out or

other contingent consideration that is not required to be accounted for as a liability on the balance sheet of such Loan Party in accordance with GAAP,

(vi)     Borrower shall have Availability plus Qualified Cash in an amount equal to or greater than $3,000,000 immediately after giving effect to the consummation of the proposed acquisition,

(vii)     the assets being acquired or the Person whose Equity Interests are being acquired did not have negative EBITDA during the 12 consecutive month period most recently concluded prior to the date of the proposed Acquisition;

(viii)     the Person, assets or business to be acquired shall be useful in, or shall be engaged in, the business conducted by the Loan Parties or otherwise ancillary, incidental or reasonably related thereto,

(ix)     the assets being acquired (other than a *de minimis* amount of assets in relation to the assets being acquired) are located within the United States or the Person whose Equity Interests are being acquired is organized in a jurisdiction located within the United States, and

(x)     the subject assets or Equity Interests, as applicable, are being acquired directly by a Loan Party, and, in connection therewith, Borrower or the applicable Loan Party shall have complied with Section 5.11 or 5.12 of the Agreement, as applicable.

For the avoidance of doubt, Inventory, Accounts, or Rolling Stock acquired in a Permitted Acquisition shall not be included in the Borrowing Base, unless and until the Agent has completed or received (A) an appraisal of such Inventory, Accounts, or Rolling Stock, as applicable, from appraisers satisfactory to the Agent and establishes an advance rate and reserves (if applicable) therefor in accordance with Section 2.1(c), and otherwise agrees that such Inventory shall be deemed Eligible Inventory, such Accounts shall be deemed Eligible Accounts, or such Rolling Stock shall be deemed Eligible Rolling Stock, and (B) such other due diligence as the Agent may require, all of the results of the foregoing to be reasonably satisfactory to the Agent.

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Dispositions" means:

(a) sales, abandonment, or other dispositions of assets or other properties that are worn-out, damaged, obsolete or no longer used or useful in the ordinary course of business,

(b) sales of Inventory to buyers in the ordinary course of business,

(c) the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other Loan Documents,

(d) the licensing on a non-exclusive basis of patents, trademarks, copyrights, and other intellectual property rights,

(e) the granting of Permitted Liens,

(f) the sale or discount, in each case without recourse, of Accounts arising in the ordinary course of business, but only in connection with the compromise or collection thereof,

(g) any involuntary loss, damage or destruction of property,

(h) any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(i) the leasing, subleasing, licensing or sublicensing of assets (including Real Property) of any Loan Party in the ordinary course of business,

(j) the sale or issuance of Equity Interests (other than Disqualified Equity Interests) of Parent or any of its Subsidiaries (so long as such issuance will not result in a Change of Control),

(k) the lapse of registered patents, trademarks, copyrights and other intellectual property of any Loan Party to the extent not economically desirable in the conduct of their business or (ii) the abandonment of patents, trademarks, copyrights, or other intellectual property rights to the extent economically desirable in the conduct of their business and so long as such lapse is not materially adverse to the interests of the Lender Group,

(l) the making of Restricted Payments that are expressly permitted to be made pursuant to the Agreement,

(m) the making of Permitted Investments (including Permitted Acquisitions),

(n) the sale, transfer or other disposition of assets (i) from a Loan Party to any other Loan Party and (ii) from any Subsidiary of Parent that is not a Loan Party to any Loan Party or any other Subsidiary of Parent which is not Loan Party,

(o) sales or dispositions of assets not otherwise described in the other clauses of this definition so long as (i) such sale or disposition is made for fair market value and (ii) the aggregate fair market value of all assets disposed of in any fiscal year pursuant to this clause (o) (including the proposed disposition) does not exceed $1,000,000,

(p) the surrender or waiver of contractual rights or the settlement, release or surrender of any contract, test or other litigation claims,

(q) sales, transfers and other dispositions of investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between the joint venture parties set forth in the joint venture arrangements and similar binding arrangements, or

(r) a 363 Sale consummated pursuant to an order approving the Sale Motion.

"Permitted Eligible Asset Lien" means Permitted Liens described in clauses (b), (g), and (s) of the definition thereof.

"Permitted Holder" means Medley and the Medley Affiliated Entities.

