## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------
                                    :  Chapter 11
In re                               :
                                    :  Case No. 17-10249 (LSS)
UNITED ROAD TOWING, INC. et al.,    :
                                    :  Jointly Administered
        Debtors.¹                   :
                                    :  Bidding Procedures:
                                    :     Hearing Date: March 6, 2017 at 10:00 am (ET)
                                    :     Obj. Deadline: February 24, 2017 at 4:00 pm (ET)
                                    :  Sale Hearing:
                                    :     [TO BE DETERMINED]
-----------------------------------------------------
```

**DEBTORS' MOTION FOR ENTRY OF (A) ORDER (I) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE OR SALES OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BIDDING PROCEDURES, ASSUMPTION AND ASSIGNMENT PROCEDURES, AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF; AND (B) ONE OR MORE ORDERS (I) APPROVING THE SALES OR OTHER ACQUISITION TRANSACTIONS FOR THE PROPERTIES, (II) AUTHORIZING THE SALES FREE AND CLEAR OF ALL ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF</u>**

United Road Towing, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), hereby submit this motion (the "**Motion**"), pursuant to

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: United Road Towing, Inc. (6962); URT Holdings, Inc. (8341); City Towing Inc. (2118); URS West, Inc. (3518); Bill & Wag's, Inc. (3518); Export Enterprises of Massachusetts, Inc. (5689); Pat's Towing, Inc. (6964); Keystone Towing, Inc. (6356); Ross Baker Towing, Inc. (9742); URT Texas, Inc. (3716); Mart-Caudle Corporation (1912); Signature Towing, Inc. (3054); WHW Transport, Inc. (3055); URS Southeast, Inc. (7289); URS Northeast, Inc. (7290); URS Southwest, Inc. (7284); Fast Towing, Inc. (5898); E&R Towing & Garage, Inc. (8500); Sunrise Towing, Inc. (7160); Ken Lehman Enterprises Inc. (1970); United Road Towing of South Florida, Inc. (9186); Rapid Recovery Incorporated (1659); United Road Towing Services, Inc. (2206); Arri Brothers, Inc. (7962); Rancho Del Oro Companies, Inc. (3924); CSCBD, Inc. (2448); URS Leasing, Inc. (9072); UR VMS LLC (4904); UR Vehicle Management Solutions, Inc. (0402). The Debtors' mailing address is c/o United Road Towing, Inc., 9550 Bormet Drive., Suite 301, Mokena, Illinois 60448.

sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), for the entry of:

(A)    an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of one or more sales of or other acquisition transactions (each a "**Sale**") of substantially all of the Debtors' personal property and other related interests (the "**Assets**"), either individually or in groupings, free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Encumbrances**"), other than those Encumbrances permitted by the applicable asset purchase agreement or other agreement for the applicable Sale (each a "**Transaction Agreement**"), and a Sale may include the acquisition of the equity of one or more Debtors though a section 363 Sale or a sale of Assets or the acquisition of the equity in one or more Debtors implemented through a chapter 11 plan (a "**Plan**"), and authorizing the assumption and assignment of certain executory contracts and unexpired leases (each, an "**Assumed Contract**," and collectively, the "**Assumed Contracts**") in connection therewith, (ii) authorizing and approving certain proposed bidding procedures for the Sales in the form attached to the Bidding Procedures Order as **Exhibit 1** (collectively, the "**Bidding Procedures**"), certain proposed assumption and assignment procedures (collectively, the "**Assumption and Assignment Procedures**"), and the form and manner of notice thereof; and (iii) granting related relief; and

(B)    an order (or orders) (each a "**Sale Order**"),[2] (i) authorizing and approving the Debtors' entry into the Transaction Agreement(s) with Successful Bidder(s), Back-Up Bidder(s), or Stalking Horse Purchaser(s), as applicable; (ii) authorizing and approving the Sale of each Property, free and clear of all Encumbrances other than those permitted by the applicable Transaction Agreement; (iii) authorizing and approving the assumption and assignment of the Assumed Contacts in connection therewith; and (iv) granting related relief.

In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408

---

[2]    The Debtors will file the applicable form of Sale Order as soon as practicable after such document is negotiated with the applicable purchaser.

and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**").

**BACKGROUND**

A.  **General Background**

2.     On February 6, 2017 (the "Petition Date"), the Debtors commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and no committees have been appointed or designated.  The Court has entered an order for joint administration of these Chapter 11 Cases. As of the date hereof, no trustee, examiner, or statutory committee has been appointed.

3.     The Debtors commenced these Chapter 11 Cases to, among other things, pursue a prompt sale of their assets in order to maximize value for stakeholders, preserving jobs, minimizing supply disruptions for the Debtors' customers and ensuring an uninterrupted supply chain for the Debtors' vendors.  Further information regarding the Debtors' business, capital structure, and the circumstances leading to these Chapter 11 Cases is set forth in the *Declaration of Michael J. Mahar of in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 2] (the "First Day Declaration") filed on the Petition Date.

**B.   The Assets**

4.       The Debtors business consists of towing, recovery, impound, and vehicle management solutions in both the private and public sector.