"Permitted Indebtedness" means:

(a) Indebtedness evidenced by the Agreement or the other Loan Documents,

(b) Indebtedness set forth on Schedule 4.14 to the Agreement, the Medley Indebtedness and any Refinancing Indebtedness in respect of such Indebtedness,

(c) Permitted Purchase Money Indebtedness and any Refinancing Indebtedness in respect of such Indebtedness,

(d) endorsement of instruments or other payment items for deposit,

(e) Indebtedness consisting of (i) unsecured guarantees incurred in the ordinary course of business with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, completion guarantee and similar obligations, (ii) unsecured guarantees arising with respect to customary indemnification obligations to purchasers in connection with Permitted Dispositions, and (iii) unsecured guarantees with respect to Indebtedness of Parent or one of its Subsidiaries, to the extent that the Person that is obligated under such guaranty could have incurred such underlying Indebtedness,

(f) Indebtedness incurred in the ordinary course of business under performance, surety, statutory, or appeal bonds,

(g) Indebtedness owed to any Person providing, or financing the acquisition of, property, casualty, liability, or other insurance to any Loan Party, so long as the amount of such Indebtedness (excluding financing charges and costs on account of such Indebtedness) is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year,

(h) the incurrence by a Loan Party of Indebtedness under Hedge Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with Parent's and its Subsidiaries' operations and not for speculative purposes,

(i) Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards"), or Cash Management Services,

(j) Intentionally omitted,

(k) Indebtedness consisting of Permitted Investments,

(l) unsecured Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business,

(m) accrual of interest, accretion or amortization of original issue discount, or the payment of interest in kind, in each case, on Indebtedness that otherwise constitutes Permitted Indebtedness,

(n) Acquired Indebtedness in an aggregate outstanding principal amount not to exceed $1,000,000 at any one time,

(o) unsecured Indebtedness owing to sellers of assets or Equity Interests acquired in a Permitted Acquisition, so long as (i) the aggregate principal amount for all such unsecured Indebtedness does not exceed $1,000,000 at any one time outstanding, (ii) is subordinated in right of payment to the Obligations and Existing Liabilities on terms and conditions acceptable to Agent, in its exclusive discretion, and (iii) is otherwise on terms and conditions (including all economic terms and the absence of covenants) acceptable to Agent, in its exclusive discretion,

(p)  contingent liabilities in respect of any indemnification obligation, adjustment of purchase price, non-compete, or similar obligation of any Loan Party incurred in connection with the consummation of any Permitted Acquisition,

(q)  Indebtedness incurred in connection with Permitted Intercompany Advances,

(r)  unsecured Indebtedness in respect of earn-out obligations or other contingent consideration owing to sellers of assets or Equity Interests acquired in a Permitted Acquisition, so long as either (i) the aggregate principal amount for all such unsecured Indebtedness does not exceed $1,500,000 at any one time outstanding (valued in accordance with clause (v) of the definition of "Permitted Acquisition") or (ii) no cash payments in respect of such Indebtedness are made or required to be made until after the Maturity Date,

(s)  any other unsecured Indebtedness incurred by a Loan Party not for borrowed money in an aggregate outstanding principal amount not to exceed $2,000,000 at any one time, and

(t)  Indebtedness in respect of the Existing Liabilities (including the Specified Letter of Credit).

For purposes of the Agreement, in the event that any item of Indebtedness meets the criteria of more than one of the categories described in clauses (a) through (t) above, the Loan Parties shall be permitted to incur any such Indebtedness in any manner that complies with this definition and may rely upon more than one of the categories described above but shall provide written notice to Agent from time to time and upon the reasonable request by the Agent of the allocation of such Indebtedness among such categories.

"Permitted Intercompany Advances" means (i) loans made by (a) a Loan Party to another Loan Party (other than Parent), (b) a Subsidiary of Parent that is not a Loan Party to another Subsidiary of Parent that is not a Loan Party, or (c) a Subsidiary of Parent that is not a Loan Party to a Loan Party, so long as the parties thereto are party to the Intercompany Subordination Agreement and (ii) other investments and transfers made by (x) a Loan Party to another Loan Party (other than Parent) or (y) a Subsidiary of Parent that is not a Loan Party to a Loan Party or to any other Subsidiary of Parent that is not a Loan Party.

"Permitted Investments" means:

(a) Investments in cash and Cash Equivalents,

(b) Investments in negotiable instruments deposited or to be deposited for collection,

(c) advances made in connection with purchases of goods or services and prepaid expenses, in each case, in the ordinary course of business,

(d) Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries,

(e) Investments owned by any Loan Party or any of its Subsidiaries on the Closing Date and set forth on Schedule P-1 to the Agreement,

(f) to the extent constituting an Investment, any Permitted Indebtedness,

(g) Permitted Intercompany Advances,

(h) Equity Interests or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party or its Subsidiaries (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims,

(i) deposits of cash in the ordinary course of business made to secure performance of operating leases,