5.       The Debtors own no real property.   Instead, the Debtors lease various office space, impound lots, and dispatch locations, each of which is described in Exhibit B to the First Day Declaration.

6.       The Debtors' primary assets include various vehicles—including tow trucks, forklifts, and unclaimed impounded vehicles—as well as the value of their interest in contracts with various municipalities and private entities for their towing and impound services.

**C.   The Debtors' Sale Process**

7.       The Debtors' goal is to obtain maximum exposure of their assets to potential buyers, and they will consider any transaction that will result in obtaining the highest and best value for their Assets.   To that end, the Debtors have developed the Bidding Procedures to allow potential purchasers with maximum flexibility in proposing an acquisition transaction, which can take the form of, among other things, a sale under section 363, with or without a credit bid, and including a "free and clear" sale, as well as to propose a transaction through a chapter 11 plan.   In leaving all of these transactional avenues open, the Debtors and their stakeholders can use all of the tools available under the Bankruptcy Code to preserve value at all levels of their capital structure.   The Debtors are also allowing potential purchasers the flexibility to propose an acquisition of the Assets relating to a single Debtor or a combination of the Assets of multiple Debtors in a single bid.

8.      To further assist them, the Debtors have retained an investment banker, SSG Advisors, LLC ("**SSG**"),[3] to assist the Debtors with negotiations with interested parties, preparing for and initiating marketing efforts as well as facilitating due diligence by various parties.  SSG began its marketing process prior to the Petition Date.  In that period, the Debtors executed 43 non-disclosure agreements with parties identified by SSG and maintained a dataroom which the Debtors populated with a wide range of information about the Debtors that could be accessed by those parties, and they additionally provided other information (including a confidential information memorandum) to them.  In the two weeks prior to the Petition Date, the Debtors received nine written indications of interest in purchasing the Debtors' assets.[4]  The Debtors are continuing to work with these parties as they continue their due diligence, and the Debtors' management team is actively participating in the sales process, including having provided management presentation to several parties in the days leading up to the commencement of these cases.

9.      As part of the negations with Wells Fargo Bank, N.A. ("**Wells Fargo**" or the "**DIP Lender**") over the terms and conditions of the debtor-in-possession financing facility (the "**DIP Facility**"), which has been approved on an interim basis by this Court [Docket No. 41], the Debtors agreed to several milestone related to this sales process.  These milestones include: (a) the Debtors entry into one or more definitive agreements with a "stalking horse" purchaser by February 22, 2017; (b) setting March 22, 2017 as the outside date for establishing a "bid deadline" by which parties will be required to submit bids for the Debtors' assets; and (c) holding an auction for the Debtors' assets (if applicable) by no later than March 27, 2017, with a

---

[3]    The Debtors' application for an order authorizing the retention of SSG is forthcoming.

[4]    Ultimately one prospective purchaser withdrew their indication of interest, leaving the net number of interested parties at eight.

Court-approval hearing being held no later than March 30, 2017.  The Debtors are thus guided by these milestones in fashioning the relief requested by this Motion.

10.     Based on the experience of the Debtors' restructuring professionals, they believe it would further the goal of maximizing the value of the Assets to designate one or more parties to serve as a stalking horse purchaser (each a "**Stalking Horse Purchaser**" and the Transaction Agreement with such party a "**Stalking Horse Agreement**") for the sale of the Assets.  As is customary, the Debtors would likely grant a Stalking Horse Purchaser one or more of a break-up fee, expense reimbursement, or other bid protections.  Accordingly, the Debtors are reserving the right to request that the Court approve the Debtors' selection of a Stalking Horse Purchaser and will supplement this Motion accordingly.

## .**BIDDING PROCEDURES**[5]

11.     The Debtors intend to solicit bids for all of the Assets, either on the basis of a single Debtor's Assets or some combination (including all) of the Debtor's Assets, in accordance with the Bidding Procedures.  The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bids become "qualified," the coordination of diligence efforts among the bidders and the Debtors, the receipt and negotiation of bids received, the conduct of any Auction, and the selection and approval of the Successful Bidder and the selection of the Back-Up Bidder.  The Bidding Procedures reflect the Debtors' objective of

---

[5]     The following is a summary of the Bidding Procedures.  It is qualified in its entirety by the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, and parties are encouraged to read the Bidding Procedures and Bidding Procedures Order in their entirety.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bidding Procedures as provided for in the Bidding Procedures Order shall control.  Capitalized terms used but not defined in this summary of the Bidding Procedures shall have the meanings ascribed to such terms in the Bidding Procedures.

conducting the Auction in a controlled, but fair and open, manner, while ensuring that the highest

and best bid is generated for the Assets.