(j) (x) non-cash loans and advances to employees, officers, and directors of Parent or any of its Subsidiaries for the purpose of purchasing Equity Interests in Parent so long as the proceeds of such loans are used in their entirety to purchase such Equity Interests in Parent, and (y) loans and advances to employees and officers of Parent or any of its Subsidiaries in the ordinary course of business for any other business purpose and in an aggregate amount not to exceed $750,000 at any one time,

(k) Investments in the form of capital contributions and the acquisition of Equity Interests made by any Loan Party in any other Loan Party (other than capital contributions to or the acquisition of Equity Interests of Parent),

(l) Investments resulting from entering into (i) Bank Product Agreements, or (ii) agreements relative to Indebtedness that is permitted under clause (h) of the definition of "Permitted Indebtedness",

(m) equity Investments by any Loan Party in any Subsidiary of such Loan Party which is required by law to maintain a minimum net capital requirement or as may be otherwise required by applicable law,

(n) Permitted Acquisitions,

(o) Investments held by a Person acquired in a Permitted Acquisition to the extent that such Investments were not made in contemplation of or in connection with such Permitted Acquisition,

(p) the formation of new Subsidiaries (subject to compliance with Section 5.11 of the Agreement),

(q) Investments in cash or other property in (i) the Brazil Joint Venture in an aggregate amount not to exceed $1,000,000 and (ii) other joint ventures and unconsolidated subsidiaries useful in the business of Parent and its Subsidiaries in an aggregate amount for this clause (ii) not to exceed $500,000, and

(r) other Investments not otherwise described above in an aggregate amount not to exceed $750,000.

For purposes of the Agreement, in the event that any Investment meets the criteria of more than one of the categories described in clauses (a) through (r) above, the Loan Parties shall be permitted to make such Investment in any manner that complies with this definition and may rely upon more than one of the categories described above but shall provide written notice to Agent from time to time and upon the reasonable request by the Agent of the allocation of such Investments among such categories.

"Permitted Liens" means

(a) Liens granted to, or for the benefit of, Agent to secure the Obligations,

(b) Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) are in respect to amounts not in excess of $100,000 in the aggregate,

(c) judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under <u>Section 8.3</u> of the Agreement,

(d) Liens set forth on <u>Schedule P-2</u> to the Agreement; <u>provided</u>, that such Lien shall only secure the Indebtedness that it secures on the Closing Date and any Refinancing Indebtedness in respect thereof,

(e) the interests of lessors under operating leases and non-exclusive licensors under license agreements,

(f) purchase money Liens or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness and so long as (i) such Lien attaches only to the asset purchased or acquired and the proceeds thereof, and (ii) such Lien only secures the Indebtedness that was incurred to acquire the asset purchased or acquired or any Refinancing Indebtedness in respect thereof,

(g) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests,

(h) Liens on amounts deposited to secure any Loan Party's obligations in connection with worker's compensation or other unemployment insurance,

(i) Liens on amounts deposited to secure any Loan Party's obligations in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money,

(j) Liens on amounts deposited to secure any Loan Party's reimbursement obligations with respect to surety or appeal bonds obtained in the ordinary course of business,

(k) with respect to any Real Property, easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to such Real Property, in each case, whether now or hereafter in existence that do not materially interfere with or impair the use or operation thereof,

(l) non-exclusive licenses of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business,

(m) Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is the subject of permitted Refinancing Indebtedness and so long as the replacement Liens only encumber those assets that secured the original Indebtedness,

(n) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the ordinary course of business,

(o) Liens granted on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent that such financing constitutes Permitted Indebtedness,

(p) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods,

(q) Liens solely on any cash earnest money deposits made by Parent or any of its Subsidiaries in connection with any letter of intent or purchase agreement with respect to a Permitted Acquisition,

(r) Liens assumed in connection with a Permitted Acquisition that secure Acquired Indebtedness provided that such Liens shall not extend to any assets of any Loan Party other that those assets subject to such Acquisition and to which such Liens had attached prior to the consummation of such Acquisition,

(s) Liens securing the Medley Indebtedness, subject to the Intercreditor Agreement, and any Refinancing Indebtedness in respect of such Indebtedness,

(t) other Liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $1,000,000, and

(u) the Existing Liens.

"Permitted Priority Liens" means non-consensual Permitted Liens having priority by operation of applicable law over the Liens of the Agent, and as otherwise provided in the DIP Orders.

"Permitted Protest" means the right of a Loan Party to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Loan Party's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party, as applicable, in good faith, and (c) Agent is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's Liens.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, purchase money Indebtedness (including Capitalized Lease Obligations) incurred after the Closing Date and at the time of, or within 30 days after, the acquisition, construction or improvement of any assets for the purpose of financing all or any part of the purchase price or cost of such acquisition, construction or improvement, as the case may be, in an aggregate principal amount outstanding at any one time not in excess of $2,000,000.