12. Certain of the key terms of the Bidding Procedures are included below:

(a) **Qualification as Bidder**: Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder.**" Parties may be qualified as a Qualifying Bidder up to the Bid Deadline (*i.e.*, **March 22, 2017 at 5:00 p.m. (ET)**), but parties interested in submitting a bid for any of the Debtors' Assets are encouraged to qualify as soon as possible because the Bidding Procedures do not permit any due diligence or financing conditions in Qualifying Bids. *Section 2 of the Bidding Procedures* identifies the requirement to be deemed a Qualifying Bidder, which include, among other things, (1) entry into a confidentiality agreement in form and substance reasonably satisfactory to the Debtors, and (2) providing sufficient information as determined by the Debtors, to allow the Debtors, after consultation with the Consultation Parties,[6] to determine that the interested party has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction or pursue confirmation of a chapter 11 plan (as applicable) and to provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code. Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate its contemplated transaction.

Once qualified, Qualifying Bidders will be able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "**Data Room**").

Notwithstanding anything to the contrary in the Bidding Procedures, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) any designated Stalking Horse Purchaser shall be considered a Qualifying Bidder, and a Stalking Horse Agreement shall be considered a Qualifying Bid (as defined below); and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

(b) **Due Diligence**: The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: Mark E. Chesen (Phone: (610-940-

---

[6] The term "**Consultation Parties**" shall mean, with respect to any Debtors' Assets: (i) counsel to any official committee appointed in these cases representing parties with an interest in the Assets; (ii) counsel to Wells Fargo Bank, N.A., as DIP Agent and agent under the prepetition first-lien credit facility; and (iii) counsel to Medley Capital Corporation, as agent under the prepetition second-lien credit facility

5801; Email: mchesen@ssgca.com) and Michael M. Gorman (Phone: (610-940-3615); Email: mgorman@ssgca.com).   The due diligence period shall extend through and including the Final Bid Deadline.  The Debtors may, but shall not be obligated to, in their sole discretion, furnish any due diligence information after the Final Bid Deadline.  The Debtors reserve the right, in their sole discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder.   Notwithstanding any limitations provided for in such information, including, without limitation, any non-disclosure, confidentiality or similar provisions, the Debtors and their estates shall be authorized to provide due diligence information to the Qualifying Bidders, provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.   The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

(c)    **Bid Requirements**:

    i.    *Form of Agreement*.   Potential Bidders intending to submit bids must include with their bids:

        a.    a statement that such Potential Bidder offers to purchase the Assets, or a number or combination of the Assets, upon the terms set forth in their Transaction Agreement; underlined provided that, in the event that the Debtors enter into a Stalking Horse Agreement and a Potential Bidder wishes to acquire Properties that are the subject of a Stalking Horse Agreement, such statement shall provide that the Potential Bidder offers to purchase those Properties upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the applicable Stalking Horse Agreement;

        b.    a clean and duly executed Transaction Agreement and a marked copy of the Transaction Agreement that reflects any variations from the Stalking Horse Agreement, if there is one for the Assets that are the subject of the bid; and

        c.    in the case of a Sale, set forth the purchase price to be paid by such Qualifying Bidder, including what amount is being paid as cash and what amount constitutes a credit bid, and identify the liabilities proposed to be paid or assumed by such Qualifying Bidder;

        d.    specify the Assets that are included in the bid and, to the extent a Stalking Horse Purchaser is designated, state that such Qualifying Bidder offers to purchase those Assets included in the applicable Stalking Horse Agreement upon substantially the same terms as, or

terms more favorable to the Debtors and their estates than, the terms set forth in the applicable Stalking Horse Agreement;

e.    if the Qualifying Bidder proposes to implement an acquisition transaction through a Plan, a detailed term sheet that includes (i) the applicable Debtors that will be included in the Plan, (ii) a description of the treatment of each class of creditors proposed under the Plan, (iii) the transactions that will be implemented and occur under the Plan, (iv) the consideration to be received by existing creditors, existing equity holders, and any other party receiving distributions under the Plan and the source thereof, (v) any conditions to the occurrence of the effective date of the proposed Plan, and (vi) any other matters that are material to the Plan and the implementation thereof.