"Permitted Variances" has the meaning set forth in Section 5.25 hereof.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" means February [__], 2017.

"Platform" has the meaning specified therefor in Section 17.9(c) of the Agreement.

"Pro Rata Share" means, as of any date of determination:

(a) with respect to a Lender's obligation to make all or a portion of the Revolving Loans, with respect to such Lender's right to receive payments of interest, fees, and principal with respect to the Revolving Loans, and with respect to all other computations and other matters related to the Revolver Commitments or the Revolving Loans, the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders,

(b)  with respect to a Lender's obligation to participate in Letters of Credit, with respect to such Lender's obligation to reimburse Issuing Bank, and with respect to such Lender's right to receive payments of Letter of Credit Fees, and with respect to all other computations and other matters related to the Letters of Credit, the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders; provided, that if all of the Revolving Loans have been repaid in full and all Revolver Commitments have been terminated, but Letters of Credit remain outstanding, Pro Rata Share under this clause shall be determined as if the Revolver Commitments had not been terminated and based upon the Revolver Commitments as they existed immediately prior to their termination, and

(c)  with respect to all other matters and for all other matters as to a particular Lender (including the indemnification obligations arising under Section 15.7 of the Agreement), the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the sum of the aggregate Revolving Loan Exposure of all Lenders, in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to Section 13.1; provided, that if all of the Loans have been repaid in full, all Letters of Credit have been made the subject of Letter of Credit Collateralization, and all Commitments have been terminated, Pro Rata Share under this clause shall be determined as if the Revolving Loan Exposures had not been repaid, collateralized, or terminated and shall be based upon the Revolving Loan Exposures as they existed immediately prior to their repayment, collateralization, or termination.

"Projections" means Parent's forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Parent's historical financial statements (subject to Section 1.2 of the Agreement), together with appropriate supporting details and a statement of underlying assumptions.

"Protective Advances" has the meaning specified therefor in Section 2.3(d)(i) of the Agreement.

"Public Lender" has the meaning specified therefor in Section 17.9(c) of the Agreement.

"Qualified Cash" means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of the Loan Parties that is held in Deposit Accounts or in Securities Accounts, or any combination thereof, with respect to which the Agent has a perfected, first priority Lien (subject to Permitted Priority Liens).

"Qualified Equity Interest" means any Equity Interests that are not Disqualified Equity Interests.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by any Loan Party and the improvements thereto.

"Real Property Collateral" means (a) the Real Property identified on Schedule R-1 to the Agreement and (b) any fee-owned Real Property acquired by any Loan Party after the Closing Date.

"Receivable Reserves" means, as of any date of determination, those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c), to establish (including reserves for rebates, discounts, warranty claims, and returns) with respect to the Eligible Accounts or the Maximum Revolver Amount.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Refinancing Indebtedness" means refinancings, renewals, or extensions of Indebtedness so long as:

(a) such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, other than by the amount of interest and premiums paid thereon and the fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto,

(b) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity (measured as of the refinancing, renewal, or extension) of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, are or would reasonably be expected to be materially adverse to the interests of the Lenders,

(c) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lender Group as those that were applicable to the refinanced, renewed, or extended Indebtedness, and

(d) the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"Related Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other response actions with respect to Hazardous Materials required by Environmental Laws.

"Replacement Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"Report" has the meaning specified therefor in Section 15.16 of the Agreement.

"Reported Fee Accruals" means all accrued and unpaid fees, disbursements, costs and expenses, allowed by the Bankruptcy Court and incurred by the Case Professionals.

"Required Lenders" means, at any time, Lenders having or holding more than 50% of the sum of the aggregate Revolving Loan Exposure of all Lenders; provided, that (i) the Revolving Loan Exposure of any Defaulting Lender shall be disregarded in the determination of the Required Lenders and (ii) at any time there are 2 or more Lenders that are not Affiliates of one another, "Required Lenders" must include at least 2 Lenders (that are not Affiliates of one another).