ii.    *Qualifying Bid*.  Other than in the case of a Stalking Horse Purchaser, to be deemed a "**Qualifying Bid**," a bid must be received from a Qualifying Bidder on or before the Final Bid Deadline and satisfy each of the requirements set forth in *Section 6 of the Bidding Procedures* (each, a "**Bid Requirement**").  These requirements include, but are not limited to:

a.    be in writing;

b.    fully disclose the identity of the Qualifying Bidder and whether such party is an insider (as defined in section 101 of the Bankruptcy Code) of any Debtor, and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

c.    in the case of a Sale, set forth the purchase price to be paid by such Qualifying Bidder, including what amount is being paid as cash and what amount constitutes a credit bid, and identify the liabilities proposed to be paid or assumed by such Qualifying Bidder;

d.    if a Plan is proposed, be accompanied with a commitment to provide funding to the applicable Debtors for the period from and after the closing of the Auction to the confirmation of such Plan, including, to the extent not otherwise satisfied or provided for, payment of any amount of DIP Financing that will mature or otherwise come due in that period (the "**Plan Incremental Funding**"), which shall constitute consideration to be provided for the transaction but shall also be in addition to any cash consideration offered for the Assets;

e.     specify the Assets that are included in the bid and, to the extent a Stalking Horse Purchaser is designated, state that such Qualifying Bidder offers to purchase those Assets included in the applicable Stalking Horse Agreement upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the applicable Stalking Horse Agreement;

f.     be accompanied by a clean and marked modified Transaction Agreement that reflects any variations from the Stalking Horse Agreement, if there is one for the subject Assets;

g.     state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until the conclusion of the Sale Hearing unless such party is the Successful Bidder or Back-Up Bidder in which case such offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the Sale of the subject Assets; *provided, however*, that if a Qualifying Bidder proposes to implement its transaction through a Plan, such bid will only remain irrevocable until the conclusion of the Sale Hearing unless that Qualifying Bidder is selected (i) as the Successful Bidder, in which case it will remain irrevocable until the effective date of the Plan, and (ii) as a Back-Up Bidder, the closing of a Sale of the subject Assets; and provided further, however, that any bid for Assets for which the Debtors have selected a Plan-bid as the Successful Bid will only be irrevocable until the Court enters an order approving the Plan bid as the Successful Bid;

h.     state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Transaction Agreement or proposed Plan and provide written evidence in support thereof;

i.     contain such financial and other information to allow the Debtors to make a reasonable determination as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by its proposed Transaction Agreement, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to make available, within one (1) business day after such receipt, such information to any counterparties to any contracts or leases being assumed and

assigned in connection with the Sale that have requested, in writing, such information;

j.      identify with particularity each and every executory contract, unexpired lease and unexpired sublease the assumption and assignment of which is a condition to close the transactions contemplated by the proposed Transaction Agreement;

k.      a commitment to close the transactions contemplated by the Transaction Agreement within 15 days of entry of the order approving the sale; provided that if the proposed transactions will be implemented through a Plan, the Debtors shall have 90 days from the date of court approval of the proposal to obtain confirmation of such Plan, provided further that the Debtors have or will have sufficient liquidity (through appropriate funding provided or arranged by the Qualifying Bidder) to continue operations through that point in time;

l.      not request or entitle such Qualifying Bidder (other than a Stalking Horse Purchaser) to any break-up fee, termination fee, expense reimbursement or similar type of fee or payment;

m.      in the event that there is a Stalking Horse Purchaser, and the Qualifying Bidder wishes to bid on the same Assets that are included in the Stalking Horse Agreement, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the purchase price under the Stalking Horse Agreement, plus (B) any break-up fee, expense reimbursement, or other bid protection provided under the Stalking Horse Agreement, plus (C) the greater of $250,000 or 1% of the purchase price under the Stalking Horse Agreement;

n.      not contain any contingencies of any kind, including, without limitation, contingencies related to financing,  due diligence, or third party regulatory or internal approval;

o.      contain written evidence satisfactory to the Debtors, in consultation with the Consultation Parties, that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Transaction Agreement or to consummate a proposed Plan transaction, including incremental funding to administer the applicable Debtors' cases through and including confirmation of such Plan, with appropriate contact information for such financing sources to verify funds;

p.      contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale, and (iv) has not entered into any agreement with any other potential bidder concerning the Auction or the Sale or discloses any agreement with any other potential bidder concerning the Auction or Sale;

q.      provides for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Successful Bid (as defined below), in accordance with the terms of the Transaction Agreement;

r.      includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Transaction Agreement;

s.      provides a good faith cash deposit (the "**Deposit**") in an amount equal to the greater of $250,000 or ten percent (10%) of the total consideration provided under the proposed Transaction Agreement; and

t.      provides for liquidated damages in the event of the Qualifying Bidder's breach of, or failure to perform under, the Transaction Agreement equal to the amount of the Deposit.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid. The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

*Credit Bidding*.  Any party that wishes to submit a credit bid either as a component or as the entirety of the consideration for its bid shall identify the amount of the claim and the nature, extent, and priority of the lien upon which its credit bid is premised.  Except where the Debtors have stipulated to the amount of a Secured Claim in a "cash collateral" order entered by the Court, any party submitting a credit bid agrees to provide the Debtors with documentation to evidence the amount, nature, extent, validity and perfection of such claim and lien to the extent it has not already done so.

The DIP Agent, DIP Lenders, Prepetition ABL Agent, Prepetition ABL Lenders, Prepetition Term Agent and Prepetition Term Lenders have the right to credit bid the full amount of all Obligations and any Existing Liabilities then outstanding as and to the extent set forth in the DIP Credit Agreement approved on an interim basis pursuant to *the Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (II) Authorizing use of Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Granting Adequate Protection to Prepetition Secured Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, a (VII) Granting Related Relief* [Docket No. 41] (the "**DIP Order**") and/or as stipulated in the DIP Order or any subsequent order approving the relief set forth in the DIP Order on a final basis.