"Reserves" means, as of any date of determination, those reserves (other than Receivable Reserves, Bank Product Reserves, and Inventory Reserves) that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c), to establish and maintain (including reserves with respect to (a) sums that any Loan Party are required to pay under any Section of the Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, (b) amounts owing by any Loan Party to any Person to the

extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to the Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral) with respect to the Borrowing Base or the Maximum Revolver Amount, (c) the Carve Out Reserve, (d) prior to entry of the Final Borrowing Order and the repayment in full of the "Revolving Loans" under the Existing Credit Agreement, a reserve equal to the "Revolving Loans" (but not, for the avoidance of doubt, Letters of Credit) outstanding under the Existing Credit Agreement, (e) Bank Product Reserves, (f) Cash Management Reserves, (g) reserves implemented in order to protect the Credit Parties from any Liens, encumbrances or claims that could, in the reasonable judgment of the Agent, take priority over the Liens of the Agent in the Collateral, including, without limitation, any valid liens in existence on the Petition Date that are capable of being perfected subsequent to the Petition Date in accordance with Sections 546(b) and/or 546(c) of the Bankruptcy Code), and (h) to reflect the amount of any priority or administrative expense claims that, in the Agent's reasonable determination, require payment during the Cases.

"Restricted Payment" means (a) the declaration or payment of any dividend or any other payment or distribution, directly or indirectly, on account of Equity Interests issued by Parent (including any payment in connection with any merger or consolidation involving Parent) or to the direct or indirect holders of Equity Interests issued by Parent in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by Parent, as applicable), (b) the purchase, redemption, making of a sinking fund or similar payment, or other acquisition or retirement for value (including in connection with any merger or consolidation involving Parent) of any Equity Interests issued by Parent, and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of Parent now or hereafter outstanding.

"Revolver Commitment" means, with respect to each Revolving Lender, its Revolver Commitment, and, with respect to all Revolving Lenders, their Revolver Commitments, in each case as such Dollar amounts are set forth beside such Revolving Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance pursuant to which such Revolving Lender became a Revolving Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Revolver Usage" means, as of any date of determination, the sum of (a) the principal amount of outstanding Revolving Loans (inclusive of Protective Advances), *plus* (b) the amount of Letter of Credit Usage (except and excluding Specified Letter of Credit Usage).

"Revolving Lender" means a Lender that has a Revolver Commitment or to which an outstanding Revolving Loan is owed.

"Revolving Loan Exposure" means, with respect to any Revolving Lender, as of any date of determination (a) prior to the termination of the Revolver Commitments, the amount of such Lender's Revolver Commitment, and (b) after the termination of the Revolver Commitments, the aggregate outstanding principal amount of the Revolving Loans of such Lender.

"Revolving Loans" has the meaning specified therefor in Section 2.1(a) of the Agreement.

"Rolling Stock" means all vehicles of type and nature consistent with or similar to those vehicles set forth in Schedule E-2 as of the Closing Date, wherever located, owned by, and used in the ordinary course of Business of, the Loan Parties.

"Sale Motion" has the meaning specified in Section 5.26(a).

"Sale Process" has the meaning specified in Section 5.26(a).

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, (d) a Person resident in or determined to be resident in a country, in each case, that is subject to a country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals maintained by OFAC.

"San Diego Business" means all or any portion of the assets, equipment, inventory, contracts and other properties used by Borrower or any Subsidiary in connection with the operation of the Loan Parties' business in San Diego, California.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Second Lien Agent" means Medley, in its capacity as Second Lien Agent under the Medley Credit Documents, or any successor thereto in such capacity.

"Securities Account" means a securities account (as that term is defined in the Code).

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Series C Stock" means the Series C 8% Cumulative Compounding Preferred Stock, $0.001 par value per share, of Parent.

"Settlement" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

"Settlement Date" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

"Solvent" means, with respect to any Person as of any date of determination, that (a) at fair valuations, the sum of such Person's debts (including contingent liabilities) is less than all of such Person's assets, (b) such Person is not engaged or about to engage in a business or transaction for which the assets of such Person constitute unreasonably small capital, and (c) such Person has not incurred and does not intend to incur, or reasonably believe that it will incur, debts beyond its ability to pay such debts as they become absolute and matured in the ordinary course of business.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Specified Letter(s) of Credit" means that certain Letter of Credit issued on November 14, 2014, in the stated amount of $4,878,521, for the benefit of ACE American Insurance Company.

"Specified Letter of Credit Reserve" means an amount equal to the lesser of (i) the Specified Letter of Credit Usage and (ii) $500,000.

"Specified Letter of Credit Usage" means, as of any date of determination, the aggregate undrawn face amount of the issued and outstanding Specified Letter of Credit.

"Specified Revolving Loan" has the meaning specified therefor in Section 2.11(d) of the Agreement.

"Standard Letter of Credit Practice" means, for Issuing Bank, any domestic or foreign law or letter of credit practices applicable in the city in which Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Subject Holder" has the meaning specified therefor in Section 2.4(e)(v) of the Agreement.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the Equity Interests having ordinary voting power to elect a majority of the Board of Directors of such corporation, partnership, limited liability company, or other entity.