iii.     *Final Bid Deadline*.  A Qualifying Bidder, other than any Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Debtors so as to be received on or before **March 22, 2017 at 5:00 p.m. (ET)** (the "**Bid Deadline**"); provided that the Debtors may extend the Bid Deadline without further order of the Court, subject to providing notice to the Consultation Parties.  **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

iv.     *Evaluation of Qualifying Bids*.  The Debtors will deliver, within one (1) business day after receipt thereof, copies of all bids from Qualifying Bidders to the Consultation Parties.  The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid, and shall notify all Qualifying Bidders whether their bids have been determined to be a Qualifying Bid by no later than two (2) days prior to the Auction Date.  In the event that a bid is determined not to be a Qualifying Bid, the Qualifying Bidder shall be notified by the Debtors and shall have one (1) day from the date of such notification to modify its bid so as to become a Qualifying Bid; provided that any Qualifying Bid may be improved at the Auction as set forth in the Bidding Procedures.

Prior to the commencement of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest and best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.  The Baseline Bid may be comprised of any combination of the Assets, and the Debtors may determine that different Baseline Bids exist for different groupings of the Assets.  The Debtors shall have the discretion to determine how to proceed when auctioning the Assets in groupings that do not include all of Debtors' Assets so as to maximize the value of the Assets.

v.    *No Qualifying Bids*.  If no timely Qualifying Bids other than any Stalking Horse Purchaser's or Purchasers' Qualifying Bid(s) are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall have the right to request at the Sale Hearing (as defined in the Bidding Procedures Order) that the Court approve the Stalking Horse Agreement or Agreements and the transactions contemplated thereunder or authorize the Debtors proceed with the Plan proposed (if applicable).

(d)    **Auction**:  In the event that the Debtors timely receive one or more Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid, the Debtors shall conduct an auction (the "**Auction**").  Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest and best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval, as well as additional costs or savings to the Debtors in the event that a bid is implemented through a chapter 11 plan or a section 363 sale; (b) variations between competing bids and any incremental execution risk that the Debtors reasonably determine, in consultation with the Consultation Parties, exist as a result of those variations; (c) the time needed to close a Sale or other transaction compared with other Qualifying Bids and the cost to the Debtors and their estates of any incremental delay; (d) the total consideration to be received by the Debtors and their estates; (e) the ability to obtain a higher or better offer for Assets when sold individually or in combination with one or more of the Debtors' other Assets; (f) existing funding available or proposed to be provided by the Qualifying Bidder during the period necessary to close the Sale or other transaction; (g) the net benefit to the Debtors' estates, taking into account any Stalking Horse Purchaser's rights to any break-up fee, expense reimbursement, or similar bid protection; (h) the proposed treatment of existing secured indebtedness, including any senior indebtedness in the case of a credit bid; (i) the impact on employees, Counterparties (including claims that may be asserted related to rejection and objections to adequate assurance), and other creditors; and (j) any other factors

the Debtors may reasonably deem relevant.

The Auction shall be **governed** by the following procedures:

i.      the Auction shall be held on **March 27, 2017 at 10:00 a.m. (ET)** (the "**Auction Date**") at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, Delaware 19801;

ii.     only a Stalking Horse Purchaser and the other Qualifying Bidders with Qualifying Bids (together, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction;

iii.    the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

iv.    only the Debtors, the Auction Bidders, the Consultation Parties, and all creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction; provided that such creditors and the Consultation Parties provide counsel for the Debtors one (1) business day's written notice of their intent to attend the Auction;

v.     the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi.    the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

vii.   bidding on any lot of Assets shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least the greater of $100,000 and 1% of the Baseline Bid, provided that: (i) each such successive bid must be a Qualifying Bid; (ii) if the then-highest and best bid was made by any Stalking Horse Purchaser, such bid shall be deemed to include the sum of the amount of any break-up fee, expense reimbursement, or other bid protections available to such Stalking Horse Purchaser; (iii) any bid made by any Stalking Horse Purchaser, including in each and every round of bidding, shall be deemed to include the sum of the amount of any break-up fee, expense reimbursement, or other bid protection available to such Stalking Horse Purchaser in addition to the cash and other consideration provided for in its bid; and (iv) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

viii.  the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

-15-

ix. all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

x. the Debtors and their professional advisors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, or any applicable order of the Court entered in connection with these chapter 11 cases, including, without limitation, the Bidding Procedures Order, and (ii) disclosed to the Auction Bidders;

xi. each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating to the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xii. the Auction Bidders shall have the right to make additional modifications to their Transaction Agreement or Stalking Horse Agreement, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of any Stalking Horse Agreement for the Assets that are the subject of the bids, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for in the Bidding Procedures;

xiii.     the Debtors shall have the right to request any additional financial information that will allow the Debtors to make a reasonable determination, in consultation with the Consultation Parties, as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Transaction Agreement or any Stalking Horse Agreement, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xiv.     upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest and best from among the Qualifying Bids submitted at the Auction (the "**Successful Bid**").  The bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the purchaser as set forth in the Transaction Agreement or any Stalking Horse Agreement, or the equivalent of a Plan bid, as applicable.  The Debtors may, in their sole discretion, designate a Back-Up Bid or Bids (and the corresponding Back-Up Bidder or Bidders) to purchase the Assets in the event that a Successful Bidder does not close a Sale; and

xv.     prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BID SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL THE TIME PERIOD SPECIFIED IN SECTION 6(D) OF THE BIDDING PROCEDURES.  EACH QUALIFYING BID  THAT IS NOT THE SUCCESSFUL BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING**

(e)     **Sale Hearing**:  If an Auction is held, the Successful Bid and any Back-Up for each Property will be subject to approval by the Court.  The Sale Hearing to approve the Successful Bid(s) and any Back-Up Bid(s) or the Stalking Horse Agreement(s) shall take place on **March 30, 2017 at 10:00 a.m. (ET)**.  The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing or by filing a notice on the docket of the Debtors' chapter 11 cases.