"Successor Cases" means any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any proceedings superseding or related to any of the foregoing.

"Supermajority Lenders" means, at any time, Lenders having or holding more than 66 2/3% of the sum of the aggregate Revolving Loan Exposure of all Lenders; provided, that (i) the Revolving Loan Exposure of any Defaulting Lender shall be disregarded in the determination of the Required Lenders and (ii) at any time there are 2 or more Lenders that are not Affiliates of one another, "Supermajority Lenders" must include at least 2 Lenders (who are not Affiliates of one another).

"Taxes" means any taxes, levies, imposts, duties, fees, deductions, withholdings (including backup withholding) assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any Governmental Authority, and all interest, additions to tax, penalties or similar liabilities with respect thereto.

"Tax Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Testing Period" has the meaning set forth in Section 5.25 hereof.

"Total Disbursements" means the sum of total operating disbursements, total non-operating disbursements and total bankruptcy disbursements as provided in the Approved Budget.

"Trademark Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Unappraised Eligible Rolling Stock" means Eligible Rolling Stock as to which the Agent has not obtained an appraisal. At such time as the Agent obtains an appraisal of such Eligible Rolling Stock by an

appraiser reasonably approved by the Agent, such Eligible Rolling Stock shall cease to be Unappraised Eligible Rolling Stock and shall constitute Appraised Eligible Rolling Stock.

"United States" means the United States of America.

"United States Trustee" means the Office of the United States Trustee.

"Unused Line Fee" has the meaning specified therefor in Section 2.10(b) of the Agreement.

"Variance Report" means a report prepared by the Borrower's management reflecting on a line-item basis the Borrower's actual performance compared to the Approved Budget for the immediately preceding weekly period and on a cumulative basis for the period after the Petition Date.

"Voidable Transfer" has the meaning specified therefor in Section 17.8 of the Agreement.

"Wells Fargo" means Wells Fargo Bank, National Association, a national banking association.

"Withdrawal Liability" means liability with respect to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**<u>Schedule 1.2</u>**


**<u>Form of Initial Approved Budget</u>**

[To be attached]

### Schedule 3.1

The obligation of each Lender to make its initial extension of credit provided for in the Agreement is subject to the satisfaction (or waiver in accordance with <u>Section 14.1</u>) of each of the conditions precedent set forth below (the making of such initial extension of credit by any Lender being conclusively deemed to be its satisfaction or waiver of such conditions precedent):

(a)     Agent shall have received each of the following documents, in form and substance reasonably satisfactory to Agent, duly executed and delivered (to the extent applicable), and each such document shall be in full force and effect:

(i)     a completed Borrowing Base Certificate;

(ii)     the Fee Letter; and

(iii)     the Guaranty and Security Agreement.

(b)     Agent shall have received a certificate from a responsible officer of each Loan Party (i) attesting to the resolutions of such Loan Party's Board of Directors authorizing its execution, delivery, and performance of the Loan Documents to which it is a party, (ii) authorizing specific officers of such Loan Party to execute the same, and (iii) attesting to the incumbency and signatures of such specific officers of such Loan Party;

(c)     Agent shall have received copies of each Loan Party's Governing Documents, as amended, modified, or supplemented to the Closing Date, which Governing Documents shall be (i) certified by a responsible officer of such Loan Party, and (ii) subject to <u>Section 3.6</u> of the Agreement, with respect to Governing Documents that are charter documents, certified as of a recent date (not more than 30 days prior to the Closing Date) by the appropriate governmental official;

(d)     Subject to <u>Section 3.6</u> of the Agreement, Agent shall have received a certificate of status with respect to each Loan Party, dated within 14 days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Loan Party, which certificate shall indicate that such Loan Party is in good standing in such jurisdiction;

(e)     Subject to <u>Section 3.6</u> of the Agreement, Agent shall have received a customary certificate of insurance, together with the endorsements thereto, as is required by <u>Section 5.6</u> of the Agreement;

(f)     Agent shall have completed its business, legal, and collateral due diligence, including (i) a collateral audit and review of Borrower's and its Subsidiaries' books and records and verification of Borrower's representations and warranties to Lender Group, (ii) to the extent requested by Agent, an inspection of each of the locations where Borrower's and its Subsidiaries' Inventory is located, and (iii) a review of Borrower's and its Subsidiaries' material agreements, in each case, the results of which shall be reasonably satisfactory to Agent;