(f)     **Backup Bidder**:  Notwithstanding any of the foregoing, in the event that a

Successful Bid proposes a Sale (rather than a Plan) and the Successful Bidder fails to close the applicable Sale within fifteen (15) days after the Court enters and order approving of the Successful Bid by (or such date as may be extended by the Debtors in consultation with the Consultation Parties), the Back-Up Bid for that Sale will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors will be authorized, but not directed, to immediately close that Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

(g)    **Return of Deposits**:  All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or Back-Up Bidders for any Sale no later than three (3) business days following the closing of the Sale.  The deposit of a Back-Up Bidder shall be returned within three (3) business days of the closing of the applicable Sale to the Successful Bidder; the deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale.  If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Transaction Agreement or any Stalking Horse Agreement, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

(h)    **Reservation of Rights**.  Notwithstanding any of the foregoing, the Debtors and their estates reserve the right to, after consultation with the Consultation Parties, modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, allow for bidding on only a portion of the Assets and not all of them, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn or cancel the Sale Hearing.  Additionally, the Debtors, in consultation with the Consultation Parties, have the right to terminate the sale and auction process with respect to any or all of the Assets at any time.

### NOTICE PROCEDURES FOR THE SALE,
### BIDDING PROCEDURES, AUCTION, AND SALE HEARING

13.    The Debtors also request approval of the sale notice (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**. Within five (5) days of entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by first class mail on: (1) the U.S. Trustee; (2) counsel to any official committee appointed in these

cases; (3) counsel to Wells Fargo Bank, N.A., in its capacity as agent; (4) counsel to Medley Capital Corporation, in its capacity as agent; (5) all parties known by the Debtors to assert a lien on any of the Assets; (6) all persons known or reasonably believed to have asserted an interest in any of the Assets; (7) all non-Debtor parties to any of the Assumed Contracts; (8) all persons known or reasonably believed to have expressed an interest in acquiring all or any portion of the Assets or making an equity or other investment in the Debtors within the twelve (12) months prior to the Petition Date; (9) the Office of the United States Attorney for the District of Delaware; (10) the Office of the Attorney General in each state in which the Debtors operate; (11) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (12) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (13) all regulatory authorities having jurisdiction over any of the Assets; (14) the Securities and Exchange Commission; (16) the United States Attorney General/Antitrust Division of Department of Justice; (17) the United States Environmental Protection Agency and similar state agencies for each state in which the Assets are located; and (16) all other parties that had filed a notice of appearance and demand for service of papers in these chapter 11 cases as of the date of service.  In addition, the Debtors will serve the Sale Notice on all of the Debtors' known creditors, investors, and equity holders (for whom identifying information and addresses are available to the Debtors).

14.    The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent, at http://www.omnimgt.com/unitedroadtowing.

15.    Not later than five (5) days after entry of this Order, the Debtors will cause the Sale Notice to be published once in the *Chicago Tribune*, once in the national edition of

either the *New York Times* or *Wall Street Journal,* and once in the local edition of newspapers in

Los Angeles, California, San Diego, California, Minneapolis, Minnesota, and Dallas, Texas.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

16.     To facilitate the Sale, the Debtors seek authority to potentially assume and

assign to any acquirer in a Sale the Assumed Contracts in accordance with the Assumption and

Assignment Procedures.   The Assumption and Assignment Procedures are detailed in the

Bidding Procedures Order and they include the following key provisions:

- The identification of contracts that could potentially be assumed or assumed and assigned and the proposed Cure Amount.

- Providing fourteen (14) days for counterparties to the Assumed Contracts (each a "**Counterparty**") to object to the Debtors' ability to assume and/or assign the contract and proposed Cure Amount, excluding adequate assurance of future performance of the applicable Debtor or assignee.

- Notice after the Auction of the proposed assignee with at least approximately three (3) business days to object to adequate assurance of future performance of the assuming Debtor or its proposed assignee, as applicable.

- Failure to timely object to the proposed assumption, assignment (if applicable), and Cure Amount, will result in the Counterparty being deemed to consent to the proposed assumption or assumption and assignment and Cure Amount.