(g)     Agent shall have completed (i) Patriot Act searches, OFAC/PEP searches and customary individual background checks for each Loan Party, and (ii) OFAC/PEP searches and customary individual background searches for each Loan Party's senior management and key principals, the results of which shall be reasonably satisfactory to Agent;

(h)     Borrower shall have paid all Lender Group Expenses incurred in connection with the transactions evidenced by the Agreement and the other Loan Documents;

(i)     Borrower and each of its Subsidiaries shall have received all material licenses, approvals or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by the Loan Parties of the Loan Documents or with the consummation of the transactions contemplated thereby;

(j)     The Agent shall have received the Approved Budget and such other financial information regarding the Loan Parties as the Agent may require;

(g)     The Agent shall have received the Interim Borrowing Order, as entered by the Bankruptcy Court, substantially in the form of Exhibit D hereto and otherwise acceptable to the Agent;

(k)     All "first day" motions and proposed orders to be filed with and submitted to the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Agent and Lenders.

(l)     The Agent shall have received the consent of the Required Lenders under the Existing Credit Agreement to the credit facility evidenced hereby and the terms hereof; and

(m)     all other documents and legal matters in connection with the transactions contemplated by the Agreement shall have been delivered, executed, or recorded and shall be in form and substance reasonably satisfactory to Agent.

**Schedule 3.6**

1.  No later than thirty (30) days after the Closing Date (or such later date as the Lender may agree to), the Borrower shall deliver to the Agent such endorsements in respect of casualty and liability insurance naming the Agent as lender's loss payee or additional insured, as applicable, and notice of cancellation endorsements, in each case, as are required to be delivered pursuant to <u>Section 5.6</u> of this Agreement, each in form and substance satisfactory to the Agent.

2.  No later than fourteen (14) days after the Closing Date (or such later date as the Agent  may agree to), the Borrower shall deliver to the Agent (i) charter documents, certified as of a recent date (not more than 30 days prior to the Closing Date) by the appropriate governmental official, and (ii) a certificate of status with respect to each Loan Party, dated within 14 days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Loan Party, which certificate shall indicate that such Loan Party is in good standing in such jurisdiction, for each Loan party incorporated or formed in California.

## Schedule 5.1

Deliver to Agent each of the financial statements, reports, or other items set forth below at the following times:

| 1. | as soon as available, but in any event within 30 days after the end of each month during each of Parent's fiscal years, | (a) an unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of shareholder's equity covering Parent's and its Subsidiaries' operations during such period and compared to (i) the comparable period in the preceding fiscal year (excluding any items for which there are no comparables for periods prior to the Closing Date) and (ii) the most recent Projections delivered to Agent, and<br><br>(b) a Compliance Certificate along with the underlying calculations. |
|----|----|----|
| 2. | as soon as available, but in any event within 120 days after the end of each of Parent's fiscal years, | (a) consolidated and consolidating financial statements of Parent and its Subsidiaries for each such fiscal year, audited by independent certified public accountants, accompanied by an unqualified opinion (determined in accordance with Section 1.2) and certified by such accountants to have been prepared in accordance with GAAP (such audited financial statements to include a balance sheet, income statement, statement of cash flow, and statement of shareholder's equity, and, if prepared, a final copy of such accountants' letter to management), and<br><br>(b) a Compliance Certificate, along with the underlying calculations. |
| 3. | as soon as available, but in any event within 30 days after the start of each of Parent's fiscal years, | copies of Parent's Projections for the forthcoming fiscal year, prepared on a month-by-month basis, certified by the chief financial officer (or other appropriate responsible officer) of Borrower to the effect that such Projections were prepared in good faith based upon assumptions believed by the preparer thereof to be reasonable at the time such assumptions were made (it being understood and agreed that financial performance projections are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties, that no assurances can be given that any particular financial projections will be realized, that actual results during the periods covered thereby may differ from such projected results and such differences may be material). |
| 4. | promptly, but in any event within 3 Business Days after Borrower has knowledge of the occurrence of any Default or an Event of Default, | notice of such Default or Event of Default and a brief description of the curative action, if any, that Borrower proposes to take with respect thereto (provided that the failure to deliver notice of the occurrence of a Default shall not itself result in an Event of Default under the Agreement if such underlying Default does not mature into an Event of Default). |
| 5. | upon the reasonable request of Agent, | any other information reasonably requested relating to the financial condition of any Loan Party. |