## RELIEF REQUESTED

17.     By this Motion, the Debtors seek entry of: (a) the Bidding Procedures

Order, (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bidding

Procedures and the Assumption and Assignment Procedures, and the form and manner of notice

thereof, and (iii) granting related relief; and (b) one or more Sale Orders, (i) authorizing and

approving the Debtors' entry into the Transaction Agreement(s) with Successful Bidder(s),

Back-Up Bidder(s), or Stalking Horse Purchaser(s), as applicable, (ii) authorizing and approving

the Sale(s), free and clear of all Encumbrances, (iii) authorizing and approving the assumption

and assignment of the Assumed Contacts in connection with such Sale(s); and (iv) granting related relief.

18.    The Bidding Procedures Order, if approved, will establish the following timeline, which the Debtors believe is appropriate to arrive at a value maximizing transaction:

| Milestones | Proposed Dates |
|---|---|
| Bidding Procedures Hearing | March 6, 2017 |
| Deadline to serve Sale Notice, including to potential purchasers by overnight mail | March 8, 2017 |
| Deadline to serve Assumption Notice | March 8, 2017 |
| Deadline to object to Sale (other than with respect to assumption and assignment) | March 23, 2017 at 4:00 p.m. (ET) |
| Deadline to object to Assumption Notice (other than adequate assurance) | March 23, 2017 at 4:00 p.m. (ET) |
| Bid Deadline | March 22, 2017 at 5:00 p.m. (ET) |
| Auction commence | March 27, 2017 at 10:00 a.m. (ET) |
| Deadline to object to adequate assurance | March 29, 2017 at 4:00 p.m. (ET) |
| Sale Hearing | March 30, 2017 |
| Outside Closing Date | April 14, 2017 [15 days after entry of the applicable Sale Order][7] |

19.    The Debtors respectfully submit that the timeline set forth in the Bidding Procedures is reasonable and necessary under the circumstances of these cases.  Such timeline provides a nearly seven week period between the filing of this Motion and the Bid Deadline, which will allow parties in interest sufficient time to formulate bids.  Further, the proposed timeline for the sale and marketing process was heavily negotiated as part of the Debtors'

---

[7]    To the extent that a Successful Bidder proposes a transaction that will be implemented through a chapter 11 plan, this deadline will be extended until the date that is 120 days from approval of such Successful Bid to provide for confirmation of such a plan.

recently obtained DIP Facility and satisfying the milestones herein will avoid the Debtors defaulting under the DIP Facility.

20.     Finally, the Debtors will also promptly make the disclosures required under Bankruptcy Rules 6004 and Local Rule 6004-1(b) with respect to any definitive Transaction Agreement the Debtors enter into, including any Stalking Horse Agreement.

## BASIS FOR RELIEF

**A.**     **Sufficient  Business Justification Exists for Consummation of the Sale Under Bankruptcy Code Sections 105(a) and 363(b)**

21.     Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor.  *See*, *e.g.*, *Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.); In re Delaware &  Hudson Ry. Co.,* 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

22.     The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

23.     The Debtors submit that their decision to market and sell their Assets, either through a section 363 sale or another transaction (including transferring assets or equity in a reorganized Debtor (or Debtors) under a Plan), represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  As discussed above and in the First Day Affidavit, as a result of lacking capital and decreases in the Debtors' net earnings and cash flow, among other reasons, the Debtors are unable to continue as a going concern under their existing capital structure, thereby necessitating a comprehensive restructuring of the Debtors and their assets.  The Debtors submit that a sale of their Assets will effectuate this necessary change.

24.     The Debtors must now seek to obtain the highest and best value for their Assets so that they can unlock and distribute to their stakeholders the value that they believe is inherent in the Assets.  The Debtors are committed to considering all rational and viable proposals in search of that goal.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest and best value available for the Assets by allowing the market to set the purchase price of the Assets (or test any purchase price that may be agreed to under a Stalking Horse Agreement).  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the

consideration to be paid by any Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

25.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

26.     The Sale conducted in accordance with the Bidding Procedures will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries to such estates, the Debtors' creditors, and all parties in interest.  The Debtors submit that ample business justification exists for the consummation of the Sale and, therefore, request that this Court approve such Sale.

**B.      The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Bankruptcy Code Section 363(f)**

27.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

28.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).  Furthermore, a debtor possesses broad authority to sell assets free and clear of liens.  *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

29.    The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell their Assets free and clear of any and all Encumbrances (except as otherwise expressly set forth in the Sale Order and a Stalking Horse Agreement or Transaction Agreement with a Successful Bidder, as applicable) in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are, or will be, satisfied with respect to any Sale.  In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Debtors' prepetition secured lenders and postpetition lenders are secured by, among other things, the Assets and such proceeds will be paid to the DIP Agent at closing of the Sale, subject to any requirement imposed under the DIP Order with respect to the payment of proceeds of the Sale.  Indeed, implementation of the sale process has been supported by the

Prepetition ABL Lenders as it is an express condition of the DIP Facility to which they have consented.

30.    The Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).  The Debtors will serve the Sale Notice on all parties known to assert a lien, claim, or encumbrance against the Assets, so lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Lienholders that are on notice of, and do not object to, a Sale should be deemed to have consented to that Sale. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  In the event of an objection from a secured lender to the Debtors' requested section 363(f) finding, the Debtors reserve the right to demonstrate that the other provisions of section 363(f) have been satisfied.