### Schedule 5.2

Provide Agent with each of the documents set forth below at the following times:

| 1. | Weekly (no later than Friday of each week (or if Friday is not a Business Day, then the next succeeding Business Day) | (a) an executed Borrowing Base Certificate,<br><br>(b) commencing on the Friday following the second full calendar week after the Closing Date, (i) a weekly cash flow forecast for the subsequent 13-week period prepared by a Responsible Officer of the Borrower Representative, and (ii) a variance report prepared by a Responsible Officer of the Borrower Representative (the "<u>Variance Report</u>") setting forth actual cash receipts and disbursements of the Loan Parties for the preceding one calendar week period and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such calendar week as compared to the Approved Budget and the most recent weekly cash flow forecast delivered by the Loan Parties, in each case, for each Testing Period (and each such Variance Report shall include reasonably detailed explanations for all material variances (including Permitted Variances) and shall be certified by a Responsible Officer of the Borrower Representative),<br><br>(c) substantially concurrently with the delivery of the Variance Report, a "flash" cash report detailing all cash and Cash Equivalents on-hand of each of the Borrower and its Subsidiaries (broken out by entity) as of the close of business on such date,<br><br>(d) upon the reasonable request of the Agent, periodic estimated summaries of the then Reported Fee Accruals, and<br><br>(e) all documents and information required to be delivered pursuant to the DIP Orders. |
| --- | --- | --- |
| 2. | Monthly (no later than the 10th Business Day of each month), | (a) an Account roll-forward with supporting details supplied from sales journals, collection journals, credit registers and any other records,<br><br>(b) notice of all claims, offsets, or disputes asserted by Account Debtors with respect to Parent's and its Subsidiaries' Accounts,<br><br>(c) a reasonably detailed aging and certification, by total, of Borrower's Accounts, together with a reconciliation and supporting documentation for any reconciling items noted (delivered electronically if Borrower has implemented electronic reporting),<br><br>(d) a reasonably detailed calculation of those Accounts that are not eligible for the Borrowing Base, if Borrower has not implemented electronic reporting,<br><br>(e) a reasonably detailed calculation of Inventory categories that are not eligible for the Borrowing Base, if Borrower has not implemented electronic reporting,<br><br>(f) a Rolling Stock Report, and |

|   |   |   |
|---|---|---|
|   |   | (g) a fleet utilization report. |
| 3. | Monthly (no later than the 20th day of each month), | (a) a detailed Inventory system/perpetual report together with a reconciliation to Borrower's general ledger accounts (delivered electronically in an acceptable format, if Borrower has implemented electronic reporting),<br><br>(b) a summary aging, by vendor, of Parent's and its Subsidiaries' accounts payable and any book overdraft (delivered electronically in a format acceptable to the Agent if Borrower has implemented electronic reporting) and an aging, by vendor, of any held checks, and<br><br>(c) a monthly Account roll-forward, in a format acceptable to Agent in its discretion tied to the beginning and ending account receivable balances of Borrower's general ledger. |
| 4. | Monthly (together with the delivery of monthly financial statements pursuant to Section 5.1), | a reconciliation of Accounts, trade accounts payable, and Inventory of Borrower's general ledger accounts to its monthly financial statements including any book reserves related to each category. |
| 5. | Annually (together with the delivery of annual financial statements pursuant to Section 5.1), | a detailed list of Parent's and its Subsidiaries' top 20 customers, with primary contact information. |
| 6. | Upon request by Agent | (a) copies of purchase orders and invoices for Inventory and Rolling Stock acquired by any Loan Party, and<br><br>(b) such other reports as to the Collateral or the financial condition of Parent and its Subsidiaries, as Agent may reasonably request. |
| 7. | ERISA Matters | Promptly (i) after the filing thereof by any Loan Party with the United States Secretary of Labor, the Internal Revenue Service or the PBGC, copies of each annual and other material report with respect to each Pension Plan or any trust created thereunder, (ii) upon becoming aware of the occurrence of any Notification Event or of any "prohibited transaction," as described in section 406 of ERISA or in section 4975 of the IRC in connection with any Pension Plan or any trust created thereunder, in each case, that would be reasonably likely to result in a material liability to any Loan Party, a written notice signed by an appropriate responsible officer of Borrower, specifying the nature thereof, what action the Loan Parties propose to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto, (iv) upon receipt thereof, copies of any notice of the PBGC's intention to terminate or to have a trustee appointed to administer any Pension Plan, along with any underlying calculations and (v) upon its receipt thereof, a copy of each estimate of Withdrawal Liability received by any Loan Party from a Multiemployer Plan or any ERISA Affiliate. |

| 8. | General | The foregoing information shall be submitted by Borrower to Agent through Agent's Collateral Services Inc. ("CSI"), and Borrower shall pay Agent all processing fees charged by Agent in connection with the processing of the foregoing reports through CSI at the current rates published by Agent for such services rendered on behalf of its customers generally. |
|---|---|---|