## C.    The Sale Should Be Subject to the Protections of Section 363(m)

31.    Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  *See* 11 U.S.C. § 363(m).  In approving the Sale free and clear of Encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets

purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.  *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

**D.     The Court Should Approve the Bidding Procedures**

32.     The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

33.     The Debtors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and creditors.  The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest and best possible consideration for the Assets.  Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare any bids received in order to determine which bids are

in the best interests of the Debtors' estates and their creditors.  Moreover, the timetable set forth

in the Bidding Procedures extends until the latest dates under the DIP Facility for the Debtors to

complete the auction and sale process, so the Debtors submit that this timetable is fair and

reasonable in light of the Debtors' current circumstances.

34.      The Debtors submit that the forgoing procedures are fair, transparent and

will derive the highest and best bids for the Assets.  Therefore, the Debtors request that the Court

approve the Bidding Procedures, including the dates established thereby for the Auction and the

Sale Hearing.

**E.      The Assumption and Assignment of the Assumed Contracts in Connection with the
Sale Satisfies Bankruptcy Code Section 365**

35.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession, "subject to the court's approval, may assume or reject any executory

contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Courts have held that "[t]he

purpose behind allowing the assumption or rejection of executory contracts is to permit the

trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and

abandon burdensome property.'"  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion

Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶

365.01[1] (15th ed. 1993)).

36.      As set forth above, the Sales should provide significant benefits to the

Debtors' estates and maximize the value of the Assets.  To that end, permitting the Debtors to

assume and assign the Assumed Contracts should provide the Debtors with maximum flexibility

to enter into a transaction that will obtain the greatest benefits from any Sale.  In addition, under

section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or

lease "relieves the trustee and the estate from any liability for any breach of such contract or

lease occurring after such assignment." 11 U.S.C. § 365(k).  Thus, following an assignment of any Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

37.    Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with this Court and serve on each Counterparty to an Assumed Contract an Assumption Notice that indicates the proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Cure Amount will be a condition to the Debtors' assumption and assignment of any Assumed Contract.

38.    Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same);  *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr.

N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

39.    Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

40.    Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  In order for its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "**Adequate Assurance Information**"), including: (a) the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such Qualifying Bidder; (b) a contact person for the proposed assignee that the applicable Counterparty may directly contact in connection with the adequate assurance of future performance; and (c) the actual assignee's identity.  To the extent available, the Adequate Assurance Information may also include: (x) a corporate organization chart or similar disclosure identifying ownership and control of the proposed assignee; and (y) financial statements, tax returns and annual reports.  Furthermore, given that the Debtors and/or Successful Bidder(s) will have the opportunity to submit evidence that they have satisfied all requirements for the assumption and assignment of the Assumed Contracts at

the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.[8]

41.    Therefore, the Debtors respectfully request that the Court (a) approve the proposed assumption and assignment of the Assumed Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[9]

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)

42.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

43.    As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale would be detrimental to the Debtors, their creditors and estates, and would impair the Debtors' ability to take advantage of the substantial cost-savings that can be achieved by an expeditious closing of the Sale.

---

[8]    The Debtors shall also provide the Adequate Assurance Information to any Counterparty that submits a written request to receive the Adequate Assurance Information by email that specifically identifies the Property for which such Counterparty would like to receive Adequate Assurance Information in accordance with the terms of the Bidding Procedure Order, and agrees to be bound by the confidentiality provisions set forth in the Bidding Procedures Order.

[9]    Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

44.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

## NOTICE

45.     Notice of this Motion has been provided to:  (a) the U.S. Trustee; (b) the first and second lien lenders, and their respective counsel; (c) the DIP Lender; (d) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (e) all applicable federal, state and local taxing and regulatory authorities having jurisdiction over the Assets; (f) all parties known to the Debtors who hold any liens or security interest in the Debtors' assets who have filed UCC-1 financing statements against the Debtors, or who, to the Debtors' knowledge, have asserted any liens on any of the Debtors' assets; and (h) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## NO PRIOR REQUEST

46.     The Debtors have not previously sought the relief requested herein from this or any other Court.

*[remainder of page intentionally left blank]*

## <u>CONCLUSION</u>

WHEREFORE, the Debtors request entry of the Bidding Procedures Order granting the relief requested herein and such other and further relief as is just and proper.

Dated: February 10, 2017
      Wilmington, Delaware

YOUNG CONAWAY STARGATT
& TAYLOR, LLP


/s/ *Ryan M. Bartley*
M. Blake Cleary (No. 3614)
Ryan M. Bartley (No. 4985)
Andrew Magaziner (No. 5426)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

WINSTON & STRAWN LLP
Daniel J. McGuire
(admitted *pro hac vice*)
Grace D. D'Arcy
(admitted *pro hac vice*)
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312) 558-5700


Carrie V. Hardman
(admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700


*Proposed Counsel for Debtors and
Debtors in Possession